# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## SOUTHERN DIVISION

DOREEN MULLADY,

Plaintiffs 2-142 (Exhibit A),

    *Plaintiffs,*

v.

OFFICE OF MANAGEMENT AND BUDGET
725 17th Street, NW, Washington, DC 20503;

RUSSELL VOUGHT, in his official capacities
as Director of the Office of Management and Budget and
as Acting Administrator of U.S. Agency for International Development
c/o Office of Management and Budget;

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW, Washington, DC 20415;

SCOTT KUPOR, in his official capacity
as Director of the Office of Personnel Management;
c/o Office of Personnel Management;

MERIT SYSTEMS PROTECTION BOARD
1615 M Street, NW, Washington, DC 20419

HENRY J. KERNER, in his official capacity
as Acting Chair of the Merit Systems Protection Board
c/o: Merit Systems Protection Board;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., NW, Washington, DC 20530;

PAMELA BONDI, in her official capacity
as Attorney General of the United States
c/o: U.S. Department of Justice;

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue SW, Washington, DC 20201;

Case No.: _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

ROBERT F. KENNEDY, JR., in his official capacity as
Secretary of the Department of Health and Human Services,
c/o:  Department of Health and Human Services;

U.S. DEPARTMENT OF STATE
2201 C Street NW, Washington, DC 20520;

MARCO RUBIO, in his official capacity
as Secretary of State,
c/o: U.S. Department of State;

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, SW, Washington, D.C. 20202;

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE, Washington, DC 20528-0525;

KRISTI NOEM, in her official capacity
as Secretary of the U.S. Department of Homeland Security
c/o: U.S. Department of Homeland Security; and

LINDA MCMAHON, in her official capacity
as Secretary of Education,
c/o: U.S. Department of Education.

    *Defendants*.

## INTRODUCTION

1.      This case seeks to end the ongoing Constitutional and statutory violations that have cost Plaintiffs their jobs, their pay, their healthcare, and their professional standing. Plaintiffs, all former federal employees, lost their jobs as a result of actions taken by the Trump Administration labeled as reductions in force ("RIFs"). These actions, which more closely resemble firings for cause than RIFs, deprived Plaintiffs of protected property and liberty interests with no real notice, no meaningful opportunity to be heard, and none of the pre-deprivation or post-deprivation process required by the Constitution and federal regulations.

2.      Plaintiffs have all appealed their so-called RIF actions to the Merit Systems Protection Board ("MSPB"), but the appeal process only compounds their suffering because the

MSPB's statutory independence has been deliberately eliminated by the Administration and its processes and procedures have been broken to the point where any appeals to it are futile. Requiring Plaintiffs to appeal to the MSPB is therefore itself a Due Process violation, and arbitrary and capricious agency action as well.

3.      In addition to these ongoing constitutional and statutory violations, in conducting these RIFs, Defendants compiled, shared, and relied upon hopelessly inaccurate and incomplete information, which directly led to Plaintiffs' terminations. Instead of taking steps to verify the contents of the relevant records and correct widespread systemic inaccuracies, Defendants used them to fire Plaintiffs and thousands of other employees — all in violation of the Privacy Act.

4.      Plaintiffs seek preliminary and permanent injunctive relief to restore them to their positions and to prevent their being forced to endure a futile MSPB appeal system that violates their Due Process rights. Plaintiffs have suffered concrete, ongoing injuries—including ongoing violations of their Constitutional rights, loss of pay, loss of federal benefits, loss of service credit, and reputational harm—which are directly traceable to Defendants' unlawful actions and redressable through declaratory and injunctive relief.

5.      Plaintiffs likewise seek damages under the Privacy Act.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Due Process Clause, the Administrative Procedure Act ("APA") and the Privacy Act.

7.      This Court has jurisdiction under 28 U.S.C. §§1361 and 2201–2202 (Declaratory Judgment Act), and 5 U.S.C. §§701–706 (APA).

8.      Venue is proper in this District under 28 U.S.C. §1391(e) because at least twenty-eight Plaintiffs reside in this District, Defendants are United States agencies or officers acting in their official capacities, and a substantial portion of the injuries caused by Defendants' actions occur within this District and continue to affect Plaintiffs here. Venue is also proper under the Privacy Act because a complainant resides here. 5 U.S.C. § 552a(g)(5)

### PARTIES

9.      Plaintiffs are career federal employees who were separated pursuant to employment actions labeled RIFs and have appealed their RIFs to the MSPB. Plaintiffs reside in multiple states, including at least twenty-eight Plaintiffs domiciled within the State of Maryland.

10.     Plaintiffs listed in Exhibit A as DOJ-ATF were employed by the Department of Justice ("DOJ"), Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in ATF's Office of Diversity, Equity, and Inclusion ("ODEI", collectively the "ODEI Plaintiffs"). They received RIF notices on February 6, 2025, were separated on April 8, 2025, and timely appealed to the MSPB.

11.     Plaintiff listed in Exhibit A as HHS was employed by the Department of Health and Human Services ("HHS"), Food and Drug Administration ("FDA") (also the "HHS Plaintiff"). The HHS Plaintiff received his RIF notice on March 21, 2025, was separated on May 23, 2025, and timely appealed to the MSPB.

12.     Plaintiffs listed in Exhibit A as State were all employed by the Department of State ("State", collectively the "State Plaintiffs"). All State Plaintiffs except number 53 on Exhibit A received their RIF notices on July 11, 2025, were separated on September 11, 2025, and timely appealed to the MSPB. State Plaintiff number 53 is a Foreign Service Officer ("FSO") who received his RIF notice on July 11, 2025, was separated from State via an

involuntary resignation due to the pending RIF on November 16, 2025, and timely appealed to the MSPB.

13.    Plaintiffs listed in Exhibit A as Education were all employed by the Department of Education ("ED", collectively the "ED Plaintiffs"). They received RIF notices on April 10, 2025, were separated on August 1, 2025, and all timely appealed to the MSPB.

14.    Plaintiffs listed in Exhibit A as DHS were all employed by the Department of Homeland Security ("DHS") Office of Civil Rights and Civil Liberties ("CRCL", collectively, the CRCL Plaintiffs). They received RIF notices on March 21, 2025, were separated May 23, 2025, and all timely appealed to the MSPB.

15.    Plaintiffs listed in Exhibit A as USAID were all employed by the U.S. Agency for International Development ("USAID") as FSOs (collectively, "USAID Plaintiffs"). They received RIF notices on March 27, 2025, were separated on July 1, 2025, or September 2, 2025, and all timely appealed to the MSPB.

16.    Defendant Office of Management and Budget ("OMB") is an agency in the Executive Office of the President and plays a central role in conducting RIFs by providing guidance agencies are required to follow, directing agencies to submit Agency Reorganization Plans ("ARRPs"), and identifying positions for elimination. By Executive Order ("EO"), among other means, OMB has significant control over the policies and budget of Defendant MSPB.

17.    Defendant Russell Vought is the Director of OMB and the Acting Administrator of U.S. Agency for International Development ("USAID") and is named in his official capacities.

18.    Defendant Office of Personnel Management ("OPM") serves as the chief human resources agency and personnel policy manager for the Federal Government. OPM provides

guidance on personnel matters, approves various aspects of agencies' RIF plans, and issues regulations under the Civil Service Reform Act.

19.    Defendant Scott Kupor is the Director of OPM and is named in his official capacity.

20.    Defendant MSPB is an agency within the Executive Branch responsible for hearing federal employee appeals of RIF actions.

21.    Defendant Henry J. Kerner is the Acting Chair of the MSPB and is named in his official capacity.

22.    Defendant DOJ separated Plaintiff employees through RIF actions. Specifically, the DOJ component of ATF separated ODEI Plaintiffs through RIF actions.

23.    Defendant Pamela Bondi is the Attorney General of the United States and is named in her official capacity.

24.    Defendant HHS separated the HHS Plaintiff through a RIF action.

25.    Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and is named in his official capacity.

26.    Defendant State separated State Plaintiffs through a RIF action.

27.    Defendant Marco Rubio is the United States Secretary of State and is named in his official capacity.

28.    Defendant ED separated ED Plaintiffs through RIF actions.

29.    Defendant Linda McMahon is the Secretary of Education and is named in her official capacity.

30.    Defendant DHS separated CRCL Plaintiffs through a RIF action.

31.    Defendant Kristi Noem is the Secretary of DHS and is named in her official capacity.

## THE CIVIL SERVICE REFORM ACT

32.    In 1978, Congress passed the Civil Service Reform Act ("CSRA") establishing the MSPB. 5 U.S.C. §§ 1201, et seq. Congress found that "Federal employees should receive appropriate protection through increasing the authority and powers of the Merit Systems Protection Board in processing hearings and appeals affecting Federal employees." Section 3 of the Civil Service Reform Act, PL 95-454, 92 Stat. 1111 (1978) ("Findings and Statement of Purpose"). Congress intended to create a "strong and independent" MSPB, one "insulated from the kind of political pressures that [had] led to violations of merit principles in the past" and "independent of any control or direction by the President." S. Rep. 95-969, at 6–7, 24.

33.    The CSRA also created a statutory process for a reduction in force—the mechanism through which the federal government may reduce positions within an agency. 5 U.S.C. §§ 3501–3504, 3595; 5 C.F.R. Part 351. Unlike a private-sector layoff, a RIF under the CSRA is not an at-will workforce tool. Congress imposed mandatory safeguards designed to protect employees and the public fisc, including defined competitive areas and competitive levels; retention registers and rankings based on tenure, service, veterans' preference, and performance; and advance notice requirements. Id.; MSPB Report to Congress, *Reduction in Force: The Evolving Ground Rules* 1 (1987).

34.    RIFs are conducted only for organizational purposes, including where there is: a lack of work; a shortage of funds; an insufficient personnel ceiling; reorganization; or a requirement for certain reclassifications of employees' positionS due to erosion of duties. 5

C.F.R. § 351.201(a)(2). RIFs cannot be used to separate employees for individual reasons, such as employee performance or conduct.

35.     OPM has issued regulations and guidance as to how RIFs should be conducted to ensure compliance with the CSRA. Specifically, the OPM regulations require that each agency "shall establish competitive areas in which employees compete for retention under this part." 5 C.F.R. § 351.402(a). The same regulation requires that:

> [a] competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and, except as provided in paragraph (e) of this section, it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency.

> 5 C.F.R. § 351.402(b).

Importantly, the regulations also establish that the "minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. 351.402(c).

36.     The CSRA does not provide for a specific appeal mechanism for a RIF. Instead, the MSPB's role in hearing RIF challenges arises solely from RIF regulations promulgated by OPM under its authority in 5 U.S.C. § 3502, which mandates OPM "prescribe regulations for the release of competing employees in a reduction in force," giving due effect to prioritizing retention of employees based on factors such as performance and length of service. *See* Fed. Register Notice. Pursuant to this authority, OPM regulations provide that an "employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901.

37.     RIFs for FSOs are not governed by the CSRA. Instead, they are governed by the Foreign Service Act. 22 U.S. Code § 4010a. The standards for RIFs set out in the Foreign Service Act are similar to those for Civil Servants, with the Secretary of State required to consider organizational changes, employee knowledge and skills, tenure of employment,

performance, and veteran's preference. *Id.* The Foreign Service Act provides for MSPB appeal rights for FSOs. *Id.*

## FACTUAL ALLEGATIONS

38.    Since taking office on January 20, 2025, President Donald J. Trump – through executive branch agencies and officials – has issued unprecedented personnel actions to reduce the size of the federal government, including through unlawful means, and has drastically reshaped the appeals process available to affected employees.

39.    The President has issued numerous official directives aimed at reducing or eliminating huge swaths of the federal government, including the elimination of entire agencies. The White House: Presidential Actions: Hiring Freeze (Jan. 20, 2025); Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing); Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy); Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy); Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and Communities); Stewart Patrick, Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy, Carnegie Endowment for Int'l Peace (Feb. 4, 2025), https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why/; Hugh Son and Daniel Arkin, Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind down agency, employees say, NBC News (Feb. 28, 2025), https://perma.cc/54PP-7C44.

40.     As it began firing federal workers, Administration officials repeatedly maligned them specifically targeting federal employees being terminated by the Administration through RIFs, often focusing on their perception of these employees' political beliefs. For example, in announcing the dismantling of the Department of Education, White House Deputy Chief of Staff Stephen Miller stated on Fox News that "the Department of Education here in Washington, D.C., is overwhelmingly staffed by radical left Marxist bureaucrats, who are in every way hostile to Western Civilization, hostile to American interests, and hostile to our founding documents and culture." *See* FOX News clip (Mar. 20, 2025), https://perma.cc/4JNN-EE5Z. Administration officials have made disparaging and stigmatizing statements about all Plaintiffs to this action.

41.     To effectuate the wholesale firings of federal workers while giving such firings a sheen of legality, the Administration has labeled the terminations as RIFs and cited to the RIF statutes and regulations in the documents provided to employees related to their removal. OMB and OPM issued guidance and provide oversight of these actions. *See, e.g.*, OMB & OPM, *Mem. Re: Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), available at https://perma.cc/TKZ9-9YKT.

42.     In implementing these purported RIFs, the Administration failed to follow RIF regulations, often with the goal of eliminating certain federal employees instead of positions and of denying federal employees their retention rights. As set forth in further detail below, at no time were Plaintiffs given a meaningful opportunity to contest their RIFs or stigmatizing statements or correct the material legal, procedural, and factual errors giving rise to their terminations.

## PLAINTIFFS' RIF ACTIONS

43.    Each Plaintiff was terminated in a process labeled a RIF and each Plaintiff has appealed their termination to the MSPB. These RIF actions were rife with legal, procedural, and factual errors, and as a result of structural deficiencies in the process and deliberate decisions by the Administration, Plaintiffs have had no meaningful opportunity to be heard on those errors.

44.    The purported RIFs were preceded or accompanied by Administration officials smearing Plaintiffs' performance and accusing them of wrongdoing. The RIFs occurred only after the Administration manipulated competitive areas to ensure Plaintiffs – as opposed to other often less experienced employees – would be fired without triggering Plaintiffs' retention rights.

The ODEI RIF

45.    The ODEI Plaintiffs worked at ATF prior to the creation of its ODEI. They were transferred to ATF's ODEI pursuant to a Biden Administration directive. ODEI Plaintiffs' duties included recruiting special agents and other personnel for ATF, duties that existed before the creation of ODEI within ATF and work that is still being performed at ATF today.

46.    On his first day in office, President Trump issued EO 14151—Ending Radical and Wasteful Government DEI Programs and Preferencing. *See* https://perma.cc/L79B-5MJP. In that EO, the President claimed, among other things, that the Biden Administration's DEI plans "demonstrated immense public waste and shameful discrimination," and ordered each agency to:

> (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

47.    Although the Executive Order speaks of ending offices, at a press briefing, Deputy Chief of Staff Stephen Miller explicitly admitted the Administration's claims about the

illegality of DEI programs extended to federal employees in DEI offices and specifically accused them of violating the law, stating that:

> [...] this nation has been plagued and crippled by illegal discrimination: diversity, equity, and inclusion policies. It has strangled our economy. It had undermined public safety. It made every aspect of life more difficult, more painful, and less safe. He has ended all DEI across the federal government. He has terminated all federal workers involved in promulgating these unlawful policies.

> *See* https://perma.cc/5TBH-4CS8.

48.     On or about January 21, 2025, the Acting Head of Defendant OPM issued "Initial Guidance Regarding DEIA Executive Orders" to all agencies directing them to close DEI offices, place all DEI personnel on administrative leave, and to submit "a written plan for executing a reduction-in-force action regarding the employees who work in a DEIA office" by January 31, 2025. *See* https://perma.cc/YZ9A-NEMH. On January 22, 2025, the ODEI Plaintiffs at ATF were put on administrative leave by Defendant DOJ.

49.     On January 24, 2025, Charles Ezell, then-acting Director of OPM, issued "Guidance Regarding RIFs of DEIA Offices" to all agencies. That Guidance stated:

> OPM's initial guidance required agencies to submit written plans no later than January 31, 2025, for executing a reduction-in-force (RIF) action regarding the employees who work in a DEIA office. However, agencies can and should begin issuing RIF notices to employees of DEIA offices now. Agencies are reminded to define the competitive area solely in terms of the DEIA office where the employees worked.

> *See* 5 C.F.R. § 351.402. *See* https://perma.cc/T9C8-VL9L.

By limiting the competitive area to DEIA offices and directing the liquidation of the entire competitive area through the RIF process, OPM ensured that those employees would not have retention rights to which they would be otherwise entitled by regulation. Essentially, OPM was directing agencies not only to eliminate the DEI positions, but also to fire all DEI employees by defining the competitive so narrowly as to ensure the agency had no other option. OPM issued

this guidance[1] even though many DEI offices, including ATF's, did not meet the criteria to be a standalone "competitive area" pursuant to OPM's own regulation, 5 C.F.R. 351.402(c), and even though under OPM regulations the competitive area is supposed to be established by the agency conducting the RIF and not OPM, *see, e.g.,* 5 C.F.R. 351.402.

50.     On or about January 29, 2025, ATF developed a RIF plan for its ODEI that would reassign the ODEI Plaintiffs to "mission critical functions" within ATF. ATF was an agency of approximately 5,000 employees and had been in a hiring freeze for more than a year. The number of ODEI employees to be reassigned was only seven, all of whom had come to ODEI from other ATF offices. ATF provided its plan to DOJ which forwarded the proposal to OPM.

51.     On February 5, 2025, OPM issued "Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives" which, among other things, provided that "To promote a federal workplace committed to equal dignity and respect, and to avoid expending precious taxpayer resources on wasteful and discriminatory programs, agencies should terminate all illegal DEIA initiatives." *See* https://perma.cc/459P-T7JF. Defendant DOJ instructed ATF to issue its RIF notices to ODEI Plaintiffs "immediately".

52.     On February 6, 2025, despite having developed a plan to reassign the ODEI Plaintiffs to "mission critical functions," ATF issued RIF notices to the ODEI Plaintiffs that indicated they would be separated from their federal positions on April 7, 2025. The decision to abandon that plan and terminate those Plaintiffs was dictated to ATF by OPM through DOJ. No opportunity for a hearing was provided prior to separation. Although the RIF notices call the action a "liquidation", they do not cite to 5 C.F.R. § 351.605

---

[1] Although labeled as "Guidance," OPM used this memorandum to direct and instruct agencies, stating that "each agency, department, or commission head *shall take action* to terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions within sixty days... Agencies are *reminded to define* the competitive area solely in terms of the DEIA office where the employees worked." (Emphasis supplied).

53.    The ODEI Plaintiffs were separated on April 8, 2025; a hearing is scheduled.

The USAID RIF

54.    Early in the Administration, the Department of Government Efficiency ("DOGE") was directed by Elon Musk to shut down USAID offices. Musk recounted on the morning of February 3 that "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down." Jennifer Hansler et al., Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down', CNN (Feb. 3, 2025), available at https://perma.cc/ZMW6-UQFM.  Upon information and belief, as part of this shutdown, DOGE gained access to USAID information technology systems and systems of records, including employee records.

55.    At the same time, the Administration began repeated attacks on USAID employees that continue to this day and were often quite personal. For example, on February 11, 2025, in a joint press conference with President Trump, Mr. Musk said, "there are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth, uh, while 45 in that position, which is what happened at USAID . . . ." The only way for Mr. Musk to have known an employee's reported net worth would be by accessing federal government employment records.

56.    Musk repeatedly posted about USAID on X.com and X Spaces, saying, among other things, USAID was "incredibly politically partisan" and has supported "radically left causes throughout the world including things that are anti-American."  Similarly, White House Deputy Chief of Staff Stephen Miller claimed that "98% of the agency's staff donated to former Vice President Kamala Harris or other Democratic candidates in the November election." USAID Controversy Explained: Why Musk, Trump Is Attacking Foreign Aid Agency.

57.     On February 23, 2025, USAID Plaintiffs were issued RIF notices. Then issued new RIF notices on March 27, 2025. Some USAID Plaintiffs received notices with a separation date of July 1, 2025, and others September 2, 2025. Regardless of separation date, RIF notices were riddled with errors, including containing the wrong service computation dates ("SCDs") and/or missing key information like performance ratings.

58.     USAID was shut down, but not all USAID personnel were separated from federal service. As part of the transfer of USAID work to the Department of State, State created Limited Non-Career Appointments (LNAs) to handle the work and portfolios being transferred from USAID to State. This system allowed the Administration to put whoever they wanted in the new LNA positions at State in a non-competitive process without regard for the RIF requirements. Indeed, the process did not even follow the few rules established by the State Department and shared with USAID personnel for LNA selection. The result was the Administration effectively chose who to keep among USAID personnel with no regard for retention registers or other requirements. Individuals with less experience and qualifications were selected for LNA positions over USAID Plaintiffs who were more qualified and were interested in such positions. These USAID LNA personnel often replaced State employees who were targeted and identified for a RIF action. Virtually all of the USAID LNAs have since been converted to permanent State FSO positions. Thus, by using the LNA process and disregarding the legal requirements for a RIF, Defendant Rubio and other members of the Administration were able to target individuals at USAID and State for removal via RIF.

59.     On or about August 29, 2025, Defendant Rubio put Defendant Vought in charge of "closing out" USAID. Truth Details | Truth Social

60.     USAID Plaintiffs were separated on July 1, 2025, or September 2, 2025. Few, if any, USAID Plaintiffs have had any meaningful progress in their MSPB appeals.

The HHS RIF

61.     On April 1, 2025, HHS notified thousands of federal workers that they were being terminated. HHS had shared personnel records with the U.S. DOGE Service ("DOGE"), OPM, and OMB, and the agencies relied on records that they knew were inaccurate to make adverse decisions affecting 10,000 employees. Those employees received notifications that they were going to be removed through a RIF and were immediately placed on administrative leave and stripped of all credentials or access, long before any legitimate RIF process or records analysis took place, if it ever did.

62.     Responding to shock from industries regulated by HHS, a spokesperson for HHS reported to Politico and other media that "to the extent there are errors, *it is because the data collected by HHS's multiple, siloed HR divisions is inaccurate.*" *A cruel April Fool's joke': HHS layoffs characterized by confusion, errors*, Politico, Rebecca Pifer Pardun, April 2, 2025, available at https://perma.cc/C89K-D36G.

63.     Defendant Secretary of Health and Human Services, Robert F. Kennedy, Jr., clarified his justification for announcing — and deciding to make the cuts and moving forward rapidly with the error-ridden notification — during one interview, saying, HHS could not slow down to fix errors because doing so "takes too long and you lose political momentum." There would be "casualties." https://www.youtube.com/watch?v=o2U0csKvqMY

64.     Indeed, according to Defendant Kennedy, "Personnel that should not have been cut, were cut." and "The part of that, DOGE -- we talked about this from the beginning -- is we're going to do 80% cuts but 20% of those are going to have to be reinstalled because we'll make

16

mistakes." *RFK Jr. announces HHS reinstating some programs, employees cut by mistake*, ABC News, Cheyenne Haslett, April 3, 2025, https://perma.cc/4Y63-JNWM.

65.     Less than two weeks after the initial [pre-] RIF notifications went out to them, Secretary Kennedy had his initial meeting with FDA employees. At that meeting, the Secretary accused FDA employees of being "sock puppet[s]" for industry. *See* https://perma.cc/DJW3-S3T9. This criticism of FDA employees by the Secretary was not new. Even before the 2024 election, Mr. Kennedy was targeting the FDA. For example, in October 2024, Kennedy posted to X that "FDA's war on public health is about to end...If you work for the FDA and are part of this corrupt system, I have two messages for you: 1. Preserve your records, and 2. Pack your bags." *See* https://perma.cc/M6BL-K5RG.

66.     The HHS Plaintiff had his competitive area manipulated so that he would be targeted for removal instead of others who scored below him in experience and performance for RIF retention. HHS deliberately refused to map Plaintiff's retention to his identified competitive area and instead carved out subcomponents to retain preferred employees instead of Plaintiff.

67.     The HHS Plaintiff was separated on July 14, 2025, and appealed to the MSPB. He has only received a September 30, 2025 Acknowledgement Order staying all deadlines and stating that, "The parties will be contacted with instructions concerning the adjudication of this appeal once the Board confirms the composition of any consolidation."

        <u>The Department of State RIF</u>

68.     In the summer of 2025, State commenced a RIF targeting civil service employees and FSOs perceived as politically troublesome. As with the other RIFs, the State RIF began with Administration officials disparaging State employees, including on the grounds of their alleged political beliefs and affiliations. For example, in announcing the reorganization, Secretary Marco

Rubio specifically targeted a group of offices known as the "J family," claiming they "provided a fertile environment for activists to redefine 'human rights' and 'democracy' and to pursue their projects at the taxpayer expense, even when they were in direct conflict with the goals of the Secretary, the President, and the American people." *See* https://perma.cc/3UWN-889Y. He went on to assert that the Bureau of Democracy, Human Rights, and Labor "became a platform for left-wing activists to wage vendettas against 'anti-woke' leaders" and that the Bureau of Population, Refugees, and Migration had "funneled millions of taxpayer dollars to international organizations and NGOs that facilitated mass migration around the world, including the invasion on our southern border." *Id.* Both offices were dismantled, their employees fired through a purported RIF, as their duties were transferred to other offices or otherwise continued.

69.     State deliberately manipulated its competitive areas to ensure these and other State Plaintiffs were terminated via the "RIF". Among other things, it expanded the number of its competitive areas from fewer than forty to approximately 1,500. Again, OPM regulations on the minimum size of a competitive area were repeatedly violated with some competitive areas consisting of a single employee.

70.     Civil servants who were separated in September 2025 commonly have seen job announcements for the same position description posted either for a permanent backfill or detail. The positions purportedly abolished by a RIF are still active at State. The duties previously performed by Plaintiffs are often required by statute or regulation. At least one office has scheduled replacements arriving for the individuals who were separated via RIF. When the supervisor asked to bring back the RIF'd personnel instead, the request was denied and they were told it would be new hires. Others learned that their duties are now being performed by other employees, despite not having had the opportunity to compete for those positions.

71.     In addition to the deliberate targeting of employees and offices, the State RIF was riddled with errors, relying upon inaccurate information, *e.g.*, employees were given the wrong SCDs or veterans' paperwork did not reflect their veteran status. State employees were provided with no contact to correct errors. When at least one employee went directly to human resources to try to fix his place on the retention register to note prior federal service, the human resources contact said that they had seen numerous errors with competitive groupings, but they were not going to be fixed, and State was not going to bring anyone back.

72.     At the MSPB, no progress has been made on the State Plaintiffs' RIF cases.

The Department of Education RIF

73.     On March 11, 2025—two weeks after mandating that all teleworking ED employees return to the office—Defendant ED directed all employees in the Washington D.C. metro area to leave work early, exit ED premises by 2:00 p.m., and not to report for work on March 12, 2025, due to unspecified security concerns. That evening, ED informed over 1,300 of its employees, including the ED Plaintiffs, that their positions would be eliminated due to a RIF, that a formal RIF notice would be forthcoming, and that they would be placed on administrative leave as of March 22, 2025. Immediately upon receipt of this "pre-RIF notice," the ED Plaintiffs' were blocked from entering ED facilities, and their access to the ED's systems and emails was stripped or severely curtailed.

*74.*     On March 11, 2025, as these employees were receiving their "pre-RIF notices," Secretary McMahon repeatedly described the employees subject to the RIF as "bureaucratic bloat," and claimed that ED had retained "all of the right people, the good people." Fox News, *Education secretary says department took first steps to eliminate 'bureaucratic bloat,"* https://www.foxnews.com/video/6369901522112.

75.    On March 12, 2025, responding to reporters from the Oval Office, President Trump stated that "Many of [the ED employees subject to the RIF] don't work at all. Many of them never showed up to work. We want to cut, but we want to cut the people that aren't working or not doing a good job. We're keeping the best people." Joseph Gedeon, *Education department slashed in half after Trump administration mass firings*, The Guardian, Mar. 12, 2025, https://perma.cc/Y899-D6ME.

76.    On or around April 10, 2025, Defendant ED issued RIF notices to the ED Plaintiffs informing them that they would be separated from ED on or around June 10, 2025.

77.    To implement this RIF, ED drastically reduced the size of its competitive areas. Until 2025, ED's competitive areas were generally coextensive with broad program office components, such as the Office of Postsecondary Education and the Office of General Counsel. However, immediately prior to the RIF, ED broke those competitive areas into much smaller competitive areas, many no larger than a single work unit, and almost all of which failed to meet the requirements of 5 C.F.R. 351.402(c). ED then proceeded by liquidating entire competitive areas, ensuring that employees in those competitive areas were blocked from any retention rights. Despite statements to the contrary, including in the formal RIF notices, ED refused to prepare a retention register. As a result, ED targeted specific employees, including the ED Plaintiffs, for removal by eliminating their positions through a liquidation RIF while their duties were transferred to other offices or agencies.

78.    The ED RIF was stayed through litigation in *State of New York v. McMahon*, 1:25-cv-10601 (D. Mass.), and ED Plaintiffs were ultimately separated through the RIF on August 1, 2025. ED Plaintiffs received no opportunity to be heard on selection mistakes or anything about the RIF prior to separation, nor were they provided any opportunity to defend themselves against

the very public charges made against them by the most senior Administration officials. As of the date of filing, the ED Plaintiffs' MSPB appeals have not progressed beyond the receipt of Acknowledgement Orders or Notices.

The Department of Homeland Security RIF

79.     In March 2025, DHS issued RIF notices to all non-SES employees in three offices: the CRCL, the CIS Ombudsman's Office ("CISOMB"), and the Office of Immigration Detention Ombudsman ("OIDO"). The DHS Plaintiffs worked in CRCL, were all separated through a process labeled a "RIF" by DHS, and all appealed those separations to the MSPB.

80.     As with the other RIF actions, DHS did not discuss the need for restructuring or downsizing, but rather alleged the employees were the problem. On the same day that DHS issued the RIF notices, DHS spokesperson Tricia McLaughlin explained the Administration's decision by stating, "These offices have obstructed immigration enforcement by adding bureaucratic hurdles and undermining [the department's] mission […] Rather than supporting law enforcement efforts, they often function as internal adversaries that slow down operations." *See* "Homeland Security makes cuts to civil rights and immigration oversight offices," NPR, March 21, 2025, available at https://perma.cc/2V2W-S53V. Months later, Administration officials continued making the same defamatory and stigmatizing claims about the Plaintiffs. *See* "Gutting of key US watchdog could pave way for grave immigration abuses, experts warn," *The Guardian,* November 30, 2025, available at https://perma.cc/56C4-77E5.

81.     On March 21, 2025, the CRCL Plaintiffs received a RIF notice by email. The notice stated that the CRCL was being dissolved and their position was being abolished. The transmittal email for the notice stated, "the RIF is being taken due to the reduction of all positions in your competitive area."

82.    The RIF notices also stated:

Staff of the OCHCO is available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. You are entitled to a copy of OPM's retention regulations found in 5 CFR Part 351, which will be provided to you upon request, and you may inspect the appropriate retention register through the OCHCO. You may obtain any information in writing by sending your request to OCHCO – RIF Team, email: workforceshapinghq@hq.dhs.gov.

Inquiries to this email requesting documents to which employees were entitled went unanswered.

83.    Although a DHS official admitted the RIF was a "liquidation", the liquidation provision of the RIF regulations was not cited in the RIF letter as required. 5 C.F.R. § 351.605. Defendant DHS then processed this employment action as a liquidation RIF, eliminating all positions in the identified competitive areas.

84.    As the Administration has acknowledged, much of CRCL's work is statutorily mandated. *See, e.g.*, 6 U.S.C. § 345. On April 24, 2025, three non-profits sued DHS for abolishing CRCL, CISOMB, and OIDO, arguing, among other things, that the action was unlawful because the dissolution of them flouted Congress's express statutory direction that these offices must exist and perform various functions. *Robert F. Kennedy Human Rights v. U.S. Department of Homeland Security*, Case No. 1:25-cv-01270, Dkt. No. 1 (D.D.C. April 24, 2025). In response to this lawsuit, DHS reversed its position and stated that "The Offices will continue to perform their statutorily mandated duties after the RIF takes place." *Id.*, Decl. of Ronald J. Sartini, Dkt. # 27-1 (D.D.C. May 18, 2025). Despite being on administrative leave when this occurred, the CRCL Plaintiffs were not reinstated. Instead, DHS undertook efforts to hire new personnel, including posting new positions on USAJobs.gov.

85.    After the CRCL Plaintiffs had been separated, Defendant DHS immediately began re-establishing the office with new personnel. DHS stated that, "[s]ince the Reduction-in-Force

took effect on Friday May 23, the Offices are free to create new positions and seek applicants.*"* *Id.,* Dkt. 39 (May 27, 2025).[2] Put plainly, DHS used the RIF processes not to eliminate the positions, but to eliminate the specific employees – the "internal adversaries" – in those positions. For example, on June 2, 2025, DHS published a job announcement for a Law Enforcement Specialist position with CRCL, and on June 18, 2025, DHS published a job announcement for an Investigator position with CRCL on USAJobs.gov.

86.    CRCL Plaintiffs were separated as of May 23, 2025; MSPB hearings are currently scheduled for April 30 and May 1, 2026.

<u>RIF Process</u>

87.    When conducting a RIF, agencies must establish and consider competitive areas, competitive levels, and retention registers; and apply tenure, service, veterans' preference, and performance rules. These steps are required to identify the employees who will be affected by the RIF and how they will be affected. Agencies must then issue written notices to affected employees that identify the specific action to be taken, the basis for that action, and its effective date. *See* 5 C.F.R. pt. 351; MSPB REPORT TO CONGRESS, REDUCTION IN FORCE: THE EVOLVING GROUND RULES 1 (1987).

88.    In several of the challenged RIFs, Defendants took concrete, adverse employment actions against Plaintiffs before completing, and in some cases before initiating, the analyses required to determine which employees would be released through a RIF. Those actions included notifying employees that their positions would be eliminated, placing them on administrative leave, revoking building and system access, and publicly criticizing the employees. These steps

---

[2] CRCL reportedly did rehire two former CRCL employees from the Security, Intelligence, and Information Policy ("SIIP") section as GS-13 investigators working on EEO issues and addressing complaints. This rehiring could not have been properly done through the RIF process because SIIP employees were not trained to handle this work, unlike other colleagues separated by RIF.

were taken prior to the completion of any retention registers, competitive-area analyses, or other processes described in the RIF notices themselves and required by RIF regulation.

89.    This sequence was explicit in the ED, USAID, HHS, and DHS RIFs. In those agencies, employees who would ultimately be separated were often notified of impending removal before the agencies completed any individualized assessment of competitive areas, retention standing, or assignment rights as required. In the Department of Education, employees were excluded from buildings and systems on the same day they received "pre-RIF" notices. At HHS, thousands of employees, including the HHS Plaintiff, were notified they would be affected by an upcoming RIF, but not noticed, and placed on administrative leave while agency leadership publicly acknowledged that the data underlying the selections was inaccurate and unreconciled. Entire DHS offices were notified and treated as eliminated, including the one employing the DHS Plaintiffs, as the agency continued to adjust its position on the continued existence and functions of those offices. USAID was officially "abolished" even though USAID employees were selected for LNA positions at State to continue the work being transferred to State.

90.    Other agencies' RIFs were equally flawed from the outset. In ATF's RIF of the ODEI Plaintiffs, the affected office and employees were identified, notified, and removed from active service before ATF had even finalized a RIF plan. Although ATF initially developed a plan that would have reassigned affected employees to other positions, that plan was later abandoned following direction from other Defendants. At State, the agency restructured and dramatically narrowed and multiplied its competitive areas before issuing RIF notices after identifying offices and categories of employees targeted for elimination largely based on their perceived political beliefs and then proceeded with selections that resulted in the separation of those employees.

91.     Plaintiffs' RIF notices were defective, containing misleading—if not outright false—statements, and omitting legally-required and material information. They relied on inaccurately defined competitive areas and levels and often contained other inaccurate information.

92.     For example, the ODEI Plaintiffs' RIF notices listed the competitive area as ATF's DEI Office and concluded by stating that "Based on the above criteria, you must be released from employment, and there is no appropriate or eligible position to which you may be reassigned in accordance with 5 C.F.R., Part 351, Subpart G." The notice stated this conclusion even though ODEI did not meet OPM regulations for the minimum size of a competitive area and even though ATF—with DOJ's approval—had identified other positions for which Plaintiffs were not only qualified but needed.

93.     Similarly, in the ED Plaintiffs' RIF notices, Defendant ED stated that the ED Plaintiffs would be released from their competitive levels, and that, based on applicable law and regulations, they "[did] not have an assignment right to another position in [their] competitive area," despite the fact that the competitive areas failed to meet the requirements of OPM regulations. The RIF notices also stated that "[t]o conduct the RIF, the Office of Human Resources (OHR) prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans' preference, length of Federal service and performance ratings." Defendant ED later stated that no retention register had been created, nor was one required, given that the RIFs were liquidation RIFs. Despite ED's admission that these were liquidation RIFs, the notices failed to cite the regulatory liquidation provisions, nor did they give the date that the liquidation would be completed as required by 5 C.F.R. § 351.605.

94.     The HHS Plaintiff's notice indicated that his competitive area was "DCBB" which corresponded to the entire Office of Management within FDA's Center for Biologics Evaluation and Research. Defendant HHS did not map Plaintiff's retention to this competitive area. Undisclosed in the notice is that HHS retained a subcomponent of Plaintiff's competitive area and Plaintiff was not considered for any position within that subcomponent, even though it was in his competitive area and had positions for which he was qualified.

95.     USAID Plaintiffs' notices claimed the RIF was to "restructure" USAID when it was being abolished and that the RIF was conducted at the "direction of USAID leadership" with no mention of DOGE or Elon Musk (who had bragged about putting USAID in a woodchipper). It stated the competitive area was "Foreign Service and Senior Foreign Service Worldwide" and that it was being abolished, without noting that some of the functions were being transferred to the State Department and some USAID personnel would be transferred as well.

96.     State's notices also included inaccurate or misleading statements such as "[t]he forthcoming reduction in force (RIF) action is necessary to better align the size, scope, and composition of the Department's domestic workforce with the foreign policy priorities of the Secretary and nation." It claimed that the employee would "be released from your competitive level and, based on your retention standing, you do not have an assignment right to another position in the competitive area." It also stated that "[t]his RIF was conducted by the Department by preparing retention registers which listed employees in retention standing order based on civil service tenure, veteran's preference, length of Federal service, and performance ratings." Other information in those notices was frequently wrong, incomplete or misleading. In fact, the retention registers that existed were difficult to access and rife with errors, and employees were given no meaningful opportunity to correct those errors.

The Administration's Control and Spoilage of the MSPB

97.     At the same time the Administration undertook massive firings across the government via RIF and otherwise, it also took steps to gain control of the MSPB.

98.     On February 8, 2025, the President removed MSPB Chair Cathy Harris. Ten days later, he issued EO 14215, asserting Presidential authority over independent agencies, including the MSPB. *See Ensuring Accountability for All Agencies*, Exec. Ord. 14215 (Feb. 18, 2025), available at https://perma.cc/U36U-89PB. The EO declares that the President's and Attorney General's opinions on questions of law are binding on all executive branch employees acting in their official capacities, explicitly including employees of independent agencies like the MSPB.

99.     The EO further directs Defendant Director of the OMB (who is now in charge of overseeing the closeout of USAID) to: establish performance standards and management objectives for independent agency heads; review agency obligations for consistency with Presidential policies and priorities; and adjust agency apportionments as necessary to advance those priorities, including by restricting the expenditure of appropriated funds. The EO also requires agency heads, including the MSPB Chair, to coordinate with the White House and to establish a White House liaison position. Consistent with the sweeping language of EO 14215, the Administration has asserted the President can fire any member of the MSPB because MSPB members assist the President in carrying out executive duties. The White House has asserted it has authority to control the adjudication of claims at the MSPB and to dismiss any MSPB employees who do not concur with the positions publicly or privately stated by the White House.

100.    The sheer volume of RIFs and other personnel actions by the Administration has also ensured that the MSPB is overwhelmed with a number of cases that it cannot timely handle.

101.    The MSPB historically has issued most initial decisions on appeals, including those challenging RIFs, within 120 days from MSPB receipt. Merit Systems Protection Board: *Judges' Handbook*, pg. 72 (2019), available at https://perma.cc/ZPN6-LLG5. The MSPB's average case processing time for initial appeals was: 102 days in 2018, 105 days in 2019, 102 days in 2020, 105 days in 2021, 96 days in 2022, 102 days in 2023, and 130 days in 2024. By comparison, those State employees who filed in September 2025, prior to the government shutdown, still have not received an acknowledgment or scheduling order over 120 days later; and no progress whatsoever has been made on those appeals. Upon information and belief, none of the over 17,000 RIFs initiated in 2025 have resulted in a final disposition at the MSPB.

102.    Between January 26, 2025, and September 27, 2025, the MSPB received 18,750 appeals, averaging 536 appeals each week. By contrast, throughout the entirety of fiscal year 2024, the MSPB's field and regional offices decided a total of approximately 4740 appeals. *See* 2024 Annual Report, https://perma.cc/4MSV-M746.

103.    Despite this predictable surge in MSPB appeals and the Administration taking control of MSPB budget and operations, no additional resources have been provided to ensure timely action by the MSPB. To the contrary, the Administration proposed cutting the MSPB's budget. The result of these collective changes is that the over-burdened, captured, and controlled MSPB process provides no meaningful remedies to the Plaintiffs. In fact, the MSPB process causes further injury in the form of time, expenses, delays, and insult suffered by those forced to pursue meaningless process in the MSPB in front of administrative judges and a Board who are required to adopt the litigating positions of the agencies that conducted and controlled the RIFs.

104.    The effect of the Administration's decisions regarding the MSPB can be seen in Plaintiffs' appeals. The vast majority of Plaintiffs have not seen any progress at the MSPB. The

HHS Plaintiff was separated on July 14, 2025. As of this date, only an Acknowledgement Notice has been issued by the MSPB. The ED Plaintiffs began filing their MSPB appeals in August 2025, with no progress beyond an Acknowledgement Order and Stay of Deadlines.

105.    The handful of Plaintiffs whose MSPB cases have progressed are faced with the potential harm of having their case heard by a completely captured administrative process and then having to overcome deference to that process at the Court of Appeals.

Defendants Used Inaccurate, Incomplete and Undisclosed Records in Adverse Employment Determinations.

106.    In implementing the RIFs and removals, Defendants maintained and used employment-related records concerning Plaintiffs to make adverse determinations, including selection for separation, termination of pay and benefits, and public justification of those actions. These records included information purporting to reflect Plaintiffs' performance, productivity, attendance, skills, tenure, service history, duties, assignments, and the value or necessity of their positions within their respective agencies.

107.    While disparaging the Plaintiffs and other RIF'd employees, Defendant agencies also publicly maintained that Plaintiffs were selected for RIF actions through objective, record-based processes that made determinations about specific employees' fitness and value to include work history, performance, attendance, and conduct. In fact, employee information was not properly compiled and verified. For example, sworn testimony by senior agency leadership in related litigation confirms that the scoring, ranking, and register-based processes described in the notices were not conducted as represented. In that testimony, the head of a Defendant agency acknowledged that the agency had not performed the scoring or register-based evaluations it claimed had occurred prior to issuing RIF notices.

108.    Defendants also relied on records purporting to define the groupings of positions and employees to be compared for selection, including records identifying the organizational, functional, or positional units within which Plaintiffs were evaluated. Those grouping determinations were embedded in the records used to generate selection outcomes and treated as fixed inputs in the decision-making process. The grouping information reflected in those records did not accurately correspond to Plaintiffs' actual duties, work assignments, or operational functions. Employees performing materially similar work were separated into different groupings, while employees with dissimilar duties were grouped together, resulting in records that misrepresented the scope, function, and comparability of Plaintiffs' positions.

109.    Defendants necessarily retrieved and relied upon information drawn from multiple, segregated employment-related record systems, including systems reflecting personnel status, performance history, attendance, position classification, tenure, veteran preference, retirement eligibility, and programmatic function. Information from these disparate systems was compiled and matched for use in determining which employees would be selected for separation and in publicly justifying those selections.

110.    The agencies executing the RIFs have shared such information outside their respective agencies (for example, with Defendants OPM, OMB, and MSPB, as well as DOGE). In a memorandum dated February 26, 2025, OPM and OMB required agencies, as part of their reorganization plans, to identify "[a]ll agency components *and employees* performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations." *See* https://perma.cc/TKZ9-9YKT.

111.    By choosing to rely on matched and compiled data drawn from multiple record systems to make adverse employment determinations, Defendants necessarily depended on the

accuracy, completeness, and reliability of the information retrieved. Defendants nevertheless proceeded to rely on such aggregated data without performing reasonable steps to verify that the information accurately reflected Plaintiffs' duties, work history, performance, tenure, veteran status, or the continued existence and function of their positions.

112.    Defendants did not disclose to Plaintiffs what records were retrieved, how information from different systems was matched or weighted, or how grouping determinations were made or incorporated into the selection process. Nor did Defendants provide notice that such data compilation and matching would occur or afford Plaintiffs any opportunity to review, contest, or seek correction of information before it was used to make adverse determinations.

113.    The result of these failures was that, in making RIF determinations, Defendants relied on records containing inaccurate, incomplete, or misleading information about Plaintiffs and the processes applied to them. For example, to the extent records concerning Plaintiff Allison Aslan's work status or productivity were relied upon, those records reflected, or were used to convey, that she was not actively performing assigned duties, when in fact she continued to carry out her responsibilities and receive work assignments through the period preceding her separation. To the extent records were relied upon concerning Plaintiff Nicole Gaertner's attendance or availability, those records reflected, or were used to convey, that she was not reporting for duty or was otherwise inactive, despite her continued attendance and performance of assigned work. To the extent Defendants relied on records indicating that Plaintiff Sergio Flores Rodriguez's position was unnecessary or to be eliminated, those records misrepresented the continued existence and operational need for his position and its functions. To the extent Defendants relied on records assigning Plaintiff Zachary Karabatak to a particular comparison or grouping category for selection purposes, those records inaccurately reflected the nature and

comparability of his duties, grouping him with employees performing materially different work.

Similarly, to the extent records were relied upon concerning Plaintiff Vaughn Smith's position or

role, those records mischaracterized the scope and function of his duties by omitting substantial

responsibilities he continued to perform at the time of the challenged determinations.

114.    Defendants also relied on records reflecting Plaintiffs' SCDs, tenure status,

veteran preference, and retirement eligibility. Those records were rife with inaccuracies and

omissions. For example, Plaintiff Debora Fisher's RIF notice reflected only approximately 20

years of credited federal service, when in fact she had more than 39 years of federal service, and

listed incorrect SCDs that failed to account for credited prior service. Plaintiff Melissa Fair's RIF

notice reflected an incorrect SCD that omitted more than a decade of prior federal service.

Plaintiff Kim Gudenkauf's SCD was inconsistently recorded across agency documents, resulting

in conflicting service dates used in the selection process. Plaintiff McKinney's RIF paperwork

omitted his veteran preference points entirely, resulting in an incorrect composite score despite

his repeated efforts to obtain correction prior to separation. Plaintiff Hopkins, a disabled veteran

with more than three years of continuous federal service, was placed in an incorrect retention

category notwithstanding his veteran's preference. Plaintiff Corina Corral was informed through

agency records that she qualified for discontinued service retirement, only for the agency later to

deny that option based on inconsistent and inaccurate use of the same service records.

115.    Despite these inaccuracies, Defendants treated the outputs of the record

compilation and grouping process as final and dispositive, executing removals and publicly

characterizing Plaintiffs as unproductive, incompetent, or unfit for service. Plaintiffs were

deprived of any opportunity to identify errors, supply missing context, or correct the information

relied upon before suffering adverse employment determinations, including separation, loss of pay and benefits, and reputational harm.

Harm to Plaintiffs

116.    Defendants' legal, procedural, and factual errors and accompanying denial of due process were the but-for cause of Plaintiffs' terminations.

117.    Plaintiffs suffered loss of salary, health and life insurance contributions, retirement credit, and other employment benefits, and were reputationally harmed as a direct result of continued RIF implementation. The ongoing denial of due process as to each Plaintiff is likewise a continuing procedural injury. The terminations and denial of process have further resulted in significant emotional, mental and physical harm for many Plaintiffs.

118.    These injuries are concrete, particularized, and ongoing.

## CAUSES OF ACTION

### COUNT I — DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

119.    The foregoing paragraphs are incorporated herein.

120.    Plaintiffs possess a protected property or liberty interest in continued federal employment and benefits.

121.    Plaintiffs also suffered reputational harm associated with termination, implicating a protected liberty interest.

122.    Plaintiffs were terminated without constitutionally required pre-deprivation procedures. They received constitutionally inadequate notice and no opportunity to be heard prior to termination, much less constitutionally adequate process, despite repeated stigmatizing statements by Administration officials, the manipulated RIF processes designed to target

Plaintiffs, and the serious errors in the facts, findings, and procedures relied upon in their terminations.

123.    Defendants' policies and other actions denied Plaintiffs any meaningful notice and opportunity to respond or be heard on these errors and any adequate remedy. Defendants' actions, including, but not limited to, the RIF plans, the RIF implementation process, and the spoilage of the MSPB process, effectively deny the Plaintiffs constitutionally adequate due process. Defendants' purported interests in speedy termination do not justify complete denial of meaningful process in light of Plaintiffs' interests in their continued federal employment and constitutional rights.

124.    Defendants' actions violated the Due Process Clause.

**COUNT II – THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)**

125.    Each of the foregoing paragraphs is incorporated herein.

126.    Defendants are "agencies" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(b)(1). Plaintiffs are "persons" within the meaning of the APA, 5 U.S.C. § 701(b)(2).

127.    The APA requires that courts "hold unlawful and set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(a).

128.    Final agency actions subject to challenge under the APA include: OPM and OMB decisions directing the manner of these so-called RIFs and each Defendant agency's decision to characterize the above-referenced employment actions against Plaintiffs as RIFs and channel objections to the MSPB under these circumstances.

129.    These actions are contrary to the constitutional rights as set forth in Count I.

130.     These actions are contrary to law and exceed the agencies' statutory authority because they frustrate objectives of the CSRA and are outside the authority of the relevant agencies.

131.     These actions are arbitrary and capricious because the agencies failed to consider the relevant statutory factors or engage in reasoned decision-making. For example, as Defendants are fully aware, the MSPB is currently bound to adhere to legal interpretations put forth by the Trump Administration and is therefore unable to provide independent judicial review. Further, due in part to the volume of these very agency decisions, the MSPB is unable to timely process the tens of thousands of appeals before it, including Plaintiffs' individual RIF appeals. Ultimately, Defendants' actions to force Plaintiffs into a venue that cannot possibly provide meaningful review of their claims are arbitrary and capricious.

### COUNT III —  THE PRIVACY ACT (5 U.S.C. §§ 552A(G)(1)(C), (D))

132.     Each of the foregoing paragraphs is incorporated herein.

133.     Defendants are "agencies" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1). Plaintiffs are "individuals" within the meaning of the Act. *Id*. § 552a(a)(2).

134.     The Privacy Act requires agencies to maintain records used in making determinations about individuals with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness in those determinations. 5 U.S.C. § 552a(e)(5).

135.     At all relevant times, Defendants maintained records concerning Plaintiffs within systems of records, including records reflecting Plaintiffs' employment status, performance, attendance, position classification, grouping or comparison assignments, and other work-related information, which were retrieved by name or other identifying particular and used to make determinations about Plaintiffs.

136.    Defendants used those inaccurate, incomplete and unverified records to make adverse determinations about Plaintiffs, including selection for separation, termination of pay and benefits, and public justification of those actions, within the meaning of 5 U.S.C. § 552a(g)(1)(C).

137.    Moreover, Defendants' actions fail to comply with other provisions of the Privacy Act, causing an adverse effect on the Plaintiffs, with the meaning of 5 U.S.C. § 552a(g)(1)(D).

138.    5 U.S.C. §§ 552a(o), (p), and (q) provide requirements for the use of "matching programs." As relevant here, a "matching program" means "any computerized comparison of . . . two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records." 5 U.S.C. § 552a(a)(8)(A)(ii).

139.    While the process has been opaque to the affected employees, Defendants DOJ, HHS. State, ED, and DHS compiled and shared data outside the relevant agencies as well for the purpose of implementing and seeking approval for the RIFs without complying with the requirements of 5 U.S.C. §§ 552a(o), (p), and (q).

140.    Defendants retrieved, compiled, and relied upon information drawn from multiple, segregated employment-related record systems and matched that information, together with inaccurate or undisclosed grouping data, for use in selecting Plaintiffs for separation.

141.    Defendants relied on the outputs of the record-matching and grouping process without performing reasonable steps to verify that the information accurately reflected Plaintiffs' duties, performance, and work status, or the continued existence and function of their positions. Defendants did not disclose to Plaintiffs the specific records used in making the determinations, provide notice that information from multiple record systems would be aggregated, matched, or

grouped for use in selection, or afford Plaintiffs any opportunity to review, contest, or seek correction of the information relied upon before adverse determinations were made.

142.    As a result of all the above-described errors, Defendants made adverse determinations about Plaintiffs based on records that were inaccurate, incomplete, or not maintained in the manner represented by Defendants. Those inaccuracies caused Plaintiffs to be selected for separation, deprived them of pay and benefits, and resulted in public characterizations of Plaintiffs as unproductive, incompetent, or unfit for service.

143.    Defendants' actions were intentional or willful within the meaning of 5 U.S.C. § 552a(g)(4). Defendants knew or should have known that the records and processes they relied upon—including grouping and comparison data—were inaccurate or had not been created or maintained as represented yet nevertheless used those records to make and justify adverse determinations about Plaintiffs.

144.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs suffered adverse determinations and actual damages, including loss of pay and benefits, loss of employment opportunities, and other pecuniary harm.

**COUNT IV - DECLARATORY JUDGMENT ACT (28 U.S.C. §§2201–2202)**

145.    Each of the foregoing paragraphs is incorporated herein.

146.    Defendants' actions violate the law for each of the reasons stated in Counts I-III.

147.    The Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such a declaration," in addition to any injunctive or other available relief.

148.    Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

Declaratory relief will clarify parties' rights and establish the unlawfulness of the current process.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

a. Declare that Defendants' implementation of RIF actions with respect to Plaintiffs violates the Due Process Clause;

b. Declare that Defendants' use of inaccurate and incomplete data in connection with the challenged RIFs was unlawful;

c. Set aside the unlawful RIFs affecting Plaintiffs;

d. Order Defendants to restore Plaintiffs to the pay, benefits, positions, and service credit they held prior to the unlawful RIF actions;

e. Enjoin Defendants from initiating, carrying out, implementing, or otherwise noticing any further RIF affecting Plaintiffs;

f. In the alternative, remedy the procedural deficiencies by allowing Plaintiffs to immediately pursue their RIF challenges in district court;

g. In the alternative, order Defendants to provide Plaintiffs with constitutionally adequate process with appropriate judicial oversight;

h. Award Plaintiffs actual damages under 5 U.S.C. § 552a(g)(4)(A), including pecuniary losses arising from loss of pay, benefits, and employment opportunities, the exact amount of which is to be determined at trial, but is not less than $1000 per person;

i. Award attorneys' fees and costs as permitted by law, including the Equal Access to Justice Act and the Privacy Act; and

j.  Grant any other relief the Court deems just and proper.


Respectfully submitted,


/s/ Joshua Rose
Joshua Rose (Bar No. 18714)
DC Consumer Law Group, PLLC
1407 Highland Drive
Silver Spring, MD 20910
Tel: (202) 288 5643
Jrose@dcclg.com



A. Gregory Pinto (pro hac vice pending)
DC Law Collective, PLLC
1629 K St., NW, Suite 300
Washington, DC 20006
Tel: (202) 599-8459
Fax: (202) 318-0271
gregpinto@dclawcollective.com

/s/ Jocelyn E. Skinner
Jocelyn (Josie) E. Skinner (admission
pending)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Tel: (202) 888-2084
josie@sligolawgroup.com

/s/ Amy E. Powell
Amy E. Powell (pro hac vice pending)
Lawyers for Good Government
1319 F St. NW, Suite 301, PMB 181
Washington, DC 20004
Tel: (646) 246-4633
Email:
amy@lawyersforgoodgovernment.org

*Counsel for Plaintiffs*

# EXHIBIT A

| No. | Client Name | Agency |
|-----|-------------|--------|
| 1 | Doreen Mullady | State |
| 2 | Michael John Duerr | State |
| 3 | Nicole R Gaertner | State |
| 4 | Megan Wessell | State |
| 5 | Micah Lee Watson | State |
| 6 | Lale Kuyumcu | State |
| 7 | Kathleen Sheehan | State |
| 8 | Kamran Sadiq | State |
| 9 | Jennifer Glaudemans | State |
| 10 | Clayton Grossinger | State |
| 11 | Yaziddah Buist | DOJ-ATF |
| 12 | Palmer Young Phillips | State |
| 13 | Will Evans | State |
| 14 | Shanna Devoy | State |
| 15 | Steven J Naplan | State |
| 16 | Michael T Fischer | HHS |
| 17 | Taisha N Winters-Ragland | Education |
| 18 | Denise Melina Joseph | Education |
| 19 | Susan Monich Arthur | Education |
| 20 | Rebecca J Walawender | Education |
| 21 | Kristen E Kushiyama | DHS |
| 22 | Nadia Batcha | DHS |
| 23 | Kathleen Crader Zelnik | Education |
| 24 | Janean Davis | USAID |
| 25 | Keisha Effiom | USAID |
| 26 | Stacie Yvette Scott | USAID |
| 27 | Phillipe Accilien | USAID |
| 28 | Christa George | State |
| 29 | Jason Smith Alexander | USAID |
| 30 | Hannah Alexander | USAID |
| 31 | Vaughn Smith | DOJ-ATF |
| 32 | Anastasia Almanzar | State |
| 33 | Leslie Reed | USAID |
| 34 | Michelle A Jennings | USAID |
| 35 | Whitney Jensen Rodrigues | USAID |
| 36 | Kirsten S. P. Rigney | USAID |
| 37 | Philip Schwada | State |
| 38 | Nicole Patel | State |
| 39 | Michael Edinger | State |
| 40 | Maheisha Adams | State |
| 41 | Farha Tahir | State |
| 42 | David Mandel-Anthony | State |
| 43 | Angel Sharma | State |
| 44 | Andrea Shinbach | State |
| 45 | Alden Scott LeClair | State |
| 46 | Mary Brooke Anderson | State |
| 47 | Michelle Eve Romo | State |
| 48 | Sumitra Siram | State |
| 49 | Nicole Smolinske | State |
| 50 | Lauren Elizabeth Eades | State |

| 51 | Chloe O'Kelly | State |
| 52 | Amanda Corcos | State |
| 53 | Sergio Flores Rodriguez | State |
| 54 | Erica Layne Morrison | Education |
| 55 | Judith Shaw Vanze | Education |
| 56 | Cheryl E Gibbs | Education |
| 57 | Travis Combs | Education |
| 58 | Marissa Courey | USAID |
| 59 | Kevin G Sampson | USAID |
| 60 | Andrew T Lohsen | USAID |
| 61 | Ishita Kala | USAID |
| 62 | Felicia Renee Wilson Young | USAID |
| 63 | Amanda Cats-Baril | USAID |
| 64 | Jenniffer A Frias | DOJ-ATF |
| 65 | Tracey D Carpenter | State |
| 66 | Megan Kuhn | State |
| 67 | Nino Nadiradze | USAID |
| 68 | Haven G Cruz-Hubbard | USAID |
| 69 | Quentin Russel Bounds | State |
| 70 | Lakeisha Yolanda Germany | State |
| 71 | Catherine Hayford | USAID |
| 72 | Michael Joseph DeSisti | USAID |
| 73 | Ryan Berney | State |
| 74 | Katrina Kruhm | USAID |
| 75 | Sarah C. Marshall | USAID |
| 76 | David Michael Pernal | State |
| 77 | Kristin Shouba | USAID |
| 78 | Ayisa Crowe | Education |
| 79 | Madison McAndrew | DHS |
| 80 | Marilyn Bernardino-Redondo | DOJ-ATF |
| 81 | Ryan Kelly | DHS |
| 82 | Marisol Perez | USAID |
| 83 | Chris Schaan | USAID |
| 84 | Richard Kudjoe Adzei | USAID |
| 85 | Dana Beegun | USAID |
| 86 | Amy Daffe | USAID |
| 87 | Christopher Hopkins | State |
| 88 | Carl Joseph Anderson | USAID |
| 89 | Mary Jayne Cassidy | USAID |
| 90 | Gary Wayne Lima | Education |
| 91 | Rasheena Reid | USAID |
| 92 | Pablo Perez | State |
| 93 | Mujahid M Abbas | State |
| 94 | Michael Curtis Aho | State |
| 95 | Leaksmy Chhay Norin | State |
| 96 | Kerry Ashforth | State |
| 97 | Jonas Adomas Vaicikonis | State |
| 98 | Jimmy Kan Wang | State |
| 99 | Jennifer L Topping | State |
| 100 | Huber Parsons | State |
| 101 | Hilary Ingraham | State |

| 102 | Ebony Kalifa Smith | State |
| 103 | Donny Kwok Kit Tang | State |
| 104 | Debora Ann Fisher | State |
| 105 | Daniel Mark Gibson | State |
| 106 | Corina Santucci Corral | State |
| 107 | Benton Wisehart | State |
| 108 | Baharak Shirooei | State |
| 109 | Andrea Lucia Samuelson | State |
| 110 | Allen James Foster | State |
| 111 | Negina Sawez | State |
| 112 | Christina Ann Dolina | State |
| 113 | Kathryn Johanna Younkins | State |
| 114 | Allison Aslan | State |
| 115 | Kimberly Anne Gudenkauf | State |
| 116 | Aubrey Rose Paris | State |
| 117 | Kiera Berdinner | State |
| 118 | Jennifer Allen | State |
| 119 | Joanne Bogart | Education |
| 120 | Richelle Davis | Education |
| 121 | Jeanne Gilroy | Education |
| 122 | Karla Ver Bryck Block | Education |
| 123 | Melanie Winston | Education |
| 124 | Megan O'Kane | DHS |
| 125 | Ayana Henry | DHS |
| 126 | Lucia Seyfarth | State |
| 127 | Joshua Templeton | USAID |
| 128 | Claudia Lynnese Houndje | USAID |
| 129 | Julia Virginia Nenon | USAID |
| 130 | Nathan Andrew Tenny | USAID |
| 131 | Justin D'Adamo | USAID |
| 132 | Sara Suliman | USAID |
| 133 | Craig Hart | USAID |
| 134 | Patricia Boerner | State |
| 135 | Vedrana Mandic | State |
| 136 | Zachary Karabatak | State |
| 137 | Sean Robertson | State |
| 138 | Stephanie Aktipis | State |
| 139 | Scott Dobberstein | USAID |
| 140 | Aaron Brownell | USAID |
| 141 | Arthur Brown | USAID |
| 142 | Sarah Creedon | State |