**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| Doreen Mullady, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 8:26-cv-00573 |
| Office of Management and Budget, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND .............................................................................................. 2

   A. The RIF Statutes, Implementing Regulations, and Guidance. ........................................ 2

      1. The CSRA and OPM Implementing Regulations and Guidance........................................ 3

      2. The Foreign Service Act and Implementing Regulations and Guidance ........................... 5

   B. Executive Assertion of Legal and Operational Control Over the MSPB ....................... 6

   C. Plaintiffs' RIF Actions............................................................................................ 10

      1. The DEI RIF Action (January 20, 2025) .......................................................................11

      2. The USAID RIF (February 23, 2025) ........................................................................... 14

      3. Department of Education RIF (March 11, 2025)........................................................... 17

      4. The DHS RIF (March 21, 2025) ................................................................................... 18

      5. The State Department RIF (July 11, 2025) .................................................................. 20

III. JURISDICTION AND JUSTICIABILITY............................................................. 23

   A. Congress Did Not Preclude under these Circumstances, and Elgin Does Not Control.
............................................................................................................................... 24

   B.   Plaintiffs Suffer Injury from Compelled Submission to the Challenged Proceedings.
     27

   C. Thunder Basin Confirms the CSRA Does Not Preclude Jurisdiction Over these
Claims.................................................................................................................... 28

      1. Channeling Would Foreclose Meaningful Judicial Review. ........................................ 28

      2. Plaintiffs' Claims Are Wholly Collateral to MSPB Merits Determinations..................... 29

      3. Plaintiffs' Claims Fall Outside of Institutional Competence. ...................................... 29

IV. ARGUMENT ................................................................................................. 30

   A. Plaintiffs Are Likely to Succeed on the Merits.......................................................... 30

      1. Defendants Violated Plaintiffs' Fifth Amendment Due Process Rights. ........................ 31

         a. Plaintiffs Were Deprived of Protected Property and Liberty Interests. ........................ 31

         b. Plaintiffs Were Not Provided Constitutionally Adequate Notice. ............................... 35

         c. Defendants Denied Plaintiffs Any Pre-Deprivation Opportunity to Be Heard. ............ 38

         d. The Post-Deprivation Process is Constitutionally Inadequate. ................................... 41

         e. Cancellation of the RIFs Is the Required Remedy.................................................... 43

      2. Defendants' Actions Violate the APA.......................................................................... 44

   B. Plaintiffs Suffer Irreparable Harm............................................................................ 48

   C. The Balance of Equities and Public Interest Strongly Favor Injunctive Relief. .......... 52

VI. REQUESTED RELIEF .................................................................................... 52

**Cases**

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 (D. Md. 2025)......................59

*Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) ......................................................... 39, 42

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191–95 (2023) ...............26, 29, 30, 31, 32, 33, 48

*Barry v. Barchi*, 443 U.S. 55, 66 (1979) ....................................................................... 45, 46

*Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)....................................................... 34, 37, 43

*Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)....................49

*Billings v. Tenn. Valley Auth.*, 21 M.S.P.R. 630, 632 (1984) ....................................................47

*Brewer v. U.S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981)...............................................48

*Cannon v. Vill. of Bald Head Island, N.C.*, 891 F.3d 489, 504–06 (4th Cir. 2018)...................42

*Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) ..........................................................................33

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–47 (1985)....................................31

*DeWeese v. Dep't of the Navy*, 67 M.S.P.R. 67 (1995)..............................................................47

*E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, No. 1:25-CV-637 (PTG/IDD), 2025
    WL 2969560, at *21 (E.D. Va. Oct. 20, 2025)...............................................................58

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) .............................................. 25, 26, 27, 28, 29

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ............................................................................56

*Fitzgerald v. Hampton*, 467 F.2d 755, 758-59 (D.C. Cir. 1972) ............................................12

*Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 489–91 (2010)....................................... 29, 32

*Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ........................................................... 41, 42, 43

*Gilbert v. Homar,* 520 U.S. 924, 930–35 (1997)...................................................................44

*Goldberg v. Kelly*, 397 U.S. 254, 267–68, 271 (1970).........................................39, 41, 42, 45

*Goss v. Lopez*, 419 U.S. 565 (1975)....................................................................................42

*Griffin v. Dep't of the Navy*, 94 M.S.P.R. 561, 565 (1994) ...................................................47

*Hamadneh v. Grand Strand Reg'l Med. Ctr., LLC*, No. 4:26-CV-0335-JD-TER, 2026 WL
    253623, at *4 (D.S.C. Jan. 31, 2026)............................................................................58

*Hoechst Diafoil Co. v. Nan Ya Plastics Co*rp., 174 F.3d 411, 421 n.3 (4th Cir. 1999) ...............59

*Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004)...............................49

*Jackler v. Department of Justice*, No. DA-0752-25-0330-I-1 (Aug. 22, 2025)........... 8, 9, 10, 28

*James v. Roberts*, No. 25CV191, 2026 WL 332327, at *9 (M.D.N.C. Feb. 4, 2026) ...............58

*Johnson v. Dep't of Air Force*, 50 F.4th 110, 115 (Fed. Cir. 2022)......................................35

*King v. Jerome*, 42 F.3d 1371, 1374 (Fed. Cir. 1994) ..........................................................29

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).............53

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)..................................................44

*Loudermill*, 470 U.S. at 542–47 ......................................................... 34, 39, 41, 42, 44, 53

*Margolin v. Nat'l Ass'n of Immigr. Judges,* No. 25A662, (U.S. Dec. 19, 2025)........................3

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................................................ 45

*Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14 (1978) ......................................... 40

*Morrissey v. Brewer*, 408 U.S. 471 (1972) .......................................................................... 42

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) .............. 50

*Mullane v. Central Hanover Bank Tr. Co.*, 339 U.S. 306, 314 (1950) ..................................... 40

*Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025), ....3, 6, 7, 8, 26, 27, 28, 46

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ......................................................................... 57

*Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ............................................................ 58

*Paul v. Davis*, 424 U.S. 693, 708–09 (1976) ................................................................ 37, 43

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) ...................... 37

*Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) ...................................................... 52

*Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)...................................................... 53, 56

*Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022) .............................. 50

*Scott v. Bierman*, 429 Fed. App'x. 225, 229 (4th Cir. 2011) ............................................. 2, 33

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)........................................ 37

*Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) .............. 52

*Stone v. FDIC*, 179 F.3d 1368, 1376–77 (Fed. Cir. 1999) ............................................... 39, 40

*Thompson v. D.C.*, 428 F.3d 283, 287-88 (D.C. Cir. 2005) .................................................. 12

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994) ................................ 26, 30, 33

*Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ................................................................... 45, 46

*Vazquez-Burgos v. Rodriguez-Perez*, 111 F. Supp. 3d 135, 140 (D.P.R. 2015).......................... 56

*Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1280–81 (Fed. Cir. 2011)...................................... 39

*Wieman v. Updegraff*, 344 U.S. 183, 190 (1952).................................................................. 43

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ................................................ 33

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975)......................................................................... 45

*Wolff v. McDonnell*, 418 U.S. 539 (1974) .......................................................................... 42

*WV Ass'n of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ................................................................................................................... 33

*Zinermon v. Burch*, 494 U.S. 113 at 132 (1990) ...................................................34, 41, 42, 44

**Statutes**

22 U.S.C. § 4010a.......................................................................................................... 6

22 U.S.C. § 4010a(c)...................................................................................................... 26

5 U.S.C. § 1103............................................................................................................ 27

5 U.S.C. § 705......................................................................................................... 52, 53

5 U.S.C. § 706(2)(A)...................................................................................................... 47

5 U.S.C. § 7513.............................................................................................................. 9

5 U.S.C. § 7703............................................................................................................ 29

5 U.S.C. §§ 3501–3504.............................................................................................. 3, 44

5 U.S.C. §§ 706(2)(A), (C) ................................................................................ 44

5 U.S.C. §§ 7701–7703 ..................................................................................... 24

**Other Authorities**

3 FAM 2580 Reduction in Force – Civil Service .................................................. 6

Dep't of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Notice of Release
Pursuant to 5 U.S.C. § 3502 (Feb. 5, 2025) .................................................. 14

Off. Person. Mgmt., Competitive Areas in Reduction in Force (RIF) (Mar. 2025)........................ 4

Off. Person. Mgmt., Initial Guidance Regarding DEIA Executive Orders at 1 (Jan. 21, 2025).. 12, 13

Off. Person. Mgmt., Reduction in Force (RIF) .....................................................11

Office of Civil Rights and Civil Liberties, Homeland Security (last updated Sept. 3, 2025)....... 19

U.S. Dep't State, 3 FAH-1 H-2530 Reduction in Force - Civil Service .................................... 21

U.S. Dep't State, 3 FAM 2580 Reduction in Force – Foreign Service .......................................... 6

U.S. Merit Sys. Prot. Bd., Weekly Number of Cases Received in the Regional and Field Offices
Fiscal Year 2025 ......................................................................................... 9

U.S. Merit Sys. Prot. Bd.,, Congressional Budget Justification FY 2026 (May 2025) ................. 9

**Rules**

Federal Rule of Civil Procedure 65(a) ................................................................. 52

**Regulations**

5 C.F.R. § 351.201(a) ........................................................................................ 4

5 C.F.R. § 351.201(a)(2) .................................................................................... 4

5 C.F.R. § 351.402 ....................................................................................... 4, 45

5 C.F.R. § 351.402(c). ...................................................................................... 4

5 C.F.R. § 351.901 ....................................................................................... 5, 27

5 C.F.R. pt. 351 ................................................................................. 3, 23, 29, 44

5 U.S.C. § 1204(a) .................................................................................... 5, 7, 47

5 U.S.C. §§ 1201–1204 ................................................................................... 5, 6

**Constitutional Provisions**

U.S. Const. amend. V ....................................................................................... 31

**Federal Register**

Reduction in Force and Performance Management, 62 Fed. Reg. 62495, 62498 (Nov. 24, 1997) 4

Reduction in Force Appeals, 91 Fed. Reg. 5861 (proposed Feb. 10, 2026) ........................... 10, 27

**Legislative Material**

S. Rep. No. 95-969, at 6–7, 24 (1978). .......................................................... 5, 24

**Statutes - Session Law**

Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3; S. Rep. No. 95-969, at 6–7, 24 (1978);...................................................................................................................... 6, 47

**Executive Orders**

Exec. Order No. 14035, 86 Fed. Reg. 34593 (June 25, 2021) ..................................................... 13
Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 20, 2025) (together, the "DEI EOs") .............. 12
Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)........................................................11
Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)...................................................... 12
Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448–49 (Feb. 24, 2025).  7, 10, 24, 25, 26, 28, 29, 30, 36, 38, 39, 46

## I. INTRODUCTION

Plaintiffs are career federal employees who were stripped of their positions, pay, healthcare, retirement accrual, and professional standing through actions the Executive Branch ("Executive") labeled as reductions in force ("RIFs"). Those separations were executed without meaningful notice, without any opportunity to respond, and without the pre-deprivation safeguards the Constitution requires when the Government takes a person's livelihood and reputation.

When Plaintiffs were notified they would be removed, almost all were immediately placed on administrative leave, locked out of agency systems, cut off from supervisors and human-resources officials, and denied access to any decision maker with authority to correct errors or halt the separations. All had their removals proceed automatically. Payroll stopped. Benefits terminated. Service credit ceased to accrue. Plaintiffs were forced into a post-deprivation administrative process while the deprivation itself remained fully in force.

The constitutional violation was completed the moment those separations took effect. The Government may not impose a deprivation first and provide process later where pre-deprivation process was feasible and required. Subsequent review cannot retroactively supply the hearing that was required before Plaintiffs were stripped of protected property and liberty interests.

Compounding that violation, Defendants insist that Plaintiffs' exclusive avenue of relief lies in proceedings before the Merit Systems Protection Board ("MSPB")—a forum over which the Executive has asserted authority to control through centralized legal interpretation, budgetary leverage, and docket management. The same Executive officials who ordered and continue to enforce Plaintiffs' separations claim authority to define the governing law inside the adjudicatory body tasked with reviewing those separations. Plaintiffs are thus compelled to seek relief in a

system whose independence has been subordinated to the very authority whose actions they challenge, and which is incapable of providing effective relief.

The Plaintiffs most catastrophically affected by these actions seek immediate injunctive relief restoring them to the pre-deprivation *status quo ante* and halting Defendants' ongoing constitutional and *ultra vires* conduct. Because a preliminary injunction is an "extraordinary remedy,"[1] we bring this motion only on behalf of those Plaintiffs who suffer continuing and compounding harm each day the separations remain in effect.[2] Each day the Executive enforces those separations while channeling review into a controlled forum, the structural injury deepens. The public interest is not served by permitting constitutional violations to persist while review is delayed; it is served by ensuring that its civil servants are not continually harmed by ongoing constitutional violations.[3]

## II. BACKGROUND

### A. The RIF Statutes, Implementing Regulations, and Guidance.

Plaintiffs ask the Court to adjudicate the adequacy of the institutions and established procedures applied to Plaintiffs, and not routine compliance with the regulatory provisions governing RIFs. Indeed, it is Plaintiffs' position that, based on the Administration's publicly-asserted justifications for not only removals, but also the procedural steps taken to effectuate them, the removals were merely cloaked in the guise of RIFs so that the Administration could implement them quickly and without the safeguards to which Plaintiffs were constitutionally and otherwise entitled. The discussion below of the statutory framework demonstrates that, under

---

[1] *Scott v. Bierman*, 429 Fed. App'x. 225, 229 (4th Cir. 2011)

[2] All of the Plaintiffs have suffered irreparable harm, but for some Plaintiffs obtaining only preliminary relief potentially exacerbates their harms as it risks disrupting their current lives and employment without providing the stability of final relief.

[3] The instant motion is premised on the claims for injunctive relief in Counts I and II of the Complaint. Plaintiffs intend to — and reserve the right to — seek additional relief outlined in the Complaint.

2

either the Civil Service Reform Act ("CSRA") or the Foreign Service Act ("FSA"), reductions in force are designed to operate through structured and neutral criteria, not as mechanisms for predetermined or stigmatizing separations coupled with exclusive administrative channeling. At the same time, it demonstrates the constitutional and statutory inadequacy of the current structural framework.

       1. The CSRA and OPM Implementing Regulations and Guidance

In 1978, Congress enacted the CSRA to comprehensively overhaul the federal civil service system. *See generally Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025), *stay denied sub nom. Margolin v. Nat'l Ass'n of Immigr. Judges,* No. 25A662, (U.S. Dec. 19, 2025) (hereinafter, "*NAIJ*"). Among other components, the CSRA establishes the statutory framework governing RIFs in the federal civil service. 5 U.S.C. §§ 3501–3504. Those provisions are implemented through regulations promulgated by the Office of Personnel Management ("OPM") in 5 C.F.R. pt. 351. Unlike private-sector layoffs, federal reductions in force are governed by detailed statutory and regulatory safeguards designed to ensure that position eliminations are carried out through objective, impersonal criteria rather than individualized discretion.

OPM has issued regulations and guidance as to how and when RIFs may be conducted to ensure compliance with the CSRA and its implementing regulations. Pursuant to OPM's regulations, RIFs must be based upon one of six justifications: "lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. §

351.201(a)(2). Although employees may be separated as a consequence of a RIF, the purpose of the RIF is to abolish positions; it is not used to remove particular employees. 5 C.F.R. § 351.201(a).

OPM regulations also require agencies to define competitive areas (the groupings within which employees must be ranked before determining who among them would be subject to a RIF action) based on organizational structure and geographic location and to include all employees within a defined area in the retention process. *See* 5 C.F.R. § 351.402. Importantly, the regulations provide that the minimum competitive area must be a subdivision of the agency under "separate administration" within the local commuting area. 5 C.F.R. § 351.402(c).

OPM has explained that "separate administration" for competitive-area purposes means the administrative authority to take or direct personnel actions such as establishing or abolishing positions, assigning duties, and directing staffing decisions, as reflected in an agency's delegations of authority and organizational structure. Reduction in Force and Performance Management, 62 Fed. Reg. 62495, 62498 (Nov. 24, 1997). OPM guidance likewise emphasizes that a competitive area must be clearly distinguished in operation, work function, staff, and personnel management. *See* Off. Person. Mgmt., Competitive Areas in Reduction in Force (RIF) (Mar. 2025) (Ex. 2 at 1-2).

These requirements, along with retention scoring and ranking, position and function analyses, bump and retreat provisions, and waterfalling based on tenure and performance history, distinguish a genuine reduction in force, conducted through neutral structural criteria, from employees' removal decisions implemented under the label of a RIF. To allow agencies to use RIFs to remove employees, rather than positions, would invalidate the protections established in

the CSRA, since any federal employee or small subgroup of federal employees could be deemed a "competitive area" and removed without the due process to which they are entitled.

Plaintiffs do not ask this Court to adjudicate routine compliance with Part 351; they cite these requirements because Defendants' wholesale departure from them is evidence that the "RIF" label was used as mere pretext and as a shield from scrutiny to effectuate predetermined employee separations—stigmatizing, life-altering, accusation-based firings—while invoking exclusive administrative channeling and dodging pre-deprivation due process requirements.

In addition to establishing standards for reductions in force, the CSRA created the MSPB as an adjudicatory body intended to operate independently in reviewing federal personnel actions. 5 U.S.C. §§ 1201–1204. Congress described the MSPB as a "strong and independent" body, insulated from political pressure and independent of direct presidential control. S. Rep. No. 95-969, at 6–7, 24 (1978). The MSPB is an agency within the Executive Branch staffed by civil service employees and charged with hearing and adjudicating matters within its statutory jurisdiction. 5 U.S.C. § 1204(a). Its independence is crucial to the statutory scheme. *See NAIJ*, 139 F.4th at 305-08. OPM regulations provide that civil service employees challenging the legality of separations by a reduction in force must submit their appeals to the MSPB. 5 C.F.R. § 351.901.

2. The Foreign Service Act and Implementing Regulations and Guidance

State Department Plaintiff Sergio Flores and all U.S. Agency for International Development ("USAID") Plaintiffs are Foreign Service Officers ("FSOs"). FSOs undergo specialized training and are appointed to a worldwide service designed for rotational assignments across posts and positions. By statute, FSOs are part of a portable professional corps rather than tied to a single fixed organizational unit.

5

Reductions in force involving FSOs are governed by the FSA rather than the CSRA. *See* 22 U.S.C. § 4010a. Like the CSRA framework, however, the FSA requires that workforce reductions be conducted according to structured statutory criteria, including consideration of organizational needs, employee qualifications, tenure, performance, and veterans' preference. Implementing regulations and agency guidance issued by the Department of State "State" and USAID reflect similar structural safeguards intended to distinguish neutral workforce restructuring from individualized removal decisions. *Compare, e.g.,* U.S. Dep't State, 3 FAM 2580 Reduction in Force – Foreign Service, https://perma.cc/S5UT-4LRK; U.S. Dep't State, 3 FAM 2580 Reduction in Force – Civil Service, https://perma.cc/4PJK-R6SH.

For both civil service and foreign service employees, Defendants relied on the "RIF" label to trigger exclusive administrative channeling while disregarding the structural safeguards that distinguish a neutral reduction in force from an employee's removal. That departure matters here because, in addition to challenging the process that deprived them of their pre-deprivation procedural protections, Plaintiffs' claims include a structural challenge to the process that forced them into an altered adjudicatory process that itself violates Plaintiffs' rights and cannot supply constitutionally adequate independent review to prevent or remedy the completed deprivation.

### B. Executive Assertion of Legal and Operational Control Over the MSPB

In enacting the CSRA, and in reaction to the spoils system that allowed the party in power to use federal appointments and removals as rewards and punishments for political support, Congress expressly provided that federal employees should receive protection through a strengthened and independent MSPB, set in the Executive Branch but insulated by the statute from political control. *See* 5 U.S.C. §§ 1201–1204; Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3; S. Rep. No. 95-969, at 6–7, 24 (1978); *see NAIJ*, 139 F.4th at 305-08. The

6

MSPB's mandate is to hear and adjudicate statutorily enumerated federal employment matters within its jurisdiction. 5 U.S.C. § 1204(a).

On February 8, 2025, the President removed MSPB Chair Cathy Harris. Ten days later, the President issued Executive Order ("EO") 14215, asserting centralized Presidential authority over "so called independent agencies," including the MSPB. The Order provides that no Executive employee acting in an official capacity may advance a legal interpretation that contravenes the President's or the Attorney General's opinion on a matter of law, including positions related to any litigation. Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448–49 (Feb. 24, 2025).

The Order further directs the Director of the Office of Management and Budget ("OMB") to: establish performance standards and management objectives for independent agency heads; review agency obligations for consistency with Presidential policies and priorities; and adjust agency apportionments as necessary to advance those priorities, including by restricting the expenditure of appropriated funds. *Id.* at. Additionally, the Order directs that agency heads, including the MSPB Chair, must coordinate with the White House and establish a White House liaison. In separate litigation, the Administration has asserted that MSPB members are removable at will because they assist the President in carrying out executive duties. Defs.' Opp'n to Pls.' Mot. for TRO, *Harris v. Bessent*, No. 1:25-cv-00412 (D.D.C. 2025) (Ex. 3 at 7-8). Following these developments, the Fourth Circuit declined to channel to the MSPB employment-related claims brought by federal immigration judges, remanding "to conduct a factual inquiry whether the CSRA continues to provide a functional adjudicatory scheme" as Congress intended. *See NAIJ*, 139 F.4th at 308.

Consistent with the EO, the Administration has taken the position that opinions of the Department of Justice's Office of Legal Counsel ("OLC") are binding on the MSPB. In *Jackler v. Department of Justice*, No. DA-0752-25-0330-I-1 (Aug. 22, 2025) (Ex. 4), and a related appeal, an MSPB administrative judge ("AJ") ordered the reinstatement of two Immigration Judges— DOJ employees summarily terminated having received no process other than a memo invoking Article II authority to do so—pending resolution of constitutional issues presented. In short, the administrative judge determined (correctly) that the MSPB could not rule that the CSRA (the statute establishing the MSPB) is unconstitutional in limiting Article II authority to fire federal civil servants without following established federal law or constitutional requirements. *Id.* At 5-6. DOJ thereafter submitted an OLC opinion and represented that it "should be considered binding upon the Board," and that the administrative judge's decision "does not represent the legal position of the Executive Branch." Agency's Mot. for Leave to File Additional Pleadings and Alternative Mot. to Remand (Sept. 27, 2025) (Ex. 5 at 3-4).

As the MSPB considered *Jackler*, it issued orders to show cause in other pending Article II appeals directing appellants to explain why their cases should not be dismissed without prejudice pending the Board's resolution of the constitutional question. *See* Order to Show Cause, *[Redacted] v. Dep't of Justice*, No. 0752-25-2038-I-1 (Nov. 26, 2025) (Ex. 6). The show-cause orders halted those appeals. Thereafter, the MSPB dismissed certain Article II appeals without reaching the merits. *See Opposed Motion Pursuant to Fed. R. 18 for Stay Pending Review, Oyer v. Dep't of Justice,* Case No. 26-1346, Doc. 10, (Fed. Cir. Feb. 23, 2026) (appellant setting out facts surrounding dismissal of her Article II case by MSPB) (Ex. 22 at ECF pp. 15-16). The result: fired federal employees who had been disparaged by the Administration and who received no due process have had their appeals dismissed, remaining stigmatized and without the

benefits of their careers, for many more months, giving the Administration time to work up new guidance, rules, or opinions that must be followed while starving out the Appellants.[4]

At the same time as interpretive and budgetary authority has been unified and leveraged, the MSPB's caseload has expanded dramatically due almost exclusively to the coordinated firings and so-called reductions in force. In FY 2024, the MSPB averaged approximately 100 new cases per week. Drew Friedman, *MSPB Faces High Workload, Low Staffing Levels*, Federal News Network (July 4, 2025), https://perma.cc/33CB-K7ED. By July 2025, weekly filings averaged more than 460. *Id*. Field offices reported receiving more than 20,000 filings in FY 2025. U.S. Merit Sys. Prot. Bd., Weekly Number of Cases Received in the Regional and Field Offices Fiscal Year 2025, https://perma.cc/4652-R34J. During this period of unprecedented increase in filings, MSPB staffing declined. The Administration's FY 2026 proposal specified a reduction in MSPB staffing to 163 full-time employees, below its September 2024 staffing level, notwithstanding the exploded docket. U.S. Merit Sys. Prot. Bd., Congressional Budget Justification FY 2026 (May 2025) (Ex. 7 at 11). Even the MSPB's budget request only asked for two additional positions. *Id.*

These developments occurred and continue while the Executive simultaneously asserts in multiple courts that federal employees must pursue exclusive administrative review before the MSPB as their sole avenue of relief. At the same time, the Executive has taken the position that its own legal interpretations—through Presidential directives and Attorney General opinions—

---

[4] On March 20, 2026, the MSPB—consistent with the OLC opinion—held that it may consider the constitutionality of the CSRA and that Article II can deprive the Board of jurisdiction. *Jackler & Jaroch Consol. v. Dep't of Justice*, 26 MSPB 3 (Mar. 20, 2026) , (Ex. 8 at 2). The Board declined to decide whether OLC opinions are binding. *Id.* at 8. It further stated that agencies cannot defeat jurisdiction merely by invoking Article II, but that where an employee is subject to at-will Article II removal, the Board must dismiss for lack of jurisdiction because 5 U.S.C. § 7513 cannot constitutionally apply. *Id.* at 16. Although disclaiming reliance on OLC's binding effect, the decision tracks the Administration's position and permits continued channeling of claims into MSPB proceedings even where the preordained or at least extremely likely outcome is dismissal for lack of jurisdiction.

constitute binding authority within that adjudicatory process. *See* Exec. Order No. 14215, 90 Fed. Reg. at 10448–49. The combined effect is that employees are required to submit to an administrative forum whose governing legal framework is controlled by the same Executive authority that appears as litigant in those proceedings.

None of these structural developments were disclosed in the notices directing employees into the MSPB process. Employees were informed of appeal rights to an independent statutory adjudicator, without notice that interpretive authority had been centralized through Executive Order 14215 outside of the MSPB, that OLC opinions were binding within MSPB proceedings, and that OMB had taken control over every policy and strategic decision made by the MSPB.[5]

### C. Plaintiffs' RIF Actions

The following facts are not offered to invite this Court to resolve individualized retention disputes. They demonstrate that the actions labeled as "RIFs" were predetermined and stigmatizing separations executed without constitutionally required pre-deprivation process and accompanied by materially defective notices, and that employees were then compelled into a post-deprivation review structure incapable of providing meaningful independent relief consistent with the requirements of Due Process. The attached Plaintiff declarations have facts sufficient to show that they were terminated without process in an action labeled a RIF, they each appealed to the MSPB, and they each have many allegations of error about the termination which cannot be effectively and meaningfully addressed through the MSPB. *See* Declarations, Ex. 1. A RIF action is supposed to allow the federal government to shrink or realign by eliminating

---

[5] OPM has not tried to hide its intent to strip federal employees of any meaningful appeal rights when challenging a RIF. OPM's February 10, 2026, Proposed Rule would remove all MSPB and judicial appeal rights for RIF challenges, channeling them exclusively to OPM itself for review. Under this proposed rule, employees' grounds for challenging a RIF would be sharply curtailed and the burden of proof would shift from agencies to appellants, requiring that they demonstrate that the RIF "was conducted inconsistent with either statute or OPM regulations such that the employee would not have suffered the same *or another reduction-in-force action*." Reduction in Force Appeals, 91 Fed. Reg. 5861 (proposed Feb. 10, 2026) (to be codified at 5 C.F.R. 351).

positions that it no longer needs. Off. Person. Mgmt., *Reduction in Force (RIF)*, https://perma.cc/2JLF-L6MV. Agencies may not cloak employee firings for cause in the guise of a RIF to avoid requisite procedural rights. *Thompson v. D.C.*, 428 F.3d 283, 287-88 (D.C. Cir. 2005) (*citing Fitzgerald v. Hampton*, 467 F.2d 755, 758-59 (D.C. Cir. 1972)). Here, however, Defendants' own actions establish that these were not mere neutral workforce realignments but instead were baseless, predetermined, and publicly stigmatized employee separations carried out through defective notices and without any meaningful pre-deprivation opportunity to respond.

Each RIF was accompanied by the Administration employing stigmatizing and derogatory statements about Plaintiffs and the other employees being fired to justify its "RIF" actions. *See, e.g.,* Exhibit J at 99.[6] These public condemnations, coupled with separation, trigger Plaintiffs' protected liberty interests and underscore why constitutionally-meaningful pre-deprivation process was required here. The resulting separation, therefore, inflicted completed constitutional injury at the moment it occurred and imposes continuing harm through compelled channeling to a post-deprivation forum that cannot provide independent or meaningful review.

1. The DEI RIF Action (January 20, 2025)

The first RIF implemented during the Administration began on Inauguration Day when the President issued EO 14151—*Ending Radical and Wasteful Government DEI Programs and Preferencing*, directing agencies to terminate diversity, equity, and inclusion ("DEI") programs and offices. Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). This EO was issued along with two other EOs aimed at DEI, "*Ending Illegal Discrimination and Restoring Merit-*

---

[6] Exhibit J provides only a sampling. Indeed, other examples are cited in this brief. Even this limited set shows a repeated pattern in which senior officials and influential allies publicly described federal employees as nonworking, fraudulent, corrupt, disloyal, incompetent, illegitimate, or fit for humiliation and removal and used such characterization to justify their mass firings. The point was not merely to attack policies or agencies in the abstract, but to stigmatize the people associated with them that the Administration was terminating.

*Based Opportunity,*" and "*Initial Rescissions of Harmful Executive Orders and Actions*" Exec.

Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order No. 14148, 90 Fed. Reg. 8237

(Jan. 20, 2025) (together, the "DEI EOs").

The DEI EOs and the statements made by Administration officials about DEI repeatedly

included accusations that DEI offices and their employees had violated civil rights laws, engaged

in discrimination, and were a waste of government funding. For example, EO 14173 specifically

claimed that "critical and influential institutions of American society, including the Federal

Government…have adopted and actively use dangerous, demeaning, and immoral race- and sex-

based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or

'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this

Nation." 90 Fed. Reg. 8633 (Jan. 21, 2025). Deputy Chief of Staff Stephen Miller made explicit

the Administration's claims about DEI programs extended to federal employees in DEI offices:

> This nation has been plagued and crippled by illegal discrimination: diversity, equity, and inclusion policies. It has strangled our economy. It had undermined public safety. It made every aspect of life more difficult, more painful, and less safe. [The President] has ended all DEI across the federal government. He has terminated all federal workers involved in promulgating these unlawful policies . . . and he has cracked down on individuals across this government and nonprofits who have engaged in illegal racial discrimination against the American people.

SKYNEWS, *White House Briefing |Thursday 20 February*, at 13:22 (YouTube, Feb. 20, 2025),

https://www.youtube.com/live/bhTMahRSkko?si=3Qr3C_npjke8Saky&t=802. Following EO

14151, OPM issued guidance directing agencies to close DEI offices, place DEI personnel on

administrative leave, and submit RIF plans for those employees. Off. Person. Mgmt., Initial

Guidance Regarding DEIA Executive Orders at 1 (Jan. 21, 2025) (Ex. 10 at 1-2). Plaintiffs

Bernardino-Redondo, Buist, Frias, and Smith were employed by Defendant Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") in its Office of Diversity, Equity and Inclusion

12

("ODEI"). 1-1, Bernardino-Redondo Decl. at ¶ 2; 1-2, V. Smith Decl. at ¶ 3. ODEI personnel had worked in other offices at ATF prior to when ODEI was created to comply with an EO by then-President Biden. Exec. Order No. 14035, 86 Fed. Reg. 34593 (June 25, 2021); 1-1, Bernardino-Redondo Decl. at ¶ 7. All were put on administrative leave immediately after OPM's January 21, 2025, guidance. 1-1, Bernardino-Redondo Decl. at ¶ 14; 1-2, V. Smith Decl. at ¶ 8. At the time ODEI employees were put on administrative leave, ATF employed approximately 5,000 people and had been in a hiring freeze for more than a year. ATF Employees, ATF at 1 (March 2018) (Ex. 11). ODEI was a small office, embedded in the Director's Office. 1-2, V. Smith Decl. at ¶ 9. To comply with the OPM guidance on the DEI EO, which dictated the closing of related offices and programs but left unstated the requirement to terminate all workers involved, ATF developed a plan that would transfer the seven ODEI employees, including Plaintiffs, to other offices where the agency had operational needs. 1-1, Bernardino-Redondo Decl. at ¶¶ 14-15; 1-2, V. Smith Decl. at ¶ 9. ATF presented its plan to DOJ, which agreed, and forwarded it to OPM. 1-1, Bernardino-Redondo Decl. at ¶15; 1-2, V. Smith Decl. at ¶ 9. The agency's plan, however, would not be followed. 1-1, Bernardino-Redondo Decl. at ¶¶ 14–17.

Following its initial guidance, but before the January 31 due date for agencies to submit their plans, OPM issued "guidance" on January 24, 2025, that stated, "[A]gencies can and should begin issuing RIF notices to employees of DEIA offices now. Agencies are reminded to define the competitive area solely in terms of the DEIA office where the employees worked. *See* 5 C.F.R. § 351.402." Off. Person. Mgmt, Guidance Regarding RIFs of DEIA Offices at 1 (Jan. 24, 2025) (Ex. 12).

On February 5, 2025, pursuant to this OPM guidance, ATF issued a RIF notice to each DEI Plaintiff that listed the competitive area as ATF's DEI Office and concluded by stating that,

"Based on the above criteria, you must be released from employment, and there is no appropriate or eligible position to which you may be reassigned in accordance with 5 C.F.R., Part 351, Subpart G." Dep't of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, Notice of Release Pursuant to 5 U.S.C. § 3502 (Feb. 5, 2025) (Ex. 13 at 2). The notice stated this conclusion even though ODEI did not meet OPM regulations for the minimum size of a competitive area and even though ATF with DOJ's approval had identified other positions that Plaintiffs were not only qualified for but were needed to perform. 1-1, Bernardino-Redondo Decl. at ¶¶ 15, 25; 1-2, V. Smith Decl. at ¶¶ 10–15. In short, the ATF Plaintiffs were separated not because the Agency decided it needed to engage in a RIF or that it did not have other positions for them, but because OPM ordered them separated by illegally narrowing the competitive area to the ODEI office, an office Miller characterized as being staffed by individuals discriminating against white men. The notices asserted a lawful, rule-bound RIF process while withholding any meaningful pre-deprivation mechanism to test the factual predicates for selection, to correct errors, or to contest the stigmatizing grounds repeatedly advanced publicly to justify the eliminations of "DEI" personnel.

 2. The USAID RIF (February 23, 2025)

 Early in the Administration, Elon Musk directed the Department of Government Efficiency ("DOGE") to shut down USAID offices. Musk recounted that, "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down." Jennifer Hansler et al., *Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down,'* CNN (Feb. 3, 2025), https://perma.cc/FD3V-DW5W. At the same time, the Administration began repeated attacks on USAID employees that continue to this day.

On February 11, 2025, in a joint press conference with President Trump, Musk said, "[T]here are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth… which is what happened at USAID[.]" Musk also repeatedly posted about USAID, saying, among other things, USAID was "incredibly politically partisan" and has supported "radically left causes throughout the world including things that are anti-American." Similarly, White House Deputy Chief of Staff Stephen Miller claimed that "98% of the agency's staff donated to former Vice President Kamala Harris or other Democratic candidates in the November election." *Why Is Elon Musk Attacking USAID? How Partisan Politics Made Foreign Aid Agency Suddenly So Controversial*, Forbes (Feb. 3, 2025, 2:17 PM) (Ex. 14).

In late March and early April 2025, USAID Plaintiffs received RIF notices. 1-3, Sampson Decl. ¶ 7; 1-4, Templeton Decl. ¶ 3; 1-5, Reed Decl. ¶ 25. Some USAID Plaintiffs received notices with a separation date of July 1, 2025, and others September 2, 2025. 1-4, Templeton Decl. ¶ 3; 1-5, Reed Decl. ¶ 22. Regardless of separation date, RIF notices were riddled with errors, including containing the wrong service computation dates ("SCDs") and/or missing key information like performance ratings. 1-5, Reed Decl. ¶ 24; 1-6, Cruz-Hubbard Decl. ¶ 7; 1-7, Beegun Decl. ¶ 9; 1-23, Dolina Decl. ¶ 26 ("My RIF letter had an incorrect service computation date likely missing my prior federal service, despite all my SF-50s for over 10 years indicating the correct service computation date.") Some even listed the reason for separation as resignation. 1-8, H. Alexander Decl. ¶ 10.

USAID was shut down, but not all USAID personnel were separated from federal service. USAID has repeatedly extended some of its employees' RIF dates, and often the retained people were lower on the retention register than those separated as part of the RIF. 1-9, Adzei

15

Decl. ¶ 8. Determining where someone falls on the retention register, however, is difficult because many USAID Plaintiffs either did not receive a retention register, it was inaccurate, or it was issued after their RIF notice and sometimes after separation. 1-4, Templeton Decl. ¶ 10; 1-10, Lohsen Decl. ¶¶ 11-12.

As part of the transfer of USAID work to State, it created Limited Non-Career Appointments ("LNAs") to handle the portfolios being transferred from USAID. This system allowed State to put whoever they wanted in the new LNA positions in a non-competitive process without regard for the RIF requirements. 1-7, Beegun ¶ 12; 1-24, Effiom ¶ 11; 1-8, H. Alexander ¶ 15. Indeed, at times, interview questions for these positions made clear the importance of applicants agreeing with the Administration's smears. 1-25, Tenny Decl. ¶ 8 (paraphrasing a question asked during an LNA interview "Throughout the history of USAID, it has been fraught with waste, fraud, and abuse. How will you fix that?"). Virtually all of the USAID LNAs have since been converted to permanent State FSO positions. 1-5, Reed Decl. ¶5; 1-4, Templeton Decl. ¶ 17. At the same time, State separated by RIF civil servants and FSOs, replacing them with chosen people from USAID. *See, e.g.*, 1-33, Gaertner Decl. ¶¶ 24, 25. Thus, by using the LNA process and disregarding the legal requirements for a RIF, Defendant Rubio and others were able to target individuals at USAID and State for removal via RIF.

On or about August 29, 2025, Defendant Rubio put Defendant Vought in charge of "closing out" USAID. Marco Rubio (@SecRubio), Truth Social, *Russ is now at the helm to oversee the closeout of an agency that long ago went off the rails. Congrats, Russ.* (Aug. 29, 2025, at 07:06 ET) (Ex. 15). USAID Plaintiffs were separated on July 1, 2025, or September 2, 2025. Only now, are the USAID Plaintiffs' MSPB appeals starting to move with the beginning of discovery and scheduling orders.

16

Not content to smear and fire them, the Administration has also taken concrete steps that interfere with USAID Plaintiffs' future employment. Since the RIF, Plaintiffs and other separated USAID personnel have been precluded from working at USAID even as contractors to "avoid the risk of impaired objectivity," according to a Jan. 6 memo from the agency's chief terminations officer. Eileen Sullivan, *They're Hiring at U.S.A.I.D. Just Not Anyone Who Worked There*, N.Y. TIMES (Mar. 2, 2026) (Ex. 16 at 5).

3. Department of Education RIF (March 11, 2025)

The Department of Education's March 11, 2025, RIF exemplifies the same unlawful pattern described above. Once again, Administration officials justified their actions by disparaging the federal workers they were about to fire. On the day the President signed the Executive Orders to dismantle the Department of Education, Deputy Chief of Staff Stephen Miller was asked on Fox News why the President was dismantling the Department. His answer, "As we know, the Department of Education here in Washington, D.C., is overwhelmingly staffed by radical left Marxist bureaucrats, who are in every way hostile to Western Civilization, hostile to American interests, and hostile to our founding documents and culture." *Stephen Miller says Dept of Education overwhelmingly staffed by 'radical left Marxist bureaucrats'*, at 01:01 (Fox News, aired Mar. 20, 2025), https://perma.cc/MP7K-35L8. Other high-ranking officials—including President Trump, Secretary McMahon, and Elon Musk—made highly-disparaging public comments about the Department of Education employees subject to the RIF, damaging their employment prospects and professional reputations. 1-29, Gilroy Decl. ¶¶ 13-14; 1-26, Zelnik Decl. ¶ 14.

Like the other actions labeled by the Administration as "RIFs," the Education RIF was implemented through artificially narrowed competitive areas, individualized selection decisions,

and coordinated separations that functioned as targeted removals rather than a neutral workforce realignment. 1-26, Zelnik Decl. ¶¶ 5-6; 1-27, Gibbs Decl. ¶¶ 21, 25; 1-28, Crowe Decl. ¶¶ 5, 26–28. The structure of the process again ensured predetermined outcomes while preserving the appearance of regulatory formality.

Education employees were selected and separated without any meaningful pre-deprivation opportunity to challenge competitive-area determinations, retention rankings, or the factual predicates underlying their selection. 1-29, Gilroy Decl. ¶ 10; 1-26, Zelnik Decl.  ¶¶ 9-11. In most instances, employees were immediately placed on administrative leave, stripped of credentials and system access, and functionally removed from their positions upon being informed of their selection—before any response could occur and without any mechanism to halt or correct errors prior to separation. 1-29, Gilroy Decl. ¶ 7; 1-27, Gibbs Decl. ¶¶ 7-9; *see Reduction* in Force Class Appeal, *Bryson et al. v. U.S. Dep't of Edu.*, MSPB Docket Nos. SF-0351-25-1796-I-1, AT-0351-25-2132-I-1 (Sept. 2, 2025) (Ex. 17). The nearly 2,000 separated employees (approximately 50% of the workforce), combined with the Department's continued enforcement of separations and opposition to reinstatement, has resulted in prolonged periods without pay, benefits, or professional standing while appeals remain unresolved.  1-16, Morrison Decl. ¶¶ 20-25; 1-30, Lima Decl. ¶¶ 28–34.

4. The DHS RIF (March 21, 2025)

In March 2025, the Department of Homeland Security ("DHS") issued RIF notices to all non-SES employees in three offices, including the Office for Civil Rights and Civil Liberties ("CRCL"). Compl., *Robert F. Kennedy Human Rights v. U.S. Department of Homeland Security*, No. 1:25-cv-01270, (D.D.C. Apr. 24, 2025), ECF No. 1 (the "RFK litigation"), (Ex. 18 at 3). The

DHS Plaintiffs worked in CRCL, all were separated through a process labeled a "RIF" by DHS, and all of them appealed those separations to the MSPB. 1-31, Batcha Decl. ¶¶ 4–5.

As with the other RIFs, DHS did not discuss the need for restructuring or downsizing, but rather alleged the employees were the problem. For example, on the same day that DHS issued the RIF notices, DHS spokesperson Tricia McLaughlin explained the Administration's decision by stating, "These offices have obstructed immigration enforcement by adding bureaucratic hurdles and undermining [the department's] mission," and "[r]ather than supporting law enforcement efforts, they often function as internal adversaries that slow down operations." *Homeland Security makes cuts to civil rights and immigration oversight offices*, NPR News (aired Mar. 21, 2025, 5:02 PM), https://perma.cc/4Q33-R8PP.

Much of CRCL's work is statutorily mandated. 1-31, Batcha Decl. ¶¶ 5, 7–8. Statements made by DHS officials to CRCL employees made clear that their work would continue by other unknown offices. Office of Civil Rights and Civil Liberties, Homeland Security (last updated Sept. 3, 2025), https://perma.cc/3G3Z-X37H; 1-31, Batcha Decl. at ¶ 7. Despite the acknowledgement that their work would continue, the CRCL Plaintiffs received RIF notices. The notice stated that CRCL was being dissolved and their positions abolished. It also stated:

> Staff of the OCHCO is available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. You are entitled to a copy of OPM's retention regulations found in 5 CFR Part 351, which will be provided to you upon request, and you may inspect the appropriate retention register through the OCHCO. You may obtain any information in writing by sending your request to OCHCO – RIF Team, email: workforceshapinghq@hq.dhs.gov.

A-32, Sazama Decl. ¶ 12.[7] However, inquiries to this email requesting documents to which CRCL employees were entitled went unanswered. *Id.* at ¶¶ 13–14.

---

[7] Ms. Sazama is not a plaintiff to this action.

On April 24, 2025, three non-profits sued DHS for abolishing CRCL and two other offices, arguing, among other things, the dissolution violated Congress's express statutory direction that the offices must exist and perform various functions. Complaint, RFK Litigation (Ex. 18). In response, DHS reversed its position and stated, "The Offices will continue to perform their statutorily mandated duties after the RIF takes place." Decl. of Ronald J. Sartini, RFK Litigation, ECF No. 27-1 (D.D.C. May 18, 2025) (Ex. 19 at 5). Despite being on administrative leave when this occurred, CRCL Plaintiffs were not reinstated. Instead, DHS undertook efforts to hire new personnel, including posting new positions on the USAJobs website. 1-32, Sazama Decl. ¶¶ 25.

After the CRCL Plaintiffs had been separated, DHS moved to re-establish the office with new personnel. As DHS explained in a status report to the Court in the RFK litigation, "Since the Reduction-in-Force took effect on Friday May 23, the Offices are free to create new positions and seek applicants." RFK litigation, ECF No. 39 (D.D.C. May 27, 2025) (Ex. 20 at 1). Once the specific people who had been targeted for removal were gone – the "internal adversaries" – DHS was happy to fill their positions with new hires.

5. The State Department RIF (July 11, 2025)

On April 22, 2025, Defendant Marco Rubio announced a reorganization of the Department of State. Marco Rubio, *A New State Department to Meet the Challenges of a New Era*, U.S. Dep't State (Apr. 22, 2025), https://perma.cc/3UWN-889Y. In doing so, he targeted a group of offices known as the "J family," claiming they "provided a fertile environment for activists to redefine 'human rights' and 'democracy' and to pursue their projects at the taxpayer expense, even when they were in direct conflict with the goals of the Secretary, the President, and the American people." *Id.*

20

Rubio went on to assert that the Bureau of Democracy, Human Rights, and Labor "became a platform for left-wing activists to wage vendettas against 'anti-woke' leaders" and that the Bureau of Population, Refugees, and Migration had "funneled millions of taxpayer dollars to international organizations and NGOs that facilitated mass migration around the world, including the invasion on our southern border." *Id.* Other State officials echoed Secretary Rubio's emphasis on the projected political ideology and affiliations of the State workforce. *See, e.g.,* Michael Rigas, Deputy Secretary of State for Management and Resources, Opening Statement on Reforming the State Department to Compete in the 21st Century at the Senate Foreign Relations Committee (July 16, 2025) (Ex. 21).

Following the same playbook used in other RIFs, State manipulated its competitive areas to target employees, including expanding the number of its competitive areas from fewer than 40 to approximately 1,500. U.S. Dep't State, 3 FAH-1 H-2530 Reduction in Force - Civil Service, https://perma.cc/DC2J-7FGG. Offices whose work continued to be performed elsewhere were designated as discrete competitive areas, including competitive areas consisting of a single employee. 1-33, Gaertner Decl. ¶ 21. Unsurprisingly, all of the employees in the offices singled out by Defendant Rubio as being allegedly filled with "left-wing" activists were separated, even though many of their functions continued in or were transferred to other offices. 1-34, Paris Decl. at ¶ 25 ("[O]n the day we received our RIF notices, I and a few other S/GWI colleagues were taunted by an official on the 7th floor who told us he was 'so glad' we were terminated."); 1-35, Glaudemans Decl. ¶ 21 ("After January 20, 2025, it became common to hear the terms 'radical leftists' and 'radical leftist Marxists' thrown at offices and people, particularly those who worked in human rights.").

21

The State Department issued RIF notices to more than 300 FSOs, employees specifically trained to be able to work in a variety of jobs, even as it continued to hire new classes of FSOs. 1-11, Karabatak Decl. ¶ 42. Likewise, civil servants who were separated in September have seen job announcements for the same position description posted. 1-33, Gaertner Decl. ¶ 50–52; 1-12, Patel Decl. ¶ 47 (noting that her office continued to seek additional staff for refugee case processing, work previously performed by RIF'd civil servants). Some have even been called by their replacement to inquire about how to do their jobs. 1-13, Aslan Decl. ¶ 17; 1-14, Edinger Decl. ¶ 12. Jobs were also simply transferred to a new office or to another office, but the employee who had been performing the job function was separated. 1-34, Paris Decl. ¶¶ 5–6; 1-12, Patel Decl. ¶ 47; 1-15, Duerr Decl. ¶ 11.

The State RIF notices provided no means for an employee to correct or otherwise be heard about mistakes or other RIF issues prior to their separation but did provide that they "may contact RIFQs@state.gov for questions and to assist you with out-processing procedures." *Id.* The RIF was riddled with errors. With nowhere identified to raise such errors, employees often sent them to the RIFQs inbox. 1-15, Duerr Decl. ¶ 6; 1-16, Morrison Decl. ¶ 14. Errors ran the gamut, but common ones were the wrong service computation dates and wrong application of veteran's preferences. 1-12, Patel Decl. ¶ 8; 1-15, Duerr Decl. ¶ 6; 1-30, Lima Decl. ¶ 20. When at least one employee went directly to an HR contact to inquire about the RIF calculations (competitive area, service computation date, etc.), the HR professional said that there was no real process behind the decisions, but they were not going to be fixed, and the Department was not going to bring anyone back. *See 1*-25, Glaudemans Decl. ¶ 16 (detailing that a colleague had been told by an HR Specialist that the service computation dates were "bullshit" and that those in charge of the RIF "just made it up to look like they went through a process"); *see also* 1-11,

22

Karabatak Decl. ¶ 34 ("When asked about transferring employees to vacant positions instead of separating them, Under Secretary Jeremy Lewin said that, in theory, we would be a great fit for those positions, but that we were in the 'RIF zone' and that the point of the RIF was to 'get rid of bodies.'"). No meaningful mechanism existed to correct the pervasive errors prior to separation. Service computation dates and veterans' preference statuses remained misstated; competitive areas stayed artificially fragmented with no factual basis for their definition; and employees were consistently informed that separation was mandatory without any opportunity to contest the underlying factual predicates before removal from payroll.

There has been no meaningful progress in the State Department Plaintiffs' MSPB appeals.

### III. JURISDICTION AND JUSTICIABILITY

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs raise substantial federal questions under the Fifth Amendment and the Administrative Procedure Act (APA). Plaintiffs do not ask this Court to decide individualized RIF compliance disputes, such as recalculating retention registers, reranking competitive levels, or resolving who should have been retained under 5 C.F.R. Part 351. Plaintiffs instead seek declaratory and injunctive relief to halt ongoing Executive action that: (1) deprived them of protected property and liberty interests without constitutionally required pre-deprivation process; and (2) compels them into an adjudicatory system over which the Executive has asserted binding interpretive authority, budgetary leverage, and docket control in a manner not only inconsistent with Congress's design of an independent tribunal, but that essentially substitutes OMB and DOJ in the decision-making process for the MSPB in all but name. *See supra* at Sections II.B.

Defendants are expected to argue that the CSRA, 5 U.S.C. §§ 7701–7703, implicitly precludes district-court jurisdiction under *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). That argument fails because Congress did not intend to channel such claims to a non-independent MSPB, and because Plaintiffs bring structural and *ultra vires* claims that are wholly collateral to MSPB merits review, fall outside the OMB/DOJ's and even the MSPB's institutional competence, and cannot receive meaningful judicial review if forced through the very process Plaintiffs challenge. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994); *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191–95 (2023); *NAIJ*, 139 F.4th at 305-08. In the *Thunder Basin* inquiry, the Court first evaluates whether Congress intended to preclude district court review of certain claims, and then whether the instant claims are the type precluded.

### A. Congress Did Not Preclude under these Circumstances, and Elgin Does Not Control.

In *Elgin*, the Supreme Court held that Congress' intent for the CSRA to preclude district court jurisdiction was "fairly discernable in the statutory scheme," *Elgin*, 567 U.S. at 17, and found that the CSRA therefore requires federal employees to first seek MSPB review of certain enumerated employment actions (which tellingly do not include RIFs), *id*. at 23. However, the Fourth Circuit recently concluded that *Elgin* will not control if the statute is not functioning as Congress intended. *NAIJ* 139 F.4th at 305. The CSRA requires a "strong and independent" MSPB free from "any control or direction of the President." *Id.* at 306 (quoting S. Rep. 95-969, at 6-7, 24). That independent MSPB no longer exists or is not being applied to these Plaintiffs, and thus *Elgin* no longer controls. In the time since the Fourth Circuit found that further fact finding was necessary on whether the MSPB was functioning as Congress intended in *NAIJ*, the Administration has continued its systematic dismantling of the MSPB's statutorily mandated independence as described above in II.B. Accordingly, *Elgin* does not control the outcome here.

24

The MSPB Congress intended was to "exercise statutory responsibilities independent of any Presidential directives," but the changes made by the Administration to the MSPB have reduced the MSPB effectively to nothing more than the front-end bureaucracy for Defendants OMB and DOJ and ultimately the President. Thanks to the EO, OMB has the final say on: (1) performance standards for the MSPB Chair; (2) budget obligations with the ability to adjust the MSPB's apportionments by activity, function, and project; and (3) the MSPB's strategic plan. The MSPB also has a White House liaison to regularly "consult and coordinate" policies and priorities with White House officials. Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448–49 (Feb. 24, 2025). Add to that, the MSPB is bound by legal interpretation by the Department of Justice, which already has used this power to reverse MSPB AJ opinions that went against the Administration. *Id.; supra* at Sections II.B And, of course, the Administration takes the position it can fire anyone at the MSPB. Together, there is truly little the MSPB has the authority to do beyond issue paperwork to implement whatever OMB or DOJ decides.

The result is a process where former federal employees may wait years for a decision on their initial appeal – a decision that is being made not by the MSPB, but by the very Administration that maligned and fired them in the first place. *See NAIJ*, 139 F.4th at 305 ("[I]f the [MSPB and Special Counsel] fail to perform their duties such that covered employees' claims are not adequately processed, then the framework of the CSRA would be thwarted."). Having abandoned the entire statutory framework of the CSRA in all but name, the Administration should not be able to invoke it for channeling.

Even if, however, the Court favored form over substance and credited the MSPB as somehow still operating sufficiently for *Elgin* to be relevant, Plaintiffs' claims here would not be covered. *Elgin* addressed constitutional challenges to the federal statute used to enact their

25

removals, brought within an intact CSRA review scheme, and emphasized the MSPB's ability to provide meaningful review within that framework. 567 U.S. at 10–13, 23. Plaintiffs do not raise constitutional challenges to the statutes under which their removals were effected within an assumed-valid adjudicatory system. Rather, Plaintiffs challenge the current structure of the system itself.

Plaintiffs' structural allegations rest on concrete examples within the MSPB process. The overruling of the MSPB AJ in *Jackler* and the related appeal, discussed *supra* at Sec. II.B, undermine the premise on which *Elgin*'s channeling analysis depends. *Elgin* presumes an adjudicator capable of exercising independent judgment within the statutory scheme and providing meaningful review. 567 U.S. at 23; *NAIJ*, 139 F.4th at 305. Defendants displaced that premise with an Executive-controlled framework in which the Executive asserts binding interpretive authority within MSPB adjudication while simultaneously enforcing separations and channeling challenges into that forum. *See supra* at Section II.B. *Elgin* does not require Plaintiffs to submit structural constitutional challenges to the very adjudicatory regime whose legality and independence they contest. *See Axon*, 598 U.S. at 191–95; *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 489–91 (2010).

Moreover, nothing in the CSRA demonstrates Congressional intent to channel review of RIF actions exclusively to the MSPB.[8] The CSRA "makes MSPB jurisdiction over an appeal dependent only on the nature of the employee and the employment action at issue" and "does not encompass every adverse personnel action against a federal employee." *Elgin*, 567 U.S. at 18; *King v. Jerome*, 42 F.3d 1371, 1374 (Fed. Cir. 1994). RIFs do not fall under the enumerated list

---

[8] The Foreign Service Act also does not give exclusive jurisdiction over RIFs to the MSPB but instead permits FSOs to appeal a RIF to the MSPB or the Foreign Service Grievance Board, depending on the nature of the challenge. 22 U.S.C. § 4010a(c).

26

of adverse actions which the Supreme Court found to be channeled to the MSPB. *Elgin*, 567 U.S. at 12; 5 U.S.C. § 7512.

Further, Defendants admit that Congress did not create an appeal right to the MSPB for RIFs, 91 FR 5861, 5861, and indeed, there is no statutory language which requires MSPB review. MSPB jurisdiction over RIF appeals derives exclusively from OPM's regulations at 5 C.F.R. § 351.901 and such regulations cannot be found to remove jurisdiction from Article III courts. Congress granted OPM the power to create regulations to carry out the CSRA, 5 U.S.C. § 1103, but it does not follow that the ability to regulate carried with it the power to remove certain personnel actions from the district courts' jurisdiction entirely. Defendants have presented these actions as RIFs; they cannot now argue that they are exclusively statutorily channeled to the MSPB.

### B. Plaintiffs Suffer Injury from Compelled Submission to the Challenged Proceedings.

Plaintiffs' claims must not be channeled to the MSPB because the MSPB proceedings are a substantial source of their injuries. *See Axon Enterprise, Inc.*, 598 U.S. at 191–95. Plaintiffs' present injury arises because Defendants insist that MSPB proceedings are the exclusive avenue for review and compel Plaintiffs now to submit to that process while the separations remain in force. Plaintiffs' injury does not depend on the eventual outcome of MSPB adjudication. Instead, Plaintiffs challenge compelled submission itself as a constitutional injury where the forum's structure and governing legal framework have been subordinated to the same Executive authority that ordered and continues to enforce the challenged deprivations.

*Axon* controls this kind of injury. Judicial review is not meaningful when a party must endure an allegedly unconstitutional proceeding as the price of later review, because the injury

27

lies in being forced to undergo the proceeding at all. 598 U.S. at 191, 193. Plaintiffs allege that precise harm here.

### C. Thunder Basin Confirms the CSRA Does Not Preclude Jurisdiction Over these Claims.

In the second stage of *Thunder Basin* analysis, courts examine whether the claims are of the type intended to be precluded in district court, including consideration of whether channeling would foreclose meaningful judicial review, whether the claims are wholly collateral, and whether the claims fall outside agency expertise. 510 U.S. at 212–13. Each factor supports jurisdiction here.

1. Channeling Would Foreclose Meaningful Judicial Review.

Channeling forecloses meaningful judicial review for two independent reasons grounded in Plaintiffs' record. First, Plaintiffs suffered a completed due process violation at the moment of separation because Defendants denied them constitutionally required pre-deprivation notice and opportunity to be heard before depriving Plaintiffs of employment, pay, benefits, and professional standing. *See supra* at section II.C. Where pre-deprivation process is feasible, due process requires it. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–47 (1985). Later administrative review cannot retroactively supply the process the Constitution required before the deprivation occurred.

Second, Plaintiffs allege an ongoing structural injury from compelled submission to an Executive-controlled adjudicatory process that cannot provide meaningful, independent relief. *See supra* at II.B. *Axon* explains why post hoc review does not cure this injury. A proceeding that has already occurred cannot be undone, and the injury lies in being forced to undergo the challenged process at all. 598 U.S. at 191, 193. Compelled submission also lacks meaning when

the Executive asserts that its own legal interpretations bind the adjudicator in proceedings in which the Executive is the litigant. *See supra* at Section II.B.

The availability of eventual Federal Circuit review under 5 U.S.C. § 7703 does not cure this defect. Federal Circuit review presumes a record developed before an adjudicator exercising independent judgment within the statutory scheme. Defendants have abandoned the MSPB in all but name, leaving the true decision-making power with OMB and DOJ by asserting centralized interpretive authority over MSPB adjudication itself through Executive Order 14215 and binding OLC submissions, while simultaneously leveraging budgetary control and docket management to constrain the tribunal's functioning. *See supra* at Section II.B. Requiring Plaintiffs to exhaust that process does not preserve meaningful review; it exacerbates their suffered injuries and conditions access to Article III courts on enduring the very injury they challenge. In any event, Defendants have so effectively captured and corrupted the administrative process that it is unclear when, if ever, any Plaintiff will get to the Federal Circuit.

### 2. Plaintiffs' Claims Are Wholly Collateral to MSPB Merits Determinations.

Plaintiffs do not ask this Court to determine whether any employee was properly ranked, scored, or retained under Part 351. Plaintiffs challenge the Executive's asserted authority to deploy the "RIF" label to effectuate predetermined and stigmatizing separations without meaningful pre-deprivation process and then to compel exclusive channeling into an adjudicatory framework the Executive has asserted authority to control. *See supra* Sections II.A.1, B, and C. Resolution of those structural and *ultra vires* questions does not require adjudication of any individual retention decision. *See Axon*, 598 U.S. at 192–94; *Free Enterprise Fund*, 561 U.S. at 489–91.

### 3. Plaintiffs' Claims Fall Outside of Institutional Competence.

As an initial matter, given how the MSPB is actually operating, the real decision-makers are OMB and DOJ, not the MSPB, and thus Plaintiffs are not being channeled to the expert agency contemplated by the CSRA and FSA. Regardless, the MSPB has no special competence to determine whether the Executive may centralize legal interpretation for independent adjudication, leverage budgetary control to constrain the tribunal, and treat OLC opinions as binding within MSPB proceedings. *See supra* at Section II.B. Nor can it provide the prospective relief Plaintiffs seek by halting ongoing Executive enforcement of separations while the alleged structural defects persist. It makes no sense to require litigants to present claims to adjudicators who lack power to grant the relief requested. *Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021).

Because channeling would foreclose meaningful judicial review, Plaintiffs' claims are wholly collateral, and the claims fall outside agency competence, the CSRA does not preclude district-court jurisdiction. *Thunder Basin*, 510 U.S. at 212–13; *Axon*, 598 U.S. at 191–95.

## IV. ARGUMENT

Plaintiffs have been subjected to an unlawful deprivation and an unlawful process—one that inflicts present harm and forecloses effective relief. Judicial intervention is required now, not after years of futile administrative proceedings. In order to receive a preliminary injunction, a plaintiff must establish "1) that the plaintiff is likely to succeed on the merits; 2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities weighs in the plaintiff's favor; and 4) that a preliminary injunction is in the public's interest." *Scott v. Bierman*, 429 Fed. App'x. 225, 228-29 (4th Cir. 2011); *see also WV Ass'n of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### A. Plaintiffs Are Likely to Succeed on the Merits.

30

As set forth in detail below, Plaintiffs are likely to succeed on the merits of the claims described in Counts I and II of the Complaint.

1. Defendants Violated Plaintiffs' Fifth Amendment Due Process Rights.

The Fifth Amendment's Due Process Clause exists to prevent exactly what occurred here: the Government's deliberate deprivation of employees' protected property and liberty interests through a stigmatizing process that afforded no meaningful opportunity to be heard before the harm was done. As established in the Background, Defendants executed a coordinated program of separations nominally labeled as reductions in force but implemented through targeted selections and predetermined elimination of employees while publicly disparaging their service, loyalty, and fitness. Defendants' own public statements establish that this was not a neutral, across-the-board workforce reduction carried out through impersonal criteria. It was a for-cause deprivation in substance, imposed without the pre-deprivation procedural protections the Constitution requires. Plaintiffs were deprived of their employment, pay, benefits, and professional standing without constitutionally adequate notice and without any pre-deprivation opportunity to respond. When the Government combines reputational condemnation, individualized targeting, and known factual inaccuracies with the immediate loss of employment and benefits, due process requires a meaningful opportunity to respond before the deprivation is executed. *See Loudermill*, 470 U.S. at 542–47; *Zinermon v. Burch*, 494 U.S. 113 at 132 (1990).

*a. Plaintiffs Were Deprived of Protected Property and Liberty Interests.*

Career federal employees whose removal is constrained by statute and regulation possess a protected property interest in continued employment and pay. *Loudermill*, 470 U.S. at 542–46; *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Johnson v. Dep't of Air Force*, 50 F.4th 110, 115 (Fed. Cir. 2022). Plaintiffs were deprived of that interest when Defendants separated them

31

from service and removed them from pay and benefits through actions that functioned in substance as for-cause removals, implicating not only Plaintiffs' protected property interest but also their constitutionally protected liberty interest.

Moreover, Plaintiffs were not separated pursuant to a neutral, position-eliminating workforce adjustment. Instead, Defendants publicly justified Plaintiffs' removals through fault-based and stigmatizing assertions that cast affected employees as incompetent, unproductive, dishonest, disloyal, or unfit for continued public service. Senior Administration officials articulated those justifications repeatedly and in public and official settings. *See supra* Part II.C. For example, the President stated that "many of them don't work at all" and that "many of them never showed up to work," and explained that the purpose of the reductions was to "cut the people that aren't working or not doing a good job" while "keeping the best people." Rebecca Shabad and Kelly O'Donnell, *Trump says he feels 'very badly' for fired federal workers but 'many of them don't work at all,'* NBC News (Mar. 12, 2025, 11:13 AM) (Ex. 9 at 8). The Vice President echoed that framing, stating that "some people clearly are collecting a check and not doing a job." *'He made mistakes': Vance on Doge's Musk firing thousands of federal employees*, First Post (Mar. 15, 2025) (Ex. 9 at 10). Other senior officials similarly questioned whether terminated employees were "fit to have a job" or even "willing to come to work." J.D. Simkins, *Trump lawyer on fired vets: 'Perhaps they're not fit to have a job,'* Military Times (Mar. 4, 2025) (Ex. 9 at 5).

Administration officials further justified these terminations by asserting misconduct and abuse of public trust. Employees and offices were accused of overseeing "billions of dollars in wasteful spending and massive regulatory overreach," *E&E News* (Oct. 14, 2025) (Ex. 9 at 12) of "rip[ping] the American people off," *PBS News* (Feb. 6, 2025) (Ex. 9 at 13) and of being

32

"corrupt, incompetent and unnecessary deep state bureaucrats." Rally Remarks, reported by *Politico* (Apr. 29, 2025) (Ex. 9 at 11). Officials also attacked the loyalty and legitimacy of career civil servants, asserting that federal employees must prove themselves "great American patriots." Turning Point USA Conference Remarks (Jan. 6, 2026), reported by *Ms. Magazine* (Ex. 9 at 4).

These statements were not abstract political rhetoric or generalized policy critiques. They were stated justifications for termination and asserted factual propositions about Plaintiffs' competence, integrity, performance, and loyalty—propositions that are inherently contestable and carry severe reputational consequences. For example, a career coach advised Plaintiff Morrison to relabel "Department of Education" as "a government agency" or "cabinet-level agency" on her job applications, since the agency's reputation and employees' reputations have been tarnished. 1-16, Morrison Decl. ¶ 25. Plaintiff Angel Sharma had a non-profit contact tell her that the entity's Director was not inclined to hire someone from her office at State given the stigma associated with RIF'd employees and a fear of the nonprofit being targeted if they were to hire her,[9] resulting in her losing an opportunity for a job for which she was professionally qualified. 1-18, Sharma Decl. ¶ 13; *see also 1*-4, Templeton Decl. ¶ 22 ("In the course of networking and job searching since my separation, individuals in a position to hire or refer candidates have expressed concern to me about hiring former USAID staff due to the perceived hostility of the current Administration toward the agency and its former employees. The stigma

---

[9] At the same time the highest officials in Government were stigmatizing employees who had been removed through actions labelled "reductions in force", the Government was also attacking funding for non-profits, even employing some of the same language it used to justify firing employees in RIFs. *See, e.g.,* Trump's cuts to grant funding are upending decades of cooperation with nonprofits | AP News (Sept. 5, 2025) (White House spokesperson Kush Desai characterizing the non-profit grants as "government largesse" that is "riddled with corruption, waste, fraud, and abuse"). Such attacks on private sector entities have been constant and across various sectors, ranging from issuing executive orders targeting law firms in the early days of the Administration to recently stripping funding from Catholic Charities following a public dispute with the Pope. *See* Trump's Executive Orders Against Law Firms, Free Speech Center at Middle Tennessee State University (March 13, 2026), https://firstamendment.mtsu.edu/article/trumps-executive-orders-against-law-firms/; Trump Yanks $11 Million From Catholic Charity Aiding Migrant Children, Forbes (Apr. 16, 2026).

attached to USAID service is widely known in the professional communities where my skills and experience would otherwise be valued."). The allegations also affected how Plaintiffs were seen in their community. *See* 1-19, Nenon Decl. ¶ 7 ("When I returned to my home town, I was asked many times about the unfounded accusations. Because they were widespread and carried out through various media outlets, friends and family were well aware and thought the accusations were true since it came from the White House. The implications were that I was actively involved in acts of corruption or that I was too incompetent to prevent corruption and therefore, willingly participated. As such, I was forced to defend my personal integrity and the integrity of USAID. To a person of faith, this was deeply offensive and traumatizing."). When the Government makes stigmatizing allegations "in connection with the discharge of an employee," and those allegations "might seriously damage his standing and associations in his community" or foreclose future employment opportunities, a protected liberty interest is implicated. *Roth*, 408 U.S. at 573–74; *Paul v. Davis*, 424 U.S. 693, 708–09 (1976); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) ("a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest."); *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006).

Plaintiffs' sworn declarations evidence the stigmatizing and fault-based nature of the Government's justifications and demonstrate that these actions did not eliminate positions or functions but instead removed particular employees while preserving the work. As Plaintiff Karabatak explains in his sworn declaration: "My position was not eliminated as part of any genuine reorganization. The Department retained the functions of my role and continued the work after my separation." 1-11, Karabatak Decl. ¶ 36. Plaintiff Gaertner attests that "the same

34

work I had been performing continued to be done by others," even as she was barred from access and from any opportunity to contest the basis for her separation. 1-33, Gaertner Decl. ¶ 51.

Other Plaintiffs attest directly to the reputational consequences of the Government's public narrative and the way it branded them as unfit for continued service. Plaintiff Edinger explains that, following the public justifications for the RIF, "the message conveyed was not that my position was eliminated, but that *I* was the problem—that I was unnecessary or unqualified— despite never having been disciplined or criticized for my work." 1-14, Edinger Decl. ¶ 14. Plaintiff Flores Rodriguez similarly attests that the public framing of the separations "created the perception that I was removed because of deficiencies in my performance or judgment, even though I had never been told my work was inadequate and had consistently met or exceeded expectations." 1-17, Flores Rodriguez Decl. ¶ 13. Plaintiff Flores Rodriguez further explains that this narrative has followed him beyond the separation itself, stating in his sworn declaration that "prospective employers have treated my removal as a reflection on my competence and integrity, not as a neutral reduction in force." *Id.* at ¶ 14.

On this record, Plaintiffs' separations were accompanied by stigma of precisely the kind the Constitution protects against. By choosing to justify Plaintiffs' removal through fault-based, stigmatizing, and contestable assertions, Defendants deprived Plaintiffs of a protected liberty interest in connection with their termination from federal service.

b. *Plaintiffs Were Not Provided Constitutionally Adequate Notice.*

Due process requires advance notice that is "reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965). To meet this standard, notice must accurately state the factual and legal bases actually relied upon for the deprivation with sufficient

35

particularity to permit a meaningful opportunity to respond before the deprivation occurs. *Loudermill*, 470 U.S. at 545–46; *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 271 (1970) ("To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on[.]"). Notice fails this constitutional function where it omits material information, misstates the grounds for action, or conceals facts relied upon by the decision-maker. *Stone v. FDIC*, 179 F.3d 1368, 1376–77 (Fed. Cir. 1999); *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1280–81 (Fed. Cir. 2011).

The notices issued here failed these requirements. Styled as routine RIF notifications, they portrayed Plaintiffs' selections as the mechanical product of neutral regulatory criteria while concealing the actual bases for the decisions made public otherwise. As set forth in the Background, competitive areas were artificially narrowed, rankings were manipulated, and outcomes were effectively predetermined. The notices did not disclose that Plaintiffs' selections rested on judgments applied to employees or particular groups of employees that departed from neutral lawful RIF criteria and reflected discriminatory assessments about those employees, their integrity, their performance, their alleged misconduct, or their perceived political affiliation. *See supra* at Section II.C.

Due process requires disclosure of the real reasons for a deprivation, not a sanitized or incomplete account that masks the decision-maker's actual rationale. In *Stone*, the Federal Circuit held that due process is violated where a deciding official relies on information not disclosed to the employee, because concealment deprives the employee of any meaningful chance to respond. 179 F.3d at 1376–77.

The notices were further constitutionally defective because they were not reasonably calculated to inform plaintiffs of an opportunity to present their objections and misdirected

Plaintiffs about what could be contested before the deprivation occurred. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14 (1978) (quoting *Mullane v. Central Hanover Bank Tr. Co.,* 339 U.S. 306, 314 (1950)). Plaintiffs were not informed that once their separations became effective, there would be no mechanism to halt enforcement, no interim relief, and no ability to prevent the immediate loss of pay, benefits, credentials, and professional standing. Background, *supra* at II.C. By omitting these material consequences, the notices deprived Plaintiffs of any realistic ability to marshal a response capable of preventing the deprivation as it unfolded.

The notices also did not inform employees that the MSPB was no longer operating as an independent agency under the CSRA or that any appeal to it would be governed by the legal opinions of the Department of Justice and policy decisions of OMB. Nor did the notices inform Plaintiffs that any effort to get before an Article III court would be effectively blocked by the crush of cases being channeled into the MSPB process. Background, *supra* at II.B. and C.

As *Loudermill* and *Goldberg* make clear, notice must be sufficient to enable an employee to make a meaningful choice about how to respond before the deprivation occurs. 470 U.S. at 546; 397 U.S. at 267–68; *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented."). Notice that obscures the true grounds for action, conceals the practical impossibility of pre-deprivation relief, and misrepresents post-deprivation relief does not satisfy that requirement.

Because Plaintiffs were not informed of the true bases for their selection or of the material constraints on their ability to contest the action before and after separation, they lacked constitutionally adequate notice and any meaningful opportunity to be heard. The Due Process

Clause does not permit the Government to obscure the grounds for its action, execute the deprivation, and then defend the result through *post hoc* process.

### c. Defendants Denied Plaintiffs Any Pre-Deprivation Opportunity to Be Heard.

Where the Government can feasibly provide pre-deprivation process, due process requires notice and a meaningful opportunity to respond before the deprivation occurs, particularly where the deprivation turns on disputed facts, individualized judgments, or stigmatizing determinations. *Loudermill*, 470 U.S. at 542–46; *Goldberg,* 397 U.S. at 267–68. The Constitution permits postponement of pre-deprivation process only in narrow circumstances— such as genuine emergencies or situations where providing prior process is impracticable. *Zinermon*, 494 U.S. at 132; *Fuentes*, 407 U.S. at 90–92. When pre-deprivation safeguards are constitutionally required and are omitted, the violation is complete at the moment of deprivation and cannot be cured by subsequent proceedings. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (holding that post-deprivation proceedings did not cure the lack of pre-deprivation notice and hearing); *Zinermon*, 494 U.S. at 132; *see Cannon v. Vill. of Bald Head Island, N.C.*, 891 F.3d 489, 504–06 (4th Cir. 2018) ("the Fourth Circuit has generally affirmed that name-clearing hearings in stigma-plus cases must occur 'before the State deprives a person of liberty and property.'").

Plaintiffs were afforded no pre-deprivation opportunity—written or oral—of any kind to challenge erroneous competitive-area determinations, contest manipulated rankings, correct factual inaccuracies, or respond to the disparaging characterizations underlying their removal. *See supra* at Section II.C. The separations were not spontaneous, exigent, or reactive. They were planned and coordinated in advance, implemented through agency-wide directives, and executed according to predetermined outcomes. Under settled Supreme Court precedent, such

circumstances require pre-deprivation safeguards. *Loudermill*, 470 U.S. 532 (1985) (government employment); *Goldberg,* 397 U.S. 254 (1970) (welfare payments); *Fuentes*, 407 U.S. 67 (1972) (property repossession); *Goss v. Lopez*, 419 U.S. 565 (1975) (school suspension); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (parole); *Wolff v. McDonnell*, 418 U.S. 539 (1974) (good time credits for inmates).

Here, many Plaintiffs were immediately placed on administrative leave upon being informed of their selection; stripped of credentials, system access, and the ability to perform their duties; and functionally removed from their positions before any opportunity to respond could even theoretically occur. *See supra* at Section II.C. No Plaintiff had a meaningful opportunity to contest their RIF notice prior to termination. The deprivation was not only predetermined but carried out in a manner that foreclosed any possibility of contemporaneous input or correction. Post-deprivation process at the MSPB provides no mechanism to halt the deprivation or prevent the cascading harms caused by separation and stigma. Even where MSPB adjudication might theoretically provide back pay or judicial review might allow for damages, the arbitrary taking of property subject to the right of procedural due process cannot be cured after the fact. *Fuentes*, 407 U.S. at 81–82.

Post-deprivation proceedings likewise cannot undo reputational injury when, as here, stigma is imposed in connection with termination and the alteration of Plaintiffs' legal status, rendering the deprivation complete at the moment of separation. Where termination is accompanied by stigma that seriously damages an employee's standing in the community or forecloses future employment opportunities, the injury is complete when the deprivation occurs and cannot be cured by later review. *Roth*, 408 U.S. at 573–74; *Paul*, 424 U.S. at 701–10; *Wieman v. Updegraff*, 344 U.S. 183, 190 (1952) ("There can be no dispute about the

39

consequences visited upon a person excluded from public employment on disloyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy.").

The contrast with cases in which pre-deprivation process has been excused confirms the violation here. In *Gilbert v. Homar*, the Supreme Court upheld a temporary suspension without a prior hearing only because the employee had been arrested on felony charges, creating an immediate and objectively verifiable basis for action and a legitimate governmental interest in swift response. 520 U.S. 924, 930–35 (1997). The Court emphasized that the arrest itself supplied assurance that the suspension was not baseless and that exigent circumstances justified postponing a hearing. *Id.* at 933–34. No such circumstances exist here. Plaintiffs were not arrested or even investigated for alleged criminal conduct, no one claimed that they posed some immediate risk, and they were removed pursuant to a planned personnel action resting on disputed, contestable, and unsupported determinations.

Defendants therefore cannot contend that any emergency or impracticability justified dispensing with minimal pre-deprivation process. Where the Government has the ability to provide notice and an opportunity to respond before imposing a deprivation—as it plainly did here—the Constitution requires it to do so. *Loudermill*, 470 U.S. at 542–47; *Zinermon*, 494 U.S. at 132; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) ("[A]bsent the necessity of quick action by the State or the impracticality of providing any pre-deprivation process, a post-deprivation hearing here would be constitutionally inadequate.").

Due process therefore requires safeguards *before* the Government inflicts such harm. The Constitution does not permit the Government to impose stigmatizing deprivations first and offer administrative review later, particularly where post-deprivation proceedings lack the capacity to restore reputation, professional standing, or lost career opportunities.

40

*d. The Post-Deprivation Process is Constitutionally Inadequate.*

Even if post-deprivation process could, in theory, satisfy due process under the circumstances presented—which it cannot—the MSPB proceedings Defendants identify fail constitutional requirements, and fail to provide adequate safeguards under *Mathews v. Eldridge*, 424 U.S. 319 (1976) (requiring an assessment of the individual interest, the government interest and the value of additional safeguards). Here, Plaintiffs have an exceedingly strong interest in their reputations and careers, and the Government has virtually no real interest in the complete abandonment of its own internal procedures. Any purported interest in efficiency is a sham, and in any event far outweighed by the individual and public interest in having the errors adjudicated. Moreover, the procedures provided fall far short of ordinary constitutional standards. For example, due process generally requires adjudication by a neutral decision-maker and resolution within a timeframe that meaningfully protects against the continued deprivation of a protected interest. *Goldberg,* 397 U.S. at 271 ("[O]f course, an impartial decision maker is essential."); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Barry v. Barchi*, 443 U.S. 55, 66 (1979). Plaintiffs do not contend that any interaction between the Executive and the MSPB is *per se* unconstitutional; due process is violated where, as here, the same Executive authority that orders and enforces a deprivation also controls the legal conclusions dictating its adjudication and outcomes, while depriving the tribunal of the capacity to halt or meaningfully remedy the deprivation in real time.

MSPB review here is neither neutral nor timely. Executive Branch directives and assertedly binding legal interpretations govern the framework applied in pending adjudications, while the same Executive authority that ordered and continues to enforce the challenged separations defines the interpretive constraints under which the Board operates. Structural

41

arrangements that create a constitutionally intolerable risk of bias violate due process, even absent proof of actual bias. *Tumey*, 273 U.S. at 523; *see NAIJ*, 139 F.4th at 305–07 (The President's removal of the Special Counsel and MSPB members such that the Board lacks a quorum raises "serious questions" as to whether the CSRA's adjudicatory scheme is functioning as intended.).

In addition, the MSPB is incapable of providing timely adjudication due to deliberate decisions by the Administration. Plaintiffs' appeals remain pending for extended periods while Plaintiffs remain separated from employment and pay. These delays are not incidental to the Board's ordinary docket; they are the predictable result of channeling thousands of simultaneous challenges into a single administrative forum that lacks the capacity to provide prompt relief, is being denied the necessary resources, and has no authority to suspend enforcement pending review. Prolonged delay in adjudicating the loss of livelihood independently violates due process. *Barry*, 443 U.S. at 66. *Barry* found that, even where a post-deprivation hearing was paired with pre-deprivation due process, a post-deprivation hearing on an indefinite timeline was not constitutionally permissible. *Barry v. Barchi*, 443 U.S. 55, 66 (1979) ("[T]he provision for an administrative hearing, neither on its face nor as applied in this case, assured a prompt proceeding and prompt disposition of the outstanding issues between Barchi and the State.").

Critically, MSPB proceedings cannot prevent the ongoing deprivation Plaintiffs suffer. The Board, having been stripped of power over its budget, policies, and legal opinions, cannot halt enforcement of the separations, cannot restore pay or benefits pending review, and cannot undo reputational injury as it accrues. Those decisions are ultimately to be made by OMB and DOJ. Post-deprivation review that neither operates independently nor functions in a timely

42

manner cannot satisfy due process, even where, unlike here, post-deprivation process might otherwise be constitutionally permissible.

The collective result of the mass RIFs, the absence of pre-deprivation process, and these changes to the MSPB is that the MSPB cannot provide meaningful relief to Plaintiffs. The MSPB is neither a neutral adjudicator nor a timely or effective safeguard against continued deprivation, and it cannot serve as a constitutionally adequate substitute for the pre-deprivation process Plaintiffs were denied.

### e. Cancellation of the RIFs Is the Required Remedy.

Cancellation is the remedy required to restore Plaintiffs to the constitutional position they would have occupied absent the unlawful deprivation. Where a RIF is carried out in violation of due process, the appropriate remedy is cancellation of the RIF and restoration of the *status quo ante*. *See DeWeese v. Dep't of the Navy*, 67 M.S.P.R. 67 (1995); *Griffin v. Dep't of the Navy*, 94 M.S.P.R. 561, 565 (1994); *Billings v. Tenn. Valley Auth.*, 21 M.S.P.R. 630, 632 (1984). Where an administrative process both ratifies an unlawful deprivation and positions that deprivation for deferential appellate review, it cannot serve as a constitutionally adequate substitute for the pre-deprivation process the Fifth Amendment requires. *See Axon*, 598 U.S. at 191–94 (highlighting that administrative review schemes can sharply limit Article III review); *see also Brewer v. U.S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981) ("In determining whether the Board's decision is supported by substantial evidence, the standard is not what the court would believe on a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole."). Because Plaintiffs were deprived of constitutionally required notice and an opportunity to be heard before their separations took effect—and because post-deprivation review has been converted into a mechanism for ratifying those constitutional violations while

positioning them to receive deferential review in the courts of appeals—Plaintiffs are likely to succeed on their Due Process claim and are entitled to injunctive relief cancelling the challenged RIFs.

2. Defendants' Actions Violate the APA.

This motion does not seek judicial re-weighing of retention registers, competitive-level calculations, or other merits determinations which were ordinarily reviewed by the MSPB. Instead, Plaintiffs challenge Defendants' threshold decision to direct and implement the manner of these RIFs, invoking RIF authority under circumstances where that authority did not lawfully apply and where its invocation functioned as a mechanism to effectuate predetermined separations while avoiding required pre-deprivation hearings. In doing so, Defendants either failed to consider or intentionally relied upon: (1) the impact that this influx of appeals would have on the MSPB; and (2) the fact that the MSPB was no longer capable of providing an independent review process.

Under the APA, agency action must be set aside if it is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary [and] capricious." 5 U.S.C. §§ 706(2)(A), (C). The CSRA and OPM's implementing regulations authorize reductions in force only where positions are legitimately abolished pursuant to lawful competitive-area determinations and neutral retention procedures. 5 U.S.C. §§ 3501–3504; 5 C.F.R. pt. 351.

Defendants OPM and OMB's decision to direct the manner of these wide-spread removals and frame them as RIFs constitute final agency actions under the APA, as do the remaining Defendant agencies' decisions to implement these removals. OPM and OMB's decision directing the manner and implementation of these so-called RIFs was a clear consummation of the agencies' decision-making processes and imposed specific legal rights and

44

consequences upon Plaintiffs. The same is true of each individual agency's decision to proceed to implement the directed "RIFs," to characterize these employment actions as RIFs, and to channel Plaintiffs' challenges to the MSPB under the current circumstances. These actions are therefore final agency actions subject to challenge under the APA. *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (citing *Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)).

The circumstances surrounding these removals, and the procedural steps taken by Defendants to implement them, are plainly contrary to established statutory and regulatory RIF requirements. For example, and as set forth above, while Defendants' paid lip service to future reorganizations in RIF notices, this assertion is belied not only by the Administration's public statements, but by the agencies' own actions. Similarly, the challenged actions did not eliminate positions pursuant to lawful competitive-area determinations consistent with 5 C.F.R. § 351.402. In multiple agencies, and in at least one case at the explicit direction of OPM, competitive areas were artificially narrowed or defined in a manner inconsistent with and without regard to OPM's own regulatory definition of "separate administration." Invoking RIF authority under these circumstances was not a mere procedural irregularity. It disguised selective firings of Plaintiffs without the required pre-deprivation hearing process, which would have been triggered if these removals were treated as what they were: removals for cause. *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022). By invoking RIF procedures where the governing statutory and regulatory prerequisites were not satisfied by design, Defendants acted in excess of their lawful authority and contrary to the structure Congress prescribed.

Moreover, agency action is arbitrary and capricious where it rests on factual premises contradicted by the record, fails to adhere to binding regulations, or adopts a rationale that cannot

45

be reconciled with governing law. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Notices asserting that no positions were available for reassignment, that competitive areas were lawfully defined, or that separations were mechanically required by regulation cannot be squared with the record evidence that positions continued, functions were transferred, competitive areas lacked the requisite separate authority, and reassignment was both possible and, in some cases, proposed by the agencies themselves.

Finally, when Defendants OMB, OPM, DOJ, HHS, State, ED, and DHS directed these RIFs, Defendants were well aware that the MSPB has been spoiled to the point of futility. As set forth in detail above, the MSPB has been purposefully and unlawfully rendered incapable of providing an independent review process, as it is currently precluded from taking any position in litigation that contradicts the legal interpretations of the Trump Administration. Exec. Order No. 14215, 90 Fed. Reg. 10447, 10448–49 (Feb. 24, 2025). Plaintiffs are therefore forced to bring their appeals—which raise primarily issues of legal interpretation—before an MSPB that is required by Executive Order to decide in favor of the agency on matters of legal interpretation.

Additionally, the volume of these same agency actions has rendered the MSPB effectively immobile. Drew Friedman, *MSPB faces high workload, low staffing levels*, Federal News Network (July 4, 2025, 12:51 PM), https://perma.cc/33CB-K7ED; Merit Sys. Prot. Bd., Weekly Number of Cases Received in the Regional and Field Offices Fiscal Year 2025, https://perma.cc/4652-R34J. Many Plaintiffs have been before the MSPB for many months without seeing any judicial progress beyond an Acknowledgment Order or Notice. These extended delays—plainly exacerbated by Administration's decision to *reduce* MSPB's funding in the face of this unprecedented backlog, U.S. Merit Systems Protection Board, Congressional Budget Justification FY 2026 at 1 (May 2025) (Ex. 7 at 4), cause protracted harm as Plaintiffs

continue without a salary, without health insurance, and without earned federal service credit as they are forced to spend time and money to pursue their appeals, just to put their arguments before an MSPB that is required to rule against them.

These actions are contrary to law and exceed statutory authority. 5 U.S.C. § 706(2)(A), (B). By channeling an overwhelming number of challenges before an MSPB that can neither timely process nor independently review their claims, Defendants' actions are outside the authority of the relevant agencies and frustrate the CSRA's objectives to provide federal employees with "appropriate protections" for federal employees through the "processing [of] hearings and appeals" that affect those employees. Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3, 92 Stat. 1111 (1978). By flooding the MSPB's systems to the point of incapacitation, the agencies' actions are also contrary to the CSRA's requirement that the MSPB be available to hear and adjudicate matters within its jurisdiction. 5 U.S.C. § 1204(a).

Assuming *arguendo* that Defendants did not, in fact, intend to flood the MSPB into incapacity, "agency action is arbitrary and capricious when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citing *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (internal citations and quotations omitted)). Defendants' actions—overwhelming the MSPB with tens of thousands of appellants and forcing Plaintiffs before a venue that cannot possibly provide meaningful review of their claims—clearly demonstrate a failure to consider relevant statutory requirements or the obvious and inevitable effects those actions would have on Plaintiffs' right to

47

appeal under the CSRA and OPM regulations, and the statutory function of the MSPB itself. As such, Defendants' actions must be set aside as arbitrary and capricious.

### B. Plaintiffs Suffer Irreparable Harm.

Plaintiffs have suffered and continue to suffer irreparable injury as a result of Defendants' unlawful conduct. Plaintiffs were deprived of constitutionally required pre-deprivation process, and the denial of a constitutional right itself constitutes irreparable harm for purposes of equitable relief. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."). In the Fourth Circuit, where a plaintiff has shown a likely constitutional violation, the irreparable-harm factor is satisfied because the injury is the ongoing deprivation of the right itself. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (*en banc*) (collecting authority and citing *Ross*). That is exactly the injury here. Plaintiffs were separated without constitutionally adequate notice or a meaningful opportunity to respond before the deprivation was executed. *See Loudermill*, 470 U.S. at 542–47. Absent relief in this Court, Plaintiffs will continue to be deprived of due process, trapped in a time-consuming and expensive administrative process that cannot afford them relief and is incapable of reaching just resolution.

In addition to the constitutional violations, Plaintiffs have suffered and continue to suffer severe and ongoing economic, professional and personal harm, much of which cannot be recompensed later. All have lost salary, resulting in some Plaintiffs being forced to sell their homes, incur significant debt, and deplete personal savings. *See, e.g.*, 1-2, V. Smith Decl. ¶¶ 26–28; 1-20, Frias Decl. ¶¶ 21–30; 1-14, Edinger Decl. ¶ 15. Plaintiffs have lost federal service credit and internal mobility opportunities and have suffered disruptions to their security

clearance or suitability status. *See, e.g.*, 1-2, V. Smith Decl. ¶¶ 10-17, 23; 1-11, Karabatak Decl. ¶ 36–37.

Numerous Plaintiffs face housing and financial instability as a direct consequence of these catastrophic losses. Plaintiff Smith sold his family home due to an inability to meet mortgage obligations. 1-2, V. Smith Decl. ¶¶ 26–32. Plaintiff Frias is facing a real risk of foreclosure of her home and lacks sufficient income to secure alternative housing. 1-20, Frias Decl. ¶¶ 21. Both Plaintiffs Smith and Frias have incurred significant credit card debt and depleted life savings in trying to avoid homelessness. Plaintiff Edinger is drawing on investments intended for retirement to cover monthly expenses. 1-14, Edinger Decl. ¶ 15. These individuals' financial hardships are not unique to them. *See, e.g,* 1-21, Norin Decl. ¶ 12. Such harms cannot all be remedied after the fact. Loss of housing, depletion of life savings, and long-term financial destabilization produce enduring consequences that monetary relief years later cannot meaningfully repair.

The loss of benefits such as health and life insurance has life and death consequences for these Plaintiffs. For example, Plaintiffs have been unable to afford consistent medical care for chronic conditions, have incurred debt to treat critical traumatic injuries, and have been unable to provide necessary medications to family members. 1-20, Frias Decl. ¶¶ 29, 24-25; 1-22, Perez Decl. ¶ 16.

Plaintiffs continue to suffer from stress and anxiety due to the sudden loss of their careers. 1-1, Bernardino-Redondo Decl. ¶ 51. Plaintiff Smith and his wife were robbed of the opportunity to conceive a child through IVF, the only viable option for them to have a biological child. Plaintiff Smith's wife had to undergo procedures including hysterectomy (removal of uterus) and salpingectomy (removal of fallopian tubes)—procedures that they had planned to

49

delay until after IVF—because their insurance coverage would not last long enough to have a baby before the medically necessary surgeries. 1-2 V. Smith Decl. ¶¶ 36–38.

Plaintiff Frias's child lost coverage for treatment of critical traumatic injuries from a hit-and-run accident, leading Plaintiff Frias to incur more debt in obtaining adequate medical care for her daughter. 1-20, Frias Decl. ¶ 21. In addition, Plaintiff Frias has not been able to afford consistent medical care and medications to control her diabetes and other chronic medical conditions, which were otherwise stable and well-controlled when Plaintiff Frias had access to regular healthcare. Frias Decl. ¶¶ 25. Plaintiff Perez paid for his parents' medical insurance with part of his salary, and his father passed away not long after he informed his parents that he could not pay for their medical care, including prescriptions to treat his father's chronic medical issues. 1-22, Perez Decl. at ¶ 16. Such medical harms are inherently irreparable because deteriorating health cannot be restored retroactively and deceased family members cannot be brought back.

Plaintiffs also continue to suffer from the stress and anxiety caused by the sudden loss of their jobs and careers. "I have an entry-level job and my husband is unemployed, and the constant fear of not having my income adds to the day-to-day stress." 1-7, Beegun ¶ 18. The mental and emotional strain on Plaintiffs affects every aspect of not only their lives, but the lives of their family members. "My husband and I both have difficulty sleeping, and it is affecting our health, our marriage and our relationships with our children…" 1-1, Bernardino-Redondo Decl. ¶ 51. "Of course, with stress and anxiety, comes the need for yet more health care that is no longer covered by Plaintiffs' federal employment. "My mental health has deteriorated since my removal, and I am unable to see a therapist due to the loss of health insurance." 1-36, Mandic Decl. ¶ 30. Back pay and reinstatement years from now is not going to undo the psychological

and emotional damage that occurs every day Plaintiffs remain illegally separated from their jobs and opportunity.

Apart from permanent financial damage and the physical and mental health harm done to Plaintiffs and their loved ones, Plaintiffs' harms are also non-compensable because the sudden, illegal termination of federal employment negatively affects the professional standing built over years or decades of service and years of creditable service for retirement eligibility purposes, which cannot be reconstructed even if reinstated later. The Fourth Circuit recognizes that unlawful actions affecting federal employment may constitute irreparable harm where the injury involves loss of protected status and career trajectory rather than mere temporary income. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Where employees are targeted based on perceived political affiliation or protected activity, the resulting harm is irreparable and not compensable by money damages. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Vazquez-Burgos v. Rodriguez-Perez*, 111 F. Supp. 3d 135, 140 (D.P.R. 2015). Those harms are compounded here where, as set out above and in their declarations, Plaintiffs continue to suffer the reputational harm of the stigmatizing statements made by the Administration. These statements continue to damage Plaintiffs' professional standing, including their ability to find work in their fields, in or out of government. This delay in finding work or being forced to pursue work outside of their field has long-term career effects that will make them less competitive for promotions and set back their career development, things that cannot be fixed by back pay and reinstatement years from now.

Accordingly, Plaintiffs have made the necessary showing of irreparable harm sufficient to warrant preliminary injunctive relief.

51

### C. The Balance of Equities and Public Interest Strongly Favor Injunctive Relief.

When the Government is a party, the balance of equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor Plaintiffs.

Plaintiffs face ongoing constitutional injury, economic disruption, and reputational harm each day they remain separated from federal service without constitutionally adequate process. The requested injunction would restore the pre-deprivation *status quo ante* pending final adjudication and prevent continued enforcement of the challenged separations.

By contrast, Defendants have no equitable interest in maintaining actions that are likely unlawful. Compliance with constitutional and statutory requirements does not constitute cognizable harm. *See id.* at 436 (recognizing the public interest in lawful governmental action). Administrative burden, delay, or inconvenience associated with suspending contested personnel actions does not outweigh the continuing deprivation of constitutional rights.

Preserving constitutional structure and preventing ongoing injury serve the public interest. The balance of equities therefore strongly favors preliminary injunctive relief.

### V. REQUESTED RELIEF

For the foregoing reasons, Plaintiffs respectfully request that, pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705, the Court restore the *status quo ante* by ordering restoration of Plaintiffs to the positions, pay, benefits, and employment status they would have held absent the challenged separations, enjoin Defendants from retaliating against Plaintiffs, and direct any other relief the court deems proper pending final resolution of this action.

To the extent required, the Court should also waive bond under Rule 65(c), which requires the court to consider whether plaintiffs should provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined." Courts may waive the bond requirement. *See, e.g.*, *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013); *Hamadneh v. Grand Strand Reg'l Med. Ctr., LLC*, No. 4:26-CV-0335-JD-TER, 2026 WL 253623, at *4 (D.S.C. Jan. 31, 2026); *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, No. 1:25-CV-637 (PTG/IDD), 2025 WL 2969560, at *21 (E.D. Va. Oct. 20, 2025); *James v. Roberts*, No. 25CV191, 2026 WL 332327, at *9 (M.D.N.C. Feb. 4, 2026), and no bond is required under 5 U.S.C. § 705, *see Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 623 (D. Md. 2025). In the alternative, the Court may order a nominal bond. *Hoechst Diafoil Co. v. Nan Ya Plastics Co*rp., 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Dated:  April 24, 2026

                                                          Respectfully submitted,


_____                                  /s/ Jocelyn E. Skinner
A. Gregory Pinto (pro hac vice)                           Jocelyn (Josie) E. Skinner (admission
DC Law Collective, PLLC                                   pending)
1629 K St., NW, Suite 300                                 SLIGO LAW GROUP, PLLC
Washington, DC 20006                                      1717 K St. NW, Suite 900
Tel: (202) 599-8459                                       Washington, DC 20006
Fax: (202) 318-0271                                       Tel: (202) 888-2084
gregpinto@dclawcollective.com                             josie@sligolawgroup.com

/s/ Joshua Rose                                           /s/ Amy E. Powell
Joshua Rose (Bar No. 18714)                               Amy E. Powell (pro hac vice)
DC Consumer Law Group, PLLC                               Lawyers for Good Government
1407 Highland Drive                                       1319 F St. NW, Suite 301, PMB 181
Silver Spring, MD 20910                                   Washington, DC 20004
Tel: (202) 288 5643                                       Tel: (646) 246-4633
Jrose@dcclg.com                                           Email:
                                                          amy@lawyersforgoodgovernment.org


                                                          *Counsel for Plaintiffs*