**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DOREEN MULLADY, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**RUSSELL VOUGHT, in his official capacity as Director of the United States Office of Management and Budget, *et al.*,**<br><br>**Defendants.** | **Civil No. 8:26-cv-00573-SAG** |

**DECLARATION OF ALBERT GREGORY PINTO**

I, Albert Gregory Pinto, hereby declare:

1. I represent Plaintiffs in this proceeding and prepared this declaration to authenticate the additional materials in support of Plaintiffs' Motion for a Preliminary Injunction.

2. I also represent many of the Plaintiffs in their MSPB appeals. This includes representation of Plaintiffs Vaughn Smith, Marilyn Bernardino-Redondo, Jenniffer Frias, and Yaziddah Buist in their MSPB appeals of their RIF from the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) (these Plaintiffs will be referred to collectively as the ATF ODEIA Plaintiffs).

3. Attached as Tab 1 is a true and correct copy of the discovery requests the ATF ODEIA Plaintiffs served on the MSPB.

4. Attached as Tab 2 is a true and correct copy of the MSPB's response to those discovery requests.

5. A true and correct copy of the ATF ODEIA Plaintiffs' discovery requests to OPM is attached at Tab 3. OPM did not respond in any way to the discovery requests and the Administrative Judge would not give a hearing date extension to further pursue that discovery.

6. Attached at Tab 4 are true and correct excerpts from the transcripts of the testimony of: Ralph Bittelari, an Agency witness who works at the Department of Justice; Marvin Richardson, former Acting Director of ATF; and Alphonso Hughes, former Executive Assistant Director (Administration) of ATF.

7. Attached as Tab 5 is a true and correct copy of the Initial Decision by the Administrative Judge in the ATF ODEIA Plaintiffs' Appeal.

8. Attached as Tab 6 is a true and correct copy of the declaration executed by Sepideh Keyvanshad, former Acting Chief Human Capital Officer at USAID.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2026.

*<u>/s/ A. Gregory Pinto</u>*

A. Gregory Pinto
DC Law Collective, PLLC
1629 K St., NW, Suite 300
Washington, DC 20006
Tel: (202) 599-8459
Fax: (202) 318-0271
gregpinto@dclawcollective.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DOREEN MULLADY, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**RUSSELL VOUGHT, in his official capacity as Director of the United States Office of Management and Budget, *et al.*,**<br><br>**Defendants.** | **Civil No. 8:26-cv-00573-SAG** |

**EXHIBITS TO THE**
**DECLARATION OF ALBERT GREGORY PINTO**

Tab 1 – ATF ODEI Plaintiffs' Discovery Requests to MSPB

Tab 2 – MSPB Response to Discovery Requests

Tab 3 – ATF ODEI Plaintiffs' Discovery Requests to OPM

Tab 4 – Hearing Transcript Excerpts

Tab 5 – MSPB Initial Decision

Tab 6 – Declaration of Sepideh Keyvanshad

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NORTHEASTERN REGIONAL OFFICE**

ATF ODEIA CONSOLIDATION,
,
Appellant,

DOCKET NUMBER
CF-0351-25-0010-I-1(4)

v.

DEPARTMENT OF JUSTICE,
Agency.

DATE: January 29, 2026

**APPELLANTS' FIRST SET OF REQUESTS FOR**
**PRODUCTION OF DOCUMENTS**
**MERIT SYSTEMS PROTECTION BOARD**

Pursuant to 5 C.F.R. §§ 1201.72 and 1201.73, Appellants Marilyn Bernardino-Redondo, Jennifer Frias, Yaziddah Buist, and Vaughn Smith submit this First Set of Requests for Production of Documents with responses due within 20 days.

**INSTRUCTIONS**

1. These Requests for Production ("Requests") are continuing in nature. If, after producing documents, MSPB obtains or becomes aware of additional responsive documents, MSPB shall promptly supplement its production.

2. Unless otherwise specified, these Requests seek all documents within the possession, custody, or control of MSPB, including documents held by MSPB employees, Board members, contractors, consultants, or agents, and documents maintained in personal accounts or non-government systems used for official business.

3. Unless otherwise specified, these Requests cover the period from January 1, 2024 through the present.

4. Documents shall be produced as kept in the usual course of business or organized and labeled to correspond to the numbered Requests.

5. Electronically stored information ("ESI") shall be produced in native format with all associated metadata intact unless otherwise agreed in writing.

6. If any responsive document no longer exists, MSPB shall identify the document, state when and why it was destroyed or deleted, and identify the person responsible for its destruction or deletion.

7. These Requests include documents created, transmitted, or stored using government systems as well as personal email accounts or messaging applications (including but not limited to Signal, WhatsApp, Teams, Slack, Discord, or similar platforms) when used for official business.

8. Documents are responsive regardless of how labeled, titled, characterized, or described.

9. For any document withheld or redacted on the basis of privilege, MSPB shall produce a privilege log identifying, for each such document:
   (a) the date of the document;
   (b) the author(s);
   (c) all recipients, including those copied or blind-copied;
   (d) the document's title or type (e.g., email, memorandum, draft);
   (e) the general subject matter sufficient to assess the applicability of the privilege asserted;
   (f) the specific privilege claimed; and
   (g) the custodian(s) of the document.

10. Blanket assertions of privilege, categorical privilege logs, or descriptions insufficient to permit assessment of the privilege claim are inadequate.

11. Descriptions insufficient to permit assessment of the privilege claim may be deemed a waiver.

**DEFINITIONS**

1. "MSPB" means the Merit Systems Protection Board, including the Board, Board members, administrative judges, employees, and agents.

2. "Document" means all writings, records, data, or information of any kind, whether draft or final, whether paper or electronic, including electronically stored information ("ESI"), metadata, and information stored in any medium or format, including documents maintained in shared drives, collaboration platforms, or document-management systems used by MSPB.

3. "Communication" means any transmission of information, whether oral, written, or electronic, including emails, text or chat messages, memoranda, letters, notes, meeting minutes, calendars, presentations, and recordings.

4. "Reduction in Force" or "RIF" means a reduction in force as that term is used in Title 5 of the United States Code and the implementing regulations at 5 C.F.R. Part 351.

5. "Executive Order" means any Executive Order referenced, relied upon, or discussed in communications with or within MSPB concerning reductions in force, DEI programs, or employee appeals.

6. "Executive Office of the President" or "EOP" means the White House Office and offices formally within the Executive Office of the President.

7. "Office of Management and Budget" or "OMB" means the Office of Management and Budget.

8. "Office of Personnel Management" or "OPM" means the United States Office of Personnel Management.

9. "White House Liaison" means any MSPB employee or official designated to serve as a liaison or point of contact between MSPB and the Executive Office of the President.

10. "Relating to" or "concerning" means referring to, reflecting, evidencing, arising out of, or in any way logically or factually connected with the subject matter.

**REQUESTS FOR PRODUCTION**

Request for Production No. 1

All documents reflecting, evidencing, or relating to the identity, selection, designation, authority, duties, performance requirements, evaluation criteria, reporting structure, oversight, or accountability mechanisms of any MSPB White House Liaison, including but not limited to:

- documents identifying the individual(s) who served as the White House Liaison;
- position descriptions, vacancy announcements, or role descriptions;
- performance plans, performance standards, appraisal criteria, or success metrics;
- guidance describing expectations, objectives, or deliverables associated with the role;
- organizational charts or reporting-line documents; and
- documents reflecting how performance in the liaison role was assessed, reviewed, or measured.

Request for Production No. 2

All communications between MSPB and the Executive Office of the President or OMB concerning the role, responsibilities, or activities of the MSPB White House Liaison.

Request for Production No. 3

All communications between the MSPB White House Liaison and any employee or official of the Executive Office of the President or OMB concerning employee appeals, reductions in force, or DEI-related employment actions.

Request for Production No. 4

All communications between any MSPB Board member, administrative judge, or senior MSPB

official and the MSPB White House Liaison concerning employee appeals, reductions in force, or DEI-related employment actions.

<u>Request for Production No. 5</u>
All documents reflecting, evidencing, or relating to internal MSPB guidance, instructions, memoranda, or directives concerning the handling, processing, timing, stays, jurisdiction, or remedies of appeals involving reductions in force.

<u>Request for Production No. 6</u>
All documents reflecting, evidencing, or relating to communications between MSPB and OPM concerning the adjudication or handling of employee appeals arising from reductions in force.

<u>Request for Production No. 7</u>
All documents reflecting, evidencing, or relating to communications between MSPB and the Executive Office of the President, OMB, or any other executive entity concerning expectations, priorities, coordination, or approaches to employee appeals involving reductions in force.

<u>Request for Production No. 8</u>
All documents reflecting, evidencing, or relating to any awareness, discussion, or consideration within MSPB of legal, statutory, regulatory, or funding constraints affecting the adjudication of reductions-in-force appeals, including any concerns regarding the legality of underlying personnel actions.

<u>Request for Production No. 9</u>
All documents reflecting, evidencing, or relating to any MSPB strategic plans, performance plans, or submissions developed pursuant to the Government Performance and Results Act of 1993 to the extent such documents address, reference, or affect in any way the handling, prioritization, timing, processing, or adjudication of employee appeals involving reductions in force, including any communications with OMB concerning comments, revisions, or approvals related to such matters.

<u>Request for Production No. 10</u>
All documents reflecting, evidencing, or relating to any performance standards, management objectives, expectations, or evaluative criteria communicated by OMB to MSPB leadership that reference or affect in any way the handling, processing, timeliness, prioritization, or resolution of employee appeals, including appeals involving reductions in force.

<u>Request for Production No. 11</u>
All documents reflecting, evidencing, or relating to any apportionment decisions, funding constraints, or resource limitations communicated to or considered by MSPB that addressed, referenced, affected, or were discussed in connection with the processing, timing, stays, jurisdiction, or adjudication of employee appeals involving reductions in force.

<u>Request for Production No. 12</u>
All drafts, versions, annotations, or iterations of any document responsive to Requests Nos. 1 through 11, including documents reflecting edits, comments, or tracked changes.

Dated: January 29, 2026

Respectfully submitted,

______________________________

A. Gregory Pinto
DC Law Collective, PLLC
Attorney for Appellants

**U.S. MERIT SYSTEMS PROTECTION BOARD**

**Office of the General Counsel**
**1615 M Street, NW**
**Washington, DC 20419-0002**

Phone: (202) 653-6772; E-Mail: officeofgeneralcounsel@mspb.gov

**Acting General Counsel**

January 30, 2026

A. Gregory Pinto
DC Law Collective, PLLC
Attorney for Appellants
via email, gregpinto@dclawcollective.com

RE: Appellants' First Set of Requests for Production of Documents to the Merit Systems Protection Board in *ATF ODEIA Consolidation v. Dep't of Justice*, MSPB Docket No. CF-0351-25-0010-I-1(4)

Dear Mr. Pinto:

The Merit Systems Protection Board (MSPB) Office of General Counsel has received your First Set of Requests for Production of Documents to the MSPB in the above-captioned case, which is pending before the MSPB. As you know, MSPB is adjudicating this appeal and is not a party to it. Therefore, pursuant to MSPB regulations at 5 C.F.R. Part 1216, I have construed your discovery request as a request for production under these regulations, and for the reasons discussed below, I am denying it.

MSPB has issued regulations that govern the circumstances and manner in which an MSPB employee may respond to requests and demands for information or testimony in cases in which the MSPB is not a party. 5 C.F.R. § 1216.102. The Supreme Court upheld these types of regulations in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). As a request for production of documents relating to the MSPB's official performance of its duties, your request falls squarely within 5 C.F.R. § 1216.103(f) - (g), and thus is governed by MSPB's *Touhy* regulations and not MSPB's discovery regulations (5 C.F.R. §§ 1201.72-.75).

Under these regulations, MSPB's General Counsel has discretion to grant or deny requests for records, information, or testimony. 5 C.F.R. §§ 1216.201-.202. Requesters must provide, among other things: a detailed description of how the information sought is relevant to the issues in the legal proceeding; a statement as to how the need for the information outweighs any need to maintain the confidentiality of the information and outweighs the burden on the MSPB to produce it; a statement indicating that the information sought is not available from another source; and a description of all prior decisions, orders, or pending motions in the case that bear upon the relevance of the

requested records or testimony. 5 C.F.R. § 1216.203(b). Your request does not address any of these issues (nor comply with most of the other procedural and substantive requirements of MSPB's *Touhy* regulations). Nor is it readily apparent what relevance your requests could have to the employment actions at issue, which were taken by the Department of Justice (Bureau of Alcohol, Tobacco, Firearms and Explosives), not MSPB.

Accordingly, I am denying your request. This letter serves as a final determination under 5 C.F.R. § 1216.206.

Sincerely,

*Katherine M. Smith*

Katherine M. Smith

cc: Joel Alexander, Regional Director for the Dallas Regional Office

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NORTHEASTERN REGIONAL OFFICE**

ATF ODEIA CONSOLIDATION,
,
Appellant,

DOCKET NUMBER
CF-0351-25-0010-I-1(4)

v.

DEPARTMENT OF JUSTICE,
Agency.

DATE: January 29, 2026

**APPELLANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**
**OFFICE OF PERSONNEL MANAGEMENT**

Pursuant to 5 C.F.R. §§ 1201.72 and 1201.73, Appellants Marilyn Bernardino-Redondo, Jennifer Frias, Yaziddah Buist, and Vaughn Smith submit this First Set of Requests for Production of Documents with responses due within 20 days.

**INSTRUCTIONS**

1. These Requests for Production ("Requests") are continuing in nature. If, after producing documents, you obtain or become aware of additional responsive documents, you must promptly supplement your production.

2. Unless otherwise specified, these Requests seek all documents within the possession, custody, or control of the United States Office of Personnel Management ("OPM"), including documents held by OPM employees, contractors, consultants, attorneys, investigators, or agents, and documents maintained in personal accounts or non-government systems used for official business.

3. Unless otherwise specified, these Requests cover the period from January 1, 2024 through the present.

4. Documents shall be produced as kept in the usual course of business or organized and labeled to correspond to the numbered Requests.

5. Electronically stored information ("ESI") shall be produced in native format with all associated metadata intact unless otherwise agreed in writing.

6. If any responsive document no longer exists, identify the document, state when and why it was destroyed or deleted, and identify the person responsible for its destruction or deletion.

7. These Requests include documents created, transmitted, or stored using government systems as well as personal email accounts or messaging applications, including but not limited to Signal, WhatsApp, Teams, Slack, Discord, or similar platforms, when used for official business.

8. Documents are responsive regardless of how labeled, titled, characterized, or described.

9. For any document withheld or redacted on the basis of privilege, OPM shall produce a privilege log that identifies, for each such document:

   (a) the date of the document;
   (b) the author(s);
   (c) all recipients, including those copied or blind-copied;
   (d) the document's title or type (e.g., email, memorandum, draft);
   (e) the general subject matter sufficient to assess the applicability of the privilege asserted;
   (f) the specific privilege claimed; and
   (g) the custodian(s) of the document.

   Blanket assertions of privilege, categorical privilege logs, or descriptions that fail to permit assessment of the privilege claim are insufficient and shall be deemed a waiver of the privilege asserted.

**DEFINITIONS**

1. "OPM" or "you" means the United States Office of Personnel Management, including all offices, divisions, components, employees, and contractors.

2. "Document" means all writings, records, data, or information of any kind, whether draft or final, whether paper or electronic, including electronically stored information ("ESI"), metadata, and information stored in any medium or format. This includes documents maintained in shared drives, collaboration platforms, or document-management systems used by OPM.

3. "Communication" means any transmission of information, whether oral, written, or electronic, including emails, text or chat messages, memoranda, letters, notes, meeting minutes, calendars, presentations, and recordings.

4. "DEI" means diversity, equity, and inclusion.

5. "Executive Order" or "EO" means Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*.

6. "RIF Regulations" means the regulations governing reductions in force set forth at 5 C.F.R. Part 351.

7. "ATF" means the Bureau of Alcohol, Tobacco, Firearms and Explosives.

8. **"**ODEIA**"** means the Office of Diversity, Equity, Inclusion, and Accessibility within ATF.

9. "Office of Management and Budget" or "OMB" means the Office of Management and Budget.

10. "Executive Office of the President" or "EOP" means the White House Office and offices formally within the Executive Office of the President.

11. "EOP-Related Official" means any officer, employee, or agent of the Executive Office of the President, the Office of Management and Budget, the Department of Justice, the White House, or any other executive entity who communicated with OPM regarding the Executive Order, DEI programs, or reductions in force.

12. "Department of Government Efficiency" or "DOGE" means the entity or initiative commonly referred to as DOGE, including any successor office, personnel, or records.

13. "Relating to" or "concerning" means referring to, reflecting, evidencing, arising out of, or in any way logically or factually connected with the subject matter.

**REQUESTS FOR PRODUCTION**

<u>Request for Production No. 1</u>
All documents reflecting, evidencing, or relating to OPM's interpretation, application, or analysis of the RIF Regulations as applied to DEI offices, DEI functions, or DEI-related positions, including any determination that such positions could be eliminated through a reduction in force.

<u>Request for Production No. 2</u>
All documents concerning the designation, approval, review, or discussion of competitive areas for any reduction in force conducted pursuant to the Executive Order, including documents addressing whether DEI offices or functions were treated as separate competitive areas or otherwise targeted for elimination.

<u>Request for Production No. 3</u>
All legal memoranda, opinions, analyses, guidance, interpretive materials, or advisory documents prepared by, received by, or relied upon by OPM concerning whether and how the Executive Order could lawfully be implemented through reductions in force under 5 C.F.R. Part 351, including all drafts and communications transmitting or discussing such materials.

Request for Production No. 4
All documents sufficient to identify the legal authority OPM contends supported the use of reductions in force to implement the Executive Order, including analyses of Title 5 of the United States Code, 5 C.F.R. Part 351, prior reduction-in-force precedent, or comparisons to prior workforce restructuring actions.

Request for Production No. 5
All communications between OPM and any EOP-Related Official, OMB, DOGE, or the Department of Justice concerning the Executive Order, DEI programs, DEI offices, or reductions in force, including emails, memoranda, instant messages, meeting materials, and briefing documents.

Request for Production No. 6
All documents reflecting internal discussions within OPM concerning whether the Executive Order could or should be implemented through reductions in force, including documents reflecting concerns, objections, dissenting views, risk assessments, or warnings regarding legality or compliance with the RIF Regulations.

Request for Production No. 7
All documents reflecting or referencing any demographic, workforce-composition, disparate-impact, or protected-class analysis considered, reviewed, prepared, or received by OPM in connection with reductions in force conducted pursuant to the Executive Order.

Request for Production No. 8
All documents sufficient to identify the custodians, repositories, record systems, databases, or locations in which documents responsive to these Requests are maintained, including records schedules, organizational charts, or data-mapping materials.

Request for Production No. 9
All communications between OPM and ATF concerning the implementation of the Executive Order, including discussions of DEI offices or functions, competitive areas, staffing decisions, or reductions in force.

Request for Production No. 10
All documents reflecting, evidencing, or relating to any analysis, consideration, or determination regarding whether the elimination of DEI offices or functions constituted a "transfer of function" within the meaning of 5 C.F.R. § 351.303, including any determination that a transfer of function did or did not occur.

Request for Production No. 11
All documents reflecting, evidencing, or relating to any consideration of reassignment, placement, or retention alternatives to separation for employees affected by DEI-related reductions in force, including any communications with ATF or other agencies regarding proposals to reassign employees instead of separating them.

Request for Production No. 12
All documents reflecting, evidencing, or relating to any framework, playbook, template,

checklist, or standardized approach used or distributed by OPM in connection with implementing the Executive Order or executing DEI-related reductions in force.

Request for Production No. 13
All documents reflecting, evidencing, or relating to any determination that the appropriate competitive area for DEI-related reductions in force at ATF was limited to the ODEIA office or other DEI offices, including any rationale for excluding other agency components from the competitive area.

Request for Production No. 14
All documents reflecting communications between OPM and any agency concerning how reductions in force related to the Executive Order should be defended, explained, or justified in administrative or judicial proceedings.

Request for Production No. 15
All drafts, versions, annotations, or iterations of any document responsive to Requests Nos. 1 through 14, including documents reflecting edits, comments, or tracked changes.

Dated: January 29, 2026

Respectfully submitted,

______________________________

A. Gregory Pinto
DC Law Collective, PLLC
Attorney for Appellants

Pinto?

MR. PINTO: One moment. What was it?

RECROSS-EXAMINATION

BY MR. PINTO:

Q. So, Mr. Bittelari, just go back -- competitive area sounds kind of ridiculous after a while. So OPM decided what the competitive area would be, correct.

A. OPM communicated what it would be.

Q. Yeah. And that was it. One more thing, too I just recalled. There's an -- there's an email, it's tab C-21, page 9 -- I can't tell what that is -- yeah, pages 9 and 10.

Did you send an email to Joe Mastrianna? Joe Mastrianna is what -- he's at ATF, let me ask that first.

A. Should I answer the first question?

Q. Yeah. Who is Joe Mastrianna?

A. Joe Mastrianna is the assistant director for the human resources and professional development director.

Q. Okay. And tab C-21, page 9, is that your email to Joe Mastrianna?

A. Okay. May I refer to the document?

Q. Of course, of course.

Q. So the Department of Justice, the people that you interacted with, didn't take the position that the Agency, being the Department of Justice, could decide whether or not they could reassign these people?

A. That is accurate.

Q. All right. How long did you work at ATF?

A. I worked at ATF for 25 years, since June of 2000.

Q. Have you been through reorganizations, offices, standing up, offices collapsing during that time due to different priorities?

A. Absolutely. Nothing that was directed outside of our Agency, but due to our mission needs, I've been involved in standing up new offices and stations across our agencies.

Q. In doing that, whenever one office may be outlived its usefulness, did you ever fire all the employees who were in that office?

A. Absolutely not.

Q. Okay. How -- was the Agency's budget affected by the employment of these four folks? Was it a budget problem for the Agency to retain these people?

A. Oh, absolutely not.

A. Yes. We have an internal review process.
Q. They would -- when I was in government we used to call it clear it, right, they would clear it. So it cleared Department of Justice to OPM and you wait. Is that right?
A. That's correct.
Q. And did anybody during the time between the 23rd and 29th when you sent this out, did anybody say to you, hey, why are you wasting all these resources, the competitive area is just these seven people, and you're not going to be able to do anything with them anyway?
A. No. That was never communicated to me.
Q. And did the Department of Justice ever tell you, we don't want you to do this?
A. No.
Q. Had you heard from anybody in the Department of Justice that they want to do similar things with their people?
A. Yes. I had conversations with the Assistant Director for Administration, Ms. Lauria. I had spoken with Mike Williams, who's the chief human capital officer, in addition to conversations that I know were held by others with them.
But I directly ask those questions

about whether or not that that was something that was feasible.

And I had been given the answer that they were going to try to do the same thing, because they want to try and save those positions and those individuals as well.

Q. Now, when you were putting together the plan, did you -- you hadn't been a RIF before, right? You've never been involved in a RIF?

A. Been on the brink but never one that actually went through.

Q. Okay. A couple things, so if you were just going to -- could you have just gotten rid of the DEI office and pulled everybody back into -- what is it, HRPD?

A. HRPD, public government affairs, wherever they came from, yes, that was something that was within my discretionary authority.

Q. So you could've -- without -- before being told that it was going to be a RIF, you could have done that without all the expense and legal and plans, and this and these hearings and all that other stuff, you could have just said DEI office no more since that executive order was rescinded, right, by President Trump? Is that right?

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**DALLAS REGIONAL OFFICE**

| | |
|---|---|
| ATF ODEIA CONSOLIDATION,<br>Appellant, | DOCKET NUMBER<br>CF-0351-25-0010-I-1 |
| v. | |
| DEPARTMENT OF JUSTICE,<br>Agency. | DATE: March 18, 2026 |

Albert Gregory Pinto, Esquire, and Pamela J. Hicks, Esquire, Washington, D.C., for the appellants.

Katherine Bolton, Esquire, Washington, D.C., for the agency.

**BEFORE**
Martha L. Russo
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On various dates in April and May 2025, the four appellants within the above-captioned consolidated appeal filed individual appeals of the agency's decision to separate them from their positions pursuant to a reduction in force (RIF) administered under the provisions of 5 C.F.R. part 351. Because the appellants' claims involve common issues, the appeals were consolidated on July 9, 2025.[1] Consolidation Appeal File (CAF), Tab 1. A hearing was conducted on

[1] The consolidated appeals are *Marilyn Bernardino-Redondo v. Department of Justice*, MSPB Docket No. PH-0351-25-1404-I-1; *Yaziddah Buist v. Department of Justice*, MSPB Docket No. DC-0351-25-2571-I-1; *Jenniffer Frias v. Department of Justice*, MSPB Docket No. AT-0351-25-1708-I-1; and *Vaughn Smith v. Department of Justice*, MSPB Docket No. DE-0351-25-1113-I-1. The records in the individual appeals will be

February 27, 2026. CAF, Tab C-27, Hearing Recording (HR). The record is closed. *Id.*

For the following reasons, the appellants' separation from Federal service is AFFIRMED.

**ANALYSIS AND FINDINGS**

Background

The agency's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) established the Office of Diversity, Equity and Inclusion (ODEI) in 2023 pursuant to Executive Order 14,035, which was issued in June 2021. HR (Joseph Mastrianna); CAF, Tab C-17 at 48. As of January 2025, each of the appellants' position of record was within the ODEI. HR (Bernardino-Redondo, Buist, Frias, Smith).

On February 5, 2025, Marvin Richardson, the Acting Director of ATF, notified the appellants their positions were being abolished, and they would be removed from federal service in a RIF action.[2] *See* 1404 IAF, Tab 9 at 15-18; 2571 IAF, Tab 3 at 15-18; 1708 IAF, Tab 5 at 23-26; 1113 IAF, Tab 4 at 15-18.

The agency separated appellants Buist, Frias, and Smith pursuant to the RIF effective April 7, 2025. *See* 2571 IAF, Tab 3 at 11; 1708 IAF, Tab 5 at 19; 1113 IAF, Tab 4 at 11. Bernardino-Redondo retired in lieu of involuntary separation due to the RIF action effective April 8, 2025. 1404 IAF, Tab 9 at 11.

The appellants timely filed appeals of the RIF action in April and May 2025. The following issues are in dispute: (1) whether the agency had a proper basis for invoking the RIF procedures when separating the appellant from employment, *see* 5 C.F.R. § 351.201(a)(2); (2) whether the agency complied with

---

cited using the four digits preceding "I-1" in the docket number followed by Initial Appeal File (IAF).

[2] Due to errors in the notice issued to Bernardino-Redondo, the agency issued her a corrected notice on February 6, 2025. HR (Bernardino-Redondo); CAF, Tab C-17 at 59-62.

the RIF procedures set out in 5 C.F.R. part 351; (3) whether the agency discriminated against the appellants based on race; and (4) whether the agency violated the appellants' right to due process. CAF, Tab C-22.

Legal Standards

The Board's jurisdiction over RIF appeals is not statutory and instead derives from regulation. *Adams v. Department of Defense,* 96 M.S.P.R. 325, ¶ 8 (2004), *dismissed*, 112 F. App'x 14 (Fed. Cir. 2004); *Kohfield v. Department of the Navy*, 75 M.S.P.R. 1, 4 (1997). Pursuant to Office of Personnel Management (OPM) regulations, an individual may appeal the following RIF actions: furlough for more than 30 days; separation; or demotion. 5 C.F.R. § 351.901.

The agency has the burden of supporting its decision by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B); *Losure v. Interstate Commerce Commission*, 2 M.S.P.R. 195, 201-2 (1980). "Preponderance of evidence" is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

The agency must show the RIF was invoked for one of the permissible reasons enumerated in the regulation. *See* 5 C.F.R. § 351.201(a)(2). If the agency provides evidence showing a RIF was undertaken for any of these reasons, then it has established a prima facie case on this element. Once the agency makes out a prima facie case, the burden of providing rebuttal evidence shifts to the employee but the burden of persuasion never shifts from the agency. *Losure*, 2 M.S.P.R. at 201-02.

The agency also bears the burden of demonstrating its compliance with the RIF procedures set out in 5 C.F.R. part 351. *Heelen v. Department of Commerce*, 154 F.3d 1306, 1309 (Fed. Cir. 1998). While the agency bears the burden of proving that it complied with RIF procedures, the appellants should identify any errors they believe were committed by the agency and explain how they were

affected by those errors. The Board will not reverse a RIF when the agency shows that its error in not precisely complying with the RIF regulations had no adverse effect on an employee's substantive entitlements. *Disney v. Department of the Navy*, 67 M.S.P.R. 563, 567 (1995).

The appellants asserted affirmative defenses of race discrimination and violation of their right to due process. The appellants have the burden to prove those claims by preponderant evidence. 5 C.F.R. § 1201.56(b)(2)(i)(C).

The agency proved it had a proper basis for invoking the RIF procedures.

A RIF may be taken under 5 C.F.R. § 351.201(a) only for one of the following permissible reasons: lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties. A reorganization is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." 5 C.F.R. § 351.203. Preponderant evidence shows the agency planned the elimination of the ODEI office and the duties performed by that office.

In its RIF notice to the appellants, Acting Director Richardson explained,

> In accordance with President Trump's January 20, 2025, Executive Order, Ending Radical and Wasteful Government DEI Programs and Preferencing, and in accordance with January 21, 2025, and January 24, 2025, Memorandums from the U.S. Office of Personnel Management, the Department of Justice has closed all DEIA offices and terminated all DEIA initiatives, and determined that for purposes of this reduction in force the competitive area required by 5 C.F.R. § 351.402 shall be Department DEIA offices.

*See* 1404 IAF, Tab 9 at 16; 2571 IAF, Tab 3 at 16; 1708 IAF, Tab 5 at 24; 1113 IAF, Tab 4 at 16.

As Richardson referenced, on January 20, 2025, President Trump issued Executive Order 14,151, in which he ordered each agency head, in consultation with the Attorney General, the Director of the Office of Management and Budget (OMB), and the Director of OPM, to terminate all DEI offices and positions.

Exec. Order No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025); CAF, Tab C-20 at 246-50.

On January 21, 2025, and January 24, 2025, OPM issued guidance to agency heads regarding the President's Executive Orders related to DEI programs. CAF, Tab C-19 at 44-51, 1404 IAF, Tab 9 at 27-31. OPM's January 21, 2025, guidance instructed agencies to, among other things, place all employees in DEIA[3] offices on paid administrative leave and to submit to OPM a "written plan for executing a reduction-in-force action regarding the employees who work in a DEIA office." CAF, Tab C-19 at 44-45. OPM's January 24, 2025, guidance informed agencies they should being issuing RIF notices to employees of DEIA offices and "are to define the competitive area solely in terms of the DEIA office where the employees worked." 1404 IAF, Tab 9 at 27. Richardson testified that the ATF ODEI was abolished pursuant to the Executive Order. HR (Richardson).

I conclude the agency's RIF, which resulted in the appellants' separation, was properly invoked in order facilitate a reorganization. *See* 5 C.F.R. § 351.201(a).

The appellants generally disputed the agency's reasons for invoking the RIF regulations, including because ATF developed a plan whereby it proposed as a first option to reassign the ODEI employees, including the appellants, rather than separate them. CAF, Tab C-17 at 48-54; HR (Hughes). ATF's RIF plan stated that in the event the reassignment proposal "is not approved," it "fully intends to begin issuing RIF notices to all listed personnel . . . ." CAF, Tab C-17 at 54. Richardson testified that the reassignments were not effectuated because the agency did not receive authority from DOJ to move forward with those actions. HR (Richardson). Richardson explained he understood that DOJ believed it needed authorization from OPM to pursue reassignments rather than

---

[3] Diversity, Equity, Inclusion, and Accessibility. *See* CAF, Tab C-19 at 44.

separations through a RIF action. *Id.* The appellants also testified that they would not characterize many of their duties, such as recruiting, as being "DEI" functions. HR (Bernardino-Redondo, Buist, Frias, Smith). Thus, they suggest their positions were wrongly eliminated due to the Executive Order.

In essence, the appellants argued the agency could have achieved the goal of abolishing the ODEI without separating them from Federal service. I am sympathetic to the appellants' arguments that they could have continued to provide valuable service to the agency in other positions for which they were qualified. However, the agency, not the Board, has the authority and discretion to decide how to effect a reorganization. *E.g.*, *Waksman v. Department of Commerce*, 37 M.S.P.R. 640, 645-46 (1988), *aff'd sub nom. Harris v. Department of Commerce*, 878 F.2d 1447 (Fed. Cir. 1989). Once an agency establishes it invoked the RIF regulations for one of the permissible reasons, the Board has no authority to review the management considerations that underlie the exercise of agency discretion. *Bacon v. Department of Housing & Urban Development*, 757 F.2d 265, 270 (Fed. Cir. 1985) (holding the Board "has no authority to probe into the mental processes" of the head of an agency "to ascertain whether a particular 'political philosophy' influenced the RIF decision"); *Griffin v. Department of Agriculture*, 2 M.S.P.R. 168, 171 (1980).

I conclude the agency established it properly invoked a valid basis for initiating a RIF and the appellants failed to specifically rebut this showing. *Decker v. Department of Health & Human Services*, 40 M.S.P.R. 119, 127 (1989) (the appellant bears the burden of providing rebuttal evidence to the agency's proper invocation of the RIF process).

The agency proved it complied with the RIF procedures set out in 5 C.F.R. part 351.

*Competitive area*

Pursuant to 5 C.F.R. § 351.402, an agency must establish competitive areas in which employees compete for retention. *Foster v. Tennessee Valley Authority*, 87 M.S.P.R. 48, ¶ 5 (2000). A competitive area must be defined solely by an agency's organizational units and geographical location, may consist of all or part of an agency, and, at a minimum, constitutes "a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. § 351.402; *Markland v. Office of Personnel Management*, 140 F.3d 1031, 1033 (Fed. Cir. 1998).

Here, the agency delineated "Bureau of Alcohol, Tobacco, Firearms, and Explosives DEI Office, Washington, DC" as each appellant's competitive area. *See* 1404 IAF, Tab 9 at 16; 2571 IAF, Tab 3 at 16; 1708 IAF, Tab 5 at 24; 1113 IAF, Tab 4 at 16. The appellants disputed that the ATF DEI Office constituted a subdivision of the agency under separate administration. HR (appellants' closing argument). In *Markland*, 140 F.3d at 1034-35, the Board's reviewing court considered whether OPM's Office of Contracts and Administrative Services (OCAS) met the minimum requirement for a competitive area.[4] The *Markland* court rejected the appellant's argument that the crucial factor in determining whether the head of an agency subdivision has the authority to take or direct personnel actions was whether he had appointing authority. *Id.* at 1034. Instead, the court examined evidence as to whether OCAS was "separately organized and clearly distinguished from others in operation, work function, staff, and personnel management." *Id.* at 1035. As to personnel management, the court noted that,

[4] The operative regulation at the time of the RIF at issue in *Markland* required that the minimum competitive area for a departmental service, such as OCAS, to be "a bureau, major command, directorate or other equivalent major subdivision of an agency within a local commuting area." *Markland*, 140 F.3d at 1033. As that definition is no less restrictive than the current requirement, I find the analysis in *Markland* persuasive.

while the head of OCAS lacked authority to authorize hazardous weather dismissals or set pay, he had authority over other actions, such as approval of leave without pay and alternative work schedules, and he assigned duties. *Id.* The court concluded, "The evidence that the head of OCAS had authority to review employees, grant quality step increases, set schedules, assign duties, and abolish positions is sufficient to establish that he had authority to take or direct personnel actions and that OCAS' personnel management is distinguished from that of other subdivisions." *Id.*; *see also O'Brien v. Office of Personnel Management*, 144 F.3d 1458, 1461 (Fed. Cir. 1998) ("While formal appointing authority may be an indicator of personnel management authority, it is not required to establish a valid competitive area."); *Castro v. Department of Defense*, 79 M.S.P.R. 152, 156-57 (1998) (holding an individual commissary constituted a separate administrative entity despite evidence that the determination to reduce positions was initiated at a higher level).

The record supports that the ATF ODEI in Washington, D.C., was distinct from other subdivisions in terms of operation, work function, and staff. It is undisputed ODEI had its own employees, consisting of Chief Diversity Officer Lisa Boykin, the appellants, one other Management Analyst, and one other Program Analyst. CAF, Tab C-17 at 21; HR (Mastrianna). ATF's RIF plan described the work functions of the ODEI as including managing ATF's general recruitment function and overseeing ATF's reasonable accommodations program, CAF, Tab C-17 at 48, a description that was consistent with the appellants' descriptions of their duties at the hearing, *see* HR (Bernardino-Redondo, Buist, Frias, Smith).

The evidence regarding personnel management is less clear. Joseph Mastrianna, the Assistant Director for Human Resources and Professional Development, testified that Boykin, a member of the Senior Executive Service (SES), had authority to take personnel actions as to the employees who reported to her. HR (Mastrianna). However, he did not elaborate on the meaning of

"personnel actions." Richardson and Hughes offered similarly conclusory testimony that Boykin lacked authority to "hire and fire" or to create or abolish positions. *Id.* (Richardson, Hughes). However, to the extent Richardson and Hughes meant that Boykin did not have the formal power to process appointments and separations, such power is not required to establish a valid competitive area, as discussed above. *Markland*, 140 F.3d at 1034-35.

All told, I find the weight of the evidence supports that Boykin had sufficient personnel management authority such that the ODEI constituted at least a "subdivision of the agency under separate administration within the local commuting area," as required by 5 C.F.R. § 351.402(b). Richardson described Boykin as being "in charge" of the ODEI, which was consistent with Buist's view that Boykin "hired" him when he joined the office. HR (Richardson, Buist). Hughes described that when the ODEI was created, the Director decided to have a member of the SES lead it and to place sufficient work functions in the office so it would be "managed as a legitimate organization." *Id.* (Hughes). Further, the position description for the ODEI Program Analyst, GS-0343-13, was signed by Boykin as the Higher-Level Supervisor or Manager, indicates that the incumbent worked under Boykin's "general direction," and states that Boykin provided "overall program objectives and policy guidance." CAF, Tab C-17 at 22-27. Together with Mastrianna's testimony that Boykin had authority to take personnel actions as to the employees who reported to her, I find the agency established a case that was sufficient to meet its burden, and the conclusory testimony offered by the appellants failed to rebut that case.

The appellants also objected to the size of the competitive area as too small to permit meaningful competition for retention. Nonetheless, as recognized by the Board's reviewing court, there is no statutory or regulatory provision that guarantees competition.[5] *O'Brien*, 144 F.3d at 1464; *Schmidt v. Department of*

[5] As discussed above, OPM's January 24, 2025, guidance informed agencies they "are to define the competitive area solely in terms of the DEIA office where the employees

*Interior*, 153 F.3d 1348, 1354 ("[A]s long as an agency's actions are not arbitrary or capricious, it has the discretion to establish single-person competitive areas or competitive areas in which all positions are abolished.").

I conclude the agency met its burden to prove it defined the relevant competitive area consistent with the regulatory requirements.

*Competitive level*

Within each competitive area, an agency must group interchangeable positions into competitive levels. Each competitive level includes positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption. 5 C.F.R. § 351.403. The agency bears the burden to prove by preponderant evidence that an appellant's competitive level was properly drawn. *McKenna v. Department of the Navy*, 105 M.S.P.R. 373, ¶ 10 (2007). To meet its burden, the agency must establish distinguishing features between positions in separate competitive levels that are sufficient as a matter of law to find that the positions are not "similar enough in duties, qualifications requirements, pay schedules, and working conditions, so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption." *Id.* (quoting 5 C.F.R. § 351.403(a)(1)). "Undue interruption" means "a degree of interruption that would prevent the completion of required work by the employee 90 days after the employee has been placed in a different position." *See* 5 C.F.R. § 351.203. An agency may create a single-employee competitive level. *Lorenz v. Department of the Interior*, 12 M.S.P.R. 248, 249-50 (1982).

---

worked." 1404 IAF, Tab 9 at 27. I do not find that instruction relevant to the determination whether the area is consistent with the applicable regulation at 5 C.F.R. § 351.402(b).

The record establishes the agency placed the appellant Bernardino-Redondo in competitive level "GS-0343-13/10", appellant Buist in competitive level "GS-0343-13/3", appellant Frias in competitive level "GS-0343-13/2", and appellant Smith in competitive level "GS-0343-14/6." *See* CAF, Tab C-17 at 61; 2571 IAF, Tab 3 at 17; 1708 IAF, Tab 5 at 25; 1113 IAF, Tab 4 at 17. These competitive levels are consistent with the appellants' positions, including classification series and grades, at the time of the RIF action. HR (Bernardino-Redondo, Buist, Frias, Smith); 1404 IAF, Tab 9 at 11; 2571 IAF, Tab 3 at 11; 1708 IAF, Tab 5 at 19; 1113 IAF, Tab 4 at 11.

Further, the record establishes that any error in as to the appellants' competitive levels had no adverse effect on their substantive entitlements, as it is uncontroverted that the entire ODEI was eliminated. HR (Bernardino-Redondo, Buist, Frias, Smith); *Schroeder v. Department of Transportation*, 60 M.S.P.R. 566, 577 (1994); *Hanks v. Federal Emergency Management Agency*, 23 M.S.P.R. 567, 574 (1984) ("In view of the clear evidence of record that all of the agency's employees were released simultaneously, the agency's failure to establish a competitive level structure in accordance with RIF procedures is not dispositive of the matter because the agency has shown by preponderant evidence that appellants were properly released regardless of their competitive levels and that no infringement of their substantive rights occurred."), *aff'd*, 776 F.2d 1060 (Fed. Cir. 1985) (Table).

*Retention factors*

In effecting a RIF, an agency must give effect to four retention factors: tenure of employment (e.g., career, career-conditional, indefinite, temporary, and term); veterans' preference; total creditable federal civilian and uniformed service; and performance ratings. 5 C.F.R. § 351.501. Agencies apply these four retention factors to create a retention register, which is the ranking of employees

in the competitive level. *See James v. Von Zemenszky*, 284 F.3d 1310, 1316 (Fed. Cir. 2002).

The agency identified the appellants' tenure of employment; total creditable federal civilian and uniformed service; and performance ratings retention factors in the RIF notices issued on February 5 and February 6, 2025. CAF, Tab C-17 at 60-61; 2571 IAF, Tab 3 at 16-17; 1708 IAF, Tab 5 at 24-25; 1113 IAF, Tab 4 at 16-17. The appellants did not dispute the accuracy of those retention factors,[6] *see* HR (Bernardino-Redondo, Buist, Frias, Smith), and they are consistent with the SF-50s in the record, *see, e.g.*, 1404 IAF, Tab 9 at 11; 2571 IAF, Tab 3 at 11; 1708 IAF, Tab 5 at 19; 1113 IAF, Tab 4 at 11. The record supports that the agency properly adjusted the appellants' service computation dates consistent with 5 C.F.R. § 351.504(d) based on their most recent three ratings of record. 1404 IAF, Tab 9 at 11 (retention register); HR (Bernardino-Redondo, Buist, Frias, Smith).

I conclude the agency showed it properly considered retention factors in constructing the retention register.[7]

---

[6] Although Buist's status as a veteran was not noted on his RIF notice, *see* 571 IAF, Tab 3 at 16-17, it was reflected correctly on the retention register, *see id.* at 10, HR (Buist).

[7] The appellants did not raise any specific claim that they had the right to assignment to another position during the RIF based on "bumping" (displacing an employee on a different competitive level who is in a lower tenure group, or in a lower subgroup within the released employee's own tenure group where the position is no more than three grades (or appropriate grade intervals or equivalent) below the position from which the employee was released) or "retreating" (displacing an employee on a different competitive level with less service within the released employee's own retention subgroup where the position is no more than three grades (or appropriate grade intervals or equivalent) below the position from which the employee was released, except that for a preference eligible employee with a compensable service-connected disability of 30 percent or more the limit is five grades (or appropriate grade intervals or equivalent)). *See* 5 C.F.R. § 351.701(b), (c). Nonetheless, those assignment rights apply only within the same competitive area. 5 C.F.R. § 351.701(a). As the entire ODEI was eliminated, the agency established the appellants did not have assignment rights to another position in their competitive area.

The appellants failed to prove their claim of race discrimination.

*Disparate Treatment*

The substantive standard for Title VII claims in the Federal sector is set forth in 42 U.S.C. § 2000e-16, which provides that all personnel actions affecting covered employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 20. This broad prohibition of discrimination is commensurate with the high standards expected of the Federal Government as an employer. *Id*.

An appellant may receive injunctive, forward-looking relief if they show that Title VII discrimination was a "motivating factor" in the employment action. *Id*., ¶¶ 21-22. In order to obtain the full relief under 42 U.S.C. § 2000e-16, including status quo ante relief, compensatory damages, or other forms of relief related to the end result of an employment decision, they must show that such discrimination was a "but-for" cause of the employment outcome. *Id*., ¶ 22. The but-for causation standard does not require discrimination to be the sole cause of the contested action, only a necessary one. *Id*. There may be more than one but-for cause of a single employment action. *Id*.

An appellant may prove discrimination under these different standards of proof by various methods. *Id*., ¶ 23. No one method is the exclusive path to a finding of liability. *Id*. The methods by which an appellant may prove a claim of discrimination under Title VII are: (1) direct evidence; (2) circumstantial evidence, which may include: (a) evidence of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn, also known as "convincing mosaic"; (b) comparator evidence, consisting of evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than

in the characteristic on which an employer is forbidden to base a difference in treatment received systematically better treatment;[8] (c) evidence that the agency's stated reason for its action is "unworthy of belief, a mere pretext for discrimination" (i.e., the burden-shifting standard under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); and (3) some combination of direct and indirect evidence. *Pridgen*, 2022 MSPB 31, ¶ 24. None of the above types of evidence, i.e., direct, "convincing mosaic," comparator, or pretext, will be needed in every case. *Id*. Each type of evidence is sufficient by itself to support a judgment for the appellant, or they can be used together. *Id*. Claims of retaliation for opposing discrimination in violation of Title VII are analyzed under the same framework used for Title VII discrimination claims. *Id*., ¶ 30 (citation omitted).

Whatever theory of discrimination an appellant pursues and whatever evidence they introduce to support it, all the evidence must be examined as a whole to determine if the appellant has shown by a preponderance of the evidence that the prohibited consideration was either a motivating factor in or a but-for cause of the contested personnel action.

In support of their claim, the appellants relied predominantly on their races (Black and Hispanic) and the absence of any white employees on the retention register.[9] HR (Bernardino-Redondo, Buist, Frias, Smith). They did not present any direct evidence of discrimination based on race, nor did they present evidence of similarly situated comparators who were treated more favorably. Although

---

[8] To be similarly situated, comparators must have reported to the same supervisor, been subjected to the same standards governing discipline, and engaged in conduct similar to the appellant's without differentiating or mitigating circumstances. *See Fox v. Department of the Army*, 120 M.S.P.R. 529, ¶ 37 (2014) (discussing the use of comparator evidence in connection with a disability discrimination claim).

[9] The appellants also cited political rhetoric disparaging DEI initiatives and employees engaged in DEI-related work. HR (Bernardino-Redondo, Buist, Frias, Smith). While I considered that evidence, I did not find it persuasive that the appellants' race was a motivating factor in or a but-for cause of the RIF action.

Smith testified that Ralph Bittelari is white and he was not included on the RIF register, *see* HR (Smith), it is undisputed Bittelari's position at the time of the RIF was in the Office of Human Capital, Justice Management Division, rather than in the ODEI, *see* HR (Bittelari). Thus I do not find Bittelari was similarly situated to the appellants. *See Fox v. Department of the Army*, 120 M.S.P.R. 529, ¶ 37 (2014) (discussing the use of comparator evidence in connection with a disability discrimination claim). The appellants also did not present persuasive evidence that the agency's stated reason for their separation, that is, the elimination of their position through a RIF, was a mere pretext for discrimination. To the contrary, the record reflects that all positions within the ODEI were eliminated consistent with an Executive Order and guidance from OPM. I conclude the appellants failed to prove that race discrimination was a motivating factor in or a but-for cause of their separation by RIF.

*Disparate Impact*

Disparate impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive is not required under a disparate impact theory. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335-36 (1977); *see also Calhoon v. Department of the Treasury*, 90 M.S.P.R. 375, ¶ 12 (2001). To prove a claim of disparate impact based on race, an appellant must identify a facially neutral employment practice, demonstrate a disparate impact upon the group to which they belong, and prove causation. *See Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 993-95 (1988).

To meet their burden of proof, the appellant must present sufficient statistical evidence to prove that the employment practice at issue fell more harshly on one group than another. *Hidalgo v. Department of Justice*,

93 M.S.P.R. 645, ¶ 12 (2003); *Pigford v. Department of the Interior*, 75 M.S.P.R. 250, 256 (1997). If they do so, then the burden of producing evidence is on the agency to offer a business justification for its use of the practice, and the dispositive issue at this stage of the analysis is whether a challenged practice significantly serves the legitimate employment goals of the employer. If the agency meets its burden of production, the appellant may establish disparate impact by showing the availability of alternative practices that achieve the same business ends with less impact on the protected group. *See Stern v. Federal Trade Commission*, 46 M.S.P.R. 328, 333 (1990).

Here, the appellants produced no statistical evidence supporting that an employment practice was because of their membership in a protected group. While they testified that they are Black (Buist and Smith) and Hispanic (Bernardino-Redondo and Frias), they offered no agency-wide statistics supporting that the RIF had a greater impact on any particular racial group. Accordingly, I conclude they failed to meet their burden regarding a claim of disparate impact. *E.g.*, *Pigford v. Department of the Interior*, 75 M.S.P.R. 250, 256 (1997); *Stern*, 46 M.S.P.R. at 333-37.

<u>The appellants' claim of a violation of their right to due process fails.</u>

The appellants also claimed the agency violated their right to due process by depriving them of "protected property interests in continued federal employment and protected liberty interests in their professional reputations through a predetermined and stigmatizing process that provided no meaningful pre-deprivation opportunity to be heard." CAF, Tab C-18 at 5-6; HR (appellants' closing argument). The appellants testified they were aware of public statements made during and after the most recent Presidential elections disparaging DEI offices and employees in positions related to DEI initiatives. HR (Bernardino-Redondo, Buist, Frias, Smith). They indicated they believed those statements

impacted their ability to find employment after their separations through the RIF action. *Id.*

Tenured public employees have a constitutionally protected property right in their employment and are entitled to due process at each stage of their removal proceedings. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985); *Stone v. Federal Deposit Insurance Corp.*, 179 F.3d 1368, 1374-76 (Fed. Cir 1999). Due process requires, at a minimum, that an employee being deprived of his property interest be given the opportunity to be heard at a meaningful time and in a meaningful manner. *Gajdos v. Department of the Army*, 121 M.S.P.R. 361, ¶ 18 (2014) (citations omitted). Nevertheless, due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances. *Id.* Rather, it is flexible and calls for such procedural protections as the particular situation demands. *Id.*

The record here shows the agency provided the appellants with the process due to them under the RIF regulations. This included that the agency provided the appellants with specific written notice at least 60 full days before the effective date of their release, as required by 5 C.F.R. § 351.801(a). That notice included the contents required by 5 C.F.R. §§ 351.802 and .803, including notice of the employees' right to appeal to the Board and information concerning their right to reemployment consideration. CAF, Tab C-17 at 60-61; 2571 IAF, Tab 3 at 16-17; 1708 IAF, Tab 5 at 24-25; 1113 IAF, Tab 4 at 16-17. The appellants contended additional process was due, in the form of pre-deprivation hearing.

Deciding whether the administrative procedures under the RIF regulations are constitutionally sufficient requires analyzing the governmental and private interests that are affected. *Gajdos*, 121 M.S.P.R. 361, ¶ 18 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). Identification of the specific dictates of due process generally requires consideration of three factors: first, the private interest affected by the official action; second, the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and third, the government's interest, including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirement would entail. *Id.*

Regarding the first factor, that is the private interests affected by the action, I considered that the separation action was not temporary and was likely to have a significant practical impact on the appellants. Nonetheless, a separation by RIF is not inherently stigmatizing. A RIF is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. *See Tippins v. United States*, 93 F.4th 1370, 1375 (Fed. Cir. 2024) (citations omitted). That is, a RIF is not an adverse action against a particular employee but is directed solely at a position within an agency. *James*, 284 F.3d at 1314 (citing *Huber v. Merit Systems Protection Board*, 793 F.2d 284, 286 (Fed. Cir. 1986)). While I considered the record evidence regarding political rhetoric concerning DEI initiatives, that evidence does not support a finding that the appellants' separations were adverse actions as opposed to administrative RIF procedures. Furthermore, the record does not support that their separations by RIF, as opposed to the rhetoric, were likely to prevent them from obtaining other gainful employment.

As to the second factor, the risk of erroneous deprivation and the probable value of additional procedural safeguards, a separation by RIF is notably different from an adverse action, such as a removal based on charged misconduct. As explained by the Board, a pre-deprivation process is necessary in an adverse action in part because "an adverse action will often involve factual disputes and consideration of an employee's response may clarify such disputes." *Gajdos*, 121 M.S.P.R. 361, ¶ 20. In addition, the appropriateness of the penalty in an adverse action may not be clear, and thus an employee must receive a meaningful opportunity to invoke the discretion of the decision maker. *Id.* A separation by RIF is fundamentally different from an adverse action. Agencies have broad management discretion to invoke a RIF and are in the best position to decide

whether a RIF will allow the agency to accomplish its mission. There are unlikely to be factual disputes that an employee's response would help clarify, and there is no "penalty" regarding which a decision maker's discretion could be invoked. Thus, there would be only minimal probable value in implementing the additional safeguard of a pre-deprivation hearing.

As to the third factor, the government has a strong interest in efficient administration. *E.g.*, *id.*, ¶ 24. Requiring agencies to conduct pre-deprivation hearings for all employees affected by RIF actions, which may in some instances be numerous, could slow the RIF process considerably and impose a significant administrative burden. *Id.*

Balancing these three factors, and considering that the appellants had the availability of post-deprivation relief in the form of a Board appeal, I conclude the agency satisfied the requirements of due process here.

In sum, I conclude the agency had a proper basis for invoking the RIF procedures when separating the appellants from employment, and the agency complied with the RIF procedures set out in 5 C.F.R. part 351. I also conclude the appellants failed to prove their affirmative defenses of discrimination based on race and violation of their right to due process. Consequently, I must AFFIRM the agency's action.

## DECISION

The agency's action is AFFIRMED.

Martha L. Russo

FOR THE BOARD: ______________________________

Martha L. Russo
Administrative Judge

**NOTICE TO APPELLANT**

This initial decision will become final on **April 22, 2026**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record. You must file it with:

The Clerk of the Board

Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

**Criteria for Granting a Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the

documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run

upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

**NOTICE TO AGENCY/INTERVENOR**

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review. Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

**NOTICE OF APPEAL RIGHTS**

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

| | |
|---|---|
| | Appellant |
| Electronic Service | ATF ODEIA Consolidation<br>Served on email address registered with MSPB |
| | Appellant Representative |
| Electronic Service | Albert Pinto<br>Served on email address registered with MSPB |
| | Agency Representative |
| Electronic Service | Katherine Bolton<br>Served on email address registered with MSPB |
| | Consolidated Appellant |
| Electronic Service | Marilyn Bernardino-Redondo<br>Served on email address registered with MSPB |
| | Consolidated Appellant |
| Electronic Service | Yaziddah Buist<br>Served on email address registered with MSPB |

Consolidated Appellant

Electronic Service JENNIFFER FRIAS
Served on email address registered with MSPB

Consolidated Representative

Electronic Service Pamela Hicks
Served on email address registered with MSPB

Consolidated Appellant

Electronic Service Vaughn Smith
Served on email address registered with MSPB

Rosa M. Marrero Rivera

03/18/2026
(Date)

Rosa M. Marrero Rivera
Paralegal Specialist

**Declaration of Sepideh Keyvanshad**

I, Sepideh Keyvanshad, declare:

1. I was terminated as a Foreign Service Officer (FSO) with the United States Agency for International Development (USAID) as a result of a Reduction in Force (RIF) on September 2, 2025. Prior to the RIF, I had served as an FSO for almost 25 years, serving in several overseas and Washington assignments. At the time of the RIF, I was serving as the Senior Deputy Assistant Administrator of our office of Human Capital and Talent Management, and as the Agency's Acting Chief Human Capital Officer (CHCO). As part of my CHCO duties, I was responsible for overseeing and managing most aspects of USAID's human resources functions for civil service, foreign service and some aspects of local staff policies. After the RIF notices went out to all USAID staff, including civil and foreign service, local staff, and limited term employees, our human resources team was made responsible for the offboarding of most of those individuals.

2. Below is the approximate sequence of events that took place from February through May of 2025, including details regarding violations of laws and policies, disclosures regarding those violations and the individuals to whom disclosures were made, and specific or approximate dates of those communications. Those communications ultimately concluded in my placement on administrative leave through an e-mail on May 2, 2025 by Rick Guy, USAID General Counsel, with Ken Jackson, Acting Deputy Administrator, and Marcus Thornton, Acting Chief of Staff, copied.

**OPM and USAID policies and guidance that were not complied with in the conduct of USAID RIF actions**

USAID RIF actions, starting in February 23, 2025 for the first round, and March 28 and then March 31, 2025 for the second round, did not comply with OPM policies and guidance for

Reductions in Force, as per Title 5 Code of Regulations part 351, and Agency policies per its Automated Directives Systems Section 454 for Foreign Service employees. These actions did not include a justification for a RIF; determination by the appropriate offices and individuals within USAID of positions to be eliminated and those to be retained; proper notice including to the relevant bargaining units; no retention register was created prior to the RIF actions; the requisite criteria for the RIF, including determination of appropriate competitive areas, performance, veterans preference were not complied with; the actual letters of RIF did not include all required information, and the majority had incorrect service computation dates; the required order of release was not followed in many instances and was overridden without the required justification and process; and ultimately USAID staff were hired directly by the Department of State to manage USAID programs and funds that had been transferred to State, outside of a proper retention register process.

**Background: Absence of Proper RIF Planning and Decision-Making Process**

3. A small group of staff within the Office of Human Capital and Talent Management (HCTM) and General Counsel (GC) had planned to start the conversation regarding a potential RIF from the very first days of the administration, anticipating its eventuality. The intent was to begin to understand the objectives and plans of the new administration and to present a plan, if needed, to the new political leadership on how to do this in compliance with the relevant laws and policies. However, given the speed with which administrative leave, the dissolution of agency, and ultimately the RIFs themselves, were conducted, those conversations became moot. No career staff (and at times, it appeared, political senior leadership) within USAID were involved in any RIF decisions. No laws, regulations, or Agency policies were followed in the conduct of the RIF. The dissolution of the Agency and the RIF of its entire workforce often also

seemed a surprise to the political staff at the Agency, as was at times communicated by some at the side lines of meetings. I was told by some of them that they had come to the Agency to reform it, not to dismantle it. Based on the knowledge I had, and in my working relationship with the small group of political staff, they did not seem to be making the decisions about the Agency, including RIFs, and were tasked with managing the implementation of decisions that came from elsewhere. The specifics of where the decisions were coming from was not always clear, and very often the instructions were communicated to us as coming from "they" without mentioning any specific names, although Pete Morroco, Jeremy Lewin, Sergio Gor, Steve Davis, as well as Elon Musk and DOGE generally, were mentioned.

**Weekend of February 22-23, 2025: First Round of RIF Letters**

4. Beginning on February 22, 2025, when I was informed that a RIF of USAID would begin to take place, I began to inform the Agency senior political leadership (Ken Jackson, Joel Borkert, Marcus Thornton, as well as Jeremy Lewin who was with DOGE) that our agency policies regarding the RIF must be followed, and that policies for civil service and foreign service were different. When the first RIF notices were sent out on February 23rd, the process and the actual letters of RIF had not complied with OPM or with Agency laws and policies per above, and guidance to work with our GC to lay out the process was not heeded.

5. On February 22, in the afternoon, I was forwarded an e-mail from OPM that had originally been sent to Jeremy Lewin, and copied to Bill Malyzka (Chief Human Capital Officer who was by then on medical leave), and three other OPM employees, with an attachment of a document approving "USAID's request for exception to the 90 day competitive area rule, and 60 day RIF notice requirement." I had no information that this request had been made, so I forwarded the email and documents to Ken Jackson and Joel Brokert, then acting Chief of Staff,

to ask about this request, trying to understand whom it had been made by. I believe I also messaged Bill Malyzka, who was by then on leave, to ask if he had made that request. He responded that he did not know anything about it. It seemed to me that Ken and Joel had not been fully aware of the details of this request. Ken then forwarded my e-mail to Jeremy.

6. I explained to them that if a RIF process were to take place, FS and CS had to be handled differently and offered to bring in GC to help lay out the process that needed to be followed for the RIF of the different employment categories. In response, I was told to hold off and to focus on the admin leave process. There was no further communication on the RIF until I found out, I believe the evening of February 23, that RIF letters had gone out to a large number of our staff.

7. Before those RIF letters had gone out, no one within HCTM, and I believe other parts of USAID, including the Agency's Management bureau, who are responsible for a legal and orderly RIF process, had been informed, or had been asked to work on the relevant processes in accordance with laws and policies.

8. After the February 23 RIF letters went out, I repeatedly spoke with same senior leadership, expressing my concerns about Agency lack of compliance, asking that the letters be rescinded, and for the appropriate staff to be allowed to redo the process in accordance with Agency RIF policies for civil service, foreign service, and senior executive service, while rescinding RIF letters that had also been sent to our foreign service limited staff, which were inappropriate as they are considered contractors for purposes of a RIF. (these communications were mainly after our daily morning senior management meetings, or in the offices of Ken Jackson, Joel Borkert.)

9. During the weeks following the first RIF, attempts were made by me and my team to rescind the first round of RIF letters, or to extend the separation date for those deemed essential

(including staff in Management and HCTM needed to support offboarding of staff). We were told by our senior leadership that RIFs cannot be rescinded. I subsequently found out from OPM that this is inaccurate, and that the Agency has the authority to rescind RIFs (just as it is the responsibility of the Agency to conduct the RIFs). During this time, I offered multiple times to work to rescind the RIFs, and to allow our teams to do this properly.

**February-March 2025: General Counsel Referrals to OPM and Assertion that Laws Were Waived**

10. During this time I also sought guidance from Rick Guy, who was the Agency's General Counsel. Each time I attempted to seek his legal guidance, he referred me to OPM, stating that OPM was handling the USAID RIF, and will be implementing it and handling all the issues. He also stated that OPM was waiving all laws and policies regarding the RIF, and that the ADS and all laws regarding RIFs were null and void, as per OPM decision. He did not explain how that legal determination had been made or what justifications it was based on. He then referred me several times to speak with Andrew Kloster at OPM. (these conversations took place during or after our daily senior management meetings, and were generally very brief as my requests for legal guidance were almost always referred to OPM).

**March 14, 2025: Meeting with OPM Regarding First RIF Deficiencies**

11. After several attempts, I was able to schedule a video call with Andrew Kloster and Noah Peters at OPM on March 14th regarding issues with the first round of RIFs and how to remediate them. Andrew and Noah seemed surprised at how the RIF had been done, and told us that if it was not done properly, it would need to be done again, and that we would need to take the time for the next round of RIFs in order to get it done right. We concluded the meeting with specific action items on how to either fix the problems of the first RIF, to rescind some, and how to do the next round. I provided detailed notes of that meeting in an e-mail at the end of the day to Ken

Jackson, Marcus Thornton, Rick Guy, Michael Tierney, and a few others, including recommended corrective actions as suggested by Andrew Kloster and Noah Peters.

12. During the month of March, I had several meetings and e-mail communications with OPM staff who provided me and my colleagues guidance and recommendations for the next round of RIFs. That included guidance on superseding the first RIF that was done incorrectly, ensuring the actual RIF letters had the correct employee information, retention register was in place prior to the letters, proper notices were sent, etc. This guidance was shared with the agency leadership, i.e the need for OPM guidance be followed in order for the RIF process to be done in accordance with the required rules and agency policies.

**Week of March 17, 2025: OPM Guidance on RIF Compliance Requirements**

13. During the week of March 17, 2025, a meeting was held with OPM representatives regarding the ongoing RIF. Among the key findings and guidance provided were the below:

a. OPM representatives stated that the authority to conduct a RIF is within the Agency. They identified the need for a retention register and justifications for competitive areas. OPM representatives further stated that OPM had provided guidance to those who were conducting the USAID RIF, but that guidance was not followed, and they could not track documents that had been used for the process. It was determined that the bargaining unit agreement was not complied with, and that OPM approval does not negate the union agreement and notice requirement. OPM representatives stated that the first priority was e-OPF review and generation of retention registers, that those who did the RIF needed to complete this, and that OPM could begin records review.

b. On March 20, 2025, an internal USAID RIF implementation meeting was held. It

was documented that the process could not proceed without a retention register or a competitive area justification. The meeting included a discussion of the need for a lawful and appropriate RIF plan, and how to approach senior leadership regarding what had been done incorrectly and what would be required to remediate the process.

c. On March 21, 2025, a meeting was held with OPM regarding RIF support for what we had been informed would include a second round. During this meeting, OPM representatives stated that initial conversations regarding the RIF had been with Jeremy Lewin, and that what OPM had advised was not followed.

d. On March 23, 2025, a meeting was held with OPM, during which OPM representatives advised the Agency to start the entire RIF process over. OPM confirmed that they had seen zero data from the first round of RIFs and had no part in it. OPM reiterated that a retention register is non-negotiable, that competitive areas must be developed, and that notices compliant with the retention register must be issued. OPM further stated that certain actions from the first round would have to be undone, specifically with respect to SES, FSL, and foreign service employees.

**March 24, 2025: OPM Recommended Path Forward Not Followed**

14. On March 24, 2025, a critical meeting was held with OPM, also attended by Joel Brokert. OPM set out a detailed and compliant path forward for the RIF. Key OPM findings and recommendations from that meeting included the following:

15. With respect to the first round of RIFs: 17 SES employees who had been included would need to be rescinded; 300 FSLs who had been terminated outside the RIF process, as they are

treated as contractors, needed to be addressed; a number of required actions for civil service employees, including accurate service computation dates and competitive areas, would not withstand legal scrutiny and should be remediated.

16. With respect to the second round of RIFs, OPM identified that the same underlying deficiencies remained, including incorrect competitive areas and inaccurate information on the specific RIF actions.

17. OPM's recommendation was to: incorporate the first round action into a consolidated second round action; rescind the first round; and apply the process to 100% of employees except for the Office of the Administrator. OPM proposed a path to resolution that would walk back from the intended July 1 and September 1 RIF dates and instead develop notices of intent to start a RIF, instead of specific notices of RIF, to be issued on May 1. This proposed process would offer a window for employees to review and correct their data, demonstrate a good faith effort to ensure correct employee data and competitive areas, provide sufficient time for OPM to develop the required retention register and proper competitive areas, allow for the correction of the first round, provide justifications for the RIF actions, and mitigate the impact of incorrect data on severance and grievances.

18. Specific actions recommended by OPM also included: providing employees a specific timeline for correction of their data; creating an e-mail channel for employees to submit correct information; providing notices to collective bargaining units; and then issuing RIF letters. OPM noted that every notice would need to come from the Agency.

19. Joel Brokert stated that he was 100% on board with this proposed approach, but needed a one-pager to enable him to make that case. He asked OPM to provide, by the end of the day, the document, which would also include the existing vulnerabilities that the Agency was open to

with the first RIF. The document "Analysis and Recommendations - USAID Reductions in Force" was provided by Jason Parman of OPM to Ken Jackson at the end of that day.

**March 25, 2025: Decision to Override OPM Recommendations**

20. On March 25, 2025, a meeting was held with OPM. During that meeting, it was communicated that Jeremy Lewin had decided to send the actual specific letters of RIF, and not the letters of intent to start a RIF, as had been recommended by OPM, despite the fact that the employee data would not be correct. It was also noted that Jeremy Lewin was not supposed to be directly working on the RIF because of a court order regarding DOGE, but was engaged in behind-the-scenes planning and communicating with the Secretary of State.

21. On March 26, 2025, an in person meeting was held with Jeremy Lewin, Gavin Kliger, and other DOGE staff at USAID offices. During that meeting, Jeremy Lewin spent time discussing legal vulnerabilities and the cost of potential settlements if the Agency were sued, appearing to conduct a cost-benefit calculation regarding moving the process through rapidly while aware of a high probability of litigation, agency vulnerability, and the cost of settlements. It was also communicated to us during that meeting that the requirement to provide union notice prior to the RIF would be complied with by sending those notices immediately before the RIF letters went out to the employees.

**March 28 and March 31, 2025: Second Round of RIF Letters**

22. On March 28, 2025, the second round of actual letters of RIF went to almost all USAID employees, civil and foreign service. Senior executive service employees did not receive letters, as we had been instructed by OPM that a different process needed to be followed through OPM Policy. This second round continued to have the same issues of non-compliance with the requirements of CFR part 351 and ADS section 454, including the lack of a retention register,

lack of properly determined competitive areas, missing information regarding performance, inaccurate service computation dates, etc.

23. RIF letters were sent to all staff from the e-mail address usaidpersonnelnotification@usaid.gov, an address that had been created by DOGE. HCTM staff did not own this address and did not have access to it. As soon as the RIF letters were sent, employees began to report that the data was incorrect, including that the service computation dates were completely wrong. My team and I reached out to OPM immediately to determine the cause.

24. On March 31, 2025, revised RIF letters were sent, dated March 27. These letters still contained inaccuracies for many employees and did not include all legally required information for a RIF. A system was subsequently established to work with employees to correct their data, which was the process that had been proposed prior to the actual RIF letters going out.

25. On March 31, 2025, a meeting was held with OPM regarding the RIF process. During that meeting, it became apparent that a retention register had not yet been created, despite the understanding that it was a legal requirement for the register to be created before the RIF letters went out. OPM would still need to create the retention register at that point. The meeting also addressed the rights of staff to view the retention register and how to provide them with that information. In subsequent weeks, and prior to my being placed on administrative leave, I was informed that Jeremy Lewin had instructed that the retention register not be shared with employees. Portions of it were eventually shared in a format that was not clearly explained on September 18, 2025.

**Month of April 2025: Continued Non-Compliance and Transition of Programs to State**

26. During the month of April 2025, when programs and corresponding funding were being

moved to the State Department to be managed, I repeatedly requested that our HCTM team be permitted to redo the RIF in a manner that allowed relevant positions and staff to be retained and moved to State with the programs that were being transferred. I was repeatedly told that "that's not what they want," and that "they want to hire the people they want." I had been informed previously that the intent was to use Schedule A and other authorities that would enable staff to be brought in without competition.

27. It became apparent during this period that the State Department was very concerned about how the USAID RIF had been conducted, including scheduling separate meetings with OPM to discuss the USAID RIF process without the presence of USAID staff, and wanted to create a separation to protect itself from the resulting legal vulnerabilities. I was informed that State lawyers had been taken off guard and had an initial estimate of billions of dollars of vulnerability due to the manner in which the RIF was conducted.

28. On April 11, 2025, in a meeting with State Department human resources staff, it was noted that State Legal continued to recommend a proper RIF register for USAID, but that this approach did not provide the flexibility that the Administration wanted. From the beginning of this process, I had advocated to senior Agency leadership that a RIF be planned and conducted with a proper retention register that would allow for the transfer of existing USAID positions and corresponding staff to the State Department to implement the remaining programs. I was repeatedly told that "they" did not want that approach, as they wanted to select the individuals that would be kept.

**April 22, 2025: General Counsel's Statement that the ADS is Null and Void**

29. On April 22, 2025, in response to a grievance on behalf of local staff, General Counsel Rick Guy provided a written response that included the statement that "the ADS is null and void

as to legal force or effect." It was this language that prompted me to seek a meeting with Rick, and further conversations with the White House Liaison, which form part of the chain of events that led to my being placed on administrative leave.

**April 28-30, 2025: Conversations with Adam Korzeniewski, White House Liaison regarding the ADS**

30. On or about April 28, I stopped by Adam's office to discuss a couple of issues: 1) information requested from a FOIA that included specific information about Jeremy Lewin and his status as a USAID official, which we did not have in our records: and 2) instructions received from Rick Guy regarding the applicability of ADS and general interactions with the General Counsel.

31. During that conversation in Adam's office I told him that Rick Guy had stated in an e-mail to AFSA and the grievants regarding the RIF of local staff that the ADS was null and void. I told Adam that when I had gone to Rick's office to discuss the issue with him, as it would impact decisions regarding order of separation for the RIF, that the meeting had turned aggressive and accusatory on his part, and that I was not able to get a response from Rick.

32. I told Adam that as the Acting CHCO and at HCTM, we need to be able to rely on GC for their legal guidance, and that had become difficult as we were not receiving adequate responses from Rick, and because Rick and Michael Tierney had asked us to keep a divide with the career GC staff.

33. Adam responded that he knew that this was an issue with Rick, that others, including other political appointees, also were having issues with Rick, and that he was working on getting a resolution (I believe with the White House).

34. The next day, on or about April 29, I ran into Adam in the hallway. He told me that he had brought up the issue of the ADS with Jeremy Lewin, and that Jeremy had indicated we

should continue to rely on the ADS as before.

35. The following day, I believe on April 30, I saw Adam again in the hallway. I asked Adam if I could have something in writing regarding the instructions from Jeremy Lewin that the ADS was still applicable. Adam stated that he wasn't sure he would be able to get something in writing. I told him that puts me and my team in a difficult position as the Agency GC had taken the position that the ADS was null and void, while it was being communicated by our Acting Deputy Administrator that we would apply it. I asked that Adam think about how we could get clear written instructions. He agreed to consider this.

**April 2025: Requests to Override Order of Separation in Violation of CFR Rules**

36. Some time in mid-April 2025, Michael Tierney, USAID Deputy General Counsel, stopped by my office to ask that I move the RIF date of one of our ethics lawyers, from July 1 to September 2. I asked him to send me an e-mail with that request, copying two colleagues who were keeping track of such requests. After sharing this request with my colleagues, I found out that Michael had already been repeatedly asking one of those colleagues to change the RIF date. In the next few days I received an e-mail from Ken Jackson, with a copy to Michael, asking that I move the RIF date of that particular ethics lawyer. I asked one of my colleagues to check the employment status of that individual in our system, and was informed that she is a career conditional employee, and that according to CFR rules of order of separation, her RIF date cannot be moved to one that is later than other career employees. I then responded to Ken's e-mail, copying Michael, explaining the rules on order of separation. I also explained that this is similar to the same challenge we were facing with our foreign service officers, where employees that were not yet tenured could not be moved to a later separation date than officers that had been tenured. Ken responded to my e-mail with something along the lines of "understood."

37. Around the same time, Michael Tierney stopped by my office to ask again about the ethics lawyer, stating that he doesn't understand why they can't keep her longer if she's a good employee. I explained that most of our other untenured and career conditional employees who have the earlier July RIF date are also good employees. However, our regulations and policies do not permit them to have a later RIF separation date, later than tenured and career employees. I also explained that was the reason for such regulations, i.e. to take away such subjective criteria, and to ensure the process is fair.

38. Some days later I ran into Michael near his office. He asked me again about the ethics lawyer. I asked if there was a particular reason they specifically wanted to work with her. He explained the type of work she was doing for them. I asked if she was the only person who could do this work and whether there were others who were also able to do this work that did not have the same issues with the order of separation. He responded that "there are, but we like her."

39. A few days later, on April 28, I received an e-mail from Rick Guy, with a copy to Michael Tierney, stating: "Please move [ethics lawyer's] RIF date to September 2nd. Please confirm when this is complete so we can inform her." I responded that we had included her name in the list of those being proposed for the later RIF date in an action memo we were drafting for our senior leadership (this would have included Ken Jackson and Jeremy Lewis among some others). I also added that "as we discussed last week, we have our meeting with OPM today to discuss if there are any restrictions with regards to having untenured and career conditional employees have later RIF dates than employees who are tenured and career." Per his instructions during my meeting with him on April 23 to reach out to OPM about questions of orders of separation, I had asked OPM to include someone from their policy team during our weekly meeting with them that was scheduled for later that day, to receive guidance on whether

deviations to order of separation were permitted, under what circumstances, and what actions would be needed. Rick responded to my e-mail, without copying anyone, stating "I am not concerned at this moment with any other person and need to have hers done as instructed please."

**April 28, 2025: OPM Guidance on Exceptions to Order of Release**

40. During our meeting with OPM on April 28th, we had asked that someone from their policy team be present to provide us with guidance regarding deviations to the order of release. It was explained to us which specific sections of 5 CFR 300 series were relevant to the deviations, which justifications would permit this action, and notification requirements. Specifically they stated that the rules do allow for some exceptions to the rule of release, but need to meet certain criteria: need to be within the competitive area; and need to notify each employee that was part of that group and inform of the name of employee being released later and why.

41. The next day, on April 29, I responded to Rick's e-mail, copying others including Ken Jackson and Michael Tierney, informing him of our discussion with OPM and their guidance regarding steps that were required to allow us to move the RIF date of the particular ethics lawyer, i.e. "going through the appropriate processes per 5 CFR part 351, to ensure this meets the appropriate exceptions, and if so to then inform others who are above her in the retention register. This was a process we were required to follow for each individual who we would be moving up the order of release within the retention register." The e-mail then provided some more detailed information about the process that had to be followed. I believe there was no further communication on this issue before I was ultimately placed on administrative leave at the end of that week.

**Concerns about handling of grievances against the Agency by employees**

42. During this time, there were also hundreds of grievances that were being received against the Agency from specific individuals or groups of employees, as well as the unions. The Agency also required specific processes for the handling of these grievances against it, which begin by acknowledging its receipt, and different layers of investigation and due diligence.

43. These types of allegations and grievances, per Agency rules and policies, were managed by the Agency's Employee Labor Relations (ELR) team, which was part of the Office of Human Capital and Talent Management (HCTM), which I was in charge of at the time of these events, in coordination and consultation with the Agency's Office of General Counsel.

44. By around mid-April, all former ELR staff had either left, or put on administrative leave. I had asked that James Truong and Alpana Gupta, lawyers who had previously been working for the General Counsel's office, to be taken off of administrative leave and be detailed to our HCTM team, with James as the Acting Director or ELR, as Rick Guy did not want them, and I understand most other lawyers, to perform any duties within his office, and our team needed staff to handle ELR related functions.

45. With regard to the employee grievances, James stated that he did not feel comfortable having the responses going to the employees in his name, as he was uncomfortable with the grounds that the responses in the letter were based on. There were several grounds that seemed indiscriminate, not relevant, or factually incorrect. For example, the first ground that the RIF letters were superseded by the later RIF letters and therefore no grounds for grievance existed was correct factually and legally. However, the second ground that the RIF process was done correctly and in accordance with laws, rules, and regulations was incorrect, and was clearly illustrated within our internal USAID records, as well as records of meetings and conversations with OPM.

46. Given we did not feel comfortable having a response go out from ELR, and from HCTM broadly or under our names, knowing the facts and the legal arguments were not correct based on our knowledge, James suggested that he make edits to the document, which Michael had offered was possible in his e-mail to James, and that he change the format of the letters with Rick as the official from whom the documents were sent to the grievants.

**May 1, 2025: Conversations with Ken Jackson**

47. On Thursday, May 1, I sent a g-chat to Ken Jackson asking if we could speak. When I didn't get a response I walked over to his office a little before 4:00 pm, asked if we could talk, and when I told him it would take more than a few minutes, he told me he would come to my office after his 4:00 meeting ends. He finally came by my office around 5:00 pm. I asked him how much time he had. He said he had time. So I asked him to close the door and to sit down. He said something along the lines of "oh it's serious." I started explaining the situation in general terms of what ELR had been instructed to do by Rick and Michael and their bandwidth. Ken interrupted after a few minutes saying "let's get to the point" or something to indicate for me to be more direct. At around this time during the conversation he also mentioned something along the lines of having to deal with a GC who is connected to the White House and the Secretary.

48. The first part of the conversation concerned my expressing concern about how we were being asked to handle employee discipline. I then discussed with Ken the concerns and discomfort by our ELR staff of being asked to sign and put their names on responses to grievances with which they do not agree. Ken stated that no one should put their name or signature where they're not comfortable doing so. We ended our conversation discussing the legacy organization that I had advocated for, which would be left behind to process the necessary offboarding and other employee actions after the September 2 RIF date. I thanked him for his

help. The meeting lasted approximately 45 minutes.

49. The next morning I met with James Truong virtually. After my meeting with Ken on May 1, I had messaged James and Alpana that I had spoken with Ken and that we should regroup the next morning. At a 10:00 am meeting, I shared my conversation with Ken and that he had stated that we should follow our process, and that no one should sign any documents that they are uncomfortable signing.

**May 2, 2025: Placement on Administrative Leave**

50. On May 2, 2025, at 3:06 pm, I received an e-mail from Rick Guy, with Ken Jackson and Marcus Thornton copied, stating:

> Sepideh,
>
> This is to inform you that effective immediately you are on administrative leave. You are prohibited from accessing work sites, systems, or contacting coworkers.
> Should you have any questions or need to follow up, your point of contact with the agency is Deputy General Counsel Michael Tierney.

I was not brought back from administrative leave and was separated on September 2, 2025.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge. Executed this 18th day of June, 2026.

Sepideh Keyvanshad
_______________________
Sepideh Keyvanshad