**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| DOREEN MULLADY, | **Civil No. 8:26-cv-00573-SAG** |
| Plaintiffs 2-323 (Exhibit A), *Plaintiffs,* | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

v.

OFFICE OF MANAGEMENT AND BUDGET
725 17th Street, NW, Washington, DC 20503;

U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
c/o Office of Management and Budget;

RUSSELL VOUGHT, in his official capacities
as Director of the Office of Management and Budget,
as Acting Administrator of U.S. Agency for International Development,
and as the successor of Elon Musk and DOGE as the head of the
Information Technology Oversight Reform Program
c/o Office of Management and Budget;

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW, Washington, DC 20415;

SCOTT KUPOR, in his official capacity
as Director of the Office of Personnel Management;
c/o Office of Personnel Management;

MERIT SYSTEMS PROTECTION BOARD
1615 M Street, NW, Washington, DC 20419

JAMES J. WOODRUFF, II, in his official capacity
as Chair of the Merit Systems Protection Board
c/o: Merit Systems Protection Board;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., NW, Washington, DC 20530;

TODD BLANCHE, in his official capacity
as Attorney General of the United States

c/o U.S. Department of Justice;

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue SW, Washington, DC 20201;

ROBERT F. KENNEDY, JR., in his official capacity as
Secretary of the Department of Health and Human Services,
c/o Department of Health and Human Services;

U.S. DEPARTMENT OF STATE
2201 C Street NW, Washington, DC 20520;

MARCO RUBIO, in his official capacity
as Secretary of State,
c/o U.S. Department of State;

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, SW, Washington, D.C. 20202;

LINDA MCMAHON, in her official capacity
as Secretary of Education,
c/o U.S. Department of Education;

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE, Washington, DC 20528-0525;

MARKWAYNE MULLIN, in his official capacity
as Secretary of the U.S. Department of Homeland Security
c/o U.S. Department of Homeland Security;

GENERAL SERVICES ADMINISTRATION
1800 F Street NW, Washington, DC 20405;

EDWARD FORST, in his official capacity as
Administrator for the General Services Administration
c/o General Services Administration;

FEDERAL DEPOSIT INSURANCE CORPORATION
550 17th Street, NW, Washington, DC 20429; and

TRAVIS HILL, in his official capacity as
Chairman of the Federal Deposit Insurance Corporation
c/o Federal Deposit Insurance Corporation.

*Defendants*.

## BACKGROUND

1. Since taking office, President Donald J. Trump and others in his Administration have engaged in wide-ranging efforts to fire and replace thousands of federal employees. This effort, part of the Administration's plan to "reshape government" began on the first day of the Administration and continues to the present.

2. The effort to reshape government was accompanied by other Administration actions aimed at politicizing the federal government in favor of its political and ideological allies and against those perceived to be political or ideological enemies. Among other steps, the Administration deliberately cut research grants to states that had voted against President Trump in the Electoral College and repeatedly denied federal disaster assistance to these so-called "blue states" at much higher rates than so-called "red states."

3. The Administration has also taken ongoing steps to reshape the federal workforce along partisan and ideological lines. For example, the Administration began hiring thousands of new federal career staff while deliberately avoiding or ignoring re-employment priority lists. Applications for federal employment now require applicants to state how they would advance the President's priorities if hired.

4. The Civil Service Reform Act, the Foreign Service Act, and other laws restrict the wholesale removal of career federal employees. Career federal employees also possess constitutional Due Process and First Amendment rights that restrict an Administration's ability to remove employees at will.

5. To quickly remove thousands of career federal employees while avoiding the due process protections provided by 5 U.S.C. Chapter 75, Defendants Office of Management and Budget (OMB), Office of Personnel Management (OPM), and Department of Government Efficiency

(DOGE)[1] directed a series of large-scale employment actions across the executive branch that were labeled as "reductions in force" (RIFs).

6. Plaintiffs are former federal employees whom Defendants terminated through such RIFs.[2] Plaintiffs have all timely appealed their RIF actions to Defendant Merit Systems Protection Board (MSPB). The current MSPB review process cannot provide meaningful review of the conduct challenged here and does not comport with due process or Defendants' statutory obligations.

7. The RIF statutes and regulations provide the means for the Executive Branch to shrink agencies and abolish positions. Under OPM's regulations and guidance, RIF authority can only be invoked for six identified justifications, including reorganizations, budgetary constraints, or a lack of work. Yet when high-ranking Administration officials were asked why Defendants were firing Plaintiffs through RIFs, they did not point to any of these lawful justifications. Instead, they repeatedly justified the firings with false, stigmatizing, and damaging claims about Plaintiffs' loyalty, honesty, and competence. Moreover, even after conducting the RIFs, Defendants continued to stigmatize Plaintiffs, and also actively to interfere with their ability to be rehired.

8. Defendants' implementation of the RIFs further demonstrates they used the RIF label to accomplish their goal of swiftly removing federal workers and replacing them with handpicked successors. At the direction of Defendants OPM, OMB, and DOGE, Agency Defendants repeatedly manipulated the RIF process to ensure the Administration's political objectives, rather than neutral RIF standards, controlled which employees would be separated. In doing so, they exceeded their authority and repeatedly violated the statutes and regulations that govern RIFs.

---

[1] DOGE no longer exists and what remains of it is now within Defendant OMB and overseen by Defendant Vought.
[2] Given the inevitability of their termination, three Plaintiffs resigned after the separation dates on their RIF notices (the agencies had indefinitely extended their separation dates due to the 2026 Continuing Resolution).

9. In many cases, other employees were immediately placed in Plaintiffs' "abolished" positions. Indeed, a State official has admitted that positions in State were not eliminated and were never going to be eliminated. Defendant State simply used the term "abolished" to apply to the person, not the position; the position would continue to exist and be backfilled. Many of the "abolished" positions at State and elsewhere were performing statutorily mandated duties.

10. Having fired thousands of federal workers, including Plaintiffs, while purportedly "abolishing" their positions, Defendants are now engaged in a mass hiring spree for many of the same duties and positions they claimed to have abolished less than a year ago. For example, Defendant Department of Health and Human Services (HHS), which separated 10,000 employees through a RIF, has announced plans to hire 12,000 employees. Similarly, Defendant General Services Administration (GSA) is now hiring as many as 3,000. Last year, while State Department Foreign Service Officers (FSOs) and Foreign Service Specialists sat home on administrative leave waiting to be separated via so-called RIFs, the Benjamin Franklin Fellowship, a conservative nonprofit, held a recruitment fair at Liberty University for applicants seeking to join the State Department as members of the Foreign Service. Indeed, Defendant State has since hired 600 new foreign service members, more than twice the number it separated via RIF and barred from re-employment. Defendant State officials have defended such hirings as necessary to keep up with "attrition." State Department civil servants, along with Plaintiffs from other Defendant Agencies, have seen their "abolished" positions posted internally and externally to hire replacements.

11. At the same time Defendants were firing Plaintiffs through deliberately mislabeled "RIFs", Defendants OPM and DOJ, with others in the Administration, took actions to restrict Plaintiffs' ability to obtain meaningful review of those actions. Specifically, the Administration took a series of steps to end the independence of Defendant MSPB and assert legal and policy control over it.

The same Executive Branch that directed and implemented the challenged RIFs asserted control over the legal positions of the administrative body charged with reviewing them. Plaintiffs have also been denied access to evidence concerning the centralized direction, coordination, and control underlying the challenged actions, preventing development of a complete administrative record. As a result, the post-deprivation process cannot provide independent and meaningful review of the conduct challenged here or develop a record sufficient for meaningful judicial review.

12. Plaintiffs seek preliminary and permanent injunctive relief to restore them to their positions and to prevent Defendants from forcing them through a post-deprivation review process that violates their Due Process rights and the Administrative Procedure Act (APA). Plaintiffs have suffered concrete, ongoing injuries, including continuing violations of their constitutional rights, loss of pay, federal benefits, service credit, and reputational harm, all of which are directly traceable to Defendants' unlawful actions and redressable through declaratory and injunctive relief.

13. In addition to these constitutional and statutory violations, Defendants compiled, shared, relied upon, and unlawfully disclosed inaccurate and incomplete information in conducting the RIFs and terminating Plaintiffs. Instead of taking steps to verify the relevant records and correct widespread inaccuracies, Defendants used those records to make adverse determinations against Plaintiffs and thousands of other employees—in violation of the Privacy Act. Defendants also gave unauthorized access to this information, including disclosures to third-party artificial intelligence programs, and relied upon information resulting from such disclosures in making adverse determinations concerning Plaintiffs. Plaintiffs seek damages under the Privacy Act.

14. A subset of State Plaintiffs has additional claims. At least three were separated without notice and in violation of the Continuing Appropriations Act, 2026 (CR) and Due Process.

## JURISDICTION AND VENUE

15. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Due Process Clause, the First Amendment, the APA, and the Privacy Act.

16. This Court has jurisdiction under 28 U.S.C. §§ 1361, 2201–2202, and 5 U.S.C. §§ 701–706 (APA).

17. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this District, Defendants are United States agencies or officers acting in their official capacities, and a substantial portion of the injuries caused by Defendants' actions occur within this District and continue to affect Plaintiffs here. At least 49 Plaintiffs reside in this District. Venue is also proper under the Privacy Act because a complainant resides here. 5 U.S.C. § 552a(g)(5).

## PARTIES

18. Plaintiffs are career federal employees who were the subject of employment actions labeled RIFs and who have all timely appealed their RIF actions to the MSPB.

19. Plaintiffs listed in Exhibit A as DOJ were employed by the Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in ATF's Office of Diversity, Equity, and Inclusion (ODEI) (collectively "DOJ Plaintiffs").

20. Plaintiffs listed in Exhibit A as HHS were employed by the Department of Health and Human Services (HHS) (collectively the "HHS Plaintiffs").

21. Plaintiffs listed in Exhibit A as State were employed by the Department of State (State) in the civil or foreign service (collectively the "State Plaintiffs").

22. Plaintiffs listed in Exhibit A as Education were employed by the Department of Education (ED) (collectively the "ED Plaintiffs").

23. Plaintiffs listed in Exhibit A as DHS were employed by the Department of Homeland Security (DHS) Office of Civil Rights and Civil Liberties (collectively the "DHS Plaintiffs").

24. Plaintiffs listed in Exhibit A as USAID were employed by the U.S. Agency for International Development (USAID) in the civil or foreign service (collectively, "USAID Plaintiffs").

25. Plaintiffs listed in Exhibit A as FDIC were employed by the Federal Deposit Insurance Corporation (FDIC) in its Office of Minority Inclusion (OMWI) (collectively the "FDIC Plaintiffs").

26. Plaintiffs listed in Exhibit A as OPM were employed by OPM (collectively the "OPM Plaintiffs").

27. Plaintiff listed in Exhibit A as GSA was employed by the General Services Administration (GSA) (the "GSA Plaintiff").

28. Defendant OMB is an agency in the Executive Office of the President (EOP) and played a central role in directing the challenged RIFs by providing mandatory guidance to agencies, directing agencies to submit Agency Reorganization Plans (ARRPs), and identifying positions for elimination. By Executive Order (EO), among other means, OMB has significant control over the policies, actions, and budget of Defendant MSPB.

29. Defendant U.S. Agency for International Development (USAID) separated the USAID Plaintiffs through RIF actions.

30. Defendant Russell Vought is the Director of OMB, the Acting Administrator of USAID, and is responsible for the implementation and requirements of the Information Technology Oversight Reform (ITOR) program, which is the successor to the DOGE. He is named in his official capacities.

31. Defendant OPM serves as the chief human resources agency and personnel policy manager

for the federal government. OPM provides guidance on personnel matters, approves various aspects of agencies' RIF plans, and issues regulations under the Civil Service Reform Act.

32. Defendant Scott Kupor is the Director of OPM and is named in his official capacity.

33. Defendant MSPB is an agency within the Executive Branch responsible for hearing federal employee appeals of RIF actions.

34. Defendant James J. Woodruff, II, is the Chair of the MSPB and is named in his official capacity.

35. Defendant DOJ separated DOJ Plaintiff employees through RIF actions.

36. Defendant Todd Blanche is the Attorney General of the United States and is named in his official capacity.

37. Defendant HHS separated the HHS Plaintiffs through RIF actions.

38. Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and is named in his official capacity.

39. Defendant State separated State Plaintiffs through RIF actions.

40. Defendant Marco Rubio is the Secretary of State and is named in his official capacity.

41. Defendant ED separated ED Plaintiffs through RIF actions.

42. Defendant Linda McMahon is the Secretary of ED and is named in her official capacity.

43. Defendant DHS separated the DHS Plaintiffs through RIF actions.

44. Defendant Markwayne Mullin is the Secretary of DHS and is named in his official capacity.

45. Defendant GSA separated the GSA Plaintiff through RIF actions.

46. Defendant Edward Forst is the Administrator for GSA and is named in his official capacity.

47. Defendant FDIC separated the FDIC Plaintiffs through RIF actions.

48. Defendant Travis Hill is the Chairman of the FDIC and is named in his official capacity.

**THE CIVIL SERVICE REFORM ACT AND THE FOREIGN SERVICE ACT**

49. In 1978, Congress passed the Civil Service Reform Act (CSRA) establishing the MSPB. 5 U.S.C. § 1201, et seq. Congress found that "Federal employees should receive appropriate protection through increasing the authority and powers of the Merit Systems Protection Board in processing hearings and appeals affecting Federal employees." CSRA, Pub. L. 95-454, § 3, 92 Stat. 1111, 1112 (1978) ("Findings and Statement of Purpose"). Congress intended to create a "strong and independent" MSPB, one "insulated from the kind of political pressures that [had] led to violations of merit principles in the past" and "independent of any control or direction by the President." S. Rep. 95-969 at 6–7, 24 (1978).

50. The CSRA also created a statutory process for a RIF, which is the mechanism through which the federal government can reduce the number of positions within an agency. 5 U.S.C. §§ 3501–3504, 3595; 5 C.F.R. § 351. Unlike a layoff (the RIF's private-sector counterpart), the CSRA prohibits at-will RIFs. Instead, it established protections for federal employees and the taxpayer through mandatory RIF processes, including justifications, competitive areas, competitive levels, retention registers, notice requirements, and employee retention rankings based on tenure, service, veterans' preference, and performance rules. *Id.*; MSPB Report to Congress, Reduction in Force: The Evolving Ground Rules 1 (1987).

51. RIFs may only be conducted for six identified organizational purposes: a lack of work; a shortage of funds; an insufficient personnel ceiling; reorganization; the exercise of re-employment rights or restoration rights; or certain reclassifications of an employee's position due to erosion of duties. 5 C.F.R. § 351.201(a)(2). Crucially, RIFs cannot be used to separate employees for individual reasons, such as employee performance or conduct.

52. OPM has issued regulations and guidance governing how RIFs must be conducted. For

example, OPM regulations require that each agency "shall establish competitive areas in which employees compete for retention under this part." 5 C.F.R. § 351.402(a). The same regulation requires that:

> [a] competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and, except as provided in paragraph (e) of this section, it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency.

5 C.F.R. § 351.402(b). The regulations also establish that the "minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. § 351.402(c).

53. The CSRA does not establish a specific appeal mechanism for a RIF. Instead, the MSPB's role in hearing RIF challenges derives solely from OPM's RIF regulations promulgated under its authority in 5 U.S.C. § 3502, which requires OPM to "prescribe regulations for the release of competing employees in a reduction in force," giving due effect to retention factors including performance and length of service. Pursuant to this authority, at all relevant times, OPM regulations provided that an "employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901.

54. RIFs for members of the foreign service are not governed by the CSRA, but by the Foreign Service Act (FSA). 22 U.S.C. § 4010a. Unlike civil servants who are assigned to specific positions, foreign service members have personal ranks that form the basis of their assignments. As a result, members of the foreign service, especially FSOs, are hired and trained to serve in a wide variety of positions over the course of their careers. The standards for RIFs in the FSA are similar to those for civil servants: the Secretary of State is required to consider organizational changes, employee knowledge and skills, tenure of employment, performance, and veterans' preference. The FSA

provides foreign service members who have been subjected to RIFs the right to appeal to the MSPB.

## FACTS

55. During the current Administration, Defendants have taken personnel actions to carry out politically directed firings of federal workers and replace them with handpicked successors.

56. As set out in more detail below, to effectuate wholesale firings of federal workers while giving the removals a sheen of legality, the Administration labeled the largest groups of terminations RIFs and cited the RIF statutes and regulations in documents provided to employees concerning their removal. Defendants OMB, DOGE, and OPM directed these actions in excess of their authority, often overruling agency decisions. Documents labeled "Guidance" were issued and treated as directives that must be followed. *See, e.g.*, Off. of Mgmt. & Budget & Off. of Pers. Mgmt., Memorandum M-25-22 for Heads of Executive Departments and Agencies, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), https://perma.cc/TKZ9-9YKT (OMB/OPM Memorandum).

57. When asked why Defendants were separating Plaintiffs and other federal employees through RIFs, officials did not invoke any of the permissible organizational reasons for RIFs. Instead, they repeatedly justified the removals by publicly accusing the affected employees of misconduct and attacking their loyalty, competence, and perceived political or ideological beliefs.

58. The Administration's stated reasons thus focused on the employees themselves rather than the organizational circumstances for which RIF authority may lawfully be invoked. These stigmatizing statements were made publicly by high-ranking officials and the President—some of the most powerful people in the world—and repeated throughout the period in which Defendants

implemented the challenged RIFs, and continuing to today.

**I. Defendants OMB, OPM, and DOGE Directed RIFs without Authority**

59. On Inauguration Day, Elon Musk, head of DOGE, made his priorities for federal employees clear. Shortly after President Trump was sworn in, Musk met with a high-ranking official at OPM and instructed the official to fire 70% of OPM's employees. He further informed the official that he could stay because he had been hired during a Republican Administration.

60. The Administration then made Musk a key figure in its mass firings of Plaintiffs and other federal workers. As part of those efforts, it created the so-called "Department of Government Efficiency." Executive Order 14158 – Establishing and Implementing the President's "Department of Government Efficiency" created "DOGE Teams" that were installed in each Executive Branch agency to "advise" agency leadership on "implementing the President's DOGE Agenda," and provided that the DOGE Team leads would coordinate their work with the DOGE office. The Executive Order directed agencies to grant their DOGE Teams "full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* 90 Fed. Reg. 8441 (Jan. 20, 2025), https://perma.cc/CNB5-AHB4.

61. By Executive Order, agencies were required to submit RIF plans to OMB and OPM for approval.

62. Defendant DOGE, along with Defendants OMB and OPM, directed and oversaw wholesale firings of federal workers across the Executive Branch. As detailed below, they directed agencies to use RIFs to remove targeted employees, dictated competitive areas, required implementation before or without required agency determinations, and overruled agency decisions to retain

affected employees. Four days after President Trump issued Executive Order No. 14151[3], OPM explicitly ordered all Executive Branch agencies to implement specifically defined RIFs within 60 days, without any identified agency determination that one of the permissible bases for a RIF existed and without any authority to make such an order:

> [E]ach agency, department, or commission head *shall* take action to terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions within sixty days…. Agencies *are reminded to define the competitive area solely in terms of the DEIA office where the employees worked*.

See 5 C.F.R. § 351.402. Off. of Pers. Mgmt., *Guidance Regarding Reductions in Force (RIFs) of DEIA Offices* (Jan. 24, 2025), https://perma.cc/79T4-VGQP (emphasis supplied).

63. Although Executive Order 14151 speaks of ending offices, at a press briefing, Deputy Chief of Staff Stephen Miller explicitly stated that these RIFs targeted employees and not positions, and that the terminations were based on purported illegal activities by the targeted employees:

> […] this nation has been plagued and crippled by illegal discrimination: diversity, equity, and inclusion policies. It has strangled our economy. It had undermined public safety. It made every aspect of life more difficult, more painful, and less safe. He has ended all DEI across the federal government. He has terminated *all federal workers involved in promulgating* these unlawful policies.

*See* Press Briefing by Deputy Chief of Staff Stephen Miller, (Feb. 20, 2025), https://perma.cc/5TBH-4CS8 (emphasis supplied). At no point did the affected agencies correct this statement. Instead, the actions that followed corroborated it.

64. Defendant Agencies, including Defendants DOJ and FDIC, complied with OPM's orders but planned to retain the affected employees in different positions outside the scope of Executive Order 14151. DOGE and OPM immediately disapproved those plans, informing the agencies that they would not be permitted to retain the employees.

[3] *See* Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing,* 90 Fed. Reg. 8339 (Jan. 20, 2025), *archived at* https://perma.cc/L79B-5MJP.

65. For example, DOGE provided a set of authoritative pronouncements and direction to FDIC related to its RIF of so-called DEI personnel in excess of DOGE's authority. Representatives of FDIC, including the Deputy Chairman and Chief Operating Officer, held meetings with DOGE personnel, including DOGE team leader Anthony Armstrong, to request permission to retain and transfer FDIC employees working in FDIC's OMWI to other positions within FDIC. When directing FDIC to terminate these employees, DOGE officials did not identify any permissible RIF justifications but instead referred to the employees' perceived political and ideological beliefs. During one or more of these meetings, Mr. Armstrong insisted that FDIC continue issuing RIF notices to OMWI employees and warned FDIC against reassigning them and "burrow[ing] them elsewhere in the agency." Mr. Armstrong expressed concern that moving an individual who is "dedicated to DEI" elsewhere in an agency would allow DEI to reemerge.

66. Similarly, DOJ had a plan to reassign ATF's ODEI personnel, including employees like the DOJ Plaintiffs who had spent a large portion of their careers performing functions related to ATF's enforcement mission. DOJ could not implement its plan because reassignment required OPM approval. OPM never gave that approval.

67. These agencies – all of which had sole authority over personnel decisions within their agencies and required no outside approval – repeatedly requested that DOGE and OPM permit them to retain Plaintiffs employed in DEI positions by transferring them to other positions that needed to be filled while abolishing the "DEI" positions as required by the Executive Order. Defendants DOGE and OPM – which had no such personnel authority – consistently rejected these requests, informing agencies that the employees could not stay because they would "spread DEI" and denying the agencies permission to retain Plaintiffs.

68. Defendants DOGE and OPM further exercised authority they did not have on RIFs beyond

the DEI RIFs. For example:

a. At HHS, DOGE essentially ran the RIF process, deciding offices to retain and abolish.

b. At GSA, DOGE met with offices to reportedly review their organization and decide which offices to keep and which to close. These meetings, however, were a sham. DOGE had already decided which offices to close; upon information and belief this was based on an analysis of office functions done by Artificial Intelligence, believed to be Grok.

c. At USAID, DOGE made most, if not all, of the decisions about the RIF.

d. DOGE and OPM directed the scope of the RIFs at ED, exercising direction and approval authority they did not possess over the boundaries of new competitive areas and over which competitive areas would be subject to the RIF.

e. The Secretary of State did not want to conduct a RIF because he believed sufficient personnel had already been cut through the dismantling of USAID and the deferred resignation program. State conducted the RIF only after ordered by DOGE to do so.

f. DOGE even took control of the OPM RIF, ordering the acting head of OPM to separate some Plaintiffs over his objections.

69. The federal government "shut down" on or about October 1, 2025, due to a lapse in appropriations. Appropriations were not enacted until November 12, 2025, when the President signed a continuing resolution. Pub. L. No. 119–37 (Nov. 12, 2025) (CR). A subset of the State Plaintiffs had not yet been separated; their RIF separation dates were after October 1, including all State Plaintiffs in the foreign service and civil servants Sheffler, House, Hicks, and Murphy. During the shutdown, following guidance and instruction from Defendants OMB and OPM, Defendant State separated employees who had previously received RIF notices, including Plaintiffs Sheffler, House, Hicks, and Murphy. These separations violated the Anti-Deficiency Act.

70. The CR contained provisions limiting RIFs, including a provision that, among other things, stated, "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken… between October 1, 2025, and [November 12, 2025], shall have no force or effect" and that "any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025."

71. In November 2025, following enactment of the CR, Defendant OPM repeatedly issued public guidance to all agencies and Defendants OMB and DOJ issued private guidance to Defendant State that contradicted the plain language of the CR, stating that the CR did not affect RIFs noticed before October 1, 2025, and that employees subject to those RIFs could and should be separated. Shortly thereafter, unions successfully challenged that "interpretation" and obtained a preliminary injunction. Among others, Plaintiffs Sheffler, House, Hicks, and Murphy were reinstated by Defendant State, albeit on administrative leave.

72. Despite having taken steps to implement the RIF during the period covered by the CR and despite the CR expressly rescinding RIF notices for RIFs implemented during the covered period, Defendant State separated numerous State Plaintiffs, including Plaintiffs House, Sheffler, and Murphy, in May 2026 without issuing new RIF notices or otherwise initiating new RIF actions in place of those rescinded by the CR.

73. As set forth in greater detail *infra*, Defendant OMB is now responsible for oversight of MSPB policies, performance standards, and other MSPB operations. Having been required to approve RIF plans before their implementation, OMB now also exercises control over the agency designated to hear appeals from the very RIFs it approved.

**II. High-Ranking Officials Politically Targeted and Publicly Smeared Plaintiffs**

74. Immediately before, during, and after the implementation of the RIFs across the Executive

Branch, Administration officials followed a coordinated approach when publicly justifying the mass firings: they repeatedly and publicly maligned the affected employees, including Plaintiffs, by falsely attacking their character, conduct, performance, and perceived ideological and political beliefs. Their stated reasons focused on Plaintiffs themselves and their perceived conduct and beliefs, rather than their positions or organizational bases for conducting RIFs. For example:

a. Elon Musk led DOGE during the relevant time period. Mr. Musk repeatedly posted about USAID on social media, saying, among other things, USAID was "incredibly politically partisan" and has supported "radically left causes throughout the world including things that are anti-American." Similarly, White House Deputy Chief of Staff Stephen Miller falsely claimed that "98% of the agency's staff donated to former Vice President Kamala Harris or other Democratic candidates in the November election." *USAID Controversy Explained: Why Musk, Trump Is Attacking Foreign Aid Agency*, FORBES (Feb. 3, 2025) https://perma.cc/Q9BY-BCJD. Political leadership at the State Department bragged about firing Plaintiff Arthur Brown, a career FSO with USAID, based on art that he had displayed while Ambassador to Ecuador.

b. White House Deputy Chief of Staff Stephen Miller justified the ED RIF on Fox News the day it was announced, falsely claiming that "the Department of Education here in Washington, D.C., is overwhelmingly staffed by radical left Marxist bureaucrats, who are in every way hostile to Western Civilization, hostile to American interests, and hostile to our founding documents and culture." *See Stephen Miller says Dept of Education overwhelmingly staffed by 'radical left Marxist bureaucrats'*, FOX NEWS (March 20, 2025) https://perma.cc/4JNN-EE5Z.

c. On March 11, 2025, as ED Plaintiffs were receiving their "pre-RIF notices," Secretary

McMahon repeatedly described the employees subject to the RIF as "bureaucratic bloat," and claimed that ED had retained "all of the right people, the good people." *Education secretary says department took first steps to eliminate "bureaucratic bloat*, FOX NEWS (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

d. On March 12, 2025, responding to reporters from the Oval Office, President Trump stated, "Many of [the ED employees subject to the RIF] don't work at all. Many of them never showed up to work. We want to cut, but we want to cut the people that aren't working or not doing a good job. We're keeping the best people." Education department slashed in half after Trump administration mass firings, THE GUARDIAN (Mar. 12, 2025), https://perma.cc/Y899-D6ME.

e. The pattern was repeated at HHS. Less than two weeks after the initial [pre-] RIF notifications were issued, Secretary Kennedy met with FDA employees. At that meeting, he accused FDA employees of being "sock puppet[s]" for industry. *See Kennedy, in private speech to FDA staff, calls agency a "sock puppet" for the industry*, NBC NEWS (April 11, 2025), https://perma.cc/DJW3-S3T9.

f. Administration officials publicly justified the State Department RIFs by disparaging State Plaintiffs, including based on their alleged political beliefs and affiliations. In announcing the reorganization, Secretary Rubio specifically targeted a group of offices known as the "J family," claiming the employees "provided a fertile environment for activists to redefine 'human rights' and 'democracy' and to pursue their projects at the taxpayer expense, even when they were in direct conflict with the goals of the Secretary, the President, and the American people." *See* Marco Rubio, *A New State Department to Meet the Challenges of a New Era*, U.S. Dep't of State, SUBSTACK (Apr. 22, 2025), https://perma.cc/3UWN-889Y.

He went on to assert that the Bureau of Democracy, Human Rights, and Labor "became a platform for left-wing activists to wage vendettas against 'anti-woke' leaders." *Id.*

75. Since implementing the RIFs, Defendant Agencies have hired and sought new employees to perform functions and fill the positions formerly performed by Plaintiffs and theoretically abolished by the RIFs. For example:

a. Defendant State has hired civil and foreign service personnel for positions it claimed to have abolished that were previously held by Plaintiffs, and to perform duties similar to those previously performed by Plaintiffs from State and Defendant USAID.

b. Defendant GSA is hiring as many as 3,000 new employees to perform the functions and duties of the GSA Plaintiff and other employees separated through RIFs.

c. Defendant HHS has stated it is hiring more than 12,000 people after firing 10,000.

d. The Administration has created "new" offices that perform the same duties as Plaintiffs, staffing them with its hand-picked successors.

76. Defendants have also taken steps to interfere with Plaintiffs' ability to obtain employment within and outside of the federal government. Defendant agencies did not comply with their Career Transition Assistance Plan (CTAP) obligations prior to Plaintiffs' separations and have manipulated CTAP to allow them to retain handpicked personnel regardless of RIF retention priority. They also did not comply with their re-employment Priority List (RPL) obligations requiring priority consideration of Plaintiffs for rehiring. For example, from the beginning of the RIF, the State Department implemented an internal policy not to rehire "RIF'd" personnel as employees or contractors. The Acting Under Secretary for Management has stated that State personnel subject to the RIF would be separated and would not return in any capacity, including as contractors. A similar policy precludes USAID personnel separated by RIF from rehire by

federal contractors to "avoid the risk of impaired objectivity," according to a Jan. 6 memo from the agency's chief terminations officer.

77. Defendants' public, false, and stigmatizing statements about Plaintiffs damaged their reputation in their communities and negatively affected their ability to obtain new employment.

78. Defendants have engaged and continue to engage in efforts to interfere with Plaintiffs' ability to find new employment with the federal government and government contractors.

79. Defendants did not provide Plaintiffs with a pre-deprivation hearing. Defendants did not even allow Plaintiffs to correct errors in their RIF documentation.

**III. Defendants OPM, OMB, and DOGE Directed Agencies to Implement RIFs in Violation of Applicable Laws and Regulations**

80. When conducting a RIF, agencies must: establish competitive areas, competitive levels, and retention registers; and apply tenure, service, veterans' preference, and performance rules. These steps are required to identify the employees who will be affected by the RIF and how they will be affected. Agencies must then issue written notices to affected employees that identify the specific action to be taken, the basis for that action, and its effective date. See 5 C.F.R. § 351; MSPB REPORT TO CONGRESS, REDUCTION IN FORCE: THE EVOLVING GROUND RULES 1 (1987).

81. Defendants OPM, OMB, and DOGE directed Agency Defendants to execute RIFs without conducting a meaningful analysis of which positions should be retained and which should be abolished, and in many cases dictated who would be subject to the RIF. Agency Defendants frequently rescinded employees' access to agency systems and buildings well before issuing RIF notices or immediately thereafter.

82. In implementing the purported RIFs, Defendants OPM, OMB, and/or DOGE directed Agency Defendants to ignore RIF regulations, often to separate specific federal employees instead

of abolishing positions and to deny federal employees their retention rights. Indeed, at USAID the General Counsel said that OPM was waiving all laws and policies regarding the RIF.

83. Agency Defendants also issued inaccurate and legally insufficient RIF notices. For example, Defendant ED issued RIF notices stating, "[t]o conduct the RIF, the Office of Human Resources (OHR) prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans' preference, length of Federal service and performance ratings." Defendant ED later admitted that no retention register had been created or would be created. Defendant State issued RIF notices that similarly stated that "[t]his RIF was conducted by the Department by preparing retention registers which listed employees in retention standing order based on civil service tenure, veteran's preference, length of Federal service, and performance ratings," only to admit later that retention registers had not been created prior to the notice.

84. Many agencies had to rescind or "walk back" their RIFs shortly after implementation. According to Defendant Kennedy, "Personnel that should not have been cut, were cut" and "[t]he part of that, DOGE -- we talked about this from the beginning -- is we're going to do 80% cuts but 20% of those are going to have to be reinstalled [*sic*] because we'll make mistakes." *RFK Jr. announces HHS reinstating some programs, employees cut by mistake*, ABC NEWS (April 3, 2025), https://perma.cc/4Y63-JNWM). *See also: IRS rescinds layoffs at civil rights office, an early target of workforce cuts*, FEDERAL NEWS NETWORK (Aug. 1, 2025), https://perma.cc/DW72-E8JN; *HHS recalls some previously laid off worker safety employees,* GOVERNMENT EXECUTIVE (Aug. 1, 2025), https://perma.cc/Z9XD-FX3U; *Dueling HHS reversals whipsaw federal employees, grant recipients,* GOVERNMENT EXECUTIVE (Jan. 14, 2026), https://perma.cc/2NPY-54XG; *GSA walks back mass layoffs of its federal buildings workforce,* FEDERAL NEWS NETWORK (Jan. 14, 2026), https://perma.cc/YA4X-JEPA. Despite this admission from Defendant Kennedy, none of the HHS

Plaintiffs' RIFs have been cancelled.

85. As set forth above, the purported RIFs were not preceded by an analysis of the agencies' bona fide need for particular positions but instead were preceded or accompanied by Administration officials publicly attacking Plaintiffs' performance and political affiliations and accusing them of wrongdoing. The RIFs occurred only after Defendants manipulated competitive areas to ensure Plaintiffs – as opposed to other, often less experienced employees – would be fired without triggering Plaintiffs' retention rights.

86. To remove large numbers of federal employees quickly while ensuring that the people targeted for removal were separated during the RIF and not merely reassigned pursuant to neutral RIF regulations, the Agency Defendants again acted in lockstep at the direction of Defendants OPM, OMB, and DOGE, creating new and illegally narrow competitive areas shortly before RIF implementation. OPM rubber-stamped waivers for these new competitive areas without receiving confirmation or documentation that they complied with OPM regulations. Defendants also consistently manipulated retention registers, thereby controlling not only who would be released from federal service, but the employees against whom they would compete for retention.

87. As set forth above, Defendants DOGE and OPM deliberately exceeded their authority by setting the competitive areas of the DEI RIFs for agencies across the Executive Branch to ensure the DOJ, FDIC and other DEI Plaintiffs would be separated and overruling Defendant Agencies' decisions to retain Plaintiffs.

88. By illegally limiting the competitive areas and directing the liquidation of entire competitive areas that did not meet long-standing published requirements, OPM and DOGE ensured that Plaintiffs would not have retention rights to which they were entitled by regulation. OPM approved these competitive areas without determining whether they met the requirements of

its own regulation and even though its regulations require that the competitive area be established by the agency conducting the RIF and not OPM. See, e.g., 5 C.F.R. § 351.402.

89. For example, OPM and DOGE directed agencies not only to eliminate the DEI positions, but also to separate all DEI employees by defining the competitive areas so narrowly that agencies had no other option, despite the fact that these competitive areas failed to meet OPM's own regulatory requirements. As set forth above, OPM and DOGE took these actions based on Plaintiffs' perceived political beliefs.

90. Defendants OPM, OMB, and DOGE repeated this approach when directing broader RIFs throughout the Agency Defendants. For example:

a. USAID had neither legally sufficient competitive areas nor a retention register when it issued the RIF notices used to separate employees. When career USAID and State Department employees recommended retention registers be used to select the USAID employees who would move to State, they were informed that retention registers would not be used because doing so would not permit officials to pick the people to retain.

b. Consistent with Defendant OPM, OMB, and DOGE's instructions, Defendant State improperly narrowed and deliberately manipulated its competitive areas to ensure specific employees, including State Plaintiffs, were terminated through the RIF, expanding the number of its competitive areas from fewer than forty to approximately 1,500, most of which failed to comply with OPM regulations.

c. At the direction of Defendants DOGE, OPM, and OMB, Defendant ED also drastically reduced the size and scope of its competitive areas. Until 2025, ED's competitive areas were generally coextensive with broad program office components, such as the Office of Postsecondary Education and the Office of General Counsel. Immediately before the RIF

and as instructed, ED broke those competitive areas into much smaller ones, many no larger than a single work unit, and almost all of which failed to meet the requirements of 5 C.F.R. § 351.402(c). ED then liquidated entire competitive areas, ensuring that employees in those competitive areas were blocked from exercising retention rights. Despite statements to the contrary, including in the formal RIF notices, ED refused to prepare a retention register. ED thereby targeted specific employees, including the ED Plaintiffs, for removal by claiming to eliminate their positions through a liquidation RIF while transferring their duties to other offices or agencies and subsequently hiring new employees for substantively identical positions.

**IV. Defendants OMB and DOJ Have Eliminated the MSPB's Independence and It Is Not Providing and Cannot Provide Meaningful Review**

91. While the Administration implemented mass removals of targeted federal employees, including Plaintiffs, and labeled those actions RIFs to avoid due process protections, the Administration asserted unprecedented control over the MSPB, effectively making the MSPB an active participant in its efforts to fire federal workers.

92. On February 8, 2025, the President removed MSPB Chair Cathy Harris. Ten days later, he issued Executive Order 14215, asserting Presidential authority over independent agencies, including the MSPB. See *Ensuring Accountability for All Agencies*, Exec. Order No. 14215, 90 Fed. Reg. 10447 (Feb. 24, 2025), https://perma.cc/U36U-89PB.

93. The Executive Order further directs Defendant OMB Director Russell Vought (who is now in charge of overseeing the closeout of USAID and what remains of DOGE) to: establish performance standards and management objectives for independent agency heads; review agency obligations for consistency with Presidential policies and priorities; and adjust agency apportionments as necessary to advance those priorities, including by restricting the expenditure

of appropriated funds. The EO also requires agency heads, including the MSPB Chair, to coordinate with the White House and to establish a White House liaison position. Consistent with this sweeping language, the Administration has asserted the President can fire any member of the MSPB because they assist the President in carrying out executive duties. The White House has asserted authority to control the adjudication of claims at the MSPB and to dismiss MSPB employees who do not concur with positions publicly or privately stated by the White House.

94. EO 14215 also directs that no Executive Branch employee, including MSPB employees, acting in an official capacity may advance a legal interpretation that contravenes the President's or the Attorney General's opinion on a matter of law, including positions related to litigation. The Administration has repeatedly taken the position that its legal positions as expressed through DOJ's Office of Legal Counsel (OLC) are binding on the MSPB.

95. For example, in *Jackler v. Department of Justice*, No. DA-0752-25-0330-I-1 (Aug. 22, 2025), and a related appeal, an MSPB administrative judge (AJ) ordered the reinstatement of two Immigration Judges—DOJ employees summarily terminated after receiving no process other than a memo invoking Article II authority—pending resolution of the constitutional issues presented. The AJ held that the MSPB could not rule on whether the CSRA is unconstitutional because it limits Article II authority to fire federal civil servants without following established federal law or constitutional requirements. DOJ thereafter submitted an OLC opinion and represented that it "should be considered binding upon the Board," and that the administrative judge's decision "does not represent the legal position of the Executive Branch."

96. On March 20, 2026, the MSPB—consistent with the OLC opinion and overruling almost 50 years of MSPB precedent—held that it may consider the constitutionality of the CSRA and that Article II can deprive the Board of jurisdiction. *Jackler & Jaroch Consol. v. Dep't of Justice*, 2026

MSPB 3 (Mar. 20, 2026), petition for review pending sub nom *Jackler v. MSPB*, No. 26-1575 (Fed. Cir.). Although the Board publicly avoided confirming its reliance on the binding effect of the OLC opinion, it adopted the Administration's position and dismissed the appeals for lack of jurisdiction.

97. The Administration has therefore asserted authority not only over the policies, operations, funding, and personnel of the MSPB, but also over the legal positions that MSPB employees may take when adjudicating challenges to Executive Branch actions. Those actions include the RIFs, which OMB, OPM, and DOGE directed and which OMB was required to review and approve before implementation. The same Executive Branch actors involved in directing and approving the challenged actions thus exercise control over the legal positions—including dictating interpretations and outcomes—available to the administrative body charged with reviewing them.

98. Upon information and belief, Henry Kerner, the Vice Chairman and then-Acting Chair of the MSPB Board, met with White House officials before the issuance of the MSPB's opinion in *Jackler* and during that meeting he was instructed to have the MSPB rule in the Administration's favor. The MSPB thereafter ruled in the Administration's favor.

99. The MSPB has removed the word "independent" from its website when describing itself.

100. Despite the MSPB's knowledge of its lack of independence and the extent of OMB and DOJ control, the MSPB has made no disclosures to Plaintiffs about its independence or ability to provide meaningful review, even when asked by Plaintiffs in discovery. The MSPB has declined to rule on challenges to its independence or ignored those challenges when Plaintiffs raised them.

101. In sum, MSPB Board Members can be removed at will by the President, and their performance standards and management objectives are subject to review by Defendant OMB. The White House has summoned at least one MSPB Board Member and told him how the Board should rule. MSPB obligations must be reviewed by Defendant OMB for consistency with "Presidential

policies and priorities" and are subject to OMB adjustment to advance those priorities, including by restricting the expenditure of appropriated funds. MSPB AJs are prohibited from advancing a legal interpretation that is inconsistent with the Administration's interpretation, including in litigation in which the Administration is a party.

102. The sheer volume of RIFs and other personnel actions by the Administration has also ensured that the MSPB is overwhelmed with a number of cases that it cannot timely handle, posing a significant burden on Plaintiffs' ability to raise their claims before an Article III court and trapping them in endless proceedings before the captured MSPB.

103. Defendant MSPB has taken steps to prevent Plaintiffs from obtaining relief. The MSPB made a coordinated decision to deny Plaintiffs the ability to pursue class action appeals. Upon information and belief, such decision was made at the behest of the Administration.

104. The MSPB is supposed to issue initial decisions on appeals, including those challenging RIFs, within 120 days of receipt. U.S. Merit Sys. Prot. Bd., *Judges' Handbook* 72 (2019), https://perma.cc/ZPN6-LLG5. The MSPB's average case processing time for initial appeals was: 102 days in 2018, 105 days in 2019, 102 days in 2020, 105 days in 2021, 96 days in 2022, 102 days in 2023, and 130 days in 2024.

105. Between January 26, 2025, and September 27, 2025, the MSPB received 18,750 appeals, averaging 536 appeals each week. During fiscal year 2024, its field and regional offices decided a total of approximately 4,740 appeals. *See* U.S. Merit Sys. Prot. Bd., *Fiscal Year 2024 Annual Performance Report* (June 24, 2025), https://perma.cc/4MSV-M746.

106. Despite this predictable surge in MSPB appeals and the Administration taking control of MSPB budget and operations, no additional resources have been provided to ensure timely action by the MSPB. To the contrary, the Administration proposed cutting the MSPB's budget. The result

of these collective changes is that the over-burdened, captured, and controlled MSPB process provides no meaningful remedies to Plaintiffs. In fact, the MSPB process causes further injury in the form of time, expenses, delays, and insult suffered by those forced to pursue meaningless process in the MSPB in front of AJs and Board members who are required to adopt the litigating positions of the agencies that conducted and controlled the RIFs.

107. The effect of the Administration's decisions regarding the MSPB can be seen in Plaintiffs' appeals. The majority of Plaintiffs have seen little-to-any progress at the MSPB. For example, the ED Plaintiffs began filing their MSPB appeals in August 2025, with no progress beyond an Acknowledgement Order and Stay of Deadlines. The civil service State Plaintiffs who filed their appeals in September 2025, prior to the government shutdown, still have not received an acknowledgment or scheduling order almost a year later; and no progress whatsoever has been made on those appeals. Upon information and belief, none of the over 17,000 RIFs initiated in 2025 have resulted in a final disposition by the MSPB.

108. Following the takeover by OMB of its policies and performance standards, MSPB now imposes and enforces unreasonably short deadlines against appellants while repeatedly extending or failing to enforce deadlines applicable to the government and itself. For example, Article II appellants were given five days over Thanksgiving 2025 weekend to respond to an Order to Show Cause issued after their appeals had been sitting with the MSPB for months with no action. Despite the short deadline imposed on them, some appellants still have received no ruling on the Order. In some of Plaintiffs' USAID appeals, when the agency repeatedly missed deadlines to produce the agency file, which should have existed at the time of the RIF, without offering an explanation or asking for an extension, the AJ *sua sponte* provided the government with multiple extensions. The Board has failed to meet its own 120-day deadline in any of Plaintiffs' RIF appeals.

109. Plaintiffs also are unable to bring their APA claims against Defendants OPM, OMB, and DOGE at the MSPB. The MSPB lacks jurisdiction over the APA claims and Plaintiffs' appeals are limited in nature to being against the agency who subjected them to a RIF, not the actors directed these actions. Some MSPB AJs have repeatedly limited the scope of Plaintiffs' inquiry and legal arguments about the RIFs beyond the specific Agency defendants in the RIF action. Some Plaintiffs have sought discovery into the direction, coordination, approval, implementation, and review of the challenged RIFs through their pending MSPB proceedings. Among other things, Plaintiffs served discovery requests on Defendants OPM, OMB, State, and the MSPB seeking documents and information concerning the actions of Defendants OPM, OMB, DOGE, the Executive Office of the President, and other entities involved in directing and implementing the challenged RIFs. Rather than produce the requested information, Defendants OPM and OMB failed to respond. Defendant State and Defendant MSPB each issued final agency determinations refusing production. As a result, Plaintiffs have been cut off from evidence concerning the centralized direction, coordination, approval, and control exercised by Defendants in implementing the challenged RIFs or to develop a complete administrative record concerning those actions.

**V. Defendants Used Inaccurate, Incomplete, and Unverified Records**

110. While implementing the RIFs, Defendants maintained and used employment-related records concerning Plaintiffs to make adverse determinations, including selection for separation, termination of pay and benefits, and public justification of the removals. These records included information purporting to reflect Plaintiffs' performance, productivity, attendance, skills, tenure, service history, duties, assignments, and the value or necessity of their positions.

111. Defendants relied on records purporting to define the groupings of positions and

employees used for selection and removal, including records identifying the organizational, functional, or positional units within which Plaintiffs were evaluated. Those grouping determinations were embedded in the records used to generate selection outcomes and treated as fixed inputs in the decision-making process. The grouping information reflected in those records did not accurately correspond to Plaintiffs' actual duties, work assignments, or operational functions. Employees performing materially similar work were separated into different groupings, while employees with dissimilar duties were grouped together, thereby misrepresenting the scope, function, and comparability of Plaintiffs' positions.

112. For example, as discussed above, at GSA, DOGE relied on information generated by an AI tool, believed to be Grok, to determine which offices to close. The individuals making these decisions lacked independent knowledge of the offices' functions and instead relied on the AI tool to supply that information without knowledgeable human input or independent verification. AI tools of this kind require accurate and informed inputs to produce reliable information and are known to generate inaccurate information when used without such inputs or verification. Upon information and belief, Defendants used AI tools in this manner more broadly.

113. The agencies executing the RIFs shared Plaintiffs' information outside their respective agencies (for example, with Defendants OPM, OMB, and MSPB, DOGE, and in some instances with private entities). For one example, in a memorandum dated February 26, 2025, OPM and OMB required agencies, as part of their reorganization plans, to identify "[a]ll agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations." *See* OMB/OPM Memorandum, *supra*. Agencies also shared information with private parties when consulting AI tools. Finally, Defendants disclosed inaccurate information about Plaintiffs when publicly justifying the RIFs.

114. Defendants relied on records containing inaccurate, incomplete, or misleading information about Plaintiffs, their positions, and the processes applied to them when making RIF determinations. Despite using these records to make decisions that would terminate Plaintiffs' employment, Defendants did not verify, audit, or otherwise check the accuracy or completeness of the information before relying on it. For example, Defendants relied on records concerning Plaintiff Allison Aslan's work status or productivity that reflected, or were used to convey, that she was not actively performing assigned duties, when in fact she continued to carry out her responsibilities and receive work assignments through the period preceding her separation. Defendants relied on records concerning Plaintiff Nicole Gaertner's attendance or availability that reflected, or were used to convey, that she was not reporting for duty or was otherwise inactive, despite her continued attendance and performance of assigned work. Records Defendants relied on concerning Plaintiff Sergio Flores Rodriguez's position indicated, or were used to convey, that it was unnecessary or subject to elimination and misrepresented the continued existence and operational need for his position and its functions. Records Defendants relied on assigned Plaintiff Zachary Karabatak to a particular comparison or grouping category that inaccurately reflected the nature and comparability of his duties, grouping him with employees performing materially different work. Similarly, records Defendants relied on concerning Plaintiff Vaughn Smith's position or role mischaracterized the scope and function of his duties by omitting substantial responsibilities he continued to perform at the time of the challenged determinations.

115. Defendants also relied on records reflecting Plaintiffs' SCDs, tenure status, veterans' preference, and retirement eligibility. Those records were rife with inaccuracies and omissions. For example, Plaintiff Debora Fisher's RIF notice reflected only approximately 20 years of credited federal service, when she had more than 39 years of federal service, and listed incorrect

SCDs that failed to account for credited prior service. Plaintiff Melissa Fair's RIF notice reflected an incorrect SCD that omitted more than a decade of prior federal service. Plaintiff Kim Gudenkauf's SCD was inconsistently recorded across agency documents, resulting in conflicting service dates used in the selection process. Plaintiff McKinney's RIF paperwork omitted his veterans' preference points entirely, resulting in an incorrect composite score despite his repeated efforts to obtain correction prior to separation. Plaintiff Hopkins, a disabled veteran with more than three years of continuous federal service, was placed in an incorrect retention category notwithstanding his veterans' preference. Plaintiff Corina Corral was informed through agency records that she qualified for discontinued service retirement, only for the agency later to deny her eligibility based on inconsistent and inaccurate use of the same service records.

116. Despite these inaccuracies and systemic errors, Defendants treated the outputs of the process as final and dispositive, executing removals while publicly characterizing Plaintiffs as unproductive, incompetent, or unfit for service. Plaintiffs were deprived of any opportunity to identify errors, supply missing context, or correct the information Defendants relied upon before Defendants made adverse employment determinations, including separation, loss of pay and benefits, and reputational harm.

**VI. Harm to Plaintiffs**

117. Defendants' legal, procedural, and factual errors, not merely those of Plaintiffs' respective employing agencies, and the accompanying denial of due process were the but-for cause of Plaintiffs' terminations.

118. Plaintiffs suffered loss of salary, health and life insurance contributions, retirement credit, and other employment benefits as a direct result of their terminations and continued RIF implementation. The ongoing denial of due process also constitutes continuing procedural injury.

The terminations and denial of process have further caused significant emotional, mental and physical harm for many Plaintiffs.

119. Plaintiffs are harmed by having their cases subjected to an unconstitutional administrative process and then having to overcome the deficiencies of and deference to that process at the Court of Appeals.

120. These injuries are concrete, particularized, and ongoing.

## CAUSES OF ACTION

### COUNT I — DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (PRE-DEPRIVATION)

121. The foregoing paragraphs are incorporated herein.

122. Plaintiffs possess a protected property interest in continued federal employment.

123. Plaintiffs suffered and continue to suffer reputational harm associated with termination and ongoing interference with employment opportunities by Defendants, implicating a protected liberty interest.

124. Plaintiffs were terminated without constitutionally required pre-deprivation procedures. They received constitutionally inadequate notice and no opportunity to be heard prior to termination despite repeated stigmatizing statements by Administration officials, the manipulated RIF process designed to target Plaintiffs, and serious errors in the facts, records, and procedures relied upon to effect their terminations.

125. The State Plaintiffs separated in May 2026 after having been illegally separated during the shutdown and whose notices were rescinded by the CR received no notice at all.

126. Defendants' purported interest in speedy terminations does not justify complete denial of meaningful process in light of Plaintiffs' interests in their continued federal employment and constitutional rights.

127. Defendants' actions violated the Due Process Clause.

**COUNT II – THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (POST-DEPRIVATION)**

128. The foregoing paragraphs are incorporated herein.

129. The Fifth Amendment required Defendants to provide Plaintiffs with a prompt, impartial, and meaningful post-deprivation process.

130. Defendants have failed to provide such a process.

131. The post-deprivation process available to Plaintiffs does not provide meaningful review of Plaintiffs' constitutional and statutory claims. Plaintiffs challenge coordinated actions taken by multiple Defendants that directed, controlled, and determined the employment actions taken by Plaintiffs' employing agencies. The MSPB process neither permits meaningful adjudication of all of Plaintiffs' claims nor provides complete relief for the injuries alleged herein.

132. The MSPB process does not provide Plaintiffs a meaningful opportunity to develop the factual record necessary to prove their claims. Plaintiffs have been prevented from obtaining evidence concerning the actions of Defendants and other entities whose direction, control, coordination, and participation form a central part of Plaintiffs' constitutional and statutory claims. As a result, Plaintiffs cannot develop through the MSPB an administrative record capable of supporting meaningful judicial review.

133. The post-deprivation process is further constitutionally deficient because it is conducted before an adjudicatory body whose structural independence has been compromised by Executive Branch direction and control, as alleged above, including control over its operations, legal positions, and outcomes. The MSPB's extraordinary backlog and resource constraints further prevent it from providing Plaintiffs prompt and meaningful review. These deficiencies operate together. The currently available post-deprivation review process cannot provide a prompt,

impartial, or in any way meaningful opportunity to fully and fairly present their claims, develop the factual record, obtain constitutionally adequate review, or secure complete relief. Because subsequent judicial review proceeds from the deficient administrative process and record developed before the MSPB, the availability of such review does not cure these deficiencies or provide Plaintiffs the meaningful post-deprivation process they have been denied.

134. By requiring Plaintiffs to proceed through this constitutionally harmful and deficient review process while continuing to deprive them of their protected property and liberty interests, Defendants have violated, and continue to violate, Plaintiffs' rights under the Due Process Clause of the Fifth Amendment.

**COUNT III – THE FIRST AMENDMENT**

135. The foregoing paragraphs is incorporated herein.

136. Plaintiffs have a constitutional right under the First Amendment not to suffer adverse employment actions based on their perceived political and ideological beliefs and affiliations.

137. Defendants repeatedly publicly justified the challenged RIFs by reference to Plaintiffs' perceived or ascribed political and ideological beliefs and affiliations.

138. Defendants placed Plaintiffs on administrative leave pending their so-called RIF actions based on those same perceived political and ideological beliefs and affiliations.

139. Defendants separated Plaintiffs through actions labeled RIFs based on their perceived political and ideological beliefs and affiliations.

140. By placing Plaintiffs on administrative leave and separating them from federal service based on their perceived political and ideological beliefs and affiliations, Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution.

**COUNT IV - THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)**

141. Each of the foregoing paragraphs is incorporated herein.

142. Defendants are "agencies" within the meaning of the APA, 5 U.S.C. § 701(b)(1). Plaintiffs are "persons" within the meaning of the APA, 5 U.S.C. § 701(b)(2).

143. The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

144. Final agency actions subject to challenge under the APA include DOGE, OPM, and OMB decisions directing the manner, scope, and implementation of the so-called RIFs and each Defendant agency's decision to characterize the above-referenced employment actions against Plaintiffs as RIFs and channel Plaintiffs' challenges to the MSPB under these circumstances.

145. These actions are contrary to Plaintiffs' constitutional rights as set forth in Counts I, II, and III.

146. These actions are contrary to law and exceed the agencies' statutory authority because they frustrate the objectives of the CSRA, the FSA, and exceed the authority of the relevant agencies.

147. These actions are arbitrary and capricious because the agencies failed to consider the relevant statutory factors or engage in reasoned decision-making. As alleged above, Defendants directed and implemented the so-called RIFs without the required position-based determinations, failed to create required retention registers prior to issuing notices, manipulated competitive areas and retention procedures to obtain predetermined personnel outcomes, overrode agency decisions to retain affected employees, and relied on inaccurate, incomplete, and unverified information in making the challenged employment determinations. Defendants further acted arbitrarily and capriciously by characterizing these employment actions as RIFs and channeling Plaintiffs'

challenges to the MSPB despite its inability to adjudicate all of Plaintiffs' claims, permit development of a complete administrative record, or provide timely and meaningful review.

**COUNT V - THE PRIVACY ACT (5 U.S.C. §§ 552A(g)(1)(C), (D))**

148. Each of the foregoing paragraphs is incorporated herein.

149. Defendants are "agencies" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1). Plaintiffs are "individuals" within the meaning of the Act. Id. § 552a(a)(2).

150. The Privacy Act requires agencies to maintain records used in making determinations about individuals with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness in those determinations. 5 U.S.C. § 552a(e)(5).

151. At all relevant times, Defendants maintained records concerning Plaintiffs within systems of records, including records reflecting Plaintiffs' employment status, performance, attendance, position classification, grouping or comparison assignments, service computation dates, tenure, veterans' preference, retirement eligibility, and other work-related information, which were retrieved by name or other identifying particular and used to make determinations about Plaintiffs.

152. Defendants used inaccurate, incomplete and unverified records to make adverse determinations about Plaintiffs, including selection for separation, termination of pay and benefits, and other employment determinations, within the meaning of 5 U.S.C. § 552a(g)(1)(C). Defendants systematically failed to maintain records with accuracy, relevance, timeliness, and completeness reasonably necessary to assure fairness and accuracy in those determinations in compliance with the Privacy Act.

153. Moreover, Defendants otherwise failed to verify records relied upon in the RIF while using and disclosing them, and failed to comply with other provisions of the Privacy Act, causing

an adverse effect on Plaintiffs, within the meaning of 5 U.S.C. § 552a(g)(1)(D).

154. Defendants unlawfully disclosed information from systems of records. These disclosures were not authorized routine uses and were made without Plaintiffs' written consent. These disclosures caused Plaintiffs to suffer adverse employment determinations and financial and reputational harm.

155. As a result of the above-described violations, Defendants made adverse determinations about Plaintiffs based on records that were inaccurate, incomplete, or not maintained in the manner represented by Defendants. Those inaccuracies caused Plaintiffs to be selected for separation, deprived them of pay and benefits, and caused other adverse employment and financial consequences alleged above.

156. Defendants' actions were intentional or willful within the meaning of 5 U.S.C. § 552a(g)(4). Defendants knew or should have known that the records and processes they relied upon—including grouping and comparison data—were inaccurate or had not been created or maintained as represented yet nevertheless used those records to make adverse determinations about Plaintiffs. Defendants did not verify, audit, or otherwise check the accuracy or completeness of records used to make those determinations despite known inaccuracies and systemic errors.

157. As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs suffered adverse determinations and actual damages, including loss of pay and benefits, loss of employment opportunities, and other pecuniary harm.

**COUNT VI – VIOLATION OF THE CONTINUING RESOLUTION, ANTI-DEFICIENCY ACT, AND THE APA**

158. Each of the foregoing paragraphs is incorporated herein.

159. Defendant Department of State separated Plaintiffs Sheffler, House, Hicks, Murphy and others in violation of the Anti-Deficiency Act in October 2025, during a lapse in its appropriations.

Defendant State reinstated these Plaintiffs following the passage of the CR, but only under court order, having received instructions from Defendants OMB, OPM, and DOJ that illegally narrowed the language of the CR.

160. Contrary to the language of the CR, Defendant State, based on direction received from Defendants OPM, DOJ, and OMB, gave force and effect to the RIF actions of Plaintiffs Sheffler, House, Hicks, Murphy, and other State employees similarly situated as having been rescinded in violation of the Continuing Resolution of 2026 and the APA.

161. In May 2026, Defendant State separated Plaintiffs Sheffler, House, Murphy, and others similarly situated without initiating new RIF actions, including by failing to provide a new RIF notice, in violation of the Continuing Resolution and the APA.

**COUNT VII - DECLARATORY JUDGMENT ACT (28 U.S.C. §§ 2201–2202)**

162. Each of the foregoing paragraphs is incorporated herein.

163. Defendants' actions violate the law for each of the reasons stated in Counts I-VI.

164. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such declaration," in addition to any injunctive or other available relief.

165. Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate. Declaratory relief will clarify the parties' rights and establish the unlawfulness of the current process.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

a. Declare that Defendants' implementation of the challenged RIF actions violated

Plaintiffs' rights under the Due Process Clause of the Fifth Amendment;

b. Declare that Defendants deprived Plaintiffs of constitutionally adequate pre-deprivation and post-deprivation process, including meaningful administrative review;

c. Declare that Defendants deprived Plaintiffs of their constitutionally protected rights under the First Amendment;

d. Declare that Defendants' implementation of the challenged RIF actions and related final agency actions violated the Administrative Procedure Act;

e. Declare that Defendants' use of inaccurate, incomplete, and unlawfully disclosed records in connection with the challenged RIFs violated the Privacy Act;

f. Hold unlawful and set aside the challenged RIF actions and all related final agency actions implementing, directing, approving, or otherwise effectuating those actions;

g. Order Defendants to restore Plaintiffs to the positions, pay, benefits, retirement credit, leave, seniority, tenure, and all other rights, privileges, and incidents of federal employment they would have enjoyed absent Defendants' unlawful actions;

h. Enjoin Defendants from again separating, removing, furloughing, reducing in force, or otherwise subjecting Plaintiffs to any involuntary adverse personnel action arising from or related to the challenged workforce reduction or reorganization efforts unless and until Defendants demonstrate to this Court that Plaintiffs have available constitutionally adequate procedures providing meaningful administrative and judicial review consistent with the Due Process Clause, and that the Court retains jurisdiction to enforce that relief;

i. In the alternative, order that each Plaintiff who requests one be afforded a prompt name-clearing hearing before this Court concerning the stigmatizing statements and governmental actions alleged in this Complaint;

j. In the alternative, declare that further administrative exhaustion is not required because the administrative review process cannot provide meaningful review of Plaintiffs' constitutional and APA claims;

k. In the further alternative, order Defendants to provide Plaintiffs with constitutionally adequate pre-deprivation and post-deprivation procedures, including meaningful discovery, an impartial adjudicator, meaningful judicial review, and such additional procedural safeguards as this Court determines are necessary to satisfy the Due Process Clause;

l. Award Plaintiffs actual damages under 5 U.S.C. § 552a(g)(4)(A), including pecuniary losses arising from loss of pay, benefits, and employment opportunities, in an amount to be determined at trial, but not less than $1,000 per Plaintiff;

m. Award Plaintiffs their reasonable attorneys' fees and costs as permitted by law, including under the Equal Access to Justice Act and the Privacy Act; and

n. Grant such other and further relief as the Court deems just and proper.

Dated: August 24, 2025

Respectfully submitted,

*/s/ A. Gregory Pinto*
A. Gregory Pinto (*pro hac vice*)
Pamela J. Hicks (*pro hac vice*)
DC Law Collective, PLLC
1629 K St., NW, Suite 300
Washington, DC 20006
Tel: (202) 599-8459; Fax: (202) 318-0271
gregpinto@dclawcollective.com

*/s/ Amy E. Powell*
Amy E. Powell (*pro hac vice*)
Lawyers for Good Government
1319 F St. NW, Suite 301, PMB 181
Washington, DC 20004
Tel: (646) 246-4633
Email: amy@lawyersforgoodgovernment.org

*/s/ Jocelyn E. Skinner*
Jocelyn (Josie) E. Skinner
Jill Siegelbaum (*pro hac vice*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Tel: (202) 888-2084
josie@sligolawgroup.com

*Counsel for Plaintiffs*