**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**~~SOUTHERN~~GREENBELT DIVISION**

DOREEN MULLADY,

Plaintiffs 2-~~142~~323 (Exhibit A),

*Plaintiffs,*

v.

**~~Case~~Civil No~~.:~~ ~~______~~. 8:26-cv-00573-SAG**

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

OFFICE OF MANAGEMENT AND BUDGET
725 17th Street, NW, Washington, DC 20503;

U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
c/o Office of Management and Budget;

RUSSELL VOUGHT, in his official capacities
as Director of the Office of Management and Budget~~ and~~,
as Acting Administrator of U.S. Agency for International Development,
and as the successor of Elon Musk and DOGE as the head of the
Information Technology Oversight Reform Program
c/o Office of Management and Budget;

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW, Washington, DC 20415;

SCOTT KUPOR, in his official capacity
as Director of the Office of Personnel Management;
c/o Office of Personnel Management;

MERIT SYSTEMS PROTECTION BOARD
1615 M Street, NW, Washington, DC 20419

~~HENRY~~JAMES J. ~~KERNER~~WOODRUFF, II, in his official capacity as~~ Acting~~ Chair of the Merit Systems Protection Board c/o: Merit Systems Protection Board;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., NW, Washington, DC 20530;

~~PAMELA BONDI~~TODD BLANCHE, in
~~her~~his official capacity as Attorney General
of the United States
c/o~~:~~ U.S. Department of Justice;

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue SW, Washington, DC 20201;

ROBERT F. KENNEDY, JR., in his official capacity as
Secretary of the Department of Health and Human Services,
c/o~~:~~ Department of Health and Human Services;

U.S. DEPARTMENT OF STATE
2201 C Street NW, Washington, DC 20520;

MARCO RUBIO, in his official capacity
as Secretary of State,
c/o~~:~~ U.S. Department of State;

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, SW, Washington, D.C. 20202;

LINDA MCMAHON, in her official capacity
as Secretary of Education,
c/o U.S. Department of Education;

U.S. DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Ave SE, Washington, DC 20528-0525;

~~KRISTI NOEM~~MARKWAYNE MULLIN, in ~~her~~his official capacity
as Secretary of the U.S. Department of Homeland Security
c/o~~:~~ U.S. Department of Homeland Security;

GENERAL SERVICES ADMINISTRATION
1800 F Street NW, Washington, DC 20405;

EDWARD FORST, in his official capacity as
Administrator for the General Services Administration
c/o General Services Administration;

FEDERAL DEPOSIT INSURANCE CORPORATION
550 17th Street, NW, Washington, DC 20429; and
~~LINDA MCMAHON, in her official capacity~~
~~as Secretary of Education,~~
~~c/o: U.S. Department of Education.~~

TRAVIS HILL, in his official capacity as
Chairman of the Federal Deposit Insurance Corporation
c/o Federal Deposit Insurance Corporation.

*Defendants*.

**BACKGROUND**

Since taking office

~~**INTRODUCTION**~~

~~1. This case seeks to end the ongoing Constitutional and statutory violations that have cost Plaintiffs their jobs, their pay, their healthcare, and their professional standing. Plaintiffs, all former federal employees, lost their jobs as a result of actions taken by the Trump Administration labeled as reductions in force ("RIFs"). These actions, which more closely resemble firings for cause than RIFs, deprived Plaintiffs of protected property and liberty interests with no real notice, no meaningful opportunity to be heard, and none of the pre-deprivation or post-deprivation process required by the Constitution and federal regulations.~~

~~2. Plaintiffs have all appealed their so-called RIF actions to the Merit Systems Protection Board ("MSPB"), but the appeal process only compounds their suffering because the~~

~~MSPB's statutory independence has been deliberately eliminated by the Administration and its processes and procedures have been broken to the point where any appeals to it are futile. Requiring Plaintiffs to appeal to the MSPB is therefore itself a Due Process violation, and arbitrary and capricious agency action as well.~~

~~3. In addition to these ongoing constitutional and statutory violations, in conducting these RIFs, Defendants compiled, shared, and relied upon hopelessly inaccurate and incomplete information, which directly led to Plaintiffs' terminations. Instead of taking steps to verify the contents of the relevant records and correct widespread systemic inaccuracies, Defendants used them to fire Plaintiffs and thousands of other employees — all in violation of the Privacy Act.~~

1. , President Donald J. Trump and others in his Administration have engaged in wide-ranging efforts to fire and replace thousands of federal employees. This effort, part of the Administration's plan to "reshape government" began on the first day of the Administration and continues to the present.

2. The effort to reshape government was accompanied by other Administration actions aimed at politicizing the federal government in favor of its political and ideological allies and against those perceived to be political or ideological enemies. Among other steps, the Administration deliberately cut research grants to states that had voted against President Trump in the Electoral College and repeatedly denied federal disaster assistance to these so-called "blue states" at much higher rates than so-called "red states."

3. The Administration has also taken ongoing steps to reshape the federal workforce along partisan and ideological lines. For example, the Administration began hiring thousands of new federal career staff while deliberately avoiding or ignoring re-employment priority lists. Applications for federal employment now require applicants to state how they would advance the President's priorities if hired.

4. The Civil Service Reform Act, the Foreign Service Act, and other laws restrict the wholesale removal of career federal employees. Career federal employees also possess constitutional Due Process and First Amendment rights that restrict an Administration's ability to remove employees at will.

5. To quickly remove thousands of career federal employees while avoiding the due process protections provided by 5 U.S.C. Chapter 75, Defendants Office of Management and Budget (OMB), Office of Personnel Management (OPM), and Department of Government Efficiency

(DOGE)[1] directed a series of large-scale employment actions across the executive branch that were labeled as "reductions in force" (RIFs).

6. Plaintiffs are former federal employees whom Defendants terminated through such RIFs.[2] Plaintiffs have all timely appealed their RIF actions to Defendant Merit Systems Protection Board (MSPB). The current MSPB review process cannot provide meaningful review of the conduct challenged here and does not comport with due process or Defendants' statutory obligations.

7. The RIF statutes and regulations provide the means for the Executive Branch to shrink agencies and abolish positions. Under OPM's regulations and guidance, RIF authority can only be invoked for six identified justifications, including reorganizations, budgetary constraints, or a lack of work. Yet when high-ranking Administration officials were asked why Defendants were firing Plaintiffs through RIFs, they did not point to any of these lawful justifications. Instead, they repeatedly justified the firings with false, stigmatizing, and damaging claims about Plaintiffs' loyalty, honesty, and competence. Moreover, even after conducting the RIFs, Defendants continued to stigmatize Plaintiffs, and also actively to interfere with their ability to be rehired.

8. Defendants' implementation of the RIFs further demonstrates they used the RIF label to accomplish their goal of swiftly removing federal workers and replacing them with handpicked successors. At the direction of Defendants OPM, OMB, and DOGE, Agency Defendants repeatedly manipulated the RIF process to ensure the Administration's political objectives, rather than neutral RIF standards, controlled which employees would be separated. In doing so, they exceeded their authority and repeatedly violated the statutes and regulations that govern RIFs.

---

[1] DOGE no longer exists and what remains of it is now within Defendant OMB and overseen by Defendant Vought.

[2] Given the inevitability of their termination, three Plaintiffs resigned after the separation dates on their RIF notices (the agencies had indefinitely extended their separation dates due to the 2026 Continuing Resolution).

9. In many cases, other employees were immediately placed in Plaintiffs' "abolished" positions. Indeed, a State official has admitted that positions in State were not eliminated and were never going to be eliminated. Defendant State simply used the term "abolished" to apply to the person, not the position; the position would continue to exist and be backfilled. Many of the "abolished" positions at State and elsewhere were performing statutorily mandated duties.

10. Having fired thousands of federal workers, including Plaintiffs, while purportedly "abolishing" their positions, Defendants are now engaged in a mass hiring spree for many of the same duties and positions they claimed to have abolished less than a year ago. For example, Defendant Department of Health and Human Services (HHS), which separated 10,000 employees through a RIF, has announced plans to hire 12,000 employees. Similarly, Defendant General Services Administration (GSA) is now hiring as many as 3,000. Last year, while State Department Foreign Service Officers (FSOs) and Foreign Service Specialists sat home on administrative leave waiting to be separated via so-called RIFs, the Benjamin Franklin Fellowship, a conservative nonprofit, held a recruitment fair at Liberty University for applicants seeking to join the State Department as members of the Foreign Service. Indeed, Defendant State has since hired 600 new foreign service members, more than twice the number it separated via RIF and barred from re-employment. Defendant State officials have defended such hirings as necessary to keep up with "attrition." State Department civil servants, along with Plaintiffs from other Defendant Agencies, have seen their "abolished" positions posted internally and externally to hire replacements.

11. At the same time Defendants were firing Plaintiffs through deliberately mislabeled "RIFs", Defendants OPM and DOJ, with others in the Administration, took actions to restrict Plaintiffs' ability to obtain meaningful review of those actions. Specifically, the Administration took a series of steps to end the independence of Defendant MSPB and assert legal and policy control over it.

The same Executive Branch that directed and implemented the challenged RIFs asserted control over the legal positions of the administrative body charged with reviewing them. Plaintiffs have also been denied access to evidence concerning the centralized direction, coordination, and control underlying the challenged actions, preventing development of a complete administrative record. As a result, the post-deprivation process cannot provide independent and meaningful review of the conduct challenged here or develop a record sufficient for meaningful judicial review.

~~1.~~12. Plaintiffs seek preliminary and permanent injunctive relief to restore them to their positions and to prevent ~~their being forced to endure~~Defendants from forcing them through a ~~futile MSPB appeal system~~post-deprivation review process that violates their Due Process rights~~.~~ and the Administrative Procedure Act (APA). Plaintiffs have suffered concrete, ongoing injuries~~—~~, including ~~ongoing~~continuing violations of their ~~Constitutional~~constitutional rights, loss of pay, ~~loss of~~ federal benefits, ~~loss of~~ service credit, and reputational harm~~—~~, all of which are directly traceable to Defendants' unlawful actions and redressable through declaratory and injunctive relief.

~~4. Plaintiffs likewise seek damages under the Privacy Act.~~

13. In addition to these constitutional and statutory violations, Defendants compiled, shared, relied upon, and unlawfully disclosed inaccurate and incomplete information in conducting the RIFs and terminating Plaintiffs. Instead of taking steps to verify the relevant records and correct widespread inaccuracies, Defendants used those records to make adverse determinations against Plaintiffs and thousands of other employees—in violation of the Privacy Act. Defendants also gave unauthorized access to this information, including disclosures to third-party artificial intelligence programs, and relied upon information resulting from such disclosures in making adverse determinations concerning Plaintiffs. Plaintiffs seek damages under the Privacy Act.

14. A subset of State Plaintiffs has additional claims. At least three were separated without notice and in violation of the Continuing Appropriations Act, 2026 (CR) and Due Process.

## JURISDICTION AND VENUE

~~2.~~15. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including the Due Process Clause, the ~~Administrative Procedure Act ("APA")~~First Amendment, the APA, and the Privacy Act.

~~3.~~16. This Court has jurisdiction under 28 U.S.C. §§ 1361 ~~and~~, 2201–2202 ~~(Declaratory Judgment Act),~~, and 5 U.S.C. §§ 701–706 (APA).

~~4.~~17. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least ~~twenty-eight Plaintiffs reside~~one Plaintiff resides in this District, Defendants are United States agencies or officers acting in their official capacities, and a substantial portion of the injuries caused by Defendants' actions occur within this District and continue to affect Plaintiffs here. At least 49 Plaintiffs reside in this District. Venue is also proper under the Privacy Act because a complainant resides here. 5 U.S.C. § 552a(g)(5~~)~~).

## PARTIES

~~5.~~18. Plaintiffs are career federal employees who were ~~separated pursuant to~~ the subject of employment actions labeled RIFs and who have all timely appealed their ~~RIFs~~RIF actions to the MSPB~~. Plaintiffs reside in multiple states, including at least twenty eight Plaintiffs domiciled within the State of Maryland~~.

~~6.~~19. Plaintiffs listed in Exhibit A as DOJ ~~ATF~~ were employed by the Department of Justice ~~("~~(DOJ~~"),~~), Bureau of Alcohol, Tobacco, Firearms and Explosives ~~("~~(ATF~~")~~) in ATF's Office of Diversity, Equity, and Inclusion ~~("~~(ODEI~~",~~) (collectively ~~the "ODEI Plaintiffs"). They received RIF notices on February 6, 2025, were separated on April 8, 2025, and timely appealed to the MSPB.~~"DOJ Plaintiffs").

~~7.~~20. ~~Plaintiff~~Plaintiffs listed in Exhibit A as HHS ~~was~~were employed by the Department of Health and Human Services ~~("~~(HHS~~"), Food and Drug Administration ("FDA") (also the "~~)

(collectively the "HHS Plaintiff"). The HHS Plaintiff received his RIF notice on March 21, 2025, was separated on May 23, 2025, and timely appealed to the MSPB.Plaintiffs").

8.21. Plaintiffs listed in Exhibit A as State were all employed by the Department of State ("State", (State) in the civil or foreign service (collectively the "State Plaintiffs"). All State Plaintiffs except number 53 on Exhibit A received their RIF notices on July 11, 2025, were separated on September 11, 2025, and timely appealed to the MSPB. State Plaintiff number 53 is a Foreign Service Officer ("FSO") who received his RIF notice on July 11, 2025, was separated from State via an

Case 8:26-cv-00573-SAG Document 31 Filed 02/13/26 Page 8 of 91

involuntary resignation due to the pending RIF on November 16, 2025, and timely appealed to the MSPB.

9. 22. Plaintiffs listed in Exhibit A as Education were all employed by the Department of Education ("(ED", ) (collectively the "ED Plaintiffs"). They received RIF notices on April 10, 2025, were separated on August 1, 2025, and all timely appealed to the MSPB.

~~10.~~23. Plaintiffs listed in Exhibit A as DHS were ~~all~~ employed by the Department of Homeland Security ~~("~~(DHS~~")~~) Office of Civil Rights and Civil Liberties ~~("CRCL", (~~(collectively~~,~~ the ~~CRCL~~"DHS Plaintiffs~~). They received RIF notices on March 21, 2025, were separated May 23, 2025, and all timely appealed to the MSPB.~~").

~~11.~~24. Plaintiffs listed in Exhibit A as USAID were ~~all~~ employed by the U.S. Agency for International Development ~~("~~(USAID~~") as FSOs~~) in the civil or foreign service (collectively, "USAID Plaintiffs"). ~~They received RIF notices on March 27, 2025, were separated on July 1, 2025, or September 2, 2025, and all timely appealed to the MSPB.~~

25. ~~Defendant~~ Plaintiffs listed in Exhibit A as FDIC were employed by the Federal Deposit Insurance Corporation (FDIC) in its Office of ~~Management and Budget ("~~Minority Inclusion (OMWI) (collectively the "FDIC Plaintiffs").

26. Plaintiffs listed in Exhibit A as OPM were employed by OPM (collectively the "OPM Plaintiffs").

27. Plaintiff listed in Exhibit A as GSA was employed by the General Services Administration (GSA) (the "GSA Plaintiff").

~~12.~~28. Defendant OMB~~")~~ is an agency in the Executive Office of the President (EOP) and ~~plays~~played a central role in ~~conducting~~directing the challenged RIFs by providing mandatory guidance to agencies ~~are required to follow~~, directing agencies to submit Agency Reorganization Plans ~~("~~(ARRPs~~"),~~), and identifying positions for elimination. By Executive Order ~~("~~(EO~~"),~~), among other means, OMB has significant control over the policies, actions, and budget of Defendant MSPB.

29. Defendant U.S. Agency for International Development (USAID) separated the USAID Plaintiffs through RIF actions.

~~13.~~30. Defendant Russell Vought is the Director of OMB ~~and~~, the Acting Administrator

of U.S. Agency for International Development ("USAID") andUSAID, and is responsible for the implementation and requirements of the Information Technology Oversight Reform (ITOR) program, which is the successor to the DOGE. He is named in his official capacities.

14.31. Defendant Office of Personnel Management ("OPM") serves as the chief human resources agency and personnel policy manager

for the ~~Federal Government~~federal government. OPM provides guidance on personnel matters, approves various aspects of agencies' RIF plans, and issues regulations under the Civil Service Reform Act.

~~15.~~32. Defendant Scott Kupor is the Director of OPM and is named in his official capacity.

~~16.~~33. Defendant MSPB is an agency within the Executive Branch responsible for hearing federal employee appeals of RIF actions.

~~17.~~34. Defendant ~~Henry~~James J. ~~Kerner~~Woodruff, II, is the ~~Acting~~ Chair of the MSPB and is named in his official capacity.

~~18.~~35. Defendant DOJ separated DOJ Plaintiff employees through RIF actions. ~~Specifically, the DOJ component of ATF separated ODEI Plaintiffs through RIF actions.~~

~~19.~~36. Defendant ~~Pamela Bondi~~Todd Blanche is the Attorney General of the United States and is named in ~~her~~his official capacity.

~~20.~~37. Defendant HHS separated the HHS ~~Plaintiff~~Plaintiffs through ~~a~~ RIF ~~action~~actions.

~~21.~~38. Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and is named in his official capacity.

~~22.~~39. Defendant State separated State Plaintiffs through ~~a~~ RIF ~~action~~actions.

~~23.~~40. Defendant Marco Rubio is the ~~United States~~ Secretary of State and is named in his official capacity.

~~24.~~41. Defendant ED separated ED Plaintiffs through RIF actions.

~~25.~~42. Defendant Linda McMahon is the Secretary of ~~Education~~ED and is named in her official capacity.

~~26.~~43. Defendant DHS separated ~~CRCL~~the DHS Plaintiffs through ~~a~~ RIF ~~action~~actions.

~~27.~~44. Defendant ~~Kristi Noem~~Markwayne Mullin is the Secretary of DHS and is named in ~~her~~his official capacity.

45. Defendant GSA separated the GSA Plaintiff through RIF actions.

46. Defendant Edward Forst is the Administrator for GSA and is named in his official capacity.

47. Defendant FDIC separated the FDIC Plaintiffs through RIF actions.

48. Defendant Travis Hill is the Chairman of the FDIC and is named in his official capacity.

## THE CIVIL SERVICE REFORM ACT AND THE FOREIGN SERVICE ACT

49. In 1978, Congress passed the Civil Service Reform Act ~~("~~(CSRA~~")~~) establishing the MSPB. 5 ~~U.S.C. §§~~ U.S.C. § 1201, et seq. Congress found that "Federal employees should receive appropriate protection through increasing the authority and powers of the Merit Systems Protection Board in processing hearings and appeals affecting Federal employees." ~~Section 3 of the Civil Service Reform Act, PL~~CSRA, Pub. L. 95-454, § 3, 92 Stat. 1111, 1112 (1978) ("Findings and Statement of Purpose"). Congress intended to create a "strong and independent" MSPB, one "insulated from the kind of political pressures that [had] led to violations of merit principles in the past" and "independent of any control or direction by the President." S. Rep. 95-969~~,~~ at 6–7, 24~~.~~ (1978).

~~28.~~50. The CSRA also created a statutory process for a ~~reduction in force —~~RIF, which is the mechanism through which the federal government ~~may~~can reduce the number of positions within an agency. 5 U.S.C. §§ 3501–3504, 3595; 5 C.F.R. ~~Part~~§ 351. Unlike a layoff (the RIF's private-sector ~~layoff, a RIF under~~counterpart), the CSRA ~~is not an~~prohibits at-will ~~workforce tool. Congress imposed mandatory safeguards designed to protect~~RIFs. Instead, it established protections for federal employees and the ~~public fisc~~taxpayer through mandatory RIF processes, including ~~defined~~justifications, competitive areas ~~and~~, competitive levels~~;~~, retention registers ~~and~~, notice requirements, and employee retention rankings based on tenure, service, veterans' preference, and performance~~; and advance notice requirements.~~ rules. *Id.*; MSPB Report to Congress, Reduction in Force: The Evolving Ground Rules 1 (1987).

~~29.~~51. RIFs ~~are~~may only be conducted ~~only~~ for six identified organizational purposes~~, including where there is~~: a lack of work; a shortage of funds; an insufficient personnel ceiling; reorganization; ~~or a requirement for~~ the exercise of re-employment rights or restoration rights; or certain reclassifications of ~~employees' positionS~~an employee's position due to erosion of duties. 5

Case 8:26-cv-00573-SAG Document 43 Filed 02/25/26 Page 14 of 91

C.F.R. § 351.201(a)(2). Crucially, RIFs cannot be used to separate employees for individual reasons, such as employee performance or conduct.

52. OPM has issued regulations and guidance ~~as to~~governing how RIFs ~~should~~must be conducted ~~to ensure compliance with the CSRA. Specifically, the~~. For

example, OPM regulations require that each agency "shall establish competitive areas in which employees compete for retention under this part." 5 C.F.R. § 351.~~5~~402(a). The same regulation requires that:

~~C.F.R. § 351.402(a). The same regulation requires that:~~

> [a] competitive area must be defined solely in terms of the ~~agency's~~agency's organizational unit(s) and geographical location and, except as provided in paragraph (e) of this section, it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency.

5 C.F.R. § 351.402(b).

~~Importantly, the~~ The regulations also establish that the "minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R.~~ 351.402(c).~~ § 351.402(c).

~~30.~~53. The CSRA does not ~~provide for~~establish a specific appeal mechanism for a RIF. Instead, the MSPB's role in hearing RIF challenges ~~arises~~derives solely from OPM's RIF regulations promulgated ~~by OPM~~ under its authority in 5 U.S.C. § 3502, which ~~mandates~~requires OPM to "prescribe regulations for the release of competing employees in a reduction in force," giving due effect to ~~prioritizing~~ retention ~~of employees based on~~ factors ~~such as~~including performance and length of service. ~~*See* Fed. Register Notice.~~ Pursuant to this authority, at all relevant times, OPM regulations ~~provide~~provided that an "employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5~~5 C.F.R. § 351.901.~~

C.F.R. § 351.901.

54. RIFs for ~~FSOs~~members of the foreign service are not governed by the CSRA~~. Instead, they are governed~~, but by the Foreign Service Act~~.~~ (FSA). 22 U.S.~~Code~~C. § 4010a. Unlike civil servants who are assigned to specific positions, foreign service members have personal ranks that form the basis of their assignments. As a result, members of the foreign service, especially FSOs, are hired

and trained to serve in a wide variety of positions over the course of their careers. The standards for RIFs ~~set out~~ in the ~~Foreign Service Act~~FSA are similar to those for ~~Civil Servants, with~~ civil servants: the Secretary of State is required to consider organizational changes, employee knowledge and skills, tenure of employment, performance, and ~~veteran's~~veterans' preference. ~~*Id.*~~ The ~~Foreign Service Act~~ FSA

provides for MSPB appeal rights for FSOs. *Id.*

**FACTUAL ALLEGATIONS**

foreign service members who have been subjected

5. Since taking office on January 20, 2025, President Donald J. Trump—through executive branch agencies and officials—has issued unprecedented personnel actions to reduce the size of the federal government, including through unlawful means, and has drastically reshaped the appeals process available to affected employees.

6. The President has issued numerous official directives aimed at reducing or eliminating huge swaths of the federal government, including the elimination of entire agencies. The White House: Presidential Actions: Hiring Freeze (Jan. 20, 2025); Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing); Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy); Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy); Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and Communities); Stewart Patrick, Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy, Carnegie Endowment for Int'l Peace (Feb. 4, 2025); Hugh

Son and Daniel Arkin, Trump administration and Musk's DOGE planRIFs the right to fire nearly all CFPB staff and wind down agency, employees say, NBC News (Feb. 28, 2025), 7C44appeal to the MSPB.

~~**As it began firing federal workers, Administration officials repeatedly maligned them specifically targeting federal employees being terminated by the Administration through RIFs, often focusing on their perception of these employees' political beliefs. For example, in announcing the dismantling of the Department of Education, White House Deputy Chief of Staff Stephen Miller stated on Fox News**~~**FACTS**

55. During the current Administration, Defendants have taken personnel actions to carry out politically directed firings of federal workers and replace them with handpicked successors.

~~7.~~ As set out in more detail below, to ~~that "the Department of Education here in Washington, D.C., is overwhelmingly staffed by radical left Marxist bureaucrats, who are in every way hostile to Western Civilization, hostile to American interests, and hostile to our founding documents and culture." *See* FOX News clip (Mar. 20, 2025), Administration officials have made disparaging and stigmatizing statements about all Plaintiffs to this action.~~

~~31.~~56. ~~To~~ effectuate ~~the~~ wholesale firings of federal workers while giving ~~such firings~~the removals a sheen of legality, the Administration ~~has~~ labeled the largest groups of terminations ~~as~~ RIFs and cited ~~to~~ the RIF statutes and regulations in ~~the~~ documents provided to employees ~~related to~~concerning their removal. Defendants OMB, DOGE, and OPM ~~issued guidance and provide oversight of~~directed these actions~~.~~ in excess of their authority, often overruling agency decisions. Documents labeled "Guidance" were issued and treated as directives that must be followed. *See, e.g.*, ~~OMB & OPM, *Mem. Re:*~~Off. of Mgmt. & Budget & Off. of Pers. Mgmt., Memorandum M-25-22 for Heads of Executive Departments and Agencies, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), https://perma.cc/TKZ9-9YKT (OMB/OPM~~available at~~ Memorandum).

57. When asked why Defendants were separating Plaintiffs and other federal employees

through RIFs, officials did not invoke any of the permissible organizational reasons for RIFs. Instead, they repeatedly justified the removals by publicly accusing the affected employees of misconduct and attacking their loyalty, competence, and perceived political or ideological beliefs.

58. The Administration's stated reasons thus focused on the employees themselves rather than the organizational circumstances for which RIF authority may lawfully be invoked. These stigmatizing statements were made publicly by high-ranking officials and the President—some of the most powerful people in the world—and repeated throughout the period in which Defendants

implemented the challenged RIFs, and continuing to today.

**I. Defendants OMB, OPM, and DOGE Directed RIFs without Authority**

59. On Inauguration Day, Elon Musk, head of DOGE, made his priorities for federal employees clear. Shortly after President Trump was sworn in, Musk met with a high-ranking official at OPM and instructed the official to fire 70% of OPM's employees. He further informed the official that he could stay because he had been hired during a Republican Administration.

~~8.~~ The Administration then made Musk a key figure in its mass firings of Plaintiffs and other federal workers. As part of those efforts, it created the so-called "Department of Government Efficiency." Executive Order 14158 – Establishing and Implementing the President's "Department of Government Efficiency" created "DOGE Teams" that were installed in each Executive Branch agency to "advise" agency leadership on "implementing the President's DOGE Agenda," and provided that the DOGE Team leads would coordinate their work with the DOGE office. The Executive Order directed agencies to grant their DOGE Teams "full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* 90 Fed. Reg. 8441 (Jan. 20, 2025), https://perma.cc/CNB5-AHB4.~~In implementing these purported RIFs, the Administration failed to follow RIF regulations, often with the goal of eliminating certain federal employees instead of positions and of denying federal employees their retention rights. As set forth in further detail below, at no time were Plaintiffs given a meaningful opportunity to contest their RIFs or stigmatizing statements or correct the material legal, procedural, and factual errors giving rise to their terminations.~~

PLAINTIFFS' RIF ACTIONS

60.

61. By Executive Order, agencies were required to submit RIF plans to OMB and OPM for approval.

62. Defendant DOGE, along with Defendants OMB and OPM, directed and oversaw wholesale firings of federal workers across the Executive Branch. As detailed below, they directed agencies to use RIFs to remove targeted employees, dictated competitive areas, required implementation before or without required agency determinations, and overruled agency decisions to retain

affected employees. Four days after President Trump issued Executive Order No. 14151[3], OPM explicitly ordered all Executive Branch agencies to implement specifically defined RIFs within 60 days, without any identified agency determination that one of the permissible bases for a RIF existed and without any authority to make such an order:

[E]ach agency, department, or commission head *shall* take action to

9. Each Plaintiff was terminated in a process labeled a RIF and each Plaintiff has appealed their termination to the MSPB. These RIF actions were rife with legal, procedural, and factual errors, and as a result of structural deficiencies in the process and deliberate decisions by the Administration, Plaintiffs have had no meaningful opportunity to be heard on those errors.

10. The purported RIFs were preceded or accompanied by Administration officials smearing Plaintiffs' performance and accusing them of wrongdoing. The RIFs occurred only after the Administration manipulated competitive areas to ensure Plaintiffs – as opposed to other often less experienced employees – would be fired without triggering Plaintiffs' retention rights.

The ODEI RIF

11. The ODEI Plaintiffs worked at ATF prior to the creation of its ODEI. They were transferred to ATF's ODEI pursuant to a Biden Administration directive. ODEI Plaintiffs' duties included recruiting special agents and other personnel for ATF, duties that existed before the creation of ODEI within ATF and work that is still being performed at ATF today.

12. On his first day in office, President Trump issued EO 14151 – Ending Radical and Wasteful Government DEI Programs and Preferencing. *See* In that EO, the President claimed, among other things, that the Biden Administration's DEI plans "demonstrated immense public waste and shameful discrimination," and ordered each agency to:

> (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions within sixty days…. Agencies *are reminded to define the competitive area solely in terms of the DEIA office where the employees worked.*

See 5 C.F.R. § 351.402. Off. of Pers. Mgmt., *Guidance Regarding Reductions in Force (RIFs) of DEIA Offices* (Jan. 24, 2025), https://perma.cc/79T4-VGQP(including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

(emphasis supplied).

13. Although the Executive Order 14151 speaks of ending offices, at a press briefing, Deputy Chief of Staff Stephen Miller explicitly admitted the Administration's claims about the

~~32.~~63. ~~illegality of DEI programs extended to federal employees in DEI offices and specifically accused them of violating the law, stating that~~stated that these RIFs targeted employees and not positions, and that the terminations were based on purported illegal activities by the targeted employees:

> […] this nation has been plagued and crippled by illegal discrimination: diversity, equity, and inclusion policies. It has strangled our economy. It had undermined public safety. It made every aspect of life more difficult, more painful, and less safe. He has ended all DEI across the federal government. He has terminated *all federal workers involved in promulgating* these unlawful policies.

~~*See*~~

~~14. On or about January 21, 2025, the Acting Head of Defendant OPM issued "Initial Guidance Regarding DEIA Executive Orders" to all agencies directing them to close DEI offices, place all DEI personnel on administrative leave, and to submit "a written plan for executing a reduction-in-force action regarding the employees who work in a DEIA office" by January 31, 2025. *See* On January 22, 2025, the ODEI Plaintiffs at ATF were put on administrative leave by Defendant DOJ.~~

~~15. On January 24, 2025, Charles Ezell, then acting Director of OPM, issued "Guidance Regarding RIFs of DEIA Offices" to all agencies. That Guidance stated:~~

> ~~OPM's initial guidance required agencies to submit written plans no later than January 31, 2025, for executing a reduction in force (RIF) action regarding the employees who work in a DEIA office. However, agencies can and should begin issuing RIF notices to employees of DEIA offices now. Agencies *are reminded to define the competitive area solely in terms of the DEIA office where the employees worked.*~~

~~See 5 C.F.R. § 351.402.~~ *See* Press Briefing by Deputy Chief of Staff Stephen Miller, (Feb. 20, 2025), https://perma.cc/5TBH-4CS8 (emphasis supplied). At no point did the affected agencies correct this statement. Instead, the actions that followed corroborated it.

64. Defendant Agencies, including Defendants DOJ and FDIC, complied with OPM's orders but planned to retain the affected employees in different positions outside the scope of Executive

Order 14151. DOGE and OPM immediately disapproved those plans, informing the agencies that they would not be permitted to retain the employees.

---

[3] *See* Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), *archived at* https://perma.cc/L79B-5MJP.

65. For example, DOGE provided a set of authoritative pronouncements and direction to FDIC related to its RIF of so-called DEI personnel in excess of DOGE's authority. Representatives of FDIC, including the Deputy Chairman and Chief Operating Officer, held meetings with DOGE personnel, including DOGE team leader Anthony Armstrong, to request permission to retain and transfer FDIC employees working in FDIC's OMWI to other positions within FDIC. When directing FDIC to terminate these employees, DOGE officials did not identify any permissible RIF justifications but instead referred to the employees' perceived political and ideological beliefs. During one or more of these meetings, Mr. Armstrong insisted that FDIC continue issuing RIF notices to OMWI employees and warned FDIC against reassigning them and "burrow[ing] them elsewhere in the agency." Mr. Armstrong expressed concern that moving an individual who is "dedicated to DEI" elsewhere in an agency would allow DEI to reemerge.

66. Similarly, DOJ had a plan to reassign ATF's ODEI personnel, including employees like the DOJ Plaintiffs who had spent a large portion of their careers performing functions related to ATF's enforcement mission. DOJ could not implement its plan because reassignment required OPM approval. OPM never gave that approval.

67. These agencies – all of which had sole authority over personnel decisions within their agencies and required no outside approval – repeatedly requested that DOGE and OPM permit them to retain Plaintiffs employed in DEI positions by transferring them to other positions that needed to be filled while abolishing the "DEI" positions as required by the Executive Order. Defendants DOGE and OPM – which had no such personnel authority – consistently rejected these requests, informing agencies that the employees could not stay because they would "spread DEI" and denying the agencies permission to retain Plaintiffs.

68. Defendants DOGE and OPM further exercised authority they did not have on RIFs beyond

the DEI RIFs. For example:

a. At HHS, DOGE essentially ran the RIF process, deciding offices to retain and abolish.

b. At GSA, DOGE met with offices to reportedly review their organization and decide which offices to keep and which to close. These meetings, however, were a sham. DOGE had already decided which offices to close; upon information and belief this was based on an analysis of office functions done by Artificial Intelligence, believed to be Grok.

c. At USAID, DOGE made most, if not all, of the decisions about the RIF.

d. DOGE and OPM directed the scope of the RIFs at ED, exercising direction and approval authority they did not possess over the boundaries of new competitive areas and over which competitive areas would be subject to the RIF.

e. The Secretary of State did not want to conduct a RIF because he believed sufficient personnel had already been cut through the dismantling of USAID and the deferred resignation program. State conducted the RIF only after ordered by DOGE to do so.

f. DOGE even took control of the OPM RIF, ordering the acting head of OPM to separate some Plaintiffs over his objections.

69. The federal government "shut down" on or about October 1, 2025, due to a lapse in appropriations. Appropriations were not enacted until November 12, 2025, when the President signed a continuing resolution. Pub. L. No. 119–37 (Nov. 12, 2025) (CR). A subset of the State Plaintiffs had not yet been separated; their RIF separation dates were after October 1, including all State Plaintiffs in the foreign service and civil servants Sheffler, House, Hicks, and Murphy. During the shutdown, following guidance and instruction from Defendants OMB and OPM, Defendant State separated employees who had previously received RIF notices, including Plaintiffs Sheffler, House, Hicks, and Murphy. These separations violated the Anti-Deficiency Act.

70. The CR contained provisions limiting RIFs, including a provision that, among other things, stated, "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken… between October 1, 2025, and [November 12, 2025], shall have no force or effect" and that "any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025."

71. In November 2025, following enactment of the CR, Defendant OPM repeatedly issued public guidance to all agencies and Defendants OMB and DOJ issued private guidance to Defendant State that contradicted the plain language of the CR, stating that the CR did not affect RIFs noticed before October 1, 2025, and that employees subject to those RIFs could and should be separated. Shortly thereafter, unions successfully challenged that "interpretation" and obtained a preliminary injunction. Among others, Plaintiffs Sheffler, House, Hicks, and Murphy were reinstated by Defendant State, albeit on administrative leave.

72. Despite having taken steps to implement the RIF during the period covered by the CR and despite the CR expressly rescinding RIF notices for RIFs implemented during the covered period, Defendant State separated numerous State Plaintiffs, including Plaintiffs House, Sheffler, and Murphy, in May 2026 without issuing new RIF notices or otherwise initiating new RIF actions in place of those rescinded by the CR.

73. As set forth in greater detail *infra*, Defendant OMB is now responsible for oversight of MSPB policies, performance standards, and other MSPB operations. Having been required to approve RIF plans before their implementation, OMB now also exercises control over the agency designated to hear appeals from the very RIFs it approved.

**II. High-Ranking Officials Politically Targeted and Publicly Smeared Plaintiffs**

74. Immediately before, during, and after the implementation of the RIFs across the Executive

Case 8:26-cv-00573-SAG Document 41-1 Filed 02/13/26 Page 33 of 91

Branch, Administration officials followed a coordinated approach when publicly justifying the mass firings: they repeatedly and publicly maligned the affected employees, including Plaintiffs, by falsely attacking their character, conduct, performance, and perceived ideological and political beliefs. Their stated reasons focused on Plaintiffs themselves and their perceived conduct and beliefs, rather than their positions or organizational bases for conducting RIFs. For example:

Elon Musk led DOGE during the relevant time period. Mr. ~~*See*~~

~~By limiting the competitive area to DEIA offices and directing the liquidation of the entire competitive area through the RIF process, OPM ensured that those employees would not have retention rights to which they would be otherwise entitled by regulation. Essentially, OPM was directing agencies not only to eliminate the DEI positions, but also to fire all DEI employees by defining the competitive so narrowly as to ensure the agency had no other option. OPM issued~~

this guidance[1] even though many DEI offices, including ATF's, did not meet the criteria to be a standalone "competitive area" pursuant to OPM's own regulation, 5 C.F.R. 351.402(c), and even though under OPM regulations the competitive area is supposed to be established by the agency conducting the RIF and not OPM, *see, e.g.,* 5 C.F.R. 351.402.

16. On or about January 29, 2025, ATF developed a RIF plan for its ODEI that would reassign the ODEI Plaintiffs to "mission critical functions" within ATF. ATF was an agency of approximately 5,000 employees and had been in a hiring freeze for more than a year. The number of ODEI employees to be reassigned was only seven, all of whom had come to ODEI from other ATF offices. ATF provided its plan to DOJ which forwarded the proposal to OPM.

17. On February 5, 2025, OPM issued "Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives" which, among other things, provided that "To promote a federal workplace committed to equal dignity and respect, and to avoid expending precious taxpayer resources on wasteful and discriminatory programs, agencies should terminate all illegal DEIA initiatives." *See* Defendant DOJ instructed ATF to issue its RIF notices to ODEI Plaintiffs "immediately".

18. On February 6, 2025, despite having developed a plan to reassign the ODEI Plaintiffs to "mission critical functions," ATF issued RIF notices to the ODEI Plaintiffs that indicated they would be separated from their federal positions on April 7, 2025. The decision to abandon that plan and terminate those Plaintiffs was dictated to ATF by OPM through DOJ. No opportunity for a hearing was provided prior to separation. Although the RIF notices call the action a "liquidation", they do not cite to Musk repeatedly 5 C.F.R. § 351.605

[1] Although labeled as "Guidance," OPM used this memorandum to direct and instruct agencies, stating that "each agency, department, or commission head *shall take action* to terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions within sixty days... Agencies are *reminded to define* the competitive area solely in terms of the DEIA office where the employees worked." (Emphasis supplied).

~~19. The ODEI Plaintiffs were separated on April 8, 2025; a hearing is scheduled.~~

~~The USAID RIF~~

~~20. Early in the Administration, the Department of Government Efficiency ("DOGE") was directed by Elon Musk to shut down USAID offices. Musk recounted on the morning of February 3 that "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down." Jennifer Hansler et al., Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down', CNN (Feb. 3, 2025), available at Upon information and belief, as part of this shutdown, DOGE~~

~~gained access to USAID information technology systems and systems of records, including employee records.~~

~~21. At the same time, the Administration began repeated attacks on USAID employees that continue to this day and were often quite personal. For example, on February 11, 2025, in a joint press conference with President Trump, Mr. Musk said, "there are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth, uh, while 45 in that position, which is what happened at USAID ......." The only way for Mr. Musk to have known an employee's reported net worth would be by accessing federal government employment records.~~

a. ~~Musk repeatedly~~ posted about USAID on ~~X.com and X Spaces~~social media, saying, among other things, USAID was "incredibly politically partisan" and has supported "radically left causes throughout the world including things that are anti-American." Similarly, White House Deputy Chief of Staff Stephen Miller falsely claimed that "98% of the agency's staff donated to former Vice President Kamala Harris or other Democratic candidates in the November election." *USAID Controversy Explained: Why Musk, Trump Is Attacking Foreign Aid Agency*, FORBES (Feb. 3, 2025) https://perma.cc/Q9BY-BCJD. Political

leadership at the State Department bragged about firing Plaintiff Arthur Brown, a career FSO with USAID, based on art that he had displayed while Ambassador to Ecuador.

White House Deputy Chief of Staff Stephen Miller justified the ED RIF on Fox News the day it was announced, falsely claiming that "the Department of Education here in Washington, D.C., is overwhelmingly staffed by radical left Marxist bureaucrats, who are in every way hostile to Western Civilization, hostile to American interests, and hostile to our founding documents and culture." *See Stephen Miller says Dept of Education overwhelmingly staffed by 'radical left Marxist bureaucrats'*, FOX NEWS (March 20, 2025) https://perma.cc/4JNN-EE5Z.

22. On February 23, 2025, USAID Plaintiffs were issued RIF notices. Then issued new RIF notices on March 27, 2025. Some USAID Plaintiffs received notices with a separation date of July 1, 2025, and others September 2, 2025. Regardless of separation date, RIF notices were riddled with errors, including containing the wrong service computation dates ("SCDs") and/or missing key information like performance ratings.

23. USAID was shut down, but not all USAID personnel were separated from federal service. As part of the transfer of USAID work to the Department of State, State created Limited Non-Career Appointments (LNAs) to handle the work and portfolios being transferred from USAID to State. This system allowed the Administration to put whoever they wanted in the new LNA positions at State in a non-competitive process without regard for the RIF requirements. Indeed, the process did not even follow the few rules established by the State Department and shared with USAID personnel for LNA selection. The result was the Administration effectively chose who to keep among USAID personnel with no regard for retention registers or other requirements. Individuals with less experience and qualifications were selected for LNA positions over USAID Plaintiffs who were more qualified and were interested in such positions. These USAID LNA personnel often replaced State employees who were targeted and identified for a RIF action. Virtually all of the USAID LNAs have since been converted to permanent State FSO positions. Thus, by using the LNA process and disregarding the legal requirements for a RIF, Defendant Rubio and other members of the Administration were able to target individuals at USAID and State for removal via RIF.

24. On or about August 29, 2025, Defendant Rubio put Defendant Vought in charge of "closing out" USAID. Truth Details | Truth Social

25. USAID Plaintiffs were separated on July 1, 2025, or September 2, 2025. Few, if any, USAID Plaintiffs have had any meaningful progress in their MSPB appeals.

The HHS RIF

26. On April 1, 2025, HHS notified thousands of federal workers that they were being terminated. HHS had shared personnel records with the U.S. DOGE Service ("DOGE"), OPM, and OMB, and the agencies relied on records that they knew were inaccurate to make adverse decisions affecting 10,000 employees. Those employees received notifications that they were going to be removed through a RIF and were immediately placed on administrative leave and stripped of all credentials or access, long before any legitimate RIF process or records analysis took place, if it ever did.

27. Responding to shock from industries regulated by HHS, a spokesperson for HHS reported to Politico and other media that "to the extent there are errors, *it is because the data collected by HHS's multiple, siloed HR divisions is inaccurate.*" *A cruel April Fool's joke': HHS layoffs characterized by confusion, errors*, Politico, Rebecca Pifer Pardun, April 2, 2025, available at

28. Defendant Secretary of Health and Human Services, Robert F. Kennedy, Jr., clarified his justification for announcing — and deciding to make the cuts and moving forward rapidly with the error-ridden notification — during one interview, saying, HHS could not slow down to fix errors because doing so "takes too long and you lose political momentum." There would be "casualties."

29. Indeed, according to Defendant Kennedy, "Personnel that should not have been cut, were cut." and "The part of that, DOGE — we talked about this from the beginning — is we're going to do 80% cuts but 20% of those are going to have to be reinstalled because we'll make

b. mistakes."

c. On March 11, 2025, as ED Plaintiffs were receiving their "pre-RIF notices," Secretary

*RFK Jr. announces HHS reinstating some programs, employees cut by mistake*, ABC News, Cheyenne Haslett, April 3, 2025,

30. Less than two weeks after the initial [pre ] RIF notifications went out to them, Secretary Kennedy had his initial meeting with FDA employees. At that meeting, the Secretary accused FDA employees of being "sock puppet[s]" for industry. *See*

S3T9. This criticism of FDA employees by the Secretary was not new. Even before the 2024 election, Mr. Kennedy was targeting the FDA. For example, in October 2024, Kennedy posted to X that "FDA's war on public health is about to end...If you work for the FDA and are part of this corrupt system, I have two messages for you: 1. Preserve your records, and 2. Pack your bags." *See*

31. The HHS Plaintiff had his competitive area manipulated so that he would be targeted for removal instead of others who scored below him in experience and performance for RIF retention. HHS deliberately refused to map Plaintiff's retention to his identified competitive area and instead carved out subcomponents to retain preferred employees instead of Plaintiff.

32. The HHS Plaintiff was separated on July 14, 2025, and appealed to the MSPB. He has only received a September 30, 2025 Acknowledgement Order staying all deadlines and stating that, "The parties will be contacted with instructions concerning the adjudication of this appeal once the Board confirms the composition of any consolidation."

The Department of State RIF

33. In the summer of 2025, State commenced a RIF targeting civil service employees and FSOs perceived as politically troublesome. As with the other RIFs, the State RIF began with Administration officials disparaging State employees, including on the grounds of their alleged political beliefs and affiliations. For example, in announcing the reorganization, Secretary Marco

Rubio specifically targeted a group of offices known as the "J family," claiming they "provided a fertile environment for activists to redefine 'human rights' and 'democracy' and to pursue their projects at the taxpayer expense, even when they were in direct conflict with the goals of the Secretary, the President, and the American people." *See* He went on to assert that the Bureau of Democracy, Human Rights, and Labor "became a platform for left-wing activists to wage vendettas against 'anti-woke' leaders" and that the Bureau of Population, Refugees, and Migration had "funneled millions of taxpayer dollars to international organizations and NGOs that facilitated mass migration around the world, including the invasion on our southern border." *Id.* Both offices were dismantled, their employees fired through a purported RIF, as their duties were transferred to other offices or otherwise continued.

34. State deliberately manipulated its competitive areas to ensure these and other State Plaintiffs were terminated via the "RIF". Among other things, it expanded the number of its competitive areas from fewer than forty to approximately 1,500. Again, OPM regulations on the minimum size of a competitive area were repeatedly violated with some competitive areas consisting of a single employee.

35. Civil servants who were separated in September 2025 commonly have seen job announcements for the same position description posted either for a permanent backfill or detail. The positions purportedly abolished by a RIF are still active at State. The duties previously performed by Plaintiffs are often required by statute or regulation. At least one office has scheduled replacements arriving for the individuals who were separated via RIF. When the supervisor asked to bring back the RIF'd personnel instead, the request was denied and they were told it would be new hires. Others learned that their duties are now being performed by other employees, despite not having had the opportunity to compete for those positions.

~~36. In addition to the deliberate targeting of employees and offices, the State RIF was riddled with errors, relying upon inaccurate information, *e.g.*, employees were given the wrong SCDs or veterans' paperwork did not reflect their veteran status. State employees were provided with no contact to correct errors. When at least one employee went directly to human resources to try to fix his place on the retention register to note prior federal service, the human resources contact said that they had seen numerous errors with competitive groupings, but they were not going to be fixed, and State was not going to bring anyone back.~~

~~37. At the MSPB, no progress has been made on the State Plaintiffs' RIF cases.~~

~~The Department of Education RIF~~

~~38. On March 11, 2025—two weeks after mandating that all teleworking ED employees return to the office—Defendant ED directed all employees in the Washington D.C. metro area to leave work early, exit ED premises by 2:00 p.m., and not to report for work on March 12, 2025, due to unspecified security concerns. That evening, ED informed over 1,300 of its employees, including the ED Plaintiffs, that their positions would be eliminated due to a RIF, that a formal RIF notice would be forthcoming, and that they would be placed on administrative leave as of March 22, 2025. Immediately upon receipt of this "pre-RIF notice," the ED Plaintiffs' were blocked from entering ED facilities, and their access to the ED's systems and emails was stripped or severely curtailed.~~

~~On March 11, 2025, as these employees were receiving their "pre-RIF notices," Secretary~~ McMahon repeatedly described the employees subject to the RIF as "bureaucratic bloat," and claimed that ED had retained "all of the right people, the good people." ~~Fox News,~~ *Education secretary says department took first steps to eliminate ~~'~~"bureaucratic bloat~~,'~~"*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

~~b.~~d. On March 12, 2025, responding to reporters from the Oval Office, President Trump stated

that, "Many of [the ED employees subject to the RIF] don't work at all. Many of them never showed up to work. We want to cut, but we want to cut the people that aren't working or not doing a good job. We're keeping the best people." Joseph Gedeon, Education department slashed in half after Trump administration mass firings, The Guardian, THE GUARDIAN (Mar. 12, 2025,), https://perma.cc/Y899-D6ME.

39. On or around April 10, 2025, Defendant ED issued RIF notices to the ED Plaintiffs informing them that they would be separated from ED on or around June 10, 2025.

40. To implement this RIF, ED drastically reduced the size of its competitive areas.

e. Until 2025, ED's competitive areas were generally coextensive with broad program office components, such as the Office of Postsecondary Education and the Office of General Counsel. However, immediately prior to the RIF, ED broke those competitive areas into much smaller competitive areas, many no larger than a single work unit, and almost all of which failed to meet the requirements of 5 C.F.R. 351.402(c). ED then proceeded by liquidating entire competitive areas, ensuring that employees in those competitive areas were blocked from any retention rights. Despite statements to the contrary, including in the formal RIF notices, ED refused to prepare a retention register. The pattern was repeated at HHS. Less than two weeks after the initial [pre-] RIF notifications were issued, Secretary Kennedy met with FDA employees. At that meeting, he accused FDA employees of being "sock puppet[s]" for industry. *See Kennedy, in private speech to FDA staff, calls agency a "sock puppet" for the industry*, NBC NEWS (April 11, 2025), https://perma.cc/DJW3-S3T9.

Administration officials publicly justified the State Department RIFs by disparaging State Plaintiffs, including based on their alleged political beliefs and affiliations. In announcing the reorganization, Secretary Rubio specifically targeted a group of offices known as the "J family," claiming the employees "provided a fertile environment for activists to redefine 'human rights' and 'democracy' and to pursue their projects at the taxpayer expense, even when they were in

direct conflict with the goals of the Secretary, the President, and the American people." *See* Marco Rubio, *A New State Department to Meet the Challenges of a New Era*, U.S. Dep't of State, SUBSTACK (Apr. 22, 2025), https://perma.cc/3UWN-889Y. As a result, ED targeted specific employees, including the ED Plaintiffs, for removal by eliminating their positions through a liquidation RIF while their duties were transferred to other offices or agencies.

41. The ED RIF was stayed through litigation in *State of New York v. McMahon*, 1:25-cv-10601 (D. Mass.), and ED Plaintiffs were ultimately separated through the RIF on August 1, 2025. ED Plaintiffs received no opportunity to be heard on selection mistakes or anything about the RIF prior to separation, nor were they provided any opportunity to defend themselves against

~~the very public charges made against them by the most senior Administration officials. As of the date of filing, the ED Plaintiffs' MSPB appeals have not progressed beyond the receipt of Acknowledgement Orders or Notices.~~

~~The Department of Homeland Security RIF~~

f. ~~In March 2025, DHS issued RIF notices to all non-SES employees in three offices: the CRCL, the CIS Ombudsman's Office ("CISOMB"), and the Office of Immigration Detention Ombudsman ("OIDO"). The DHS Plaintiffs worked in CRCL, were all separated through a process labeled a "RIF" by DHS, and all appealed those separations to the MSPB.~~

He went on to assert that the Bureau of Democracy, Human Rights, and Labor "became a platform for left-wing activists to wage vendettas against 'anti-woke' leaders." *Id.*

75. Since implementing the RIFs, Defendant Agencies have hired and sought new employees to perform functions and fill the positions formerly performed by Plaintiffs and theoretically abolished by the RIFs. For example:

a. Defendant State has hired civil and foreign service personnel for positions it claimed to have abolished that were previously held by Plaintiffs, and to perform duties similar to those previously performed by Plaintiffs from State and Defendant USAID.

b. Defendant GSA is hiring as many as 3,000 new employees to perform the functions and duties of the GSA Plaintiff and other employees separated through RIFs.

c. Defendant HHS has stated it is hiring more than 12,000 people after firing 10,000.

d. The Administration has created "new" offices that perform the same duties as Plaintiffs, staffing them with its hand-picked successors.

76. Defendants have also taken steps to interfere with Plaintiffs' ability to obtain employment within and outside of the federal government. Defendant agencies did not comply with their Career Transition Assistance Plan (CTAP) obligations prior to Plaintiffs' separations and have manipulated CTAP to allow them to retain handpicked personnel regardless of RIF retention priority. They also did not comply with their re-employment Priority List (RPL) obligations requiring priority consideration of Plaintiffs for rehiring. For example, from the beginning of the RIF, the State Department implemented an internal policy not to rehire "RIF'd" personnel as employees or contractors. The Acting Under Secretary for Management has stated that State personnel subject to the RIF would be separated and would not return in any capacity, including as contractors. A similar policy precludes USAID personnel separated by RIF from rehire by

federal contractors to "avoid the risk of impaired objectivity," according to a Jan. 6 memo from the agency's chief terminations officer.

77. Defendants' public, false, and stigmatizing statements about Plaintiffs damaged their reputation in their communities and negatively affected their ability to obtain new employment.

78. Defendants have engaged and continue to engage in efforts to interfere with Plaintiffs' ability to find new employment with the federal government and government contractors.

79. Defendants did not provide Plaintiffs with a pre-deprivation hearing. Defendants did not even allow Plaintiffs to correct errors in their RIF documentation.

**III. Defendants OPM, OMB, and DOGE Directed Agencies to Implement RIFs in Violation of Applicable Laws and Regulations**

42. As with the other RIF actions, DHS did not discuss the need for restructuring or downsizing, but rather alleged the employees were the problem. On the same day that DHS issued the RIF notices, DHS spokesperson Tricia McLaughlin explained the Administration's decision by stating, "These offices have obstructed immigration enforcement by adding bureaucratic hurdles and undermining [the department's] mission […] Rather than supporting law enforcement efforts, they often function as internal adversaries that slow down operations." *See* "Homeland Security makes cuts to civil rights and immigration oversight offices," NPR, March 21, 2025, available at Months later, Administration officials continued making the same defamatory and stigmatizing claims about the Plaintiffs. *See* "Gutting of key US watchdog could pave way for grave immigration abuses, experts warn," *The Guardian,* November 30, 2025, available at

43. On March 21, 2025, the CRCL Plaintiffs received a RIF notice by email. The notice stated that the CRCL was being dissolved and their position was being abolished. The transmittal email for the notice stated, "the RIF is being taken due to the reduction of all

~~positions in your competitive area."~~

44. The RIF notices also stated:

> Staff of the OCHCO is available to assist you by explaining this proposed action and will provide you with copies of pertinent regulations, benefits information, or other material related to this action that you may wish to review. You are entitled to a copy of OPM's retention regulations found in 5 CFR Part 351, which will be provided to you upon request, and you may inspect the appropriate retention register through the OCHCO. You may obtain any information in writing by sending your request to OCHCO – RIF Team, email:

Inquiries to this email requesting documents to which employees were entitled went unanswered.

45. Although a DHS official admitted the RIF was a "liquidation", the liquidation provision of the RIF regulations was not cited in the RIF letter as required. 5 C.F.R. § 351.605. Defendant DHS then processed this employment action as a liquidation RIF, eliminating all positions in the identified competitive areas.

46. As the Administration has acknowledged, much of CRCL's work is statutorily mandated. *See, e.g.*, 6 U.S.C. § 345. On April 24, 2025, three non-profits sued DHS for abolishing CRCL, CISOMB, and OIDO, arguing, among other things, that the action was unlawful because the dissolution of them flouted Congress's express statutory direction that these offices must exist and perform various functions. *Robert F. Kennedy Human Rights v. U.S. Department of Homeland Security*, Case No. 1:25-cv-01270, Dkt. No. 1 (D.D.C. April 24, 2025). In response to this lawsuit, DHS reversed its position and stated that "The Offices will continue to perform their statutorily mandated duties after the RIF takes place." *Id.*, Decl. of Ronald J. Sartini, Dkt. # 27-1 (D.D.C. May 18, 2025). Despite being on administrative leave when this occurred, the CRCL Plaintiffs were not reinstated. Instead, DHS undertook efforts to hire new personnel, including posting new positions on USAJobs.gov.

47. After the CRCL Plaintiffs had been separated, Defendant DHS immediately began re-establishing the office with new personnel. DHS stated that, "[s]ince the Reduction-in-Force

took effect on Friday May 23, the Offices are free to create new positions and seek applicants." *Id.*, Dkt. 39 (May 27, 2025).[2] Put plainly, DHS used the RIF processes not to eliminate the positions, but to eliminate the specific employees – the "internal adversaries" – in those positions. For example, on June 2, 2025, DHS published a job announcement for a Law Enforcement Specialist position with CRCL, and on June 18, 2025, DHS published a job announcement for an Investigator position with CRCL on USAJobs.gov.

48. CRCL Plaintiffs were separated as of May 23, 2025; MSPB hearings are currently scheduled for April 30 and May 1, 2026.

RIF Process

33. 80. When conducting a RIF, agencies must: establish and consider competitive areas, competitive levels, and retention registers; and apply tenure, service, veterans' preference, and performance rules. These steps are required to identify the employees who will be affected by the RIF and how they will be affected. Agencies must then issue written notices to affected employees that identify the specific action to be taken, the basis for that action, and its effective date. See 5 C.F.R. pt. § 351; MSPB REPORT TO CONGRESS, REDUCTION IN FORCE: THE EVOLVING GROUND RULES 1 (1987).

49. In several of the challenged RIFs, Defendants took concrete, adverse employment actions against Plaintiffs before completing, and in some cases before initiating, the analyses required to determine which employees would be released through a RIF. Those actions included notifying employees that their positions would be eliminated, placing them on administrative leave, revoking building and system access, and publicly criticizing the employees. These steps

[2] CRCL reportedly did rehire two former CRCL employees from the Security, Intelligence, and Information Policy ("SIIP") section as GS-13 investigators working on EEO issues and addressing complaints. This rehiring could not have been properly done through the RIF process because SIIP employees were not trained to handle this work, unlike other colleagues separated by RIF.

were taken prior to the completion of any retention registers, competitive-area analyses, or other processes described in the RIF notices themselves and required by RIF regulation.

50. This sequence was explicit in the ED, USAID, HHS, and DHS RIFs. In those agencies, employees who would ultimately be separated were often notified of impending removal before the agencies completed any individualized assessment of competitive areas, retention standing, or assignment rights as required. In the Department of Education, employees were excluded from buildings and systems on the same day they received "pre-RIF" notices. At HHS, thousands of employees, including the HHS Plaintiff, were notified they would be affected by an upcoming RIF, but not noticed, and placed on administrative leave while agency leadership publicly acknowledged that the data underlying the selections was inaccurate and unreconciled. Entire DHS offices were notified and treated as eliminated, including the one employing the DHS Plaintiffs, as the agency continued to adjust its position on the continued existence and functions of those offices. USAID was officially "abolished" even though USAID employees were selected for LNA positions at State to continue the work being transferred to State.

51. Other agencies' RIFs were equally flawed from the outset. In ATF's RIF of the ODEI Plaintiffs, the affected office and employees were identified, notified, and removed from active service before ATF had even finalized a RIF plan. Although ATF initially developed a plan that would have reassigned affected employees to other positions, that plan was later abandoned following direction from other Defendants. At State, the agency restructured and dramatically narrowed and multiplied its competitive areas before issuing RIF notices after identifying offices and categories of employees targeted for elimination largely based on their perceived political beliefs and then proceeded with selections that resulted in the separation of those employees.

~~52. Plaintiffs' RIF notices were defective, containing misleading—if not outright false—statements, and omitting legally-required and material information. They relied on inaccurately defined competitive areas and levels and often contained other inaccurate information.~~

~~53. For example, the ODEI Plaintiffs' RIF notices listed the competitive area as ATF's DEI Office and concluded by stating that "Based on the above criteria, you must be released from employment, and there is no appropriate or eligible position to which you may be reassigned in accordance with 5 C.F.R., Part 351, Subpart G." The notice stated this conclusion even though ODEI did not meet OPM regulations for the minimum size of a competitive area and even though ATF—with DOJ's approval—had identified other positions for which Plaintiffs were not only qualified but needed.~~

<u>81.</u> ~~Similarly, in the ED Plaintiffs' RIF notices, Defendant ED stated that the ED Plaintiffs would be released from their competitive levels, and that, based on applicable law and regulations, they "[did] not have an assignment right to another position in [their] competitive area," despite the fact that the competitive areas failed to meet the requirements of OPM regulations. The RIF notices also stated that~~<u>Defendants OPM, OMB, and DOGE directed Agency Defendants to execute RIFs without conducting a meaningful analysis of which positions should be retained and which should be abolished, and in many cases dictated who would be subject to the RIF. Agency Defendants frequently rescinded employees' access to agency systems and buildings well before issuing RIF notices or immediately thereafter.</u>

<u>82. In implementing the purported RIFs, Defendants OPM, OMB, and/or DOGE directed Agency Defendants to ignore RIF regulations, often to separate specific federal employees instead</u>

Case 8:26-cv-00573-SAG Document 3-1 Filed 02/13/26 Page 49 of 91

of abolishing positions and to deny federal employees their retention rights. Indeed, at USAID the General Counsel said that OPM was waiving all laws and policies regarding the RIF.

54. Agency Defendants also issued inaccurate and legally insufficient RIF notices. For example, Defendant ED issued RIF notices stating, "[t]o conduct the RIF, the Office of Human Resources (OHR) prepared retention registers which listed employees in retention standing order based on civil service tenure, veterans' veterans' preference, length of Federal service and performance ratings." Defendant ED later stated admitted that no retention register had been created, nor was one required, given that the RIFs were liquidation RIFs. Despite ED's admission that these were liquidation RIFs, the notices failed to cite the regulatory liquidation provisions, nor did they give the date that the liquidation or would be completed as required by 5 C.F.R. § 351.605.

55. The HHS Plaintiff's notice indicated that his competitive area was "DCBB" which corresponded to the entire Office of Management within FDA's Center for Biologics Evaluation and Research.created. Defendant HHS did not map Plaintiff's retention to this competitive area. Undisclosed in the notice is that HHS retained a subcomponent of Plaintiff's competitive area and Plaintiff was not considered for any position within that subcomponent, even though it was in his competitive area and had positions for which he was qualified.

56. USAID Plaintiffs' notices claimed the RIF was to "restructure" USAID when it was being abolished and that the RIF was conducted at the "direction of USAID leadership" with no mention of DOGE or Elon Musk (who had bragged about putting USAID in a woodchipper). It stated the competitive area was "Foreign Service and Senior Foreign Service Worldwide" and that it was being abolished, without noting that some of the functions were being transferred to the State Department and some USAID personnel would be transferred as well.

34.83. State's notices also included inaccurate or misleading statements such as "[t]he forthcoming reduction in force (RIF) action is necessary to better align the size, scope, and composition of the Department's domestic workforce with the foreign policy priorities of the Secretary and nation." It claimed that the employee would "be released from your competitive level and, based on your retention standing, you do not have an assignment right to another position in the competitive area." It alsoissued RIF notices that similarly stated that "[t]his RIF was conducted by the Department by preparing retention registers which listed employees in retention standing order based on civil service tenure, veteran's preference, length of Federal service, and performance ratings." Other information in those notices was frequently wrong, incomplete or misleading. In fact, the retention registers that existed were difficult to access and rife with errors, and employees were given no meaningful opportunity to correct those errors," only to admit later that retention registers had not been created prior to the notice.

84. Many agencies had to rescind or "walk back" their RIFs shortly after implementation. According to Defendant Kennedy, "Personnel that should not have been cut, were cut" and "[t]he part of that, DOGE -- we talked about this from the beginning -- is we're going to do 80% cuts but 20% of those are going to have to be reinstalled [*sic*] because we'll make mistakes." *RFK Jr. announces HHS reinstating some programs, employees cut by mistake*, ABC NEWS (April 3, 2025), https://perma.cc/4Y63-JNWM). *See also: IRS rescinds layoffs at civil rights office, an early target of workforce cuts*, FEDERAL NEWS NETWORK (Aug. 1, 2025), https://perma.cc/DW72-E8JN; *HHS recalls some previously laid off worker safety employees,* GOVERNMENT EXECUTIVE (Aug. 1, 2025), https://perma.cc/Z9XD-FX3U; *Dueling HHS reversals whipsaw federal employees, grant recipients,* GOVERNMENT EXECUTIVE (Jan. 14, 2026), https://perma.cc/2NPY-54XG; *GSA walks back mass layoffs of its federal buildings workforce,* FEDERAL NEWS NETWORK (Jan. 14, 2026), https://perma.cc/YA4X-JEPA. Despite this admission from Defendant Kennedy, none of the HHS

Plaintiffs' RIFs have been cancelled.

85. As set forth above, the purported RIFs were not preceded by an analysis of the agencies' bona fide need for particular positions but instead were preceded or accompanied by Administration officials publicly attacking Plaintiffs' performance and political affiliations and accusing them of wrongdoing. The RIFs occurred only after Defendants manipulated competitive areas to ensure Plaintiffs – as opposed to other, often less experienced employees – would be fired without triggering Plaintiffs' retention rights.

86. To remove large numbers of federal employees quickly while ensuring that the people targeted for removal were separated during the RIF and not merely reassigned pursuant to neutral RIF regulations, the Agency Defendants again acted in lockstep at the direction of Defendants OPM, OMB, and DOGE, creating new and illegally narrow competitive areas shortly before RIF implementation. OPM rubber-stamped waivers for these new competitive areas without receiving confirmation or documentation that they complied with OPM regulations. Defendants also consistently manipulated retention registers, thereby controlling not only who would be released from federal service, but the employees against whom they would compete for retention.

87. As set forth above, Defendants DOGE and OPM deliberately exceeded their authority by setting the competitive areas of the DEI RIFs for agencies across the Executive Branch to ensure the DOJ, FDIC and other DEI Plaintiffs would be separated and overruling Defendant Agencies' decisions to retain Plaintiffs.

88. By illegally limiting the competitive areas and directing the liquidation of entire competitive areas that did not meet long-standing published requirements, OPM and DOGE ensured that Plaintiffs would not have retention rights to which they were entitled by regulation. OPM approved these competitive areas without determining whether they met the requirements of

Case 8:25-cv-01573-SAG Document 41-1 Filed 02/13/26 Page 53 of 91

its own regulation and even though its regulations require that the competitive area be established by the agency conducting the RIF and not OPM. See, e.g., 5 C.F.R. § 351.402.

89. For example, OPM and DOGE directed agencies not only to eliminate the DEI positions, but also to separate all DEI employees by defining the competitive areas so narrowly that agencies had no other option, despite the fact that these competitive areas failed to meet OPM's own regulatory requirements. As set forth above, OPM and DOGE took these actions based on Plaintiffs' perceived political beliefs.

90. Defendants OPM, OMB, and DOGE repeated this approach when directing broader RIFs throughout the Agency Defendants. For example:

a. USAID had neither legally sufficient competitive areas nor a retention register when it issued the RIF notices used to separate employees. When career USAID and State Department employees recommended retention registers be used to select the USAID employees who would move to State, they were informed that retention registers would not be used because doing so would not permit officials to pick the people to retain.

b. Consistent with Defendant OPM, OMB, and DOGE's instructions, Defendant State improperly narrowed and deliberately manipulated its competitive areas to ensure specific employees, including State Plaintiffs, were terminated through the RIF, expanding the number of its competitive areas from fewer than forty to approximately 1,500, most of which failed to comply with OPM regulations.

c. At the direction of Defendants DOGE, OPM, and OMB, Defendant ED also drastically reduced the size and scope of its competitive areas. Until 2025, ED's competitive areas were generally coextensive with broad program office components, such as the Office of Postsecondary Education and the Office of General Counsel. Immediately before the RIF

and as instructed, ED broke those competitive areas into much smaller ones, many no larger than a single work unit, and almost all of which failed to meet the requirements of 5 C.F.R. § 351.402(c). ED then liquidated entire competitive areas, ensuring that employees in those competitive areas were blocked from exercising retention rights. Despite statements to the contrary, including in the formal RIF notices, ED refused to prepare a retention register.

The Administration's Control and Spoilage of the MSPB

ED thereby targeted specific employees, including the ED Plaintiffs, for removal by claiming to eliminate their positions through a liquidation RIF while transferring their duties to other offices or agencies and subsequently hiring new employees for substantively identical positions.

**IV. Defendants OMB and DOJ Have Eliminated the MSPB's Independence and It Is Not Providing and Cannot Provide Meaningful Review**

91. While the Administration implemented mass removals of targeted federal employees, including Plaintiffs, and labeled those actions RIFs to avoid due process protections, the Administration asserted unprecedented control over the MSPB, effectively making the MSPB an active participant in its efforts to fire federal workers.

57. At the same time the Administration undertook massive firings across the government via RIF and otherwise, it also took steps to gain control of the MSPB.

35.92. On February 8, 2025, the President removed MSPB Chair Cathy Harris. Ten days later, he issued EOExecutive Order 14215, asserting Presidential authority over independent agencies, including the MSPB. See *Ensuring Accountability for All Agencies*, Exec. OrdOrder No. 14215, 90 Fed. Reg. 10447 (Feb. 1824, 2025), available at https://perma.cc/U36U-89PB. The EO declares that the President's and Attorney General's opinions on questions of law are binding on all executive branch employees acting in their official capacities, explicitly including employees of independent agencies like the MSPB.

36.93. The EOExecutive Order further directs Defendant OMB Director of the OMBRussell Vought (who is now in charge of overseeing the closeout of USAID and what remains of DOGE) to: establish performance standards and management objectives for independent agency heads; review agency obligations for consistency with Presidential policies and priorities; and adjust agency apportionments as necessary to advance those priorities, including by restricting

the expenditure

of appropriated funds. The EO also requires agency heads, including the MSPB Chair, to coordinate with the White House and to establish a White House liaison position. Consistent with ~~the~~this sweeping language ~~of EO 14215~~, the Administration has asserted the President can fire any member of the MSPB because ~~MSPB members~~they assist the President in carrying out executive duties. The White House has asserted ~~it has~~ authority to control the adjudication of claims at the MSPB and to dismiss ~~any~~ MSPB employees who do not concur with ~~the~~ positions publicly or privately stated by the White House.

94. EO 14215 also directs that no Executive Branch employee, including MSPB employees, acting in an official capacity may advance a legal interpretation that contravenes the President's or the Attorney General's opinion on a matter of law, including positions related to litigation. The Administration has repeatedly taken the position that its legal positions as expressed through DOJ's Office of Legal Counsel (OLC) are binding on the MSPB.

95. For example, in *Jackler v. Department of Justice*, No. DA-0752-25-0330-I-1 (Aug. 22, 2025), and a related appeal, an MSPB administrative judge (AJ) ordered the reinstatement of two Immigration Judges—DOJ employees summarily terminated after receiving no process other than a memo invoking Article II authority—pending resolution of the constitutional issues presented. The AJ held that the MSPB could not rule on whether the CSRA is unconstitutional because it limits Article II authority to fire federal civil servants without following established federal law or constitutional requirements. DOJ thereafter submitted an OLC opinion and represented that it "should be considered binding upon the Board," and that the administrative judge's decision "does not represent the legal position of the Executive Branch."

96. On March 20, 2026, the MSPB—consistent with the OLC opinion and overruling almost 50 years of MSPB precedent—held that it may consider the constitutionality of the CSRA and that Article II can deprive the Board of jurisdiction. *Jackler & Jaroch Consol. v. Dep't of Justice*, 2026

MSPB 3 (Mar. 20, 2026), petition for review pending sub nom *Jackler v. MSPB*, No. 26-1575 (Fed. Cir.). Although the Board publicly avoided confirming its reliance on the binding effect of the OLC opinion, it adopted the Administration's position and dismissed the appeals for lack of jurisdiction.

97. The Administration has therefore asserted authority not only over the policies, operations, funding, and personnel of the MSPB, but also over the legal positions that MSPB employees may take when adjudicating challenges to Executive Branch actions. Those actions include the RIFs, which OMB, OPM, and DOGE directed and which OMB was required to review and approve before implementation. The same Executive Branch actors involved in directing and approving the challenged actions thus exercise control over the legal positions—including dictating interpretations and outcomes—available to the administrative body charged with reviewing them.

98. Upon information and belief, Henry Kerner, the Vice Chairman and then-Acting Chair of the MSPB Board, met with White House officials before the issuance of the MSPB's opinion in *Jackler* and during that meeting he was instructed to have the MSPB rule in the Administration's favor. The MSPB thereafter ruled in the Administration's favor.

99. The MSPB has removed the word "independent" from its website when describing itself.

100. Despite the MSPB's knowledge of its lack of independence and the extent of OMB and DOJ control, the MSPB has made no disclosures to Plaintiffs about its independence or ability to provide meaningful review, even when asked by Plaintiffs in discovery. The MSPB has declined to rule on challenges to its independence or ignored those challenges when Plaintiffs raised them.

101. In sum, MSPB Board Members can be removed at will by the President, and their performance standards and management objectives are subject to review by Defendant OMB. The White House has summoned at least one MSPB Board Member and told him how the Board should rule. MSPB obligations must be reviewed by Defendant OMB for consistency with "Presidential

policies and priorities" and are subject to OMB adjustment to advance those priorities, including by restricting the expenditure of appropriated funds. MSPB AJs are prohibited from advancing a legal interpretation that is inconsistent with the Administration's interpretation, including in litigation in which the Administration is a party.

~~37.~~102. The sheer volume of RIFs and other personnel actions by the Administration has also ensured that the MSPB is overwhelmed with a number of cases that it cannot timely handle, posing a significant burden on Plaintiffs' ability to raise their claims before an Article III court and trapping them in endless proceedings before the captured MSPB.

103. Defendant MSPB has taken steps to prevent Plaintiffs from obtaining relief. The MSPB ~~historically has issued most~~made a coordinated decision to deny Plaintiffs the ability to pursue class action appeals. Upon information and belief, such decision was made at the behest of the Administration.

~~38.~~104. The MSPB is supposed to issue initial decisions on appeals, including those challenging RIFs, within 120 days ~~from MSPB~~of receipt. U.S. Merit ~~Systems Protection Board:~~Sys. Prot. Bd., *Judges' Handbook*~~, pg.~~ 72 (2019), ~~available at~~ https://perma.cc/ZPN6-LLG5. The MSPB's average case processing time for initial appeals was: 102 days in 2018, 105 days in 2019, 102 days in 2020, 105 days in 2021, 96 days in 2022, 102 ~~days in 2023, and 130 days in 2024. By comparison, those State employees who filed in September 2025, prior to the government shutdown, still have not received an acknowledgment or scheduling order over 120 days later; and no progress whatsoever has been made on those appeals. Upon information and belief, none of the over 17,000 RIFs initiated in 2025 have resulted in a final disposition at the MSPB.~~
days in 2023, and 130 days in 2024.

~~39.~~105. Between January 26, 2025, and September 27, 2025, the MSPB received 18,750 appeals, averaging 536 appeals each week. ~~By contrast, throughout the entirety of~~During fiscal year 2024, ~~the MSPB's~~its field and regional offices decided a total of approximately ~~4740~~4,740

appeals. *See* U.S. Merit Sys. Prot. Bd., *Fiscal Year 2024 Annual Performance Report*, (June 24, 2025), https://perma.cc/4MSV-M746.

~~40.~~106. Despite this predictable surge in MSPB appeals and the Administration taking control of MSPB budget and operations, no additional resources have been provided to ensure timely action by the MSPB. To the contrary, the Administration proposed cutting the MSPB's budget. The result

of these collective changes is that the over-burdened, captured, and controlled MSPB process provides no meaningful remedies to ~~the~~ Plaintiffs. In fact, the MSPB process causes further injury in the form of time, expenses, delays, and insult suffered by those forced to pursue meaningless process in the MSPB in front of ~~administrative judges~~AJs and ~~a~~ Board members who are required to adopt the litigating positions of the agencies that conducted and controlled the RIFs.

~~58.~~ The effect of the Administration's decisions regarding the MSPB can be seen in Plaintiffs' appeals. The ~~vast~~ majority of Plaintiffs have ~~not~~ seen little-to-any progress at the MSPB. ~~The~~

Case 8:26-cv-00573-SAG Document 13-1 Filed 02/18/26 Page 62 of 91

41.107. HHS Plaintiff was separated on July 14, 2025. As of this date, only an Acknowledgement Notice has been issued byFor example, the MSPB. The ED Plaintiffs began filing their MSPB appeals in August 2025, with no progress beyond an Acknowledgement Order and Stay of Deadlines. The civil service State Plaintiffs who filed their appeals in September 2025, prior to the government shutdown, still have not received an acknowledgment or scheduling order almost a year later; and no progress whatsoever has been made on those appeals. Upon information and belief, none of the over 17,000 RIFs initiated in 2025 have resulted in a final disposition by the MSPB.

59. The handful of Plaintiffs whose MSPB cases have progressed are faced with the potential harm of having their case heard by a completely captured administrative process and then having to overcome deference to that process at the Court of Appeals.

108. Following the takeover by OMB of its policies and performance standards, MSPB now imposes and enforces unreasonably short deadlines against appellants while repeatedly extending or failing to enforce deadlines applicable to the government and itself. For example, Article II appellants were given five days over Thanksgiving 2025 weekend to respond to an Order to Show Cause issued after their appeals had been sitting with the MSPB for months with no action. Despite the short deadline imposed on them, some appellants still have received no ruling on the Order. In some of Plaintiffs' USAID appeals, when the agency repeatedly missed deadlines to produce the agency file, which should have existed at the time of the RIF, without offering an explanation or asking for an extension, the AJ *sua sponte* provided the government with multiple extensions. The Board has failed to meet its own 120-day deadline in any of Plaintiffs' RIF appeals.

109. Plaintiffs also are unable to bring their APA claims against Defendants OPM, OMB, and DOGE at the MSPB. The MSPB lacks jurisdiction over the APA claims and Plaintiffs' appeals are limited in nature to being against the agency who subjected them to a RIF, not the actors directed these actions. Some MSPB AJs have repeatedly limited the scope of Plaintiffs' inquiry and legal arguments about the RIFs beyond the specific Agency defendants in the RIF action. Some Plaintiffs have sought discovery into the direction, coordination, approval, implementation, and review of the challenged RIFs through their pending MSPB proceedings. Among other things, Plaintiffs served discovery requests on Defendants OPM, OMB, State, and the MSPB seeking documents and information concerning the actions of Defendants OPM, OMB, DOGE, the Executive Office of the President, and other entities involved in directing and implementing the challenged RIFs. Rather than produce the requested information, Defendants OPM and OMB failed to respond. Defendant State and Defendant MSPB each issued final agency determinations refusing production. As a result, Plaintiffs have been cut off from evidence concerning the centralized direction, coordination, approval, and control exercised by Defendants in implementing the challenged RIFs or to develop a complete administrative record concerning those actions.

## ~~I.~~V. Defendants Used Inaccurate, Incomplete, and ~~Undisclosed~~Unverified Records~~ in Adverse Employment Determinations.~~

~~42.~~110. ~~In~~While implementing the RIFs~~ and removals~~, Defendants maintained and used employment-related records concerning Plaintiffs to make adverse determinations, including selection for separation, termination of pay and benefits, and public justification of ~~those actions.~~the removals. These records included information purporting to reflect Plaintiffs' performance, productivity, attendance, skills, tenure, service history, duties, assignments, and the value or necessity of their positions~~ within their respective agencies~~.

~~60. While disparaging the Plaintiffs and other RIF'd employees, Defendant agencies also publicly maintained that Plaintiffs were selected for RIF actions through objective, record based processes that made determinations about specific employees' fitness and value to include work history, performance, attendance, and conduct. In fact, employee information was not properly compiled and verified. For example, sworn testimony by senior agency leadership in related litigation confirms that the scoring, ranking, and register-based processes described in the notices were not conducted as represented. In that testimony, the head of a Defendant agency acknowledged that the agency had not performed the scoring or register-based evaluations it claimed had occurred prior to issuing RIF notices.~~

43.111. Defendants also relied on records purporting to define the groupings of positions and

employees ~~to be compared~~used for selection and removal, including records identifying the organizational, functional, or positional units within which Plaintiffs were evaluated. Those grouping determinations were embedded in the records used to generate selection outcomes and treated as fixed inputs in the decision-making process. The grouping information reflected in those records did not accurately correspond to Plaintiffs' actual duties, work assignments, or operational functions. Employees performing materially similar work were separated into different groupings, while employees with dissimilar duties were grouped together, ~~resulting in records that misrepresented~~thereby misrepresenting the scope, function, and comparability of Plaintiffs' positions.

~~61. Defendants necessarily retrieved and relied upon information drawn from multiple, segregated employment-related record systems, including systems reflecting personnel status, performance history, attendance, position classification, tenure, veteran preference, retirement eligibility, and programmatic function. Information from these disparate systems was compiled and matched for use in determining which employees would be selected for separation and in publicly justifying those selections.~~

112. For example, as discussed above, at GSA, DOGE relied on information generated by an AI tool, believed to be Grok, to determine which offices to close. The individuals making these decisions lacked independent knowledge of the offices' functions and instead relied on the AI tool to supply that information without knowledgeable human input or independent verification. AI tools of this kind require accurate and informed inputs to produce reliable information and are known to generate inaccurate information when used without such inputs or verification. Upon information and belief, Defendants used AI tools in this manner more broadly.

~~44.~~113. The agencies executing the RIFs ~~have~~ shared ~~such~~Plaintiffs' information outside their respective agencies (for example, with Defendants OPM, OMB, and MSPB, ~~as well as~~

~~DOGE). In~~DOGE, and in some instances with private entities). For one example, in a memorandum dated February 26, 2025, OPM and OMB required agencies, as part of their reorganization plans, to identify "[a]ll agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations." ~~*See*~~ *See* OMB/OPM Memorandum, *supra*. Agencies also shared information with private parties when consulting AI tools. Finally, Defendants disclosed inaccurate information about Plaintiffs when publicly justifying the RIFs.

Case 8:26-cv-00573-SAG Document 4-1 Filed 02/18/26 Page 68 of 91

62. By choosing to rely on matched and compiled data drawn from multiple record systems to make adverse employment determinations, Defendants necessarily depended on the

~~accuracy, completeness, and reliability of the information retrieved. Defendants nevertheless proceeded to rely on such aggregated data without performing reasonable steps to verify that the information accurately reflected Plaintiffs' duties, work history, performance, tenure, veteran status, or the continued existence and function of their positions.~~

~~63. Defendants did not disclose to Plaintiffs what records were retrieved, how information from different systems was matched or weighted, or how grouping determinations were made or incorporated into the selection process. Nor did Defendants provide notice that such data compilation and matching would occur or afford Plaintiffs any opportunity to review, contest, or seek correction of information before it was used to make adverse determinations.~~

~~45.~~114. ~~The result of these failures was that, in making RIF determinations,~~ Defendants relied on records containing inaccurate, incomplete, or misleading information about Plaintiffs, their positions, and the processes applied to them~~.~~ when making RIF determinations. Despite using these records to make decisions that would terminate Plaintiffs' employment, Defendants did not verify, audit, or otherwise check the accuracy or completeness of the information before relying on it. For example, ~~to the extent~~Defendants relied on records concerning Plaintiff Allison Aslan's work status or productivity ~~were relied upon, those records~~that reflected, or were used to convey, that she was not actively performing assigned duties, when in fact she continued to carry out her responsibilities and receive work assignments through the period preceding her separation. ~~To the extent~~Defendants relied on records ~~were relied upon~~ concerning Plaintiff Nicole Gaertner's attendance or availability~~, those records~~ that reflected, or were used to convey, that she was not reporting for duty or was otherwise inactive, despite her continued attendance and performance of assigned work. ~~To the extent~~Records Defendants relied on ~~records indicating that~~ concerning Plaintiff Sergio Flores Rodriguez's position indicated, or were used to convey, that it was unnecessary or ~~to be eliminated, those records~~subject to elimination and misrepresented the

continued existence and operational need for his position and its functions. ~~To the extent~~Records Defendants relied on ~~records assigning~~assigned Plaintiff Zachary Karabatak to a particular comparison or grouping category ~~for selection purposes, those records~~that inaccurately reflected the nature and comparability of his duties, grouping him with employees performing materially different work. Similarly, ~~to the extent~~ records ~~were~~Defendants relied ~~upon~~on concerning Plaintiff Vaughn Smith's position or role~~, those records~~ mischaracterized the scope and function of his duties by omitting substantial responsibilities he continued to perform at the time of the challenged determinations.

~~46.~~115. Defendants also relied on records reflecting Plaintiffs' SCDs, tenure status, ~~veteran~~veterans' preference, and retirement eligibility. Those records were rife with inaccuracies and omissions. For example, Plaintiff Debora Fisher's RIF notice reflected only approximately 20 years of credited federal service, when ~~in fact~~ she had more than 39 years of federal service, and listed incorrect

SCDs that failed to account for credited prior service. Plaintiff Melissa Fair's RIF notice reflected an incorrect SCD that omitted more than a decade of prior federal service. Plaintiff Kim Gudenkauf's SCD was inconsistently recorded across agency documents, resulting in conflicting service dates used in the selection process. Plaintiff McKinney's RIF paperwork omitted his ~~veteran~~veterans' preference points entirely, resulting in an incorrect composite score despite his repeated efforts to obtain correction prior to separation. Plaintiff Hopkins, a disabled veteran with more than three years of continuous federal service, was placed in an incorrect retention category notwithstanding his ~~veteran's~~veterans' preference. Plaintiff Corina Corral was informed through agency records that she qualified for discontinued service retirement, only for the agency later to deny ~~that option~~her eligibility based on inconsistent and inaccurate use of the same service records.

~~47.~~116. Despite these inaccuracies and systemic errors, Defendants treated the outputs of the ~~record compilation and grouping~~ process as final and dispositive, executing removals ~~and~~while publicly characterizing Plaintiffs as unproductive, incompetent, or unfit for service. Plaintiffs were deprived of any opportunity to identify errors, supply missing context, or correct the information Defendants relied upon before ~~suffering~~Defendants made adverse employment determinations, including separation, loss of pay and benefits, and reputational harm.

## ~~H.~~VI. Harm to Plaintiffs

~~48.~~117. Defendants' legal, procedural, and factual errors, not merely those of Plaintiffs' respective employing agencies, and the accompanying denial of due process were the but-for cause of Plaintiffs' terminations.

~~49.~~118. Plaintiffs suffered loss of salary, health and life insurance contributions, retirement credit, and other employment benefits~~, and were reputationally harmed~~ as a direct result of their terminations and continued RIF implementation. The ongoing denial of due process ~~as to each Plaintiff is likewise a~~also constitutes continuing procedural injury. ~~The terminations and denial of~~

~~process have further resulted in significant emotional, mental and physical harm for many Plaintiffs~~.

The terminations and denial of process have further caused significant emotional, mental and physical harm for many Plaintiffs.

119. Plaintiffs are harmed by having their cases subjected to an unconstitutional administrative process and then having to overcome the deficiencies of and deference to that process at the Court of Appeals.

~~50.~~120. These injuries are concrete, particularized, and ongoing.

## CAUSES OF ACTION

### COUNT I — DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (PRE-DEPRIVATION)

~~51.~~121. The foregoing paragraphs are incorporated herein.

~~52.~~122. Plaintiffs possess a protected property ~~or liberty~~ interest in continued federal employment~~ and benefits~~.

~~53.~~123. Plaintiffs ~~also~~ suffered and continue to suffer reputational harm associated with termination and ongoing interference with employment opportunities by Defendants, implicating a protected liberty interest.

~~54.~~124. Plaintiffs were terminated without constitutionally required pre-deprivation procedures. ~~They received constitutionally inadequate notice and no opportunity to be heard prior to termination, much less constitutionally adequate process, despite repeated stigmatizing statements by Administration officials, the manipulated RIF processes designed to target~~

They received constitutionally inadequate notice and no opportunity to be heard prior to termination despite repeated stigmatizing statements by Administration officials, the manipulated RIF process designed to target Plaintiffs, and ~~the~~ serious errors in the facts, ~~findings~~records, and procedures relied upon ~~in~~to effect their terminations.

125. ~~Defendants' policies and other actions denied Plaintiffs any meaningful notice and opportunity to respond or be heard on these errors and any adequate remedy. Defendants' actions, including, but not limited to, the RIF plans, the RIF implementation process, and the spoilage of~~

~~the MSPB process, effectively deny the Plaintiffs constitutionally adequate due process. Defendants' purported interests in speedy termination do~~The State Plaintiffs separated in May 2026 after having been illegally separated during the shutdown and whose notices were rescinded by the CR received no notice at all.

~~55.~~126. Defendants' purported interest in speedy terminations does not justify complete denial of meaningful process in light of Plaintiffs' interests in their continued federal employment and constitutional rights.

~~56.~~127. Defendants' actions violated the Due Process Clause.

**COUNT II – THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (POST-DEPRIVATION)**

128. The foregoing paragraphs are incorporated herein.

129. The Fifth Amendment required Defendants to provide Plaintiffs with a prompt, impartial, and meaningful post-deprivation process.

130. Defendants have failed to provide such a process.

131. The post-deprivation process available to Plaintiffs does not provide meaningful review of Plaintiffs' constitutional and statutory claims. Plaintiffs challenge coordinated actions taken by multiple Defendants that directed, controlled, and determined the employment actions taken by Plaintiffs' employing agencies. The MSPB process neither permits meaningful adjudication of all of Plaintiffs' claims nor provides complete relief for the injuries alleged herein.

132. The MSPB process does not provide Plaintiffs a meaningful opportunity to develop the factual record necessary to prove their claims. Plaintiffs have been prevented from obtaining evidence concerning the actions of Defendants and other entities whose direction, control, coordination, and participation form a central part of Plaintiffs' constitutional and statutory claims. As a result, Plaintiffs cannot develop through the MSPB an administrative record capable of supporting meaningful judicial review.

133. The post-deprivation process is further constitutionally deficient because it is conducted before an adjudicatory body whose structural independence has been compromised by Executive Branch direction and control, as alleged above, including control over its operations, legal positions, and outcomes. The MSPB's extraordinary backlog and resource constraints further prevent it from providing Plaintiffs prompt and meaningful review. These deficiencies operate together. The currently available post-deprivation review process cannot provide a prompt,

Case 8:26-cv-00573-SAG Document 41-1 Filed 02/13/26 Page 76 of 91

impartial, or in any way meaningful opportunity to fully and fairly present their claims, develop the factual record, obtain constitutionally adequate review, or secure complete relief. Because subsequent judicial review proceeds from the deficient administrative process and record developed before the MSPB, the availability of such review does not cure these deficiencies or provide Plaintiffs the meaningful post-deprivation process they have been denied.

134. By requiring Plaintiffs to proceed through this constitutionally harmful and deficient review process while continuing to deprive them of their protected property and liberty interests, Defendants have violated, and continue to violate, Plaintiffs' rights under the Due Process Clause of the Fifth Amendment.

**COUNT III – THE FIRST AMENDMENT**

135. The foregoing paragraphs is incorporated herein.

136. Plaintiffs have a constitutional right under the First Amendment not to suffer adverse employment actions based on their perceived political and ideological beliefs and affiliations.

137. Defendants repeatedly publicly justified the challenged RIFs by reference to Plaintiffs' perceived or ascribed political and ideological beliefs and affiliations.

138. Defendants placed Plaintiffs on administrative leave pending their so-called RIF actions based on those same perceived political and ideological beliefs and affiliations.

139. Defendants separated Plaintiffs through actions labeled RIFs based on their perceived political and ideological beliefs and affiliations.

140. By placing Plaintiffs on administrative leave and separating them from federal service based on their perceived political and ideological beliefs and affiliations, Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution.

**COUNT IV - THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 706)**

141. Each of the foregoing paragraphs is incorporated herein.

64. Defendants are "agencies" within the meaning of the Each of the foregoing paragraphs is incorporated herein.

57.142. Defendants are "agencies" within the meaning of the Administrative Procedure Act ("APA"),, 5 U.S.C. § 701(b)(1).

Plaintiffs are "persons" within the meaning of the APA, 5 U.S.C. § 701(b)(2).

58.143. The APA requires that courts "hold unlawful and set aside agency actionsaction, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(aA).

59.144. Final agency actions subject to challenge under the APA include: DOGE, OPM, and OMB decisions directing the manner of these, scope, and implementation of the so-called RIFs and each Defendant agency's decision to characterize the above-referenced employment actions against Plaintiffs as RIFs and channel objectionsPlaintiffs' challenges to the MSPB under these circumstances.

60.145. These actions are contrary to thePlaintiffs' constitutional rights as set forth in CountCounts I, II, and III.

61.146. These actions are contrary to law and exceed the agencies' statutory authority because they frustrate the objectives of the CSRA, the FSA, and are outsideexceed the authority of the relevant agencies.

62.147. These actions are arbitrary and capricious because the agencies failed to consider the relevant statutory factors or engage in reasoned decision-making. For example, as Defendants are fully aware, the MSPB is currently bound to adhere to legal interpretations put forth by the Trump Administration and is therefore unable to provide independent judicial review. Further, due in part to the volume of these very agency decisions, the MSPB is unable to timely process the tens of thousands of appeals before it, including Plaintiffs' individual RIF appeals. Ultimately,

~~Defendants' actions to force Plaintiffs into a venue that cannot possibly provide meaningful review of their claims are arbitrary and capricious.~~ As alleged above, Defendants directed and implemented the so-called RIFs without the required position-based determinations, failed to create required retention registers prior to issuing notices, manipulated competitive areas and retention procedures to obtain predetermined personnel outcomes, overrode agency decisions to retain affected employees, and relied on inaccurate, incomplete, and unverified information in making the challenged employment determinations. Defendants further acted arbitrarily and capriciously by characterizing these employment actions as RIFs and channeling Plaintiffs'

challenges to the MSPB despite its inability to adjudicate all of Plaintiffs' claims, permit development of a complete administrative record, or provide timely and meaningful review.

**COUNT III —V - THE PRIVACY ACT (5 U.S.C. §§ 552A(Gg)(1)(C), (D))**

63.1. Each of the foregoing paragraphs is incorporated herein.

Defendants are "agencies" within the meaning of the

148. Each of the foregoing paragraphs is incorporated herein.

64.149. Defendants are "agencies" within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1).

Plaintiffs are "individuals" within the meaning of the Act. Id. § 552a(a)(2).

65.150. The Privacy Act requires agencies to maintain records used in making determinations about individuals with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness in those determinations. 5 U.S.C. § 552a(e)(5).

66.151. At all relevant times, Defendants maintained records concerning Plaintiffs within systems of records, including records reflecting Plaintiffs' employment status, performance, attendance, position classification, grouping or comparison assignments, service computation dates, tenure, veterans' preference, retirement eligibility, and other work-related information, which were retrieved by name or other identifying particular and used to make determinations about Plaintiffs.

67.152. Defendants used those inaccurate, incomplete and unverified records to make adverse determinations about Plaintiffs, including selection for separation, termination of pay and benefits, and public justification of those actions, within the meaning of 5 U.S.Cother employment determinations, within the meaning of 5 U.S.C. § 552a(g)(1)(C). Defendants systematically failed to maintain records with accuracy, relevance, timeliness, and completeness reasonably necessary to assure fairness and accuracy in those determinations in compliance with the Privacy Act.

§ 552a(g)(1)(C).

68.153. Moreover, Defendants' actions failDefendants otherwise failed to verify records

relied upon in the RIF while using and disclosing them, and failed to comply with other provisions of the Privacy Act, causing

an adverse effect on ~~the~~ Plaintiffs, ~~with~~within the meaning of 5 U.S.C. § 552a(g)(1)(D). ~~5 U.S.C. §§ 552a(o), (p), and (q) provide requirements for the use of "matching programs." As relevant here, a "matching program" means "any computerized comparison of . . . two or more automated Federal personnel or payroll~~

~~65.~~ Defendants unlawfully disclosed information from systems of records ~~or a system of Federal personnel or payroll records with non-Federal records." 5 U.S.C. § 552a(a)(8)(A)(ii).~~

~~66. While the process has been opaque to the affected employees, Defendants DOJ, HHS. State, ED, and DHS compiled~~. These disclosures were not authorized routine uses and ~~shared data outside the relevant agencies as well for the purpose of implementing and seeking approval for the RIFs~~were made without ~~complying with the requirements of 5 U.S.C. §§ 552a(o), (p), and (q).~~

~~67. Defendants retrieved, compiled, and relied upon information drawn from multiple, segregated employment-related record systems and matched that information, together with inaccurate or undisclosed grouping data, for use in selecting Plaintiffs for separation.~~

~~69.~~154. ~~Defendants relied on the outputs of the record matching and grouping process without performing reasonable steps to verify that the information accurately reflected~~ Plaintiffs' ~~duties, performance, and work status, or the continued existence and function of their positions. Defendants did not disclose to Plaintiffs the specific records used in making the~~written consent. These disclosures caused Plaintiffs to suffer adverse employment determinations~~, provide notice that information from multiple record systems would be aggregated, matched, or~~ and financial and reputational harm.

~~grouped for use in selection, or afford Plaintiffs any opportunity to review, contest, or seek correction of the information relied upon before adverse determinations were made.~~

~~70.~~155. As a result of ~~all~~ the above-described ~~errors~~violations, Defendants made adverse determinations about Plaintiffs based on records that were inaccurate, incomplete, or not maintained in the manner represented by Defendants. Those inaccuracies caused Plaintiffs to be selected for separation, deprived them of pay and benefits, and ~~resulted in public characterizations of Plaintiffs as unproductive, incompetent, or unfit for service~~caused other adverse employment and financial consequences alleged above.

~~71.~~156. Defendants' actions were intentional or willful within the meaning of 5 U.S.C. § 552a(g)(4). Defendants knew or should have known that the records and processes they relied upon—including grouping and comparison data—were inaccurate or had not been created or maintained as represented yet nevertheless used those records to make ~~and justify~~ adverse determinations about Plaintiffs. Defendants did not verify, audit, or otherwise check the accuracy or completeness of records used to make those determinations despite known inaccuracies and systemic errors.

~~72.~~157. As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs suffered adverse determinations and actual damages, including loss of pay and benefits, loss of employment opportunities, and other pecuniary harm.

**COUNT ~~IV~~VI – VIOLATION OF THE CONTINUING RESOLUTION, ANTI-DEFICIENCY ACT, AND THE APA**

158. Each of the foregoing paragraphs is incorporated herein.

159. Defendant Department of State separated Plaintiffs Sheffler, House, Hicks, Murphy and others in violation of the Anti-Deficiency Act in October 2025, during a lapse in its appropriations.

Defendant State reinstated these Plaintiffs following the passage of the CR, but only under court order, having received instructions from Defendants OMB, OPM, and DOJ that illegally narrowed the language of the CR.

160. Contrary to the language of the CR, Defendant State, based on direction received from Defendants OPM, DOJ, and OMB, gave force and effect to the RIF actions of Plaintiffs Sheffler, House, Hicks, Murphy, and other State employees similarly situated as having been rescinded in violation of the Continuing Resolution of 2026 and the APA.

161. In May 2026, Defendant State separated Plaintiffs Sheffler, House, Murphy, and others similarly situated without initiating new RIF actions, including by failing to provide a new RIF notice, in violation of the Continuing Resolution and the APA.

**COUNT VII - DECLARATORY JUDGMENT ACT (28 U.S.C. §§ 2201–2202)**

~~73.~~162. Each of the foregoing paragraphs is incorporated herein.

~~74.~~163. Defendants' actions violate the law for each of the reasons stated in Counts I-~~III~~VI.

~~75.~~164. The Declaratory Judgment Act, 28 U.S.C. ~~§ §~~§§ 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such ~~a~~ declaration," in addition to any injunctive or other available relief.

~~76.~~165. Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate. Declaratory relief will clarify the parties' rights and establish the unlawfulness of the current process.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

a. Declare that Defendants' implementation of the challenged RIF actions ~~with respect to Plaintiffs violates the Due Process Clause;~~violated

Plaintiffs' rights under the Due Process Clause of the Fifth Amendment;

b. Declare that Defendants deprived Plaintiffs of constitutionally adequate pre-deprivation and post-deprivation process, including meaningful administrative review;

c. Declare that Defendants deprived Plaintiffs of their constitutionally protected rights under the First Amendment;

d. Declare that Defendants' implementation of the challenged RIF actions and related final agency actions violated the Administrative Procedure Act;

e. Declare that Defendants' use of inaccurate ~~and~~, incomplete ~~data~~, and unlawfully disclosed records in connection with the challenged RIFs ~~was~~violated the Privacy Act;

~~b.~~f. Hold unlawful and set aside the challenged RIF actions and all related final agency actions implementing, directing, approving, or otherwise effectuating those actions;

~~a. Set aside the unlawful RIFs affecting Plaintiffs;~~

~~c.~~g. Order Defendants to restore Plaintiffs to the positions, pay, benefits, ~~positions, and service credit they held prior to the unlawful RIF~~retirement credit, leave, seniority, tenure, and all other rights, privileges, and incidents of federal employment they would have enjoyed absent Defendants' unlawful actions;

~~b. Enjoin Defendants from initiating, carrying out, implementing, or otherwise noticing any further RIF affecting Plaintiffs;~~

~~c. In the alternative, remedy the procedural deficiencies by allowing Plaintiffs to immediately pursue their RIF challenges in district court;~~

h. Enjoin Defendants from again separating, removing, furloughing, reducing in force, or otherwise subjecting Plaintiffs to any involuntary adverse personnel action arising from or related to the challenged workforce reduction or reorganization efforts unless and until Defendants demonstrate to this Court that Plaintiffs have available constitutionally adequate procedures providing meaningful administrative and judicial review consistent with the Due

Process Clause, and that the Court retains jurisdiction to enforce that relief;

i. In the alternative, order that each Plaintiff who requests one be afforded a prompt name-clearing hearing before this Court concerning the stigmatizing statements and governmental actions alleged in this Complaint;

j. In the alternative, declare that further administrative exhaustion is not required because the administrative review process cannot provide meaningful review of Plaintiffs' constitutional and APA claims;

~~d.~~k. In the further alternative, order Defendants to provide Plaintiffs with constitutionally adequate ~~process with appropriate judicial oversight~~pre-deprivation and post-deprivation procedures, including meaningful discovery, an impartial adjudicator, meaningful judicial review, and such additional procedural safeguards as this Court determines are necessary to satisfy the Due Process Clause;

~~e.~~l. Award Plaintiffs actual damages under 5 U.S.C. § 552a(g)(4)(A), including pecuniary losses arising from loss of pay, benefits, and employment opportunities, ~~the exact~~in an amount ~~of which is~~ to be determined at trial, but ~~is~~ not less than $~~1000~~1,000 per ~~person~~Plaintiff;

~~f.~~m. Award Plaintiffs their reasonable attorneys' fees and costs as permitted by law, including under the Equal Access to Justice Act and the Privacy Act; and

~~g.~~n. Grant ~~any~~such other and further relief as the Court deems just and proper.

Dated: August 24, 2025 Respectfully submitted,

/s/ ~~Joshua Rose~~
~~Joshua Rose (Bar No. 18714)~~
~~DC Consumer Law Group, PLLC~~
~~1407 Highland Drive~~
~~Silver Spring, MD 20910~~
~~Tel: (202) 288-5643~~



*A. Gregory Pinto* | */s/ Jocelyn E. Skinner*
A. Gregory Pinto (*pro hac vice*) | Jocelyn (Josie) E. Skinner ~~pending)~~
Pamela J. Hicks (*pro hac vice*) | Jill Siegelbaum (*pro hac vice*)
DC Law Collective, PLLC | SLIGO LAW GROUP, PLLC

Case 8:26-cv-00573-SAG Document 41 Filed 02/12/26 Page 87 of 91

1629 K St., NW, Suite 300 1717 K St. NW, Suite 900
Washington, DC 20006 Washington, DC 20006
Tel: (202) 599-8459; Fax: (202) 318-0271 Tel: (202) 888-2084
gregpinto@dclawcollective.com

/s/ Jocelyn E. Skinner
Jocelyn (Josie) E. Skinner (admission pending)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Tel: (202) 888-2084
josie@sligolawgroup.com

*/s/ Amy E. Powell* *Counsel for Plaintiffs*
Amy E. Powell (*pro hac vice* pending) Lawyers for Good Government 1319 F St. NW, Suite 301, PMB 181
Washington, DC 20004
Tel: (646) 246-4633
Email: amy@lawyersforgoodgovernment.org

*Counsel for Plaintiffs*